IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

FILED
2012 APR 11  AM 10: 38
CLERK US DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____
DEPUTY

| | |
|---|---|
| THE STATE OF TEXAS;<br>THE STATE OF CONNECTICUT;<br>THE STATE OF ALASKA;<br>THE STATE OF ARIZONA;<br>THE STATE OF COLORADO;<br>THE STATE OF ILLINOIS;<br>THE STATE OF IOWA;<br>THE STATE OF MARYLAND;<br>THE STATE OF MISSOURI;<br>THE STATE OF OHIO;<br>THE COMMONWEALTH OF PENNSYLVANIA;<br>THE COMMONWEALTH OF PUERTO RICO;<br>THE STATE OF SOUTH DAKOTA;<br>THE STATE OF TENNESSEE;<br>THE STATE OF VERMONT; and<br>THE STATE OF WEST VIRGINIA;<br><br>        Plaintiffs,<br><br><br>        v.<br><br>PENGUIN GROUP (USA) INC.;<br>MACMILLAN HOLDINGS, LLC;<br>SIMON & SCHUSTER, INC.;<br>SIMON & SCHUSTER DIGITAL SALES, INC.; and<br>APPLE INC.;<br><br>        Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br><br>Civil Action No.<br><br>**Public Version**<br><br> |

**A12CV0324LY**

COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL PENALTIES &
AS PARENS PATRIAE ON BEHALF OF CONSUMERS

The States of Texas, Connecticut, Alaska, Arizona, Colorado, Illinois, Iowa, Maryland, Missouri, Ohio, South Dakota, Tennessee, Vermont, and West Virginia and the Commonwealths of Pennsylvania and Puerto Rico (the "Plaintiff States"), by and through their Attorneys General, bring this action against Penguin Group (USA) Inc. ("Penguin"), Macmillan Holdings, LLC ("Macmillan"), Simon & Schuster, Inc. and Simon & Schuster Digital Sales, Inc. (collectively "Simon & Schuster") and Apple Inc. ("Apple") (collectively, "the Defendants") and allege as follows:

## I. SUMMARY OF COMPLAINT

1.      As a result of facts learned during a non-public investigation begun by the State of Texas in March 2010, the Plaintiff States charge Macmillan, Penguin, Simon & Schuster, and Apple with entering into contracts, combinations, and conspiracies that restrain trade.

2.      Specifically, by the end of summer 2009 at the latest, Hachette, HarperCollins, Macmillan, Penguin, and Simon & Schuster (collectively, "the Conspiring Publishers" or "the Publishers") entered into an agreement to raise the retail price of electronic books ("e-books"). In furtherance of this conspiracy, by mid-December 2009, Macmillan, Simon & Schuster, Hachette, and HarperCollins agreed to delay publication of certain frontlist e-books for several months following each book's first printed release.  In the publishing industry, this practice is known as "Windowing."  These four Publishers viewed this collective Windowing as providing them with enhanced bargaining power with which they could negotiate higher retail prices from Amazon and other distribution outlets (collectively, "the Outlets").

3.      No later than January 2010, Apple joined Hachette, HarperCollins, Macmillan,

Penguin, and Simon & Schuster's conspiracy and facilitated the Publishers' direct implementation of the agreement to increase e-book prices. Apple played a facilitating role by bringing the Conspiring Publishers into agreement with one another on a scheme to raise retail prices. The scheme had two components. First, the Conspiring Publishers would shift their marketwide distribution model for e-books from a Wholesale-Retail Model, in which distribution Outlets such as Amazon or Barnes & Noble set retail e-book prices and sell e-books directly to consumers, to an Agency Model, in which the Publishers set retail e-book prices and sell e-books directly to consumers. Second, the Conspiring Publishers would then raise retail prices.

4.    As a result of their conspiracy with Apple, Macmillan, Penguin, Simon & Schuster, Hachette, and HarperCollins agreed to eliminate e-book retail price competition between Apple and Amazon and other Outlets. The agreement also ensured that Apple earned a 30% gross margin on e-books. The Conspiring Publishers and Apple increased e-book retail prices pursuant to this illegal agreement beginning on April 1, 2010.

5.    As a result of the conspiracy, consumers nationwide, in aggregate, paid substantially more than one hundred million dollars in overcharges on e-books. As of the filing of this Complaint, these overcharges are ongoing.

6.    The Plaintiff States seek a finding that the Defendants' actions violated federal and state antitrust laws; a permanent injunction preventing the Defendants from continuing their illegal conduct and rectifying ongoing anticompetitive effects caused by their illegal conduct; damages on behalf of natural persons located in the Plaintiff States; civil penalties; and other relief for injuries sustained as a result of Defendants' violations of law.

## II. JURISDICTION & VENUE

7.      The Court has jurisdiction over this action under Section 1 of the Sherman Act, 15

U.S.C. § 1, Sections 4c and 16 of the Clayton Act, 15 U.S.C. §§ 15c & 26, and under 28 U.S.C.

§§ 1331 and 1337.

8.      In addition to pleading violations of federal law, the Plaintiff States also allege

violations of state law, as set forth below, and seek civil penalties and equitable relief under those

state laws.  All claims under federal and state law are based upon a common nucleus of operative

fact, and the entire action commenced by this Complaint constitutes a single case that would

ordinarily be tried in one judicial proceeding.  This Court has jurisdiction over the non-federal

claims under 28 U.S.C. § 1367(a), as well as under principles of pendent jurisdiction.  Pendent

jurisdiction will avoid unnecessary duplication and multiplicity of actions, and should be

exercised in the interests of judicial economy, convenience and fairness.

9.      This Court may exercise personal jurisdiction over all of the Defendants because

all of the Defendants currently transact business in the Austin Division of the Western District of

Texas.  Specifically, the Publishers sell e-books to consumers residing in the Austin Division,

and Apple distributes e-books and sells e-book reading devices to consumers residing in the

Austin Division.

10.      Venue is proper in this district under Section 12 of the Clayton Act, 15 U.S.C. §

22, and 28 U.S.C. § 1391(b)-(c).  The Defendants all may be found and transact business within

the Austin Division of the Western District of Texas.

4

### III. THE PARTIES

11.     The Attorneys General of the Plaintiff States are the chief legal officers for their respective states and commonwealths.  They are granted authority under federal antitrust law to bring actions for injunctive relief and as parens patriae on behalf of consumers, and under the laws of their respective states to bring actions to ensure compliance with their state laws and to enjoin violations of state law.

12.     Defendant Macmillan Holdings, LLC, formerly known as Holtzbrinck Publishing Holdings, LP ("Macmillan"), is a group of publishing companies in the United States ultimately owned by Georg von Holtzbrinck GmbH & Co. KG, which is based in Stuttgart, Germany. Macmillan is a corporation organized and existing under the laws of the State of New York with its principal place of business at 175 Fifth Avenue, New York, New York 10010.

13.     Defendant Penguin Group (USA) Inc. ("Penguin") is the U.S. affiliate of the Penguin Group, the incorporated division of parent Pearson PLC that oversees publishing operations. Penguin is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 375 Hudson Street, New York, New York 10014.

14.     Defendant Simon & Schuster, Inc. is the publishing operation of CBS Corporation. Simon & Schuster, Inc. is a corporation organized and existing under the laws of the State of New York, with its principal place of business at 1230 Avenue of the Americas, New York, New York, 10020. Defendant Simon & Schuster Digital Sales, Inc. is a wholly-owned subsidiary of Simon & Schuster, Inc., organized and existing under the laws of the State of Delaware, with its principal place of business at the same address as its parent.  For purposes of the Complaint, Simon & Schuster, Inc. and Simon & Schuster Digital Sales, Inc. are referred to collectively as "Simon &

Schuster."

15.     Defendant Apple Inc. ("Apple") is a corporation organized and existing under the laws of the State of California, with its principal place of business at 1 Infinite Loop, Cupertino, California 95014.

## IV. FACTS SUPPORTING THE LEGAL CLAIMS

**A.     Book Sales: An Overview**

16.     Publishers work with authors to bring books to market in a variety of printed and other formats, including hardcover, trade paperback and mass market paperback.

17.     The American publishing industry is dominated by six Manhattan-based publishers:  Hachette, HarperCollins, Macmillan, Penguin, Random House and Simon & Schuster (the "Big Six").  For decades, the Big Six or their predecessors have served as authors' primary intermediaries to secure widespread retail print distribution and marketing.  Collectively, the Big Six publishers are responsible for approximately 60% of all revenue generated from print titles sold in the United States, including 85% of all revenue generated from the sale of New York Times ("NYT")-Bestsellers.  As of 2009, these publishers' revenue-based market shares for print titles sold in the United States were as follows: Hachette (10%), HarperCollins (9.8%), Macmillan (5.4%), Penguin (11.3%), Random House (17.5%) and Simon & Schuster (9.1%).

18.     Publishers generally sell printed books to retailers on a Wholesale-Retail Model.  In the Wholesale-Retail Model, publishers set a list price for the printed book and a discount percentage from the list price for a particular Outlet.  The list price minus the amount discounted is the wholesale price of the printed book.  For example, a hardcover book with a list price of $30.00 that

6

has a discount off list of 50% has a wholesale price of $15.00.

19.     In the Wholesale-Retail Model, Publishers generally bear the costs of printing physical books.  They also bear the costs of returns of unsold inventory.

20.     Once the books are received by the Outlets, the Outlets place printed books into their inventories for storage, set retail prices for these books, and sell them directly to consumers.

21.     Publishers divide their catalogues between frontlist and backlist titles.  Frontlist titles refer to the publishers' most recently released titles.  Depending on the publisher, it usually refers to titles released within the past seven months to the past year.  Backlist titles comprise the remainder of the publishers' catalogues.

22.     For books released in hardcover format, among printed formats, publishers typically make only the hardcover book available for a period of time.  Hardcover books command the highest wholesale prices among the print formats and publishers typically set the list prices of hardcover books higher than other print formats.

23.     After some period of time, publishers may release a lower-priced trade paperback version of the title and, after additional time, an even lower priced mass market paperback version.  For books not released in hardcover, publishers will release a trade paperback or mass market paperback version as the first edition.

24.     E-books are electronic versions of books.  Generally, the Big Six provide a printed edition of a title simultaneously with the e-book.  Consumers can read e-books on a variety of electronic devices, including cellular phones, personal computers, tablet computers, and devices dedicated solely to reading e-books ("dedicated e-readers").  E-book consumers cannot resell e-books and face strict limitations on e-book lending.  E-books offer consumers greater portability

7

than most print books and some dedicated e-readers allow e-book consumers to purchase the e-books within minutes, as opposed to waiting for delivery or visiting a brick-and-mortar bookstore.

25.    Despite their availability for approximately two decades, e-books have only recently become a commercially-viable mainstream market.  Between 2007 and 2011, e-books' share of all titles sold in the United States grew from under 2% to approximately 25%.  In 2010, approximately 114 million e-books were sold, and e-book sales hit $441.3 million.

26.    Historically, as with printed book distribution, an Outlet would pay the publisher a wholesale price for each e-book sold.  The wholesale price was calculated by subtracting a discounted amount from the digital list price.  For example, if an e-book had a digital list price of $26.00 and a discount of 50%, the wholesale price was $13.00.  The Outlet would then set the retail price of the e-book, functioning as a retailer.

27.    By 2009, Amazon accounted for the vast majority of the Publishers' e-book sales, conservatively estimated at upwards of 80%.  Among other reasons, Amazon earned this leading position by its substantial investments in developing the leading dedicated e-reader, the Amazon Kindle.  Unique among dedicated reading devices at the time of its introduction, the Amazon Kindle allowed a consumer to download a book wirelessly directly onto the device, thus making newly published e-book titles easily accessible to consumers.  Also, Amazon made substantial efforts to offer a greater selection of e-books to readers.

28.    Additionally, in the fall of 2007, shortly after releasing the Kindle, Amazon publicly committed to sell NYT-Bestselling e-books to consumers for $9.99, a retail price point popular with consumers.  This low price point helped make it attractive for consumers to switch

8

from purchasing print books to purchasing e-books.

29.    As the leading e-book retailer, Amazon's $9.99 pricing policy for NYT-Bestselling e-books stoked intense competition among e-book retailers as its rivals priced at or near Amazon's price point to remain competitive.  As a result, prior to January 2010, consumers could generally purchase NYT-Bestselling e-books for $9.99 contemporaneously with hardcover releases.

**B.     The Conspiring Publishers Agree that NYT-Bestselling E-book Prices Must Rise from $9.99**

30.    Amazon's low retail pricing and leading position among e-book retailers gave rise to serious concerns for the Conspiring Publishers.  First, the Conspiring Publishers feared that, as e-books sales grew larger in the future, Amazon would utilize its significant bargaining clout as the leading e-book retailer to seek lower wholesale e-book prices.

31.    Second, as e-book sales grew as a percentage of all books purchased, the Conspiring Publishers feared increased competition from electronic-only publishers.  In the market for printed books, the publishers' competitive advantage is derived, in substantial part, from their long-established distribution systems.  In a robust e-books market, e-book only publishers could compete without relying on those long-established distribution systems.  E-book only publishers could enhance consumer choice, meet consumer demand, and provide innovative distribution.  The Conspiring Publishers feared that Amazon would emerge as a direct competitor by contracting directly with authors to publish its own e-books.

32.    Third, the Conspiring Publishers were concerned that sales of lower priced e-books would cannibalize sales of printed books; i.e., the Conspiring Publishers were concerned

9

that increased sales of e-books would reduce sales of as higher priced printed editions of the same books.

33.     Because of these concerns, the Conspiring Publishers, individually and collectively, began searching for a path to higher prices for NYT-Bestselling e-books.

34.     Starting no later than summer 2008 and continuing throughout 2009 on a regular basis, CEOs representing the Big Six Publishers began attending exclusive dinners organized in private rooms at elite New York restaurants.  At these meetings, the attending Big Six Publishers' CEOs discussed sensitive business matters, including concerns related to e-books and Amazon.  No antitrust counsel attended any of the dinners.

35.     As of late 2008, Simon & Schuster charged wholesale prices for frontlist e-books that were lower than their wholesale prices for hardcover printed editions of the same title.  Most of the other Conspiring Publishers already charged wholesale prices equivalent or roughly equivalent to hardcover print wholesale prices for these titles.  By early 2009, Simon & Schuster raised its wholesale prices for e-books released simultaneously with hardcover books, including NYT-Bestsellers, to parity (or near parity) with hardcover editions of the same titles.  By raising its e-book wholesale prices, Simon & Schuster hoped to cause the e-book Outlets to raise their e-book retail prices.  However, despite the increase in wholesale prices, Amazon and other e-book retailers continued offering NYT-Bestselling e-books at $9.99.

36.     Beginning in early 2009, Macmillan, Simon & Schuster and one other Conspiring Publisher each independently considered, but did not adopt, alternative distribution models to restrain retailers from discounting the price for sales of their e-book titles.  The alternative distribution methods considered by the publishers included banning retailers from discounting e-

books (known as "Resale Price Maintenance") or preventing retailers from advertising any discounted e-book prices (known as "Minimum Advertised Price").  None of the publishers that considered adopting one of these two strategies was ultimately willing to adopt such a strategy unilaterally, because of the substantial risks to individual publishers of acting alone.

37.    Macmillan also considered adopting Windowing (delaying publication of certain frontlist titles as e-books for several months after the books were released in print) for the sale of certain books.  Macmillan ultimately decided not to pursue Windowing independently, because of the substantial risks it would face from acting alone.

38.    During the last week of July 2009, an executive from the parent company of one of the Conspiring Publishers met with the other Publishers' executives in New York to discuss a joint venture that would ostensibly create a competitive platform to Amazon.  This executive already believed that this joint venture would primarily serve another purpose: forcing Amazon to charge higher retail prices.  He informed his superior that he was making progress on this strategy with the other Conspiring Publishers and received positive feedback.

39.    On August 19, 2009, one of the Conspiring Publisher's executives sent Macmillan CEO John Sargent and Macmillan President Brian Napack a fax discussing his company's proposal for improving e-book prices.  ███████████████████████████████ ███████████████████████████ He wrote, ███████████████████████████████ ███████████████████████████ He added, ████████████████ ██████████████████████████

40.    By the summer of 2009, it was clear to all of the Conspiring Publishers that, only by working together, could they successfully force Amazon and other e-book retailers to raise

their prices for NYT-Bestsellers.  Specifically, any successful method to raise the price of e-books would require the Conspiring Publishers to overcome two obstacles.  First, the publishers would need to acquire enough bargaining power to coerce Amazon into ending its practice of pricing NYT-Bestselling e-books at $9.99.  In the absence of such collective bargaining power, Amazon could retaliate against individual publishers by delisting their e-books and print books from its website.  Second, the Conspiring Publishers needed to implement their new pricing structure contemporaneously.  Otherwise, each Publisher would lose sales to lower priced e-books, because the retail prices of its books would rise too high relative to the retail prices of the others.

41.     On information and belief, by no later than the end of summer 2009, the Conspiring Publishers reached an agreement that something had to be done to end Amazon's $9.99 pricing of NYT-Bestsellers and they were collectively searching for the means to effectuate a price increase.

**C.     Windowing: The First Collective Attempt to Raise Prices**

42.     In fall 2009, Simon & Schuster and two other Conspiring Publishers began experimenting with Windowing certain frontlist e-books.  By early December 2009, these three Publishers agreed to Window a broad number of titles as a means of gaining bargaining leverage over Amazon.  By December 15, 2009, Macmillan agreed to join these three Publishers in Windowing certain frontlist titles.

43.     Months before announcing that they would experiment with Windowing certain titles, certain Publishers shared information among one another about which titles they would Window and their anticipated delay period for e-book publication.

44.     In an August 14, 2009 e-mail, an executive for one of the Conspiring Publishers wrote to his boss discussing Amazon's practice of pricing NYT-Bestselling e-books at $9.99. The e-mail also included a detailed account of Simon & Schuster's plans to Window the e-book release of its upcoming Stephen King title, *Under the Dome*.  Simon & Schuster had yet to announce publicly its Windowing plans, but Simon & Schuster CEO Carolyn Reidy provided the executive with this information confidentially.  At the conclusion of the e-mail, ███████████ ███████████████████████████████████, a method used to prevent its preservation and discovery.

45.     In a September 23, 2009 e-mail by Carolyn Reidy, CEO of Simon & Schuster, to Les Moonves, the CEO of Simon & Schuster's parent corporation CBS, she discussed the possible Windowing of the upcoming release of Stephen King's new novel *Under the Dome*. Reidy's e-mail concludes by suggesting collective action:



46.     By late September 2009, as their agreement to implement Windowing came in place, the Conspiring Publishers considering Windowing referenced themselves in one email as ██████

47.     On October 20, 2009, Barnes & Noble held a launch party for its Nook e-reader at Chelsea Piers.  Many Conspiring Publisher CEOs, including Simon & Schuster CEO Carolyn Reidy, Macmillan CEO John Sargent, and Penguin CEO David Shanks, as well as other Conspiring Publisher executives, attended the launch party.  These three CEOs discussed

Windowing at this event.

48.     By early December 2009, Simon & Schuster and the two other Conspiring Publishers had reached an agreement to broadly Window frontlist titles as a method of effectuating their agreement to raise frontlist e-book prices.

49.     On December 7, 2009, Simon & Schuster informed Amazon that it would begin Windowing titles.  The next day, December 8, 2009, Simon & Schuster became the first major publisher to announce systematic Windowing of e-book versions of its frontlist titles.  Simon & Schuster's announcement stated that the printed versions of its frontlist titles would be available in the first half of 2010, but that it would delay the release of certain of these titles as e-books by approximately four months.

50.     On December 8, 2009, an executive for one of the Conspiring Publishers also announced that it had similar plans to Window frontlist, best-selling e-book titles for three to four months.  Contemporaneously, this executive stated publicly that Hachette had decided on this strategy "to preserve our industry."

51.     On December 9, 2009, the other Conspiring Publisher announced that it would Window five to ten e-book titles per month, beginning in January 2010.

52.     The three Publishers' Windowing announcements were followed almost immediately by a series of communications with Macmillan.  These communications provided ample opportunity to recruit Macmillan to pursue Windowing.

53.     On December 9, 2009, an executive for the parent of one of the Conspiring Publishers forwarded by e-mail an article about Simon & Schuster and another Conspiring Publisher's Windowing plans to Stefan von Holtzbrinck, Chairman of Macmillan's parent

14

company Verlagsgruppe Georg von Holtzbrinck.  He wrote ███████████████████
████████████████████████████

54.    On December 10, 2009, Simon & Schuster CEO Carolyn Reidy discussed
systematic Windowing of e-books with Macmillan executive Stephen Rubin, a friend and former
colleague of Reidy's.  In an e-mail to Macmillan CEO John Sargent recounting part of their
conversation, Mr. Rubin wrote, ████████████████████████████████
████████████████████████████████████

55.    On or about December 15, 2009, Macmillan joined the agreement with the other
three Publishers.  On December 15, 2009, Macmillan announced that it would also systematically
Window frontlist, bestselling e-books.

56.    Windowing unilaterally would have been against each Publisher's economic self-
interest, because it would introduce substantial economic risks.  These risks included consumers
purchasing e-books from other publishers' non-Windowed e-books, negative consumer reviews
online related solely to Windowing, and potential retaliation from Amazon.  By agreeing to act
together, these risks were substantially reduced.

57.    Only Simon & Schuster and the two other Conspiring Publishers broadly
Windowed e-book titles.  These three Publishers delayed these titles roughly from December 26,
2009 through April 1, 2010.  The delay in publication constituted an illegal restriction on output
to the detriment of consumers.  Macmillan ultimately did not broadly Window e-books.

58.    As set forth below, the agreement among the Conspiring Publishers to raise prices
via the Agency Model made Windowing unnecessary.

**D.    The Publishers and Apple Agree to Raise E-book Prices Using the Agency Model**

59.    In a series of negotiations beginning in December 2009 and culminating in late January 2010, Apple facilitated the Publishers' agreement on a scheme to raise frontlist e-book retail prices.  First, the Conspiring Publishers would collectively impose the Agency Model of distribution on all of their Outlets.  Second, the Conspiring Publishers would use their pricing authority under the Agency Model to raise all frontlist e-book prices directly.  For example, the Conspiring Publishers and Apple agreed that NYT-Bestsellers would be priced at either $12.99 or $14.99.  By January 27, 2010, the Publishers had agreed among themselves and with Apple to implement this scheme.  By April 1, 2010, after having converted all or almost all of their Outlets to the Agency Model, the Publishers began to implement higher retail e-book prices.

60.    In mid-December 2009, Apple approached the Conspiring Publishers about becoming an e-book Outlet.  Apple planned to release its iPad tablet computer in early 2010 and wanted to supply e-books to iPad customers in its iBookstore.  Apple learned during these meetings that, on some NYT-Bestselling titles, the Conspiring Publishers were charging a wholesale e-book price to Amazon greater than Amazon's $9.99 retail e-book price.  (Amazon was willing to sell such titles at a loss because its sales of e-books were profitable overall.)  Apple does not generally sell any content below cost, and wanted each and every e-book title sold via the iBookstore to contribute to its profits.

61.    During Apple's meetings with two of the Conspiring Publishers, these Publishers proposed to Apple a distribution strategy known as the "Agency Model."  Under the Agency Model, the Publisher would be the direct seller of e-books to consumers, setting the retail price for each e-book sold.  Apple would act as an agent that facilitates the sale and would receive a

16

commission on each e-book sold through the iBookstore.  Because Apple would receive a

commission on each sale, it would make a profit on every e-book title it sold.

62.     Between these meetings and the end of 2009, Apple communicated with

Macmillan and Simon & Schuster about the Agency Model.

63.     Between January 4, 2010 and January 6, 2010, Eddy Cue, Apple's Vice President

of Internet Sales and lead negotiator, sent a separate e-mail to each of the Conspiring Publishers'

CEOs.  These e-mails presented Apple's initial terms for e-book distribution contracts with each

Publisher.  These terms included an Agency Model relationship and a 30% commission on

individual books.  Additionally, Apple demanded price bands that would ostensibly set

maximum prices for certain frontlist e-books, including NYT-Bestsellers.

64.     Apple's proposal was simple: the Conspiring Publishers would collectively adopt

the Agency Model across all of their Outlets and then use their pricing authority under the

Agency Model to raise e-book prices to consumers across all of these Outlets.  From this time

forward, at the latest, Apple was actively seeking to bring the Publishers into a collective

agreement to use Agency Model as a mechanism to raise e-book retail prices marketwide.

65.     Apple's e-mails made clear to Macmillan and Penguin that the other Publishers

would participate in this common plan, stating at the outset that Apple had talked to ▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

66.     Among Eddy Cue's list of ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

On information and belief, ▇▇▇▇▇▇▇ is code for "higher prices."

67.     As negotiations unfolded, Apple facilitated an agreement among the Conspiring

Publishers to price NYT-Bestselling e-books at the maximum level permitted by the price bands, and all other frontlist titles at or close to the maximum. Apple did this by providing implicit and explicit assurances to the Conspiring Publishers that other Publishers in the conspiracy would price at the maximum permitted by the price bands. At the same time, representatives of the Conspiring Publishers called each other on a regular basis to confirm that they were agreeing to Apple's scheme.

68.     On January 11, 2010, Apple attached to, or included with, e-mails to Penguin, Simon & Schuster and one other Conspiring Publisher a chart showing each Publisher's NYT-Bestselling e-book titles priced at $12.99 on the iBookstore.

69.     On January 11, 2010, Macmillan CEO John Sargent sent Eddy Cue an e-mail asking Apple to reduce the commissions it would receive on frontlist, bestselling e-books. He wrote, ███████████████████████████████████████████████
███████████████████████████████████████████████████████
██████████████████████████████████████████████

70.     A move by a single Publisher to convert all of its Outlets to the Agency Model would have been against that Publisher's unilateral self-interest. First, any single Publisher would have faced potential retaliation from Amazon, which had made clear to the Conspiring Publishers that it viewed the $9.99 e-book price as an effective marketing mechanism to drive consumer purchases. Second, even if a single Publisher succeeded in adopting the Agency Model, it would not be able to raise prices without concern that consumers would turn to other Publishers' e-books that the Outlets priced lower under a Wholesale-Retail Model. The Conspiring Publishers would not have agreed to the adoption of the Agency Model to raise

18

prices, but for the assurances that a sufficient number of the other Publishers would participate.

71.      Simon & Schuster CEO Carolyn Reidy took handwritten notes on a printed copy of an Apple e-mail of January 16, 2010 in which she underscored the collective nature of the Agency Model scheme.  She wrote, █████████████████████

72.      By January 21, 2010, the negotiations between Apple and the Conspiring Publishers had reached a fever pitch.  Apple had told the Publishers that it would announce the launch of the iPad on January 27, 2010 and that it would require the agreement of a critical mass of the Conspiring Publishers to move forward with the iBookstore at the launch.  In connection with this timeline, at some point in the negotiations, Apple told Macmillan that a deal would need to be completed by Thursday, January 21, 2010.  On that day, Apple CEO Steve Jobs would hold a rehearsal for the launch of Apple's iPad on Wednesday of the following week.

73.      On or about January 21, 2010, Apple sent e-mails to the various Conspiring Publishers stating that it was near completing or had completed an agreement with another Publisher.  On January 21, 2010, the Conspiring Publishers' CEOs began to call one another by telephone.  These calls were made to confirm whether competing Publishers would agree to join the Agency Model scheme.

74.      Below are charts depicting telephone calls in both duration and absolute number of calls among executives of four of the Conspiring Publishers from November 2009 through February 2010.  These charts depict calls from the executives' office landlines, cell phones and home telephones.  This time period includes both the Windowing and Agency Model schemes to raise e-book prices:

19









Macmillan CEO John Sargent
Call Attempts Per Day (Incoming and Outgoing)
Carolyn Reidy
Publisher A
Publisher B
5
4
3
2
1
0
11/1/2009
11/5/2009
11/9/2009
11/13/2009
11/17/2009
11/21/2009
11/25/2009
11/29/2009
12/3/2009
12/7/2009
12/11/2009
12/15/2009
12/19/2009
12/23/2009
12/27/2009
12/31/2009
1/4/2010
1/8/2010
1/12/2010
1/16/2010
1/20/2010
1/24/2010
1/28/2010
2/1/2010
2/5/2010
2/9/2010
2/13/2010
2/17/2010
2/21/2010
2/25/2010

Macmillan CEO John Sargent
Duration of Calls
Minutes
Carolyn Reidy
Publisher A
Publisher B
15
14
12
10
8
6
4
2
0
Systematic Windowing policy announced by Hachette and Simon & Schuster
First written proposal from Apple to Publishers
Apple's stated deadline
Macmillan buy button episode Jan. 28 - Feb. 5

Simon & Schuster CEO Carolyn Reidy
Call Attempts Per Day (Incoming and Outgoing)
Publisher A
Publisher B
John Sargent

Simon & Schuster CEO Carolyn Reidy
Duration of Calls
Minutes
Publisher A
Publisher B
John Sargent
Systematic Windowing publicly announced by Hachette and Simon & Schuster
First written proposal from Apple to Publishers
Apple's stated deadline
Macmillan buy button episode Jan. 28 - Feb. 5

75.    On information and belief, although no included in the previous charts, the telephone records of either John Makinson or David Shanks of Penguin would show calls to other Publishers during this time period.

76.    On January 21, 2010, at 10:50 am, a Conspiring Publisher executive wrote to the CEO of its parent corporation by e-mail:



77.    On January 21, 2010, Eddy Cue wrote in an e-mail to a Conspiring Publisher executive,

78.    On Saturday, January 22, Penguin CEO David Shanks contacted Apple's negotiator Eddie Cue.  As Mr. Cue reported to Steve Jobs, Shanks

79.    Also on January 22, 2010, an executive of a Conspiring Publisher sent an e-mail to an officer of the parent corporation stating that

On information and belief, the CEO obtained this information from Apple.

80.    At some subsequent point during the negotiations, Apple's Eddy Cue informed an

executive of a Conspiring Publisher that Macmillan had agreed to move forward with the Agency Model on Apple's terms.

81.     The executive for the Conspiring Publisher then called Macmillan CEO John Sargent to confirm whether Macmillan would agree to Apple's proposal.  Sargent confirmed that it would.  The executive informed John Sargent that his company likely would not.  On information and belief, this phone call is one of those depicted on the charts above.

82.     During a conversation between Macmillan CEO John Sargent and Simon & Schuster CEO Carolyn Reidy prior to Simon & Schuster signing its Agreement with Apple, Mr. Sargent stated that Macmillan was going to pursue the Agency Model and thought it was the future of publishing.

83.     After Eddy Cue could not secure one of the Conspiring Publisher's commitment directly from an executive, Apple turned to its parent.  At this point, Apple CEO Steve Jobs became directly involved in negotiations.  On January 24, 2010, following an exchange of e-mails, Mr. Jobs wrote to an executive at the parent company, in part:



84.    Within three days of Mr. Jobs' email, by January 27, 2010, the Conspiring Publisher he contacted, along with the other Conspiring Publishers, had agreed to the Agency Model scheme and signed a formal, Agency Model distribution contract with Apple.

85.    On Wednesday, January 27, 2010, in his public demonstration of what would become the iBookstore at Apple's launch of the iPad, then-Apple CEO Steve Jobs displayed Edward Kennedy's bestselling autobiography *True Compass* at retail the price of $14.99.  When journalist Walter Mossberg of the Wall Street Journal asked how Apple would compete with Amazon's $9.99 pricing, Steve Jobs responded, "the prices will be the same."  Mr. Jobs could make this statement because Apple had entered into an agreement with the Conspiring Publishers that would use the Agency Model to fix marketwide e-book prices at this higher level. As stated in Mr. Jobs' biography:

> So we told the publishers, "We'll go to the agency model, where you set the price, and we get our 30%, and yes, the customer pays a little more, but that's what you want anyway."

86.    Each of the contracts signed between Apple and the Conspiring Publishers contained an Exhibit A, which is focused on customer pricing.  Exhibit A provided an agreed-upon breakdown of what prices should be offered to U.S. purchasers for all of the Conspiring Publishers' frontlist titles.

87.    The Exhibit A in each of the Conspiring Publishers' agreements with Apple, contained some form of the following chart, which provided target prices for all frontlist e-books published by the Conspiring Publishers across hardcover list pricing tiers. ████████

████████████████████████████████████████████████



88.     Exhibit A in each of the Conspiring Publishers' contracts contains a definition of NYT-Bestselling titles.  For example, as set forth in Exhibit A to the Penguin agreement, ███ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ This definition is, for all intents and purposes, identical in the Exhibit A of each of Conspiring Publishers' agreements with Apple.

89.     As to NYT-Bestselling titles, in Exhibit A, each of the Conspiring Publishers agreed that, ████████████████████████████████████████████████████



90.     Each of the Conspiring Publishers also agreed, in Exhibit A, to fix e-book prices for all frontlist trade or mass market paperback titles.  Specifically, each of the Conspiring Publishers agreed to ██████████████████████████████████████████████████████

91.     On information and belief, although the written agreements between the Conspiring Publishers and Apple spoke of the pricing at various points in Exhibit A as a maximum price, it was understood by all of the Conspiring Publishers and Apple that the prices listed were actually agreed upon set prices; and the Conspiring Publishers rarely, if ever, deviated from the prices set in Exhibit A.

92.     To provide incentives for the Conspiring Publishers to convert Amazon and other Outlets to the Agency Model, Apple's contracts with the Conspiring Publishers included a retail price most favored nations clause (the "Apple MFN clause") covering hardcover new releases. The Apple MFN clauses state that, for hardcover new releases, the Conspiring Publisher lower its price at the iBookstore to match the lowest price being used at any competing e-bookstore, whether or not the competing e-bookstore is distributing the title under the Agency Model or Wholesale-Retail Model.

93.     As a result of the Apple MFN clause, if a Conspiring Publisher failed to implement the Agency Model scheme and raise prices across all e-bookstores, it would diminish the revenue on its titles with no effect on retail prices.  For example, if Barnes & Noble chose to offer the new Tom Clancy novel *Search and Destroy* to Nook owners at 10% off Penguin's Agency price of $12.99 ($11.69), Penguin would have to offer the $11.69 price to consumers at the iBookstore.  At Barnes & Noble, Penguin would earn $9.09 and Barnes & Noble would earn $2.60 on the sale of the novel.  In contrast, at the iBookstore, Penguin would earn $8.18 (70% of $11.69) and Apple would earn $3.51 (30% of $11.69).  If Outlets charged even lower retail prices for e-book titles, the math would become untenable for the Publisher.  Each Publisher needed to

26

control retail prices across all Outlets to ensure that retail price competition did not make the Agency Model unprofitable.

94.     Between January 27, 2010 and April 1, 2010, the Conspiring Publishers converted the largest Outlets, including Amazon, to the Agency Model.  Starting in April 2010 and pursuant to their illegal agreement, the Conspiring Publishers generally raised retail prices of NYT-Bestselling e-books from $9.99 to the $12.99 - $14.99 level.  Contemporaneously, the Conspiring Publishers also raised retail e-book prices on frontlist books to higher price points. The Conspiring Publishers also on average substantially raised prices across their backlists.

95.     Penguin could not convert Amazon to the Agency Model until June 2010 because its existing agreement with Amazon ran longer than those of the other Conspiring Publishers.  In the interim, Penguin withheld from Amazon all newly released e-books so that it could charge the collusively agreed to higher prices at other Outlets.

96.     The higher retail prices benefitted Apple because it would earn higher revenues from its commissions on each sale.  Insulated from e-book price competition with other Outlets, Apple could earn gross margins up to several times higher than in the Wholesale-Retail Model. The Publishers achieved their long-running collective goal: higher retail prices for e-books.

E.     **The Conspiring Parties Police and Enforce Their Agreement**

97.     Over the next four months, the conspiring parties took steps to ensure that the anticompetitive agreement was implemented, providing necessary support to one of the conspirators, Macmillan, in its negotiations with Amazon, and forcing the only non-conspiring Big Six publisher, Random House, to switch to the Agency Model.

98.     Macmillan was the first Conspiring Publisher to enter into renegotiations of its e-

books contract with Amazon.  The Conspiring Publishers and Apple understood that forcing

Amazon, by far the largest Outlet for e-books, to accept the Agency Model would be central to

ensuring that their illegal scheme was successful.  For this reason, the Conspiring Publishers thus

provided material support and encouragement to Macmillan throughout its ultimately successful

negotiations with Amazon.

99.    Macmillan presented Amazon with a choice: either adopt the Agency Model or

lose the ability to sell Macmillan new e-book releases for the first seven months after their

release.  Amazon rejected Macmillan's proposal.  In an attempt to push Macmillan off this

position, Amazon effectively stopped selling Macmillan's print books and e-books.  The other

Conspiring Publishers jumped in to assist Macmillan.

100.    An executive of the parent of one of the Conspiring Publishers stated in an email

that Macmillan CEO █████████████████    The executive continued, Macmillan ██

███████████████████████████████████████████████

███████████████████████

101.    The same executive also assured Macmillan CEO John Sargent of his company's

support.  Specifically, in a January 31, 2010 email, he told Mr. Sargent that ███████████

████████████████████████

102.    The January 31, 2010 email is merely one example of the supporting

correspondence that Mr. Sargent received from the Conspiring Publishers during Macmillan's

negotiations with Amazon.  On February 1, 2010, John Makinson, the Chairman of Penguin's

parent the Penguin Group, wrote to Macmillan CEO John Sargent ███████████████

███████████████████████████

103.    Simon & Schuster's Vice President of Marketing & Digital Products similarly recognized, in a February 1, 2010 email to other Simon & Schuster executives, that Macmillan, in its negotiations with Amazon, was ███████████████████████████████████ ███████

104.    In addition to support from the other Conspiring Publishers, Macmillan also received support from Barnes & Noble.  In fact, the CEO of Barnes & Noble told Mr. Sargent that ████████████████████████████████████ In an attempt to assist Macmillan during the negotiation process, Barnes & Noble moved its titles to the top of its merchandizing pods and search results on the Nook.

105.    Macmillan understood that, while it was the first of the Conspiring Publishers to begin negotiations with Amazon over the Agency Model, ultimately Amazon would be negotiating with all five of the Conspiring Publishers.  In fact, Amazon soon learned that all of the Conspiring Publishers had agreed to the Agency Model, including taking control of both e-book retail pricing and the direct selling of e-books to consumers.  These five publishers cumulatively accounted for approximately half of Amazon's e-book business.  Faced with the possibility of losing so much e-book business, Amazon was forced to give in to Macmillan's demands.  Two days after it stopped selling Macmillan titles, Amazon publicly announced that it had been forced to accept the Agency Model, and thereafter resumed selling Macmillan's e-book and print book titles.

106.    The Defendants also worked together to force the largest of the Big Six publishers, Random House, to switch to the Agency Model.

107.    Random House is the largest book publisher in the United States.  In 2009, the

29

books Random House published constituted over 17% of all books published in the United States, making it significantly larger than any of the other Big Six.

108.    Random House had not agreed to move to the Agency Model in January 2010. The Conspiring Publishers understood that, if Random House was also forced to use the Agency Model, the Agency Model would be cemented in place as the e-book standard.  Moreover, the Conspiring Publishers were extremely concerned that Random House would benefit by gaining sales due to its lower e-book prices.

109.    Penguin put pressure on Barnes & Noble to force Random House to switch to the Agency Model.  Barnes & Noble is the largest book retailer in the United States.  In the United States, it currently owns and operates over 700 retail bookstores, and manages over 600 college and university bookstores.  It also sells the Nook e-book reader, which is, after the Kindle, the second most popular e-book reader in the United States.  Stephen Riggio is currently the Vice Chairman of Barnes & Noble.  From January 2002 through March 2010, he was Chief Executive Officer of Barnes & Noble.

110.    On March 4, 2010, Penguin CEO David Shanks sent Stephen Riggio an email. Shanks stated in his email that ███████████████████████████████████████
████████████████████████████████ (emphasis added)  Mr. Shanks' email continued ████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████
███████████████████████ On information and belief, what Mr. Shanks was suggesting was that Barnes & Noble stop any promotion or advertising of Random House titles.

111.   When Barnes & Noble continued to promote Random House titles, Penguin CEO Shanks went back to Barnes & Noble again.  Following this contact, Barnes & Noble's management decided not to feature Random House in any future advertising.

112.   Throughout 2010, Barnes & Noble continued to apply pressure to Random House to switch to the Agency Model.  In addition, on information and belief, other Conspiring Publishers also continued to pressure Random House to move to the Agency Model.  Ultimately, Random House signed an agreement with Apple.  Random House's contract contained the same Exhibit A price terms and the same MFN clause as the contracts between Apple and the Conspiring Publishers.

113.   As of the filing date for this action, as a result of their illegal agreement, the Conspiring Publishers continue to restrict output of e-books by charging consumers artificially high prices.  As a result consumers have suffered from tens of millions of dollars in overcharges nationwide and, at minimum, millions in each of the Plaintiff States.

## V. RELEVANT MARKETS

114.   The relevant product market is the market for the sale of e-books.  Hachette, HarperCollins, Macmillan, Penguin, and Simon & Schuster are competitors in this product market.

115.   The relevant geographic market is the United States.  Hachette, HarperCollins, Macmillan, Penguin, and Simon & Schuster are competitors in this geographic market.

## VI. TRADE & COMMERCE

116.    The activities of the Defendants, including the production, sale and distribution of

e-books, were in the regular, continuous and substantial flow of interstate trade and commerce

and have had and continue to have a substantial effect upon interstate commerce.  The

Defendants' activities also had and continue to have a substantial effect upon the trade and

commerce within each of the Plaintiff States.

## VII. MARKET EFFECTS

117.    The acts and practices of Defendants have had the purpose or effect, or the

tendency or capacity, of restraining competition unreasonably and injuring competition by

preventing the competitive pricing of e-books, and have directly resulted in an increase in retail

e-book prices across both the Defendants' frontlist and backlist titles.

118.    By preventing the competitive pricing of e-books, Defendants have deprived the

Plaintiff States and their consumers of the benefits of the competition that the federal and state

antitrust laws, consumer protection laws and/or unfair competition statutes and related state laws

are designed to promote, preserve, and protect.

119.    As a direct and proximate result of the unlawful conduct alleged above, the

general economies of the Plaintiff States have sustained injury and the Plaintiff States are

threatened with further injury to their general economies unless Defendants are enjoined from

continuing their unlawful conduct.

**COUNT I  (AGAINST MACMILLAN, PENGUIN AND SIMON & SCHUSTER) —
HORIZONTAL CONSPIRACY TO RAISE E-BOOK RETAIL PRICES IN VIOLATION
OF SECTION I OF THE SHERMAN ACT**

120.    Plaintiff States repeat and reallege every preceding allegation as if fully set forth

herein.

121.    By no later than the end of summer 2009, Macmillan, Penguin, Simon &

Schuster, and the other two Conspiring Publishers entered into an agreement to work together to

raise the NYT-Bestseller e-book retail prices from the $9.99 price point.

122.    This Agreement among and between horizontal competitors to raise e-book prices

constitutes a per se violation of Section 1 of the Sherman Act.

123.    In the alternative, the agreement between and among Macmillan, Penguin, Simon

& Schuster, and the other two Conspiring Publishers caused anticompetitive effects that

substantially outweigh any procompetitive justifications, if any exist.  For this reason, under a

rule of reason analysis, the Agreement is a violation of Section 1 of the Sherman Act.


**COUNT II  (AGAINST MACMILLAN AND SIMON & SCHUSTER) –
HORIZONTAL CONSPIRACY TO RAISE E-BOOK RETAIL PRICES USING
WINDOWING IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT**

124.    Plaintiff States repeat and reallege every preceding allegation as if fully set forth

herein.

125.    In December 2009, Macmillan, Simon & Schuster, and two other Conspiring

Publishers entered into an agreement to Window their frontlist e-books.  The goal of this

agreement was to restrict frontlist e-book output in an attempt to cause retail Outlets to raise

frontlist e-book prices.  For this reason, the agreement among and between four horizontal

Case 1:12-cv-03394-DLC-MHD   Document 1   Filed 04/11/12   Page 34 of 56

competitors to raise e-book prices constitutes a per se violation of Section 1 of the Sherman Act.

126.    In the alternative, the agreement to Window between and among Macmillan, Simon & Schuster, and two other Conspiring Publishers caused anticompetitive effects that substantially outweigh any procompetitive justifications, if any exist.  For this reason, under a rule of reason analysis, the Agreement is a violation of Section 1 of the Sherman Act.

### COUNT III  (AGAINST MACMILLAN, PENGUIN, SIMON & SCHUSTER AND APPLE) -- HORIZONTAL CONSPIRACY TO RAISE E-BOOK RETAIL PRICES USING THE AGENCY MODEL IN VIOLATION OF THE SHERMAN ACT

127.    Plaintiff States repeat and reallege every preceding allegation as if fully set forth herein.

128.    By no later than the end of January 2010, Macmillan, Penguin, Simon & Schuster, and the other two Conspiring Publishers entered into a horizontal agreement, facilitated and also entered into by Apple, to use the Agency Model as a mechanism to raise the retail prices for frontlist e-books.  This agreement to raise e-book prices among and between horizontal competitors, facilitated and also entered into by Apple, constitutes a per se violation of Section 1 of the Sherman Act.

129.    In the alternative, the purpose and effect of the agreement between and among Macmillan, Penguin, Simon & Schuster, the other two Conspiring Publishers, and Apple to use the Agency Model to raise e-book prices was to restrain competition between and among the Publishers in the market for direct e-book retail sales to consumers.  The Agreement has caused anticompetitive effects that substantially outweigh procompetitive justifications, if any exist.  For

34

this reason, under a rule of reason analysis, the Agreement is a violation of Section 1 of the Sherman Act.

## COUNT IV -- SUPPLEMENTAL STATE LAW CLAIMS

130.   Plaintiff State of Alaska repeats and realleges every preceding allegation.

131.   The aforementioned practices by Defendants were in violation of Alaska's Restraint of Trade Act, AS 45.50.562 *et seq.* and Alaska's Unfair Trade Practices and Consumer Protection Act, AS 45.50.471 *et seq.*, and the common law of Alaska.

132.   Plaintiff State of Arizona repeats and realleges every preceding allegation.

133.   The aforementioned practices by Defendants were in violation of the Arizona State Uniform Antitrust Act, § 44-1401 *et seq.*

134.   Plaintiff State of Colorado repeats and realleges every preceding allegation.

135.   The aforementioned practices by Defendants violate, and Plaintiff State of Colorado is entitled to relief under, the Colorado Antitrust Act of 1992, § 6-4-101, et seq., Colo. Rev. Stat., and the common law of Colorado.

136.   Plaintiff State of Connecticut repeats and realleges every preceding allegation.

137.   Defendants' actions as alleged herein violate Conn. Gen. Stat. §§ 35-26, 35-28 and 35-29 in that Defendants entered into contracts, combinations or conspiracies for the purpose of, or having the effect of, fixing, controlling and maintaining prices, rates, quotations or fees for e-books sold in the State of Connecticut.

138.   Defendants' actions as alleged herein violate Conn. Gen. Stat. §§ 35-26, 35-28 and 35-29 in that they have the purpose and/or effect of substantially lessening competition and

unreasonably restraining trade and commerce within the State of Connecticut and elsewhere.

139.     Defendants' actions as alleged herein have damaged, directly and indirectly, the prosperity, welfare, and general economy of the State of Connecticut and the economic well-being of a substantial portion of the People of the State of Connecticut and its citizens and businesses at large.  George Jepsen, Attorney General of the State of Connecticut, seeks recovery of such damages as *parens patriae* on behalf of the those persons in the State of Connecticut harmed by Defendants' conduct, pursuant to Conn. Gen. Stat. § 35-32(c)(1).

140.     Defendants' acts and practices as alleged herein constitute unfair methods of competition, all in violation of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat § 42-110b.

141.     Plaintiff State of Illinois repeats and realleges every preceding allegation.

142.     The Defendants violated section 3 of the Illinois Antitrust Act, 740 ILCS 10/3, by agreeing to fix the prices of e-books and to restrict their output for the purpose and with the effect of raising e-book prices.

143.     Plaintiff State of Iowa repeats and realleges every preceding allegation.

144.     The aforementioned practices by Defendants were in violation of Iowa Competition Law, Iowa Code ch.553.

145.     Plaintiff State of Maryland repeats and realleges every preceding allegation.

146.     The aforementioned practices by Defendants were in violation of the Maryland Antitrust Act, Md. Code Ann. Com. Law §11-201 et seq.

147.     Plaintiff State of Missouri repeats and realleges every preceding allegation.

148.     The aforementioned practices Defendants were in violation of Missouri's antitrust

36

law, Missouri Rev. Stat. §§ 416.031 *et seq.* and, further, were unfair and deceptive practices in

violation of Missouri's Merchandising Practices Act, Mo. Rev. Stat. §§ 407.010 *et seq.*, as

further interpreted by 15 CSR 60-8.010 *et seq.* and 15 CSR 60-9.01, *et seq.*

149.   Plaintiff State of Ohio repeats and realleges every preceding allegation.

150.   The aforementioned practices by Defendants were in violation of Ohio's antitrust

law, the Valentine Act, Ohio Rev. Code §§ 1331.01 et seq, and the common law of Ohio.

151.   Plaintiff Commonwealth of Pennsylvania repeats and realleges every preceding

allegation.

152.   The aforementioned practices by Defendants were in violation of Pennsylvania

common law doctrines against unreasonable restraint of trade.

153.   Plaintiff Commonwealth of Puerto Rico repeats and realleges every preceding

allegation.

154.   The aforementioned practices by Defendants were in violation of Puerto Rico Law

No. 77 of June 25, 1964, also known as "Puerto Rico's Antitrust and Restrictions of Commerce

Law", 10 P.R. Laws Ann. §§ 257 et seq., and 32 P.R. Laws Ann. § 3341.

155.   Plaintiff State of South Dakota repeats and realleges every preceding allegation.

156.   The aforementioned practices by Defendants were in violation of South Dakota's

antitrust law, South Dakota Codified Laws 37-1-3.1 et seq.

157.   Plaintiff State of Tennessee repeats and realleges every preceding allegation.

158.   The aforementioned practices by Defendants were in violation of Tennessee's

antitrust law, the Tennessee Trade Practices Act, Tenn. Code Ann. §§ 47-25-101 et seq, the

Tennessee Consumer Protection Act, Tenn. Code Ann. §§ 47-18-101 et seq, and the common law

37

of Tennessee.

159.    Plaintiff State of Texas repeats and realleges every preceding allegation.

160.    The aforementioned practices by Defendants were in violation of Texas Business and Commerce Code §15.01 et seq.

161.    Plaintiff State of Vermont repeats and realleges every preceding allegation.

162.    The aforementioned practices by Defendants were in violation of the State of Vermont's Consumer Fraud Act, 9 V.S.A. §§ 2451 *et seq.*

163.    Plaintiff State of West Virginia repeats and realleges every preceding allegation. The aforementioned practices by Defendants were in violation of the West Virginia Antitrust Act, W.Va. Code § 47-18-1 et seq. West Virginia seeks injunctive relief, treble damages, civil penalties and its costs and attorneys' fees under federal and state law, including, the West Virginia Antitrust Act, W.Va. Code § 47-18-8 and -9.

## **PRAYER FOR RELIEF**

Accordingly, the Plaintiff States request that the Court:

1.    Adjudge and decree that the Defendants have committed violations of Section 1 of the Sherman Act, 15 U.S.C. § 1;

2.    Adjudge and decree that the Defendants have committed violations of each of the state laws enumerated in Count IV;

3.    Enjoin and restrain, pursuant to federal and state law, the Defendants, their affiliates, assignees, subsidiaries, successors and transferees, and their officers, directors, partners, agents, and employees, and all persons acting or claiming to act on their behalf or in concert with them, from continuing to engage in any anticompetitive conduct (including the conspiracies described herein) and from adopting in the future any practice, plan program or device having a similar purpose or effect to the anticompetitive actions set forth above;

4.    Award treble damages for injury to natural persons under 4c of the Clayton Act

and applicable state laws;

5.  Order Defendants to pay a civil fine of up to $50 million pursuant to Alaska Statute 45.50.578(b)(2);

6.  Order Defendants to pay civil penalties pursuant to § 44-1407 of the Arizona State Uniform Antitrust Act;

7.  Order Defendants to pay civil penalties pursuant to the Colorado Antitrust Act of 1992, §6-4-112, Colo.Rev.Stat.;

8.  Order each Defendant to pay civil penalties pursuant to Conn. Gen. Stat. § 35-38 for each and every violation of the Connecticut Antitrust Act;

9.  Order each Defendant to pay a civil penalty of $5,000 for each and every willful violation of the Connecticut Unfair Trade Practices Act pursuant to Conn. Gen. Stat. § 42-110o;

10. Order each Defendant to pay restitution pursuant to Conn. Gen. Stat. § 42-110m;

11. Order each Defendant to disgorge all revenues, profits, and gains achieved in whole or in part through the unfair and/or deceptive acts and practices complained of herein, pursuant to Conn. Gen. Stat. § 42-110m;

12. Order Defendants to pay civil penalties pursuant to section 7(4) of the Illinois Antitrust Act, 740 ILCS 10/7(4);

13. Order Defendants to pay a civil penalty pursuant to Iowa Code §553.13;

14. Order the Defendants to pay civil penalties pursuant to Md. Code Ann. Com. Law §11-209(a)(4);

15. Order Defendants to pay civil penalties pursuant to Missouri Rev. Stat. § 407.100.6 for each sale made in violation of Missouri's Merchandising Practices Act;

16. Order the Defendants to pay civil forfeitures pursuant to Ohio Revised Code Section 1331.03;

17. Order the Defendants to pay civil penalties and civil forfeitures pursuant to Puerto Rico Sections 259 and 268 of Law No. 77;

18. Order Defendants to pay civil penalties pursuant to South Dakota Codified Laws 37-1-14.2;

19. Order Defendants to pay civil penalties pursuant to Tenn. Code Ann § 47-25-106;

20.    Order Defendants to pay civil fines pursuant to Section 15.20(a) of the Texas Business and Commerce Code;

21.    Order Defendants to pay civil penalties pursuant to Title 9 of the Vermont Statutes, Section 2461;

22.    Order Defendants to pay civil penalties to the State of West Virginia pursuant to Section 47-18-8 of the West Virginia Antitrust Act;

23.    Order other equitable relief as may be appropriate;

24.    Award the Plaintiff States the costs of this action, including reasonable attorneys' fees and costs, as provided in Section 4c of the Clayton Act and applicable state law; and

25.    Direct such other and further relief as the Court deems just and proper.


## **JURY DEMAND**

The Plaintiff States demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, on all issues triable as of right by jury.

Respectfully submitted,

GREG ABBOTT
Attorney General of Texas

DANIEL HODGE
First Assistant Attorney General

JOHN B. SCOTT
Deputy Attorney General for Civil Litigation

JOHN T. PRUD'HOMME
Chief, Consumer Protection Division

KIM VAN WINKLE
Section Chief, Antitrust Section
Consumer Protection Division


GABRIEL R. GERVEY
Texas Bar No. 24072112
Assistant Attorney General
Office of the Attorney General
P.O. Box 12548
Austin, Texas  78711-2548
Telephone: 512-463-1262
Facsimile: 512-320-0975
gabriel.gervey@texasattorneygeneral.gov


DAVID ASHTON
Assistant Attorney General
Texas Bar No. 24031828
Assistant Attorney General
Office of the Attorney General
P.O. Box 12548
Austin, Texas  78711-2548
Telephone: 512-936-1781
Facsimile: 512-320-0975
david.ashton@texasattorneygeneral.gov

**ATTORNEYS FOR THE STATE OF TEXAS**

41

Respectfully submitted,

STATE OF CONNECTICUT
GEORGE JEPSEN
ATTORNEY GENERAL

Michael E. Cole
Chief, Antitrust Department

W. Joseph Niesen
Gary M. Becker
Assistant Attorneys General
55 Elm Street
Hartford, CT 06106
PH: 860-808-5040
FAX: 860-808-5033
Michael.Cole@ct.gov
Joseph.Nielsen@ct.gov
Gary.Becker@ct.gov

**ATTORNEYS FOR THE STATE OF CONNECTICUT**

42

Respectfully submitted,

The STATE OF ALASKA

MICHAEL C. GERAGHTY
Attorney General

Clyde E. Sniffen, Jr.
Senior Assistant Attorney General
Alaska Bar # 8906036
Alaska Department of Law
1031 W. 4th Ave. # 200
Anchorage, AK  99501
(907) 269-5200
(907) 276-8554 (Telefax)

**ATTORNEYS FOR THE STATE OF ALASKA**

43

Respectfully submitted,

THOMAS C. HORNE
Attorney General of Arizona

NANCY M. BONNELL
Antitrust Unit Chief
Susan V. Myers
Assistant Attorney General
Office of the Arizona Attorney General
Consumer Protection and Advocacy Section
1275 West Washington
Phoenix, Arizona 85028
Tel:  (602) 542-7728
Fax:  (602) 542-9088
Nancy.bonnell@azag.gov

**ATTORNEYS FOR THE STATE OF ARIZONA**

44

Respectfully submitted,

JOHN W. SUTHERS
Attorney General of Colorado


Devin M. Laiho
Assistant Attorney General
Colorado Department of Law
1525 Sherman Street, Seventh Floor
Denver, Colorado 80203
Voice: 303.866.5079
Email: devin.laiho@state.co.us

**ATTORNEYS FOR THE STATE OF COLORADO**

45

Respectfully submitted,

LISA MADIGAN
Attorney General of Illinois

Chadwick O. Brooker
Assistant Attorney General
Office of the Illinois Attorney General
Antitrust Bureau
100 W. Randolph Street
Chicago, Illinois 60601
Tel: (312) 793-3891
Fax: (312) 814-4209
cbrooker@atg.state.il.us

**ATTORNEYS FOR THE STATE OF ILLINOIS**

46

Respectfully submitted,

THOMAS J. MILLER
Attorney General

LAYNE M. LINDEBAK
IA Bar AT0004755
Assistant Attorney General
Special Litigation Division
Hoover Office Building-Second Floor
1305 East Walnut Street
Des Moines, IA 50319
Tel:  (515) 281-7054
Fax:  (515) 281-4902
Layne.Lindebak@iowa.com

**ATTORNEYS FOR THE STATE OF IOWA**

Respectfully submitted,

DOUGLAS F. GANSLER
Attorney General of Maryland

ELLEN S. COOPER
Chief, Antitrust Division

JOHN R. TENNIS
Deputy Chief, Antitrust Division

Schonette Walker
Assistant Attorney General
Office of the Maryland Attorney General
Antitrust Division
200 St. Paul Place, 19th Floor
Baltimore, Maryland  21202
Tel: (410) 576-6470
Fax: (410) 576-6404

**ATTORNEYS FOR THE STATE OF MARYLAND**

Respectfully submitted,

CHRIS KOSTER
Attorney General of Missouri

ANNE E. SCHNEIDER
Assistant Attorney General/Antitrust Counsel
Missouri Bar No. 35479

BRIANNA LENNON
Assistant Attorney General
Mo. Bar # 63964

P. O. Box 899
Jefferson City, MO 65102
(573) 751-7445
(573) 751-2041 (facsimile)
Anne.Schneider@ago.mo.gov
Brianna.Lennon@ago.mo.gov

**ATTORNEYS FOR THE STATE OF MISSOURI**

49

Respectfully submitted,

R. MICHAEL DEWINE
Attorney General of Ohio

JENNIFER L. PRATT
Chief, Antitrust Section

Edward J. Olszewski
(Ohio S.Ct. No. 82655)
Assistant Attorney General
Office of the Ohio Attorney General, Antitrust
Section
150 E. Gay St. – 23rd Floor
Columbus, OH 43215
Tel: (614) 466-4328
Fax: (614) 995-0269

**ATTORNEYS FOR THE STATE OF OHIO**

50

Respectfully submitted,

The Commonwealth of Pennsylvania

LINDA L. KELLY
Attorney General

James A. Donahue, III
Chief Deputy Attorney General
Attorney I.D. # 42624
PA Office of Attorney General
14th Floor, Strawberry Square
Harrisburg, PA  17120
(717) 787-4530
(717) 787-1190 (Telefax)

Jennifer J. Kirk
Deputy Attorney General
Attorney I.D. # 90544
PA Office of Attorney General
14th Floor, Strawberry Square
Harrisburg, PA  17120
(717) 787-4530
(717) 787-1190 (Telefax)

**ATTORNEYS FOR THE COMMONWEALTH OF PENNSYLVANIA**

Respectfully submitted,

The Commonwealth of Puerto Rico

Guillermo Somoza-Colombani
Attorney General

José G. Díaz-Tejera
PR Bar No. 12561
Chief Deputy Attorney General
Office of Monopolistic Affairs
Department of Justice
Commonwealth of Puerto Rico
P. O. Box 9020192
San Juan, P.R. 00902-0192
Telephone: (787) 721-2900 Ext. 2669
Facsimile:  (787) 723-9188
jdiaz@justicia.pr.gov

**ATTORNEYS FOR THE COMMONWEALTH OF PUERTO RICO**

Respectfully submitted,

MARTY J. JACKLEY
Attorney General of South Dakota


Jeffrey P. Hallem
South Dakota Bar No. 1955
Assistant Attorney General
Office of the Attorney General
1302 E. Hwy. 14, Suite 1
Pierre, SD 57501-8501
Telephone: (605) 773-3215
Facsimile: (605) 773-4106
Jeff.Hallem@state.sd.us

**ATTORNEYS FOR THE STATE OF SOUTH
DAKOTA**

53

Respectfully submitted,

ROBERT E. COOPER, JR.
Attorney General & Reporter of Tennessee


VICTOR J. DOMEN, JR.
Senior Counsel
Office of the Tennessee Attorney General
425 Fifth Avenue North
Nashville, TN   37202
Telephone: 615-253-3327
Facsimile: 615-532-6951
Vic.Domen@ag.tn.gov

**ATTORNEYS FOR THE STATE OF TENNESSEE**

Respectfully submitted,

STATE OF VERMONT
WILLIAM H. SORRELL
ATTORNEY GENERAL

Ryan Kriger
Assistant Attorney General
Public Protection Division
Vermont Attorney General's Office
109 State Street
Montpelier, VT 05609
Tel: (802) 828-5479
Fax: (802) 828-2154

**ATTORNEYS FOR THE STATE OF VERMONT**

Respectfully submitted,

DARRELL V. MCGRAW, JR.
Attorney General of West Virginia

JILL L. MILES
Deputy Attorney General
Consumer Protection and Antitrust Division

DOUGLAS L. DAVIS
West Virginia Bar No. 5502
Assistant Attorney General
Office of the West Virginia Attorney General
P.O. Box 1789
Charleston, West Virginia 25326
Telephone (304) 558-8986
Facsimile (304) 558-0184
doug.davis@wvago.gov

**ATTORNEYS FOR THE STATE OF WEST
VIRGINIA**