# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE ELECTRONIC BOOKS ANTITRUST LITIGATION | ) 11-md-02293 (DLC)<br>) ECF Case |

**This Document Relates to:**

| | |
|---|---|
| THE STATE OF TEXAS;<br>THE STATE OF CONNECTICUT;<br>THE STATE OF ALABAMA;<br>THE STATE OF ALASKA;<br>THE STATE OF ARIZONA;<br>THE STATE OF ARKANSAS;<br>THE STATE OF COLORADO;<br>THE STATE OF DELAWARE;<br>THE DISTRICT OF COLUMBIA;<br>THE STATE OF IDAHO;<br>THE STATE OF ILLINOIS;<br>THE STATE OF INDIANA;<br>THE STATE OF IOWA;<br>THE STATE OF KANSAS;<br>THE STATE OF LOUISIANA;<br>THE STATE OF MARYLAND;<br>THE COMMONWEALTH OF MASSACHUSETTS;<br>THE STATE OF MICHIGAN;<br>THE STATE OF MISSOURI;<br>THE STATE OF NEBRASKA;<br>THE STATE OF NEW MEXICO;<br>THE STATE OF NEW YORK;<br>THE STATE OF NORTH DAKOTA;<br>THE STATE OF OHIO;<br>THE COMMONWEALTH OF PENNSYLVANIA;<br>THE COMMONWEALTH OF PUERTO RICO;<br>THE STATE OF SOUTH DAKOTA;<br>THE STATE OF TENNESSEE;<br>THE STATE OF UTAH;<br>THE STATE OF VERMONT;<br>THE COMMONWEALTH OF VIRGINIA;<br>THE STATE OF WEST VIRGINIA; and<br>THE STATE OF WISCONSIN<br>Plaintiffs,<br><br>v. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) Civil Action No. 12-cv-03394<br>) (DLC)<br>)<br>)<br>) **JURY DEMAND**<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

| | |
|---|---|
| PENGUIN GROUP (USA) INC.; | ) |
| HOLTZBRINCK PUBLISHERS, LLC | ) |
| d/b/a MACMILLAN; and | ) |
| APPLE INC.; | ) |
| Defendants. | ) |

**[PROPOSED] SECOND AMENDED COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL PENALTIES & AS PARENS PATRIAE ON BEHALF OF CONSUMERS**

The States of Texas, Connecticut, Alabama, Alaska, Arizona, Arkansas, Colorado, Delaware, Idaho, Illinois, Indiana, Iowa, Kansas, Louisiana, Maryland, Michigan, Missouri, Nebraska, New Mexico, New York, North Dakota, Ohio, South Dakota, Tennessee, Utah, Vermont, West Virginia, and  Wisconsin, the District of Columbia, and the Commonwealths of Massachusetts, Pennsylvania, Puerto Rico, and Virginia (the "Plaintiff States"), by and through their Attorneys General, bring this action against Penguin Group (USA) Inc. ("Penguin"), Holtzbrinck Publishers, LLC d/b/a Macmillan ("Macmillan"), and Apple Inc. ("Apple") (collectively, "the Defendants") and allege as follows:


## I. SUMMARY OF COMPLAINT

1.      As a result of facts learned during a non-public investigation begun by the State of Texas in March 2010, the Plaintiff States charge Macmillan, Penguin, and Apple with entering into contracts, combinations, and conspiracies that restrain trade.

2.      Specifically, by the end of summer 2009 at the latest, Hachette, HarperCollins, Macmillan, Penguin, and Simon & Schuster, Inc. (collectively, "the Conspiring Publishers" or "the Publishers") entered into an agreement to raise the retail price of electronic books ("e-books").  In furtherance of this conspiracy, by mid-December 2009, Macmillan, Simon & Schuster, Hachette, and HarperCollins agreed to delay publication of certain frontlist e-books for

2

several months following each book's first printed release. In the publishing industry, this practice is known as "Windowing." These four Publishers viewed this collective Windowing as providing them with enhanced bargaining power with which they could negotiate higher retail prices from Amazon and other distribution outlets (collectively, "the Outlets").

3.     No later than January 2010, Apple joined Hachette, HarperCollins, Macmillan, Penguin, and Simon & Schuster's conspiracy and facilitated the Publishers' direct implementation of the agreement to increase e-book prices. Apple played a facilitating role by bringing the Conspiring Publishers into agreement with one another on a scheme to raise retail prices. The scheme had two components. First, the Conspiring Publishers would shift their marketwide distribution model for e-books from a Wholesale-Retail Model, in which distribution Outlets such as Amazon or Barnes & Noble set retail e-book prices and sell e-books directly to consumers, to an Agency Model, in which the Publishers set retail e-book prices and sell e-books directly to consumers. Second, the Conspiring Publishers would then raise retail prices.

4.     As a result of their conspiracy with Apple, Macmillan, Penguin, Simon & Schuster, Hachette, and HarperCollins agreed to eliminate e-book retail price competition between Apple and Amazon and other Outlets. The agreement also ensured that Apple earned a 30% gross margin on e-books. The Conspiring Publishers and Apple increased e-book retail prices pursuant to this illegal agreement beginning on April 1, 2010.

5.     As a result of the conspiracy, consumers nationwide, in aggregate, paid substantially more than one hundred million dollars in overcharges on e-books. As of the filing of this Complaint, these overcharges are ongoing.

6.     The Plaintiff States seek a finding that the Defendants' actions violated federal

3

and state antitrust laws; a permanent injunction preventing the Defendants from continuing their illegal conduct and rectifying ongoing anticompetitive effects caused by their illegal conduct; damages on behalf of natural persons located in the Plaintiff States; civil penalties; and other relief for injuries sustained as a result of Defendants' violations of law.

## II. JURISDICTION & VENUE

7.      The Court has jurisdiction over this action under Section 1 of the Sherman Act, 15 U.S.C. § 1, Sections 4c and 16 of the Clayton Act, 15 U.S.C. §§ 15c & 26, and under 28 U.S.C. §§ 1331 and 1337.

8.      In addition to pleading violations of federal law, the Plaintiff States also allege violations of state law, as set forth below, and seek civil penalties and equitable relief under those state laws.  All claims under federal and state law are based upon a common nucleus of operative fact, and the entire action commenced by this Complaint constitutes a single case that would ordinarily be tried in one judicial proceeding.  This Court has jurisdiction over the non-federal claims under 28 U.S.C. § 1367(a), as well as under principles of pendent jurisdiction.  Pendent jurisdiction will avoid unnecessary duplication and multiplicity of actions, and should be exercised in the interests of judicial economy, convenience and fairness.

9.      This Court may exercise personal jurisdiction over all of the Defendants because all of the Defendants currently transact business in the Southern District of New York. Specifically, the Publishers are headquartered and sell e-books to consumers residing in the Southern District of New York, and Apple distributes e-books and sells e-book reading devices to consumers residing in the Southern District of New York.

4

10.     Venue is proper in this district under Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391(b)-(c).  The Defendants all may be found and transact business within the Southern District of New York.


## III. THE PARTIES

11.     The Attorneys General of the Plaintiff States are the chief legal officers for their respective states and commonwealths.  They are granted authority under federal antitrust law to bring actions for injunctive relief and as parens patriae on behalf of consumers, and under the laws of their respective states to bring actions to ensure compliance with their state laws and to enjoin violations of state law.

12.     Defendant Holtzbrinck Publishers, LLC d/b/a Macmillan ("Macmillan"), is a group of publishing companies in the United States ultimately owned by Georg von Holtzbrinck GmbH & Co. KG, which is based in Stuttgart, Germany. Macmillan is a corporation organized and existing under the laws of the State of New York with its principal place of business at 175 Fifth Avenue, New York, New York 10010.

13.     Defendant Penguin Group (USA) Inc. ("Penguin") is the U.S. affiliate of the Penguin Group, the incorporated division of parent Pearson PLC that oversees publishing operations. Penguin is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 375 Hudson Street, New York, New York 10014.

14.     Defendant Apple Inc. ("Apple") is a corporation organized and existing under the laws of the State of California, with its principal place of business at 1 Infinite Loop, Cupertino, California 95014.

5

## IV. FACTS SUPPORTING THE LEGAL CLAIMS

**A.    Book Sales: An Overview**

15.    Publishers work with authors to bring books to market in a variety of printed and other formats, including hardcover, trade paperback and mass market paperback.

16.    The American publishing industry is dominated by six Manhattan-based publishers:  Hachette, HarperCollins, Macmillan, Penguin, Random House and Simon & Schuster (the "Big Six").  For decades, the Big Six or their predecessors have served as authors' primary intermediaries to secure widespread retail print distribution and marketing.  Collectively, the Big Six publishers are responsible for approximately 60% of all revenue generated from print titles sold in the United States, including 85% of all revenue generated from the sale of New York Times ("NYT")-Bestsellers.  As of 2009, these publishers' revenue-based market shares for print titles sold in the United States were as follows: Hachette (10%), HarperCollins (9.8%), Macmillan (5.4%), Penguin (11.3%), Random House (17.5%) and Simon & Schuster (9.1%).

17.    Publishers generally sell printed books to retailers on a Wholesale-Retail Model.  In the Wholesale-Retail Model, publishers set a list price for the printed book and a discount percentage from the list price for a particular Outlet.  The list price minus the amount discounted is the wholesale price of the printed book.  For example, a hardcover book with a list price of $30.00 that has a discount off list of 50% has a wholesale price of $15.00.

18.    In the Wholesale-Retail Model, Publishers generally bear the costs of printing physical books.  They also bear the costs of returns of unsold inventory.

19.    Once the books are received by the Outlets, the Outlets place printed books into their inventories for storage, set retail prices for these books, and sell them directly to consumers.

6

20.     Publishers divide their catalogues between frontlist and backlist titles.  Frontlist titles refer to the publishers' most recently released titles.  Depending on the publisher, it usually refers to titles released within the past seven months to the past year.  Backlist titles comprise the remainder of the publishers' catalogues.

21.     For books released in hardcover format, among printed formats, publishers typically make only the hardcover book available for a period of time.  Hardcover books command the highest wholesale prices among the print formats and publishers typically set the list prices of hardcover books higher than other print formats.

22.     After some period of time, publishers may release a lower-priced trade paperback version of the title and, after additional time, an even lower priced mass market paperback version.  For books not released in hardcover, publishers will release a trade paperback or mass market paperback version as the first edition.

23.     E-books are electronic versions of books.  Generally, the Big Six provide a printed edition of a title simultaneously with the e-book.  Consumers can read e-books on a variety of electronic devices, including cellular phones, personal computers, tablet computers, and devices dedicated solely to reading e-books ("dedicated e-readers").  E-book consumers cannot resell e-books and face strict limitations on e-book lending.  E-books offer consumers greater portability than most print books and some dedicated e-readers allow e-book consumers to purchase the e-books within minutes, as opposed to waiting for delivery or visiting a brick-and-mortar bookstore.

24.     Despite their availability for approximately two decades, e-books have only recently become a commercially-viable mainstream market.  Between 2007 and 2011, e-books'

7

share of all titles sold in the United States grew from under 2% to approximately 25%. In 2010, approximately 114 million e-books were sold, and e-book sales hit $441.3 million.

25.     Historically, as with printed book distribution, an Outlet would pay the publisher a wholesale price for each e-book sold. The wholesale price was calculated by subtracting a discounted amount from the digital list price. For example, if an e-book had a digital list price of $26.00 and a discount of 50%, the wholesale price was $13.00. The Outlet would then set the retail price of the e-book, functioning as a retailer.

26.     By 2009, Amazon accounted for the vast majority of the Publishers' e-book sales, conservatively estimated at upwards of 80%. Among other reasons, Amazon earned this leading position by its substantial investments in developing the leading dedicated e-reader, the Amazon Kindle. Unique among dedicated reading devices at the time of its introduction, the Amazon Kindle allowed a consumer to download a book wirelessly directly onto the device, thus making newly published e-book titles easily accessible to consumers. Also, Amazon made substantial efforts to offer a greater selection of e-books to readers.

27.     Additionally, in the fall of 2007, shortly after releasing the Kindle, Amazon publicly committed to sell NYT-Bestselling e-books to consumers for $9.99, a retail price point popular with consumers. This low price point helped make it attractive for consumers to switch from purchasing print books to purchasing e-books.

28.     As the leading e-book retailer, Amazon's $9.99 pricing policy for NYT-Bestselling e-books stoked intense competition among e-book retailers as its rivals priced at or near Amazon's price point to remain competitive. As a result, prior to January 2010, consumers could generally purchase NYT-Bestselling e-books for $9.99 contemporaneously with hardcover

8

releases.

**B.     The Conspiring Publishers Agree that NYT-Bestselling E-book Prices Must Rise from $9.99**

29.     Amazon's low retail pricing and leading position among e-book retailers gave rise to serious concerns for the Conspiring Publishers.  First, the Conspiring Publishers feared that, as e-books sales grew larger in the future, Amazon would utilize its significant bargaining clout as the leading e-book retailer to seek lower wholesale e-book prices.

30.     Second, as e-book sales grew as a percentage of all books purchased, the Conspiring Publishers feared increased competition from electronic-only publishers.  In the market for printed books, the publishers' competitive advantage is derived, in substantial part, from their long-established distribution systems.  In a robust e-books market, e-book only publishers could compete without relying on those long-established distribution systems.  E-book only publishers could enhance consumer choice, meet consumer demand, and provide innovative distribution.  The Conspiring Publishers feared that Amazon would emerge as a direct competitor by contracting directly with authors to publish its own e-books.

31.     Third, the Conspiring Publishers were concerned that sales of lower priced e-books would cannibalize sales of printed books; i.e., the Conspiring Publishers were concerned that increased sales of e-books would reduce sales of higher priced printed editions of the same books.

32.     Because of these concerns, the Conspiring Publishers, individually and collectively, began searching for a path to higher prices for NYT-Bestselling e-books.

33.     Starting no later than summer 2008 and continuing throughout 2009 on a regular basis, CEOs representing the Big Six Publishers began attending exclusive dinners organized in

private rooms at elite New York restaurants.  At these meetings, the attending Big Six

Publishers' CEOs discussed sensitive business matters, including concerns related to e-books and

Amazon.  No antitrust counsel attended any of the dinners.

34.     As of late 2008, Simon & Schuster charged wholesale prices for frontlist e-books

that were lower than their wholesale prices for hardcover printed editions of the same title.  Most

of the other Conspiring Publishers already charged wholesale prices equivalent or roughly

equivalent to hardcover print wholesale prices for these titles.  By early 2009, Simon & Schuster

raised its wholesale prices for e-books released simultaneously with hardcover books, including

NYT-Bestsellers, to parity (or near parity) with hardcover editions of the same titles.  By raising

its e-book wholesale prices, Simon & Schuster hoped to cause the e-book Outlets to raise their e-

book retail prices.  However, despite the increase in wholesale prices, Amazon and other e-book

retailers continued offering NYT-Bestselling e-books at $9.99.

35.     Beginning in early 2009, Macmillan, Simon & Schuster and one other Conspiring

Publisher each independently considered, but did not adopt, alternative distribution models to

restrain retailers from discounting the price for sales of their e-book titles.  The alternative

distribution methods considered by the publishers included banning retailers from discounting e-

books (known as "Resale Price Maintenance") or preventing retailers from advertising any

discounted e-book prices (known as "Minimum Advertised Price").  None of the publishers that

considered adopting one of these two strategies was ultimately willing to adopt such a strategy

unilaterally, because of the substantial risks to individual publishers of acting alone.

36.     Macmillan also considered adopting Windowing (delaying publication of certain

frontlist titles as e-books for several months after the books were released in print) for the sale of

certain books.  Macmillan ultimately decided not to pursue Windowing independently, because of the substantial risks it would face from acting alone.

37.     During the last week of July 2009, an executive from the parent company of one of the Conspiring Publishers, met with the other Publishers' executives in New York to discuss a joint venture that would ostensibly create a competitive platform to Amazon.  This executive already believed that this joint venture would primarily serve another purpose: forcing Amazon to charge higher retail prices.  He informed his superior, that he was making progress on this strategy with the other Conspiring Publishers and received positive feedback.

38.     On August 19, 2009, one of the Conspiring Publisher's executives sent Macmillan CEO John Sargent and Macmillan President Brian Napack a fax discussing his company's proposal for improving e-book prices.  The executive suggested developing enhanced e-books and offering these at a $20 price point.  He wrote, "Publishers need to develop digital products at $20, $10 and $5 to maximize the value of our copyrights."  He added, "I strongly believe there is a sizable market for a $20 consumer price point."

39.     By the summer of 2009, it was clear to all of the Conspiring Publishers that, only by working together, could they successfully force Amazon and other e-book retailers to raise their prices for NYT-Bestsellers. Specifically, any successful method to raise the price of e-books would require the Conspiring Publishers to overcome two obstacles.  First, the publishers would need to acquire enough bargaining power to coerce Amazon into ending its practice of pricing NYT-Bestselling e-books at $9.99.  In the absence of such collective bargaining power, Amazon could retaliate against individual publishers by delisting their e-books and print books from its website.  Second, the Conspiring Publishers needed to implement their new pricing structure

11

contemporaneously. Otherwise, each Publisher would lose sales to lower priced e-books, because the retail prices of its books would rise too high relative to the retail prices of the others.

40.    On information and belief, by no later than the end of summer 2009, the Conspiring Publishers reached an agreement that something had to be done to end Amazon's $9.99 pricing of NYT-Bestsellers and they were collectively searching for the means to effectuate a price increase.

**C.    Windowing: The First Collective Attempt to Raise Prices**

41.    In fall 2009, Simon & Schuster and two other Conspiring Publishers began experimenting with Windowing certain frontlist e-books. By early December 2009, these three Publishers agreed to Window a broad number of titles as a means of gaining bargaining leverage over Amazon. By December 15, 2009, Macmillan agreed to join these three Publishers in Windowing certain frontlist titles.

42.    Months before announcing that they would experiment with Windowing certain titles, certain Publishers shared information among one another about which titles they would Window and their anticipated delay period for e-book publication.

43.    In an August 14, 2009 e-mail, an executive for one of the Conspiring Publishers wrote to his boss discussing Amazon's practice of pricing NYT-Bestselling e-books at $9.99. The e-mail also included a detailed account of Simon & Schuster's plans to Window the e-book release of its upcoming Stephen King title, *Under the Dome*. Simon & Schuster had yet to announce publicly its Windowing plans, but Simon & Schuster CEO Carolyn Reidy provided the executive with this information confidentially. At the conclusion of the e-mail, the executive urges his boss to "double delete" this e-mail from his files, a method used to prevent its

12

preservation and discovery.

44.     In a September 23, 2009 e-mail by Carolyn Reidy, CEO of Simon & Schuster, to

Les Moonves, the CEO of Simon & Schuster's parent corporation CBS, she discussed the

possible Windowing of the upcoming release of Stephen King's new novel *Under the Dome*.

Reidy's e-mail concludes by suggesting collective action:

> We will keep thinking of how to attack the problem (as we perceive
> it) of current eBook pricing; as you realize, we think it's too
> important to ignore. But we clearly need to "gather more troops" and
> ammunition first!

45.     By late September 2009, as their agreement to implement Windowing came in

place, the Conspiring Publishers considering Windowing referenced themselves in one email as

"the Club!"

46.     On October 20, 2009, Barnes & Noble held a launch party for its Nook e-reader at

Chelsea Piers.  Many Conspiring Publisher CEOs, including Simon & Schuster CEO Carolyn

Reidy, Macmillan CEO John Sargent, and Penguin CEO David Shanks, as well as other

Conspiring Publisher executives, attended the launch party.  These three CEOs discussed

Windowing at this event.

47.     By early December 2009, Simon & Schuster and the two other Conspiring

Publishers had reached an agreement to broadly Window frontlist titles as a method of

effectuating their agreement to raise frontlist e-book prices.

48.     On December 7, 2009, Simon & Schuster informed Amazon that it would begin

Windowing titles.  The next day, December 8, 2009, Simon & Schuster became the first major

publisher to announce systematic Windowing of e-book versions of its frontlist titles.  Simon &

Schuster's announcement stated that the printed versions of its frontlist titles would be available

13

in the first half of 2010, but that it would delay the release of certain of these titles as e-books by approximately four months.

49.     On December 8, 2009, an executive for one of the Conspiring Publishers also announced that it had similar plans to Window frontlist, best-selling e-book titles for three to four months.  Contemporaneously, this executive stated publicly that Hachette had decided on this strategy "to preserve our industry."

50.     On December 9, 2009, the other Conspiring Publisher announced that it would Window five to ten e-book titles per month, beginning in January 2010.

51.     The three Publishers' Windowing announcements were followed almost immediately by a series of communications with Macmillan.  These communications provided ample opportunity to recruit Macmillan to pursue Windowing.

52.     On December 9, 2009, an executive for the parent of one of the Conspiring Publishers forwarded by e-mail an article about Simon & Schuster and another Conspiring Publisher's Windowing plans to Stefan von Holtzbrinck, Chairman of Macmillan's parent company Verlagsgruppe Georg von Holtzbrinck.  He wrote "I am sure you've seen this, but in case..[sic] Feel free to call me should you need any input."

53.     On December 10, 2009, Simon & Schuster CEO Carolyn Reidy discussed systematic Windowing of e-books with Macmillan executive Stephen Rubin, a friend and former colleague of Reidy's.  In an e-mail to Macmillan CEO John Sargent recounting part of their conversation, Mr. Rubin wrote, "In the nicest possible way, she'd [Carolyn Reidy] love for you to join them.  She feels if one more publisher comes aboard, everyone else will follow suit."

54.     On or about December 15, 2009, Macmillan joined the agreement with the other

14

three Publishers.  On December 15, 2009, Macmillan announced that it would also systematically
Window frontlist, bestselling e-books.

55.     Windowing unilaterally would have been against each Publisher's economic self-
interest, because it would introduce substantial economic risks.  These risks included consumers
purchasing e-books from other publishers' non-Windowed e-books, negative consumer reviews
online related solely to Windowing, and potential retaliation from Amazon.  By agreeing to act
together, these risks were substantially reduced.

56.     Only Simon & Schuster and the two other Conspiring Publishers broadly
Windowed e-book titles.  These three Publishers delayed these titles roughly from December 26,
2009 through April 1, 2010.  The delay in publication constituted an illegal restriction on output
to the detriment of consumers.  Macmillan ultimately did not broadly Window e-books.

57.     As set forth below, the agreement among the Conspiring Publishers to raise prices
via the Agency Model made Windowing unnecessary.

**D.     The Publishers and Apple Agree to Raise E-book Prices Using the Agency Model**

58.     In a series of negotiations beginning in December 2009 and culminating in late
January 2010, Apple facilitated the Publishers' agreement on a scheme to raise frontlist e-book
retail prices.  First, the Conspiring Publishers would collectively impose the Agency Model of
distribution on all of their Outlets.  Second, the Conspiring Publishers would use their pricing
authority under the Agency Model to raise all frontlist e-book prices directly.  For example, the
Conspiring Publishers and Apple agreed that NYT-Bestsellers would be priced at either $12.99
or $14.99.  By January 27, 2010, the Publishers had agreed among themselves and with Apple to
implement this scheme.  By April 1, 2010, after having converted all or almost all of their Outlets

15

to the Agency Model, the Publishers began to implement higher retail e-book prices.

59.      In mid-December 2009, Apple approached the Conspiring Publishers about becoming an e-book Outlet.  Apple planned to release its iPad tablet computer in early 2010 and wanted to supply e-books to iPad customers in its iBookstore.  Apple learned during these meetings that, on some NYT-Bestselling titles, the Conspiring Publishers were charging a wholesale e-book price to Amazon greater than Amazon's $9.99 retail e-book price.  (Amazon was willing to sell such titles at a loss because its sales of e-books were profitable overall.)  Apple does not generally sell any content below cost, and wanted each and every e-book title sold via the iBookstore to contribute to its profits.

60.      During Apple's meetings with two of the Conspiring Publishers, these Publishers proposed to Apple a distribution strategy known as the "Agency Model."  Under the Agency Model, the Publisher would be the direct seller of e-books to consumers, setting the retail price for each e-book sold.  Apple would act as an agent that facilitates the sale and would receive a commission on each e-book sold through the iBookstore.  Because Apple would receive a commission on each sale, it would make a profit on every e-book title it sold.

61.      Between these meetings and the end of 2009, Apple communicated with Macmillan and Simon & Schuster about the Agency Model.

62.      Between January 4, 2010 and January 6, 2010, Eddy Cue, Apple's Vice President of Internet Sales and lead negotiator, sent a separate e-mail to each of the Conspiring Publishers' CEOs.  These e-mails presented Apple's initial terms for e-book distribution contracts with each Publisher.  These terms included an Agency Model relationship and a 30% commission on individual books.  Additionally, Apple demanded price bands that would ostensibly set

16

maximum prices for certain frontlist e-books, including NYT-Bestsellers.

63.     Apple's proposal was simple: the Conspiring Publishers would collectively adopt the Agency Model across all of their Outlets and then use their pricing authority under the Agency Model to raise e-book prices to consumers across all of these Outlets. From this time forward, at the latest, Apple was actively seeking to bring the Publishers into a collective agreement to use the Agency Model as a mechanism to raise e-book retail prices marketwide.

64.     Apple's e-mails made clear to Macmillan and Penguin that the other Publishers would participate in this common plan, stating at the outset that Apple had talked to "all the other publishers" and had surveyed "the overall book environment."

65.     Among Eddy Cue's list of "several things we have to accomplish in order to sell e-books at realistic prices," he stated that "all resellers of new titles need to be agency model." On information and belief, "realistic prices" is code for "higher prices."

66.     As negotiations unfolded, Apple facilitated an agreement among the Conspiring Publishers to price NYT-Bestselling e-books at the maximum level permitted by the price bands, and all other frontlist titles at or close to the maximum. Apple did this by providing implicit and explicit assurances to the Conspiring Publishers that other Publishers in the conspiracy would price at the maximum permitted by the price bands. At the same time, representatives of the Conspiring Publishers called each other on a regular basis to confirm that they were agreeing to Apple's scheme.

67.     On January 11, 2010, Apple attached to, or included with, e-mails to Penguin, Simon & Schuster and one other Conspiring Publisher a chart showing each Publisher's NYT-Bestselling e-book titles priced at $12.99 on the iBookstore.

17

68.     On January 11, 2010, Macmillan CEO John Sargent sent Eddy Cue an e-mail asking Apple to reduce the commissions it would receive on frontlist, bestselling e-books. He wrote, "Am thinking a possible way to ease the financial pain for the publishers and authors of moving to the agency model.  Could you take a reduced cut on hardcover first releases (where we are presently making 14.00 in revenue and would make 9.00 under your assumptions)?"

69.     A move by a single Publisher to convert all of its Outlets to the Agency Model would have been against that Publisher's unilateral self-interest. First, any single Publisher would have faced potential retaliation from Amazon, which had made clear to the Conspiring Publishers that it viewed the $9.99 e-book price as an effective marketing mechanism to drive consumer purchases.  Second, even if a single Publisher succeeded in adopting the Agency Model, it would not be able to raise prices without concern that consumers would turn to other Publishers' e-books that the Outlets priced lower under a Wholesale-Retail Model.  The Conspiring Publishers would not have agreed to the adoption of the Agency Model to raise prices, but for the assurances that a sufficient number of the other Publishers would participate.

70.     Simon & Schuster CEO Carolyn Reidy took handwritten notes on a printed copy of an Apple e-mail of January 16, 2010 in which she underscored the collective nature of the Agency Model scheme.  She wrote, "Need for competitors 3 agree = ok?"

71.     By January 21, 2010, the negotiations between Apple and the Conspiring Publishers had reached a fever pitch.  Apple had told the Publishers that it would announce the launch of the iPad on January 27, 2010 and that it would require the agreement of a critical mass of the Conspiring Publishers to move forward with the iBookstore at the launch.  In connection with this timeline, at some point in the negotiations, Apple told Macmillan that a deal would

18

need to be completed by Thursday, January 21, 2010.  On that day, Apple CEO Steve Jobs would hold a rehearsal for the launch of Apple's iPad on Wednesday of the following week.

72.     On or about January 21, 2010, Apple sent e-mails to the various Conspiring Publishers stating that it was near completing or had completed an agreement with another Publisher.  On January 21, 2010, the Conspiring Publishers' CEOs began to call one another by telephone.  These calls were made to confirm whether competing Publishers would agree to join the Agency Model scheme.

73.     Below are charts depicting telephone calls in both duration and absolute number of calls among executives of four of the Conspiring Publishers from November 2009 through February 2010.  These charts depict calls from the executives' office landlines, cell phones and home telephones.  This time period includes both the Windowing and Agency Model schemes to raise e-book prices:









74.     On information and belief, although not included in the previous charts, the telephone records of either John Makinson or David Shanks of Penguin would show calls to other Publishers during this time period.

75.     On January 21, 2010, at 10:50 am, a Conspiring Publisher executive wrote to the CEO of its parent corporation by e-mail:

> [Eddy Cue] … was eloquent on why they would be a great partner, that price could and would be experimented with as Apple want [sic] to drive high revenues; that this would be for a one year term; that one major publisher (clearly RH) was out and that ne [sic] need the five majors in but maybe four.  He said that he was sure he would close on two today and two tomorrow. Amazon is in town being provocative and with, as Jeff Trachtenberg said to me this morning, 'a swagger in their step'. I'm off to the AAP so will try and discover what is going on.

76.     On January 21, 2010, Eddy Cue wrote in an e-mail to a Conspiring Publisher executive, "I gave [Apple in-house counsel] some language to add about price test that I want to do with you.  I need a box to make sure everyone plays by the same rules but the goal is to maximize sales revenue."

77.     On Saturday, January 22, Penguin CEO David Shanks contacted Apple's negotiator Eddie Cue.  As Mr. Cue reported to Steve Jobs, Shanks "wanted[ed] an assurance that he is 1 of 4 [of the Conspiring Publishers] before signing."

78.     Also on January 22, 2010, an executive of a Conspiring Publisher sent an e-mail to an officer of the parent corporation stating that "I believe that Random House is not signing with Apple.  Penguin and S&S have.  [Another Conspiring Publisher] and Macmillan are undecided."  On information and belief, the CEO obtained this information from Apple.

79.     At some subsequent point during the negotiations, Apple's Eddy Cue informed an

executive of a Conspiring Publisher that Macmillan had agreed to move forward with the Agency Model on Apple's terms.

80.     The executive for the Conspiring Publisher then called Macmillan CEO John Sargent to confirm whether Macmillan would agree to Apple's proposal.  Sargent confirmed that it would.  The executive informed John Sargent that his company likely would not.  On information and belief, this phone call is one of those depicted on the charts above.

81.     During a conversation between Macmillan CEO John Sargent and Simon & Schuster CEO Carolyn Reidy prior to Simon & Schuster signing its Agreement with Apple, Mr. Sargent stated that Macmillan was going to pursue the Agency Model and thought it was the future of publishing.

82.     After Eddy Cue could not secure one of the Conspiring Publisher's commitment directly from an executive, Apple turned to its parent.  At this point, Apple CEO Steve Jobs became directly involved in negotiations.  On January 24, 2010, following an exchange of e-mails, Mr. Jobs wrote to an executive at the parent company, in part:

> As I see it, [Conspiring Publisher] has the following choices:
> 1.     Throw in with Apple and see if we can all make a go of this to create a real mainstream ebooks market at $12.99 and $14.99.
>
> 2.     Keep going with Amazon at $9.99. You will make a bit more money in the short term, but in the medium term Amazon will tell you they will be paying you 70% of $9.99. They have shareholders too.
>
> 3.     Hold back your books from Amazon.  Without a way for customers to buy your ebooks, they will steal them.  This will be the start of piracy and once started, there will be no stopping it.  Trust me, I've seen this happen with my own eyes.
>
> Maybe I'm missing something, but I don't see any other alternatives. Do you?

83.     Within three days of Mr. Jobs' email, by January 27, 2010, the Conspiring Publisher he contacted, along with the other Conspiring Publishers, had agreed to the Agency Model scheme and signed a formal, Agency Model distribution contract with Apple.

84.     On Wednesday, January 27, 2010, in his public demonstration of what would become the iBookstore at Apple's launch of the iPad, then-Apple CEO Steve Jobs displayed Edward Kennedy's bestselling autobiography *True Compass* at the retail price of $14.99.  When journalist Walter Mossberg of the Wall Street Journal asked how Apple would compete with Amazon's $9.99 pricing, Steve Jobs responded, "the prices will be the same."  Mr. Jobs could make this statement because Apple had entered into an agreement with the Conspiring Publishers that would use the Agency Model to fix marketwide e-book prices at this higher level. As stated in Mr. Jobs' biography:

> So we told the publishers, "We'll go to the agency model, where you set the price, and we get our 30%, and yes, the customer pays a little more, but that's what you want anyway."

85.     Each of the contracts signed between Apple and the Conspiring Publishers contained an Exhibit A, which is focused on customer pricing.  Exhibit A provided an agreed-upon breakdown of what prices should be offered to U.S. purchasers for all of the Conspiring Publishers' frontlist titles.

86.     The Exhibit A in each of the Conspiring Publishers' agreements with Apple, contained some form of the following chart, which provided target prices for all frontlist e-books published by the Conspiring Publishers across hardcover list pricing tiers. (The 70% profit margin column was not included in Exhibit A to Penguin's agreement.)

24

| Publisher Hardcover List Price | Maximum Customer Price | 70% |
|---|---|---|
| | | |
| $20.01-22.00 | $9.99 | $7.00 |
| $22.01-$24.00 | $10.99 | $7.70 |
| $24.01-$25.00 | $11.99 | $8.40 |
| $25.01-$27.50 | $12.99 | $9.10 |
| $27.51-$30.00 | $14.99 | $10.50 |
| $30.01-$35.00 | $16.99 | $11.90 |
| $35.01-$40.00 | $19.99 | $14.00 |

87.     Exhibit A in each of the Conspiring Publishers' contracts contains a definition of

NYT-Bestselling titles.  For example, as set forth in Exhibit A to the Penguin agreement, "NYT

Bestseller List shall mean the Hardcover (adult) Fiction and Hardcover (adult) Nonfiction and

Hardcover Advice bestseller lists, as published on the New York Times website, excluding the

below-the-line 'Also Selling' titles also known as the 'Expanded List'."  This definition is, for all

intents and purposes, identical in the Exhibit A of each of Conspiring Publishers' agreements

with Apple.

88.     As to NYT-Bestselling titles, in Exhibit A, each of the Conspiring Publishers

agreed that, if a book with a printed hardcover list price of $30 or less reaches the NYT-

Bestseller List, the Conspiring Publisher would sell it at the e-book price of "no greater than

$12.99."  For books with a list price between $30.01 and $35, the Conspiring Publishers agreed

that the e-book sales price for a book on the NYT-Bestseller list would be "no greater than

$14.99."

89.     Each of the Conspiring Publishers also agreed, in Exhibit A, to fix e-book prices

for all frontlist trade or mass market paperback titles.  Specifically, each of the Conspiring

Publishers agreed to set the e-book price at "no greater than" $9.99 for all paperback frontlist

titles with a suggested print list price of $22.00 or less.

25

90.     On information and belief, although the written agreements between the Conspiring Publishers and Apple spoke of the pricing at various points in Exhibit A as a maximum price, it was understood by all of the Conspiring Publishers and Apple that the prices listed were actually agreed upon set prices; and the Conspiring Publishers rarely, if ever, deviated from the prices set in Exhibit A.

91.     To provide incentives for the Conspiring Publishers to convert Amazon and other Outlets to the Agency Model, Apple's contracts with the Conspiring Publishers included a retail price most favored nations clause (the "Apple MFN clause") covering hardcover new releases. The Apple MFN clauses state that, for hardcover new releases, the Conspiring Publisher lower its price at the iBookstore to match the lowest price being used at any competing e-bookstore, whether or not the competing e-bookstore is distributing the title under the Agency Model or Wholesale-Retail Model.

92.     As a result of the Apple MFN clause, if a Conspiring Publisher failed to implement the Agency Model scheme and raise prices across all e-bookstores, it would diminish the revenue on its titles with no effect on retail prices. For example, if Barnes & Noble chose to offer the new Tom Clancy novel *Search and Destroy* to Nook owners at 10% off Penguin's Agency price of $12.99 ($11.69), Penguin would have to offer the $11.69 price to consumers at the iBookstore. At Barnes & Noble, Penguin would earn $9.09 and Barnes & Noble would earn $2.60 on the sale of the novel. In contrast, at the iBookstore, Penguin would earn $8.18 (70% of $11.69) and Apple would earn $3.51 (30% of $11.69). If Outlets charged even lower retail prices for e-book titles, the math would become untenable for the Publisher. Each Publisher needed to control retail prices across all Outlets to ensure that retail price competition did not make the

26

Agency Model unprofitable.

93.     Between January 27, 2010 and April 1, 2010, the Conspiring Publishers converted the largest Outlets, including Amazon, to the Agency Model. Starting in April 2010 and pursuant to their illegal agreement, the Conspiring Publishers generally raised retail prices of NYT-Bestselling e-books from $9.99 to the $12.99 - $14.99 level. Contemporaneously, the Conspiring Publishers also raised retail e-book prices on frontlist books to higher price points. The Conspiring Publishers also on average substantially raised prices across their backlists.

94.     Penguin could not convert Amazon to the Agency Model until June 2010 because its existing agreement with Amazon ran longer than those of the other Conspiring Publishers. In the interim, Penguin withheld from Amazon all newly released e-books so that it could charge the collusively agreed to higher prices at other Outlets.

95.     The higher retail prices benefitted Apple because it would earn higher revenues from its commissions on each sale. Insulated from e-book price competition with other Outlets, Apple could earn gross margins up to several times higher than in the Wholesale-Retail Model. The Publishers achieved their long-running collective goal: higher retail prices for e-books.

E.     **The Conspiring Parties Police and Enforce Their Agreement**

96.     Over the next four months, the conspiring parties took steps to ensure that the anticompetitive agreement was implemented, providing necessary support to one of the conspirators, Macmillan, in its negotiations with Amazon, and forcing the only non-conspiring Big Six publisher, Random House, to switch to the Agency Model.

97.     Macmillan was the first Conspiring Publisher to enter into renegotiations of its e-books contract with Amazon. The Conspiring Publishers and Apple understood that forcing

Amazon, by far the largest Outlet for e-books, to accept the Agency Model would be central to ensuring that their illegal scheme was successful. For this reason, the Conspiring Publishers thus provided material support and encouragement to Macmillan throughout its ultimately successful negotiations with Amazon.

98.     Macmillan presented Amazon with a choice: either adopt the Agency Model or lose the ability to sell Macmillan new e-book releases for the first seven months after their release. Amazon rejected Macmillan's proposal. In an attempt to push Macmillan off this position, Amazon effectively stopped selling Macmillan's print books and e-books. The other Conspiring Publishers jumped in to assist Macmillan.

99.     An executive of the parent of one of the Conspiring Publishers stated in an email that Macmillan CEO "John Sargent needs our help!" The executive continued, Macmillan "has been brave, but they are small. We need to move the lines. And I am thrilled to know how A[mazon] will react against 3 or 4 of the big guys."

100.    The same executive also assured Macmillan CEO John Sargent of his company's support. Specifically, in a January 31, 2010 email, he told Mr. Sargent that "I can ensure you that you are not going to find your company alone in the battle."

101.    The January 31, 2010 email is merely one example of the supporting correspondence that Mr. Sargent received from the Conspiring Publishers during Macmillan's negotiations with Amazon. On February 1, 2010, John Makinson, the Chairman of Penguin's parent the Penguin Group, wrote to Macmillan CEO John Sargent "Just to say that I'm full of admiration for your articulation of Macmillan's position on this. Bravo."

102.    Simon & Schuster's Vice President of Marketing & Digital Products similarly

recognized, in a February 1, 2010 email to other Simon & Schuster executives, that Macmillan, in its negotiations with Amazon, was "leading the charge on moving Amazon to the agency model."

103.   In addition to support from the other Conspiring Publishers, Macmillan also received support from Barnes & Noble.  In fact, the CEO of Barnes & Noble told Mr. Sargent that Barnes & Noble would "go to the mat" for Macmillan.  In an attempt to assist Macmillan during the negotiation process, Barnes & Noble moved its titles to the top of its merchandizing pods and search results on the Nook.

104.   Macmillan understood that, while it was the first of the Conspiring Publishers to begin negotiations with Amazon over the Agency Model, ultimately Amazon would be negotiating with all five of the Conspiring Publishers.  In fact, Amazon soon learned that all of the Conspiring Publishers had agreed to the Agency Model, including taking control of both e-book retail pricing and the direct selling of e-books to consumers.  These five publishers cumulatively accounted for approximately half of Amazon's e-book business.  Faced with the possibility of losing so much e-book business, Amazon was forced to give in to Macmillan's demands.  Two days after it stopped selling Macmillan titles, Amazon publicly announced that it had been forced to accept the Agency Model, and thereafter resumed selling Macmillan's e-book and print book titles.

105.   The Defendants also worked together to force the largest of the Big Six publishers, Random House, to switch to the Agency Model.

106.   Random House is the largest book publisher in the United States.  In 2009, the books Random House published constituted over 17% of all books published in the United

29

States, making it significantly larger than any of the other Big Six.

107.    Random House had not agreed to move to the Agency Model in January 2010.
The Conspiring Publishers understood that, if Random House was also forced to use the Agency
Model, the Agency Model would be cemented in place as the e-book standard.  Moreover, the
Conspiring Publishers were extremely concerned that Random House would benefit by gaining
sales due to its lower e-book prices.

108.    Penguin put pressure on Barnes & Noble to force Random House to switch to the
Agency Model.  Barnes & Noble is the largest book retailer in the United States.  In the United
States, it currently owns and operates over 700 retail bookstores, and manages over 600 college
and university bookstores.  It also sells the Nook e-book reader, which is, after the Kindle, the
second most popular e-book reader in the United States.  Stephen Riggio is currently the Vice
Chairman of Barnes & Noble.  From January 2002 through March 2010, he was Chief Executive
Officer of Barnes & Noble.

109.    On March 4, 2010, Penguin CEO David Shanks sent Stephen Riggio an email.
Shanks stated in his email that "Random House has chosen to stay on their current model and
*will allow retailers to sell at whatever price they wish*."  (emphasis added)  Mr. Shanks' email
continued "I would hope that [Barnes & Noble] would be equally brutal to Publishers who have
thrown in with your competition [Amazon] with obvious disdain for your welfare. . . . I hope you
make Random House hurt like Amazon is doing to people who are looking out for the overall
welfare of the publishing industry."  On information and belief, what Mr. Shanks was suggesting
was that Barnes & Noble stop any promotion or advertising of Random House titles.

110.    When Barnes & Noble continued to promote Random House titles, Penguin CEO

30

Shanks went back to Barnes & Noble again.  Following this contact, Barnes & Noble's

management decided not to feature Random House in any future advertising.

111.    Throughout 2010, Barnes & Noble continued to apply pressure to Random House

to switch to the Agency Model.  In addition, on information and belief, other Conspiring

Publishers also continued to pressure Random House to move to the Agency Model.  Ultimately,

Random House signed an agreement with Apple.  Random House's contract contained the same

Exhibit A price terms and the same MFN clause as the contracts between Apple and the

Conspiring Publishers.

112.    As of the filing date for this action, as a result of their illegal agreement, the

Conspiring Publishers continue to restrict output of e-books by charging consumers artificially

high prices.  As a result consumers have suffered from tens of millions of dollars in overcharges

nationwide and, at minimum, millions in each of the Plaintiff States.

## V. RELEVANT MARKETS

113.    The relevant product market is the market for the sale of e-books.  Hachette,

HarperCollins, Macmillan, Penguin, and Simon & Schuster are competitors in this product

market.

114.    The relevant geographic market is the United States.  Hachette, HarperCollins,

Macmillan, Penguin, and Simon & Schuster are competitors in this geographic market.

## VI. TRADE & COMMERCE

115.    The activities of the Defendants, including the production, sale and distribution of

31

e-books, were in the regular, continuous and substantial flow of interstate trade and commerce

and have had and continue to have a substantial effect upon interstate commerce.  The

Defendants' activities also had and continue to have a substantial effect upon the trade and

commerce within each of the Plaintiff States.

## VII. MARKET EFFECTS

116.    The acts and practices of Defendants have had the purpose or effect, or the

tendency or capacity, of restraining competition unreasonably and injuring competition by

preventing the competitive pricing of e-books, and have directly resulted in an increase in retail

e-book prices across both the Defendants' frontlist and backlist titles.

117.    By preventing the competitive pricing of e-books, Defendants have deprived the

Plaintiff States and their consumers of the benefits of the competition that the federal and state

antitrust laws, consumer protection laws and/or unfair competition statutes and related state laws

are designed to promote, preserve, and protect.

118.    As a direct and proximate result of the unlawful conduct alleged above, the

general economies of the Plaintiff States have sustained injury and the Plaintiff States are

threatened with further injury to their general economies unless Defendants are enjoined from

continuing their unlawful conduct.

## COUNT I  (AGAINST MACMILLAN AND PENGUIN) — HORIZONTAL CONSPIRACY TO RAISE E-BOOK RETAIL PRICES IN VIOLATION OF SECTION I OF THE SHERMAN ACT

119.    Plaintiff States repeat and reallege every preceding allegation as if fully set forth herein.

120.    By no later than the end of summer 2009, Macmillan, Penguin, and the other three Conspiring Publishers entered into an agreement to work together to raise the NYT-Bestseller e-book retail prices from the $9.99 price point.

121.    This Agreement among and between horizontal competitors to raise e-book prices constitutes a per se violation of Section 1 of the Sherman Act.

122.    In the alternative, the agreement between and among Macmillan, Penguin, and the other three Conspiring Publishers caused anticompetitive effects that substantially outweigh any procompetitive justifications, if any exist.  For this reason, under a rule of reason analysis, the Agreement is a violation of Section 1 of the Sherman Act.

## COUNT II  (AGAINST MACMILLAN) – HORIZONTAL CONSPIRACY TO RAISE E-BOOK RETAIL PRICES USING WINDOWING IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT

123.    Plaintiff States repeat and reallege every preceding allegation as if fully set forth herein.

124.    In December 2009, Macmillan and three other Conspiring Publishers entered into an agreement to Window their frontlist e-books.  The goal of this agreement was to restrict frontlist e-book output in an attempt to cause retail Outlets to raise frontlist e-book prices.  For this reason, the agreement among and between four horizontal competitors to raise e-book prices constitutes a per se violation of Section 1 of the Sherman Act.

33

125.     In the alternative, the agreement to Window between and among Macmillan, and three other Conspiring Publishers caused anticompetitive effects that substantially outweigh any procompetitive justifications, if any exist.  For this reason, under a rule of reason analysis, the Agreement is a violation of Section 1 of the Sherman Act.

## COUNT III  (AGAINST MACMILLAN, PENGUIN, AND APPLE) – HORIZONTAL CONSPIRACY TO RAISE E-BOOK RETAIL PRICES USING THE AGENCY MODEL IN VIOLATION OF THE SHERMAN ACT

126.     Plaintiff States repeat and reallege every preceding allegation as if fully set forth herein.

127.     By no later than the end of January 2010, Macmillan, Penguin,  and the other three Conspiring Publishers entered into a horizontal agreement, facilitated and also entered into by Apple, to use the Agency Model as a mechanism to raise the retail prices for frontlist e-books. This agreement to raise e-book prices among and between horizontal competitors, facilitated and also entered into by Apple, constitutes a per se violation of Section 1 of the Sherman Act.

128.     In the alternative, the purpose and effect of the agreement between and among Macmillan, Penguin, the other three Conspiring Publishers, and Apple to use the Agency Model to raise e-book prices was to restrain competition between and among the Publishers in the market for direct e-book retail sales to consumers.  The Agreement has caused anticompetitive effects that substantially outweigh procompetitive justifications, if any exist.  For this reason, under a rule of reason analysis, the Agreement is a violation of Section 1 of the Sherman Act.

34

## COUNT IV -- SUPPLEMENTAL STATE LAW CLAIMS

129.    Plaintiff State of Alabama repeats and realleges every preceding allegation.

130.    The aforementioned act and practices by Defendants constituted unconscionable, false, misleading, or deceptive acts or practices in the conduct or trade or business in violation of the Alabama Deceptive Trade Practice Act, Code of Alabama 1975, 8-19-5 Subsection 27.  The Defendants knowingly engaged in these acts and practices.

131.    Plaintiff State of Alaska repeats and realleges every preceding allegation.

132.    The aforementioned practices by Defendants were in violation of Alaska's Restraint of Trade Act, AS 45.50.562 *et seq.* and Alaska's Unfair Trade Practices and Consumer Protection Act, AS 45.50.471 *et seq.*, and the common law of Alaska.

133.    Plaintiff State of Arizona repeats and realleges every preceding allegation.

134.    The aforementioned practices by Defendants were in violation of the Arizona State Uniform Antitrust Act, § 44-1401 *et seq.*

135.    Plaintiff State of Arkansas repeats and realleges every preceding allegation.

136.    The aforementioned practices by Defendants were in violation of Arkansas's Unfair Practices Act, Ark. Code Ann. § 4-75-201, et seq., Arkansas's Deceptive Trade Practices Act, Ark. Code Ann. § 4-88-101, et seq., and the common law of Arkansas.

137.    Plaintiff State of Colorado repeats and realleges every preceding allegation.

138.    The aforementioned practices by Defendants violate, and Plaintiff State of Colorado is entitled to relief under, the Colorado Antitrust Act of 1992, § 6-4-101, et seq., Colo. Rev. Stat., and the common law of Colorado.

139.    Plaintiff State of Connecticut repeats and realleges every preceding allegation.

35

140.    Defendants' actions as alleged herein violate Conn. Gen. Stat. §§ 35-26, 35-28 and 35-29 in that Defendants entered into contracts, combinations or conspiracies for the purpose of, or having the effect of, fixing, controlling and maintaining prices, rates, quotations or fees for e-books sold in the State of Connecticut.

141.    Defendants' actions as alleged herein violate Conn. Gen. Stat. §§ 35-26, 35-28 and 35-29 in that they have the purpose and/or effect of substantially lessening competition and unreasonably restraining trade and commerce within the State of Connecticut and elsewhere.

142.    Defendants' actions as alleged herein have damaged, directly and indirectly, the prosperity, welfare, and general economy of the State of Connecticut and the economic well-being of a substantial portion of the People of the State of Connecticut and its citizens and businesses at large.  George Jepsen, Attorney General of the State of Connecticut, seeks recovery of such damages as *parens patriae* on behalf of the those persons in the State of Connecticut harmed by Defendants' conduct, pursuant to Conn. Gen. Stat. § 35-32(c)(1).

143.    Defendants' acts and practices as alleged herein constitute unfair methods of competition, all in violation of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat § 42-110b.

144.    Plaintiff State of Delaware repeats and realleges every preceding allegation.

145.    The aforementioned practices by Defendants were in violation of Section 2103 of the Delaware Antitrust Act, 6 Del.C. § 2101, et. seq.

146.    Plaintiff District of Columbia ("District") repeats and realleges every preceding allegation.

147.    The aforementioned practices by Defendants were in violation of the District of

Columbia Antitrust Act, D.C. Code §28-4502.

148.    Residents of the District of Columbia, as purchasers of e-books, have been injured by Defendants' actions.  The District, as parens patriae on behalf of residents of the District of Columbia, is entitled to monetary relief pursuant to D.C. Code §§ 28-4507 and 28-4509 for injuries suffered by residents of the District of Columbia by reason of the violations alleged above.

149.    Plaintiff State of Idaho repeats and realleges every preceding allegation.

150.    Defendants' acts of conspiracy and unreasonable restraint of trade and commerce had the purpose and effect of suppressing competition in the sale of e-books in the State of Idaho and elsewhere, and had a substantial and adverse impact on prices for e-books in Idaho.  The violations alleged above unreasonably restrained Idaho commerce (as defined by Idaho Code § 48-103(1)).

151.    Pursuant to Idaho Code § 48-108 of the Idaho Competition Act, the Plaintiff State of Idaho, as parens patriae on behalf of Idaho persons (as defined by Idaho Code § 48-103(2)), is entitled to monetary relief for injuries suffered by reason of the violations alleged above. Plaintiff State of Idaho is also entitled to and seeks injunctive relief, civil penalties, and attorney fees pursuant to Idaho Code § 48-108(1) of the Act.

152.    The activities of Defendants, as alleged above, are a per se violation of Idaho Code § 48-104 of the Idaho Competition Act.  Pursuant to Idaho Code § 48-108(2) of the Act, the Plaintiff State of Idaho as parens patriae on behalf of Idaho persons is entitled to treble damages for per se violations of Idaho Code § 48-104.

153.    Plaintiff State of Illinois repeats and realleges every preceding allegation.

37

154.   The Defendants violated section 3 of the Illinois Antitrust Act, 740 ILCS 10/3, by agreeing to fix the prices of e-books and to restrict their output for the purpose and with the effect of raising e-book prices.

155.   Plaintiff State of Indiana repeats and realleges every preceding allegation.

156.   The aforementioned practices were in violation of Indiana Code §24-1-1-1 and §24-1-2-1.

157.   Plaintiff State of Iowa repeats and realleges every preceding allegation.

158.   The aforementioned practices by Defendants were in violation of Iowa Competition Law, Iowa Code ch.553.

159.   Plaintiff State of Kansas repeats and realleges every preceding allegation.

160.   The aforementioned practices by the Defendants were in violation of the Kansas Restraint of Trade Act, Kan. Stat. Ann. §§ 50-101, et seq.  Kansas seeks injunctive relief, treble damages, civil penalties, and its attorney fees and costs, pursuant to Kan. Stat. Ann. §§ 50-103, 50-160 and 50-161.

161.   The aforementioned practices by Defendants violate Louisiana's Monopolies Act, Louisiana Revised Statutes 51:121 et seq., and Louisiana's Unfair Trade Practices and Consumer Protection Act, Louisiana Revised Statutes 51:1401 et seq.

162.   Plaintiff State of Maryland repeats and realleges every preceding allegation.

163.   The aforementioned practices by Defendants were in violation of the Maryland Antitrust Act, Md. Code Ann. Com. Law §11-201 et seq.

164.   Plaintiff Commonwealth of Massachusetts repeats and realleges every preceding allegation.

38

165.     Defendants' methods, acts or practices as alleged herein constitute unfair methods of competition or unfair or deceptive acts or practices in violation of the Massachusetts Consumer Protection Act, M.G.L. c. 93A § 2 et seq.

166.     Plaintiff State of Michigan repeats and realleges every preceding allegation.

167.     The aforementioned practices by Defendants were in violation of § 2 of the Michigan Antitrust Reform Act, MCL 445.772.

168.     Plaintiff State of Missouri repeats and realleges every preceding allegation.

169.     The aforementioned practices Defendants were in violation of Missouri's antitrust law, Missouri Rev. Stat. §§ 416.031 *et seq.* and, further, were unfair and deceptive practices in violation of Missouri's Merchandising Practices Act, Mo. Rev. Stat. §§ 407.010 *et seq.*, as further interpreted by 15 CSR 60-8.010 *et seq.* and 15 CSR 60-9.01, *et seq.*

170.     Plaintiff State of Nebraska repeats and realleges every preceding allegation.

171.     The aforementioned practices by Defendants were in violation of Nebraska laws, including the Unlawful Restraint of Trade Act, Neb. Rev. Stat. § 59-801 et seq. (Reissue 2010), the Consumer Protection Act, Neb. Rev. Stat. § 59-1601 et seq. (Reissue 2010), the Uniform Deceptive Trade Practices Act, Neb. Rev. Stat. § 87-301 et seq. (Reissue 2008), and the common law.

172.     Plaintiff State of New Mexico repeats and realleges every preceding allegation.

173.     The aforementioned practices by Defendants violate the New Mexico Antitrust Act, NMSA 1978, § 57-1-1 et seq. and New Mexico's Unfair Practices Act, NMSA 1978, § 57-12-1 et seq.

174.     Plaintiff State of New York repeats and realleges every preceding allegation as if

fully set forth herein.

175.    The aforementioned practices by the Defendants were in violation of New York's antitrust law, the Donnelly Act, New York Gen. Bus. Law §§ 340-347.

176.    Plaintiff State of North Dakota repeats and realleges every preceding allegation.

177.    The aforesaid practices by Defendants were in violation of North Dakota Century Code (N.D.C.C.), Uniform State Antitrust Act, § 51-08.1-01 et seq.

178.    Plaintiff State of Ohio repeats and realleges every preceding allegation.

179.    The aforementioned practices by Defendants were in violation of Ohio's antitrust law, the Valentine Act, Ohio Rev. Code §§ 1331.01 et seq, and the common law of Ohio.

180.    Plaintiff Commonwealth of Pennsylvania repeats and realleges every preceding allegation.

181.    The aforementioned practices by Defendants were in violation of Pennsylvania common law doctrines against unreasonable restraint of trade.

182.    Plaintiff Commonwealth of Puerto Rico repeats and realleges every preceding allegation.

183.    The aforementioned practices by Defendants were in violation of Puerto Rico Law No. 77 of June 25, 1964, also known as "Puerto Rico's Antitrust and Restrictions of Commerce Law", 10 P.R. Laws Ann. §§ 257 et seq., and 32 P.R. Laws Ann. § 3341.

184.    Plaintiff State of South Dakota repeats and realleges every preceding allegation.

185.    The aforementioned practices by Defendants were in violation of South Dakota's antitrust law, South Dakota Codified Laws 37-1-3.1 et seq.

186.    Plaintiff State of Tennessee repeats and realleges every preceding allegation.

40

187.    The aforementioned practices by Defendants were in violation of Tennessee's antitrust law, the Tennessee Trade Practices Act, Tenn. Code Ann. §§ 47-25-101 et seq, the Tennessee Consumer Protection Act, Tenn. Code Ann. §§ 47-18-101 et seq, and the common law of Tennessee.

188.    Plaintiff State of Texas repeats and realleges every preceding allegation.

189.    The aforementioned practices by Defendants were in violation of Texas Business and Commerce Code §15.01 et seq.

190.    Plaintiff State of Utah repeats and realleges every preceding allegation.

191.    The aforementioned practices by Defendants were in violation of the Utah Antitrust Act, Utah Code Ann. §§ 76-10-911 et seq., and the common law of Utah.

192.    Plaintiff State of Vermont repeats and realleges every preceding allegation.

193.    The aforementioned practices by Defendants were in violation of the State of Vermont's Consumer Fraud Act, 9 V.S.A. §§ 2451 *et seq*.

194.    Plaintiff Commonwealth of Virginia repeats and realleges every preceding allegation.

195.    The aforementioned practices by Defendants were in violation of § 59.1-9.5 of the Virginia Antitrust Act, Virginia Code Ann. §§ 59.1-9.1 through 59.1-9.18.

196.    Plaintiff State of West Virginia repeats and realleges every preceding allegation. The aforementioned practices by Defendants were in violation of the West Virginia Antitrust Act, W.Va. Code § 47-18-1 et seq. West Virginia seeks injunctive relief, treble damages, civil penalties and its costs and attorneys' fees under federal and state law, including, the West Virginia Antitrust Act, W.Va. Code § 47-18-8 and -9.

41

197.    Plaintiff State of Wisconsin repeats and realleges every preceding allegation.

198.    The aforementioned practices by Macmillan, Penguin, Apple and the other Conspiring Publishers were in violation of Wisconsin's Antitrust Act, Wis. Stat. Ch. §133.03 et seq. These violations substantially affected the people of Wisconsin and had impacts within the State of Wisconsin.

## **PRAYER FOR RELIEF**

Accordingly, the Plaintiff States request that the Court:

1.    Adjudge and decree that the Defendants have committed violations of Section 1 of the Sherman Act, 15 U.S.C. § 1;

2.    Adjudge and decree that the Defendants have committed violations of each of the state laws enumerated in Count IV;

3.    Enjoin and restrain, pursuant to federal and state law, the Defendants, their affiliates, assignees, subsidiaries, successors and transferees, and their officers, directors, partners, agents, and employees, and all persons acting or claiming to act on their behalf or in concert with them, from continuing to engage in any anticompetitive conduct (including the conspiracies described herein) and from adopting in the future any practice, plan program or device having a similar purpose or effect to the anticompetitive actions set forth above;

4.    Award treble damages for injury to natural persons under Section 4c of the Clayton Act and applicable state laws;

5.    Order Defendants to pay a civil penalty of not more than $2,000 per violation pursuant to Alabama law Section 8-19-5;

6.    Order Defendants to pay a civil fine of up to $50 million pursuant to Alaska Statute 45.50.578(b)(2);

7.    Order Defendants to pay civil penalties pursuant to § 44-1407 of the Arizona State Uniform Antitrust Act;

8.    Order Defendants to pay restitution and civil penalties pursuant to Ark. Code Ann. § 4-75-213(a)(3) and (4);

9.    Order Defendants to pay civil penalties pursuant to the Colorado Antitrust Act of 1992, §6-4-112, Colo.Rev.Stat.;

10.   Order each Defendant to pay civil penalties pursuant to Conn. Gen. Stat. § 35-38 for each and every violation of the Connecticut Antitrust Act;

11.   Order each Defendant to pay  a civil penalty of $5,000 for each and every willful violation of the Connecticut Unfair Trade Practices Act pursuant to Conn. Gen. Stat. § 42-110o;

12.   Order each Defendant to pay restitution pursuant to Conn. Gen. Stat. § 42-110m;

13.   Order each Defendant to disgorge all revenues, profits, and gains achieved in whole or in part through the unfair and/or deceptive acts and practices complained of herein, pursuant to Conn. Gen. Stat. § 42-110m;

14.   Order Defendants to pay civil penalties pursuant to Section 2107 of the Delaware Antitrust Act, 6 Del.C. §2101, et. seq.;

15.   Order Defendants to pay monetary relief pursuant to §28-4507 of the District of Columbia Antitrust Act;

16.   Order Defendants to pay civil penalties pursuant to Idaho Code Section 48-108(1)(d);

17.   Order Defendants to pay civil penalties pursuant to section 7(4) of the Illinois Antitrust Act, 740 ILCS 10/7(4);

18.   Order Defendants to pay a civil penalty pursuant to Iowa Code §553.13;

19.   Order each Defendant to pay civil penalties for each day of violation of  the Kansas Restraint of Trade Act, pursuant to Kan. Stat. Ann. § 50-160(a);

20.   Order the Defendants to pay civil penalties pursuant to Louisiana Revised Statutes 51:122, 123, 126 and 1407 and restitution pursuant to 51:137 and 1408;

21.   Order the Defendants to pay civil penalties pursuant to Md. Code Ann. Com. Law §11-209(a)(4);

22.   Order each Defendant to pay restitution pursuant to the Massachusetts Consumer Protection Act, M.G.L. c. 93A § 4;

23.   Order each Defendant to pay civil penalties pursuant to the Massachusetts Consumer Protection Act, M.G.L. c. 93A § 4 for each and every method, act or practice such Defendant knew or should have known to be in violation of M.G.L. c. 93A § 2;

43

24. Order Defendants to pay civil penalties pursuant to § 7 of the Michigan Antitrust Act, MCL 445.777;

25. Order Defendants to pay civil penalties pursuant to Missouri Rev. Stat. § 407.100.6 for each sale made in violation of Missouri's Merchandising Practices Act;

26. Order each Defendant to pay a civil penalty of up to $2,000 for each violation of Nebraska's Consumer Protection Act pursuant to Neb. Rev. Stat. § 59-1614 (Reissue 2010);

27. Order each Defendant to pay a civil penalty of up to $2,000 for each violation of Nebraska's Uniform Deceptive Trade Practices Act pursuant to Neb. Rev. Stat. § 87-303.11 (Reissue 2008);

28. Order each Defendant to pay civil penalties pursuant to the New Mexico Antitrust Act NMSA 1978, § 57-1-7(A) and Unfair Practices Act, NMSA 1978, § 57-12-11;

29. Order the Defendants to pay civil penalties pursuant to New York Gen. Bus. Law § 342-a;

30. Order Defendants to pay civil penalties pursuant to North Dakota Century Code (N.D.C.C.), Uniform State Antitrust Act, § 51-08.1-07;

31. Order the Defendants to pay civil forfeitures pursuant to Ohio Revised Code Section 1331.03;

32. Order the Defendants to pay civil penalties and civil forfeitures pursuant to Puerto Rico Sections 259 and 268 of Law No. 77;

33. Order Defendants to pay civil penalties pursuant to South Dakota Codified Laws 37-1-14.2;

34. Order Defendants to pay civil penalties pursuant to Tenn. Code Ann § 47-25-106;

35. Order Defendants to pay civil fines pursuant to Section 15.20(a) of the Texas Business and Commerce Code;

36. Order Defendants to pay civil penalties pursuant to Utah Code Ann. § 76-10-918;

37. Order Defendants to pay civil penalties pursuant to Title 9 of the Vermont Statutes, Section 2461;

38. Order each Defendant to pay a civil penalty of not more than $100,000 for each willful or flagrant violation of the Virginia Antitrust Act pursuant to Virginia

44

Code Ann. § 59.1-9.11;

39.     Order Defendants to pay civil penalties to the State of West Virginia pursuant to Section 47-18-8 of the West Virginia Antitrust Act;

40.     Order Defendants to pay civil forfeitures pursuant to Wisconsin Stat. §133.03(3);

41.     Order other equitable relief as may be appropriate;

42.     Award the Plaintiff States the costs of this action, including reasonable attorneys' fees and costs, as provided in Section 4c of the Clayton Act and applicable state law; and

43.     Direct such other and further relief as the Court deems just and proper.


## JURY DEMAND

The Plaintiff States demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, on all issues triable as of right by jury.

45

Respectfully submitted,

GREG ABBOTT
Attorney General of Texas

DANIEL HODGE
First Assistant Attorney General

JOHN B. SCOTT
Deputy Attorney General for Civil Litigation

JOHN T. PRUD'HOMME
Chief, Consumer Protection Division

KIM VAN WINKLE
Section Chief, Antitrust Section
Consumer Protection Division

ERIC LIPMAN
Texas Bar No. 24071869
SDNY Bar No. EL-6300
Assistant Attorney General
Telephone: 512-463-1579
eric.lipman@texasattorneygeneral.gov

GABRIEL R. GERVEY
Texas Bar No. 24072112
Assistant Attorney General
Telephone: 512-463-1262
gabriel.gervey@texasattorneygeneral.gov

DAVID ASHTON
Texas Bar No. 24031828
Assistant Attorney General
Telephone: 512-936-1781
david.ashton@texasattorneygeneral.gov
Office of the Attorney General
P.O. Box 12548
Austin, Texas  78711-2548
Facsimile: 512-320-0975
**ATTORNEYS FOR THE STATE OF TEXAS**

Respectfully submitted,

STATE OF CONNECTICUT
GEORGE JEPSEN
ATTORNEY GENERAL

Michael E. Cole
Chief, Antitrust Department

W. Joseph Niesen
Gary M. Becker
Assistant Attorneys General
55 Elm Street
Hartford, CT 06106
PH: 860-808-5040
FAX: 860-808-5033
Michael.Cole@ct.gov
Joseph.Nielsen@ct.gov
Gary.Becker@ct.gov

**ATTORNEYS FOR THE STATE OF CONNECTICUT**

47

Respectfully submitted,

LUTHER STRANGE
State of Alabama Attorney General

JAMES M. STEINWINDER
Assistant Attorney General
Antitrust Section Chief
OFFICE OF THE ATTORNEY GENERAL
501 Washington Avenue
Montgomery, AL  36130
(334) 353-9171
(334) 242-2433 (fax)
jsteinwinder@ago.state.al.us

**ATTORNEYS FOR THE STATE OF ALABAMA**

48

Respectfully submitted,

The STATE OF ALASKA

MICHAEL C. GERAGHTY
Attorney General

Clyde E. Sniffen, Jr.
Senior Assistant Attorney General
Alaska Bar # 8906036
Alaska Department of Law
1031 W. 4th Ave. # 200
Anchorage, AK  99501
(907) 269-5200
(907) 276-8554 (Telefax)

**ATTORNEYS FOR THE STATE OF ALASKA**

49

Respectfully submitted,

THOMAS C. HORNE
Attorney General of Arizona

NANCY M. BONNELL
Antitrust Unit Chief
Susan V. Myers
Assistant Attorney General
Office of the Arizona Attorney General
Consumer Protection and Advocacy Section
1275 West Washington
Phoenix, Arizona 85028
Tel:  (602) 542-7728
Fax:  (602) 542-9088
Nancy.bonnell@azag.gov

**ATTORNEYS FOR THE STATE OF ARIZONA**

Respectfully submitted,

The STATE OF ARKANSAS

DUSTIN McDANIEL
Attorney General

Kevin Wells, Ark. Bar No. 2007213
Assistant Attorney General
Arkansas Attorney General's Office
323 Center Street, Suite 500
Little Rock, AR 72201
Phone: (501) 682-2007
Fax: (501) 682-8118
Email: kevin.wells@arkansasag.gov

**ATTORNEYS FOR THE STATE OF ARKANSAS**

51

Respectfully submitted,

JOHN W. SUTHERS
Attorney General of Colorado


Devin M. Laiho
Assistant Attorney General
Colorado Department of Law
1525 Sherman Street, Seventh Floor
Denver, Colorado 80203
Voice: 303.866.5079
Email: devin.laiho@state.co.us

**ATTORNEYS FOR THE STATE OF COLORADO**

Respectfully submitted,

JOSEPH R. BIDEN, III
Attorney General

Michael A. Undorf
Delaware Bar No. 3874
Deputy Attorney General
Delaware Department of Justice
820 N. French St., 5th Floor
Wilmington, DE 19801
(302) 577-8924
(302) 577-8924 (facsimile)
Michael.Undorf@state.de.us

**ATTORNEYS FOR THE STATE OF DELAWARE**

53

Respectfully submitted,

IRVIN B. NATHAN
Attorney General for the District of Columbia

ELLEN S. EFROS
Deputy Attorney General, Public Interest
Division

BENNETT RUSHKOFF
Chief, Public Advocacy Section

CATHERINE A. JACKSON
Assistant Attorney General
Office of the Attorney General
441 Fourth Street, N.W., Suite 600-S
Washington, DC  20001
(202) 442-9864
(202) 741-0655
catherine.jackson@dc.gov

**ATTORNEYS FOR THE DISTRICT OF COLUMBIA**

54

Respectfully submitted,

LAWRENCE G. WASDEN
Attorney General of Idaho

Brett T. DeLange
Deputy Attorney General
(Idaho State Bar No. 3628)

Consumer Protection Division
Office of the Attorney General
954 W. Jefferson St., 2nd Floor
P. O. Box 83720
Boise, Idaho 83720-0010
Telephone:      (208) 334-4114
Facsimile:      (208) 334-4151
brett.delange@ag.idaho.gov

**ATTORNEYS FOR THE STATE OF IDAHO**

55

Respectfully submitted,

LISA MADIGAN
Attorney General of Illinois

Chadwick O. Brooker
Assistant Attorney General
Office of the Illinois Attorney General
Antitrust Bureau
100 W. Randolph Street
Chicago, Illinois 60601
Tel: (312) 793-3891
Fax: (312) 814-4209
cbrooker@atg.state.il.us

**ATTORNEYS FOR THE STATE OF ILLINOIS**

Respectfully submitted,

The State of Indiana
GREGORY F. ZOELLER
Attorney General

Jeremy R. Comeau
Deputy Attorney General
Attorney Number 26310-53
302 West Washington Street, 5th Fl.
Indianapolis, IN 46204
Tel: 317.232.6317
Fax: 317.233.4393

**ATTORNEYS FOR THE STATE OF INDIANA**

57

Respectfully submitted,

THOMAS J. MILLER
Attorney General

LAYNE M. LINDEBAK
IA Bar AT0004755
Assistant Attorney General
Special Litigation Division
Hoover Office Building-Second Floor
1305 East Walnut Street
Des Moines, IA 50319
Tel: (515) 281-7054
Fax: (515) 281-4902
Layne.Lindebak@iowa.com

ATTORNEYS FOR THE STATE OF IOWA

58

Respectfully submitted,

DEREK SCHMIDT
Attorney General of Kansas

Lynette R. Bakker, KS Bar #22104
Assistant Attorney General
Office of the Kansas Attorney General
120 S.W. 10th Avenue, Suite 430
Topeka, Kansas 66612-1597
Telephone: (785) 368-8451
Facsimile: (785) 291-3699
lynette.bakker@ksag.org

**ATTORNEYS FOR THE STATE OF KANSAS**

Respectfully submitted,

STATE OF LOUISIANA
JAMES D. "BUDDY" CALDWELL
ATTORNEY GENERAL

Stacie Lambert deBlieux
La. Bar Roll # 29142
Assistant Attorney General
Public Protection Division
Louisiana Department of Justice
1185 North 3rd St.
Baton Rouge, LA 70802
Tel: (225) 326-6458
Fax: (225) 326-6498
deblieuxs@ag.state.la.us

**ATTORNEYS FOR THE STATE OF LOUISIANA**

Respectfully submitted,

DOUGLAS F. GANSLER
Attorney General of Maryland

ELLEN S. COOPER
Chief, Antitrust Division

JOHN R. TENNIS
Deputy Chief, Antitrust Division

Schonette Walker
Assistant Attorney General
Office of the Maryland Attorney General
Antitrust Division
200 St. Paul Place, 19th Floor
Baltimore, Maryland  21202
Tel: (410) 576-6470
Fax: (410) 576-6404

ATTORNEYS FOR THE STATE OF MARYLAND

61

Respectfully submitted,
The Commonwealth of Massachusetts
MARTHA COAKLEY
Attorney General


William T. Matlack (MA BBO No. 552109)
Assistant Attorney General
Chief, Antitrust Division
Michael Franck (MA BBO No. 668132,
NY Bar Registration No. 4759668)
Assistant Attorney General
Antitrust Division
1 Ashburton Place
Boston, MA 02108
Tel: (617) 727-2200
Fax: (617) 722-0184 (fax)
William.Matlack@state.ma.us
Michael.Franck@state.ma.us

**ATTORNEYS FOR THE COMMONWEALTH OF MASSACHUSETTS**

Respectfully submitted,

BILL SCHUETTE
Attorney General of Michigan

Jason R. Evans
Assistant Attorney General
Corporate Oversight Division
525 West Ottawa Street, 6th Floor
Lansing, MI 48933
Phone:  (517) 373-1160
Fax:  (517) 335-1935
evansj@michigan.gov

**ATTORNEYS FOR THE STATE OF MICHIGAN**

63

Respectfully submitted,

CHRIS KOSTER
Attorney General of Missouri

ANNE E. SCHNEIDER
Assistant Attorney General/Antitrust Counsel
Missouri Bar No. 35479

BRIANNA LENNON
Assistant Attorney General
Mo. Bar # 63964

P. O. Box 899
Jefferson City, MO 65102
(573) 751-7445
(573) 751-2041 (facsimile)
Anne.Schneider@ago.mo.gov
Brianna.Lennon@ago.mo.gov

**ATTORNEYS FOR THE STATE OF MISSOURI**

Respectfully submitted,

JON BRUNING
Attorney General of Nebraska

Melissa R. Vincent, NSBA #23464
Assistant Attorney General
Nebraska Attorney General's Office
2115 State Capitol
Lincoln, NE 68509-8920
Ph: (402) 471-2653
Fx: (402) 471-2957
melissa.vincent@nebraska.gov

**ATTORNEYS FOR THE STATE OF NEBRASKA**

65

Respectfully submitted,

GARY K. KING
NEW MEXICO ATTORNEY GENERAL

Matthew E. Jackson
Assistant Attorney General
N.M. Bar 126355
P.O. Drawer 1508
Santa Fe, NM 87504-1508
(505) 827-6021
(505) 827-6036, facsimile
mjackson@nmag.gov

**ATTORNEYS FOR THE STATE OF NEW MEXICO**

Respectfully submitted,

STATE OF NEW YORK
ERIC T. SCHNEIDERMAN
Attorney General

Robert L. Hubbard
Linda J. Gargiulo
Assistant Attorneys General
Antitrust Bureau
Office of the Attorney General
120 Broadway, 26th Floor
New York, NY 10271-0332
Tel: (212) 416-8267 (rlh)
    (212) 416-8274 (ljg)
Fax: (212) 416-6015
Robert.Hubbard@ag.ny.gov
Linda.Gargiulo@ag.ny.gov

ATTORNEYS FOR THE STATE OF NEW YORK

Respectfully submitted,

The State of North Dakota
Wayne Stenehjem
Attorney General

Parrell D. Grossman (ND ID 04684)
Assistant Attorney General
Director, Consumer Protection and Antitrust
Division

Elin S. Alm (ND ID 05924)
Assistant Attorney General
Consumer Protection and Antitrust Division
Office of Attorney General
Gateway Professional Center
1050 E Interstate Ave, Ste 200
Bismarck, ND 58503-5574
(701) 328-5570
(701) 328-5568 (fax)

**ATTORNEYS FOR THE STATE OF NORTH
DAKOTA**

Respectfully submitted,

R. MICHAEL DEWINE
Attorney General of Ohio

JENNIFER L. PRATT
Chief, Antitrust Section

Edward J. Olszewski
(Ohio S.Ct. No. 82655)
Assistant Attorney General
Office of the Ohio Attorney General, Antitrust
Section
150 E. Gay St. – 23rd Floor
Columbus, OH 43215
Tel: (614) 466-4328
Fax: (614) 995-0269

**ATTORNEYS FOR THE STATE OF OHIO**

69

Respectfully submitted,

The Commonwealth of Pennsylvania

LINDA L. KELLY
Attorney General

James A. Donahue, III
Chief Deputy Attorney General
Attorney I.D. # 42624
PA Office of Attorney General
14th Floor, Strawberry Square
Harrisburg, PA  17120
(717) 787-4530
(717) 787-1190 (Telefax)

Jennifer J. Kirk
Deputy Attorney General
Attorney I.D. # 90544
PA Office of Attorney General
14th Floor, Strawberry Square
Harrisburg, PA  17120
(717) 787-4530
(717) 787-1190 (Telefax)

**ATTORNEYS FOR THE COMMONWEALTH OF PENNSYLVANIA**

70

Respectfully submitted,

The Commonwealth of Puerto Rico

Guillermo Somoza-Colombani
Attorney General

José G. Díaz-Tejera
PR Bar No. 12561
Chief Deputy Attorney General
Office of Monopolistic Affairs
Department of Justice
Commonwealth of Puerto Rico
P. O. Box 9020192
San Juan, P.R. 00902-0192
Telephone: (787) 721-2900 Ext. 2669
Facsimile:  (787) 723-9188
jdiaz@justicia.pr.gov

**ATTORNEYS FOR THE COMMONWEALTH OF
PUERTO RICO**

71

Respectfully submitted,

MARTY J. JACKLEY
Attorney General of South Dakota


Jeffrey P. Hallem
South Dakota Bar No. 1955
Assistant Attorney General
Office of the Attorney General
1302 E. Hwy. 14, Suite 1
Pierre, SD 57501-8501
Telephone: (605) 773-3215
Facsimile: (605) 773-4106
Jeff.Hallem@state.sd.us

**ATTORNEYS FOR THE STATE OF SOUTH DAKOTA**

72

Respectfully submitted,

ROBERT E. COOPER, JR.
Attorney General & Reporter of Tennessee


VICTOR J. DOMEN, JR.
Senior Counsel
Office of the Tennessee Attorney General
425 Fifth Avenue North
Nashville, TN   37202
Telephone: 615-253-3327
Facsimile: 615-532-6951
Vic.Domen@ag.tn.gov

ATTORNEYS FOR THE STATE OF TENNESSEE

73

Respectfully submitted,

MARK L. SHURTLEFF (Utah Bar #4666)
Attorney General of Utah


RONALD J. OCKEY (Utah Bar # 2441)
DAVID N. SONNENREICH (Utah Bar # 4917)
JAMES W. PALMER (Utah Bar # 6959)
Assistant Attorneys General
Commercial Enforcement Division
The Office of the Utah Attorney General
160 East 300 South, 5th Floor
P.O. Box 140872
Salt Lake City, Utah 84114-0872
Phone 801-366-0310
Fax 801-366-0315
rockey@utah.gov
Direct Phone 801-366-0359
dsonnenreich@utah.gov
Direct Phone 801-366-0132
jimpalmer@utah.gov
Direct Phone 801-366-0544

ATTORNEYS FOR THE STATE OF UTAH

74

Respectfully submitted,

STATE OF VERMONT
WILLIAM H. SORRELL
ATTORNEY GENERAL

Ryan Kriger
Assistant Attorney General
Public Protection Division
Vermont Attorney General's Office
109 State Street
Montpelier, VT 05609
Tel: (802) 828-5479
Fax: (802) 828-2154

ATTORNEYS FOR THE STATE OF VERMONT

75

Respectfully submitted,

Kenneth T. Cuccinelli, II
Attorney General of Virginia

Charles E. James, Jr.
Chief Deputy Attorney General

Wesley G. Russell, Jr.
Deputy Attorney General

David B. Irvin (VSB # 23927)
Senior Assistant Attorney General

Sarah Oxenham Allen (VSB # 33217)
Matthew R. Hull (VSB # 80500)
Assistant Attorneys General

Office of the Attorney General of Virginia
900 East Main Street
Richmond, Virginia 23219
Telephone:         (804) 786-6557
Fax: (804) 786-0122

**ATTORNEYS FOR THE COMMONWEALTH OF
VIRGINIA**

76

Respectfully submitted,

DARRELL V. MCGRAW, JR.
Attorney General of West Virginia

JILL L. MILES
Deputy Attorney General
Consumer Protection and Antitrust Division

DOUGLAS L. DAVIS
West Virginia Bar No. 5502
Assistant Attorney General
Office of the West Virginia Attorney General
P.O. Box 1789
Charleston, West Virginia 25326
Telephone (304) 558-8986
Facsimile (304) 558-0184
doug.davis@wvago.gov

**ATTORNEYS FOR THE STATE OF WEST
VIRGINIA**

Respectfully submitted,

The State of Wisconsin
J.B. VAN HOLLEN
Attorney General

Gwendolyn J. Cooley
Assistant Attorney General
Wis. State Bar No. 1053856
Wisconsin Department of Justice
17 W. Main St.
P.O. Box 7857
Madison, WI 53707-7857
(608) 261-5810
(608) 267-2778 (fax)

**ATTORNEYS FOR THE STATE OF WISCONSIN**