UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA,

           Plaintiff,

     v.                     12 Civ. 2826 (DLC)

APPLE INC., *et al.*,

           Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

THE STATE OF TEXAS,
THE STATE OF CONNECTICUT, *et al.*,

           Plaintiffs,

     v.                     12 Civ. 03394 (DLC)

PENGUIN GROUP (USA) INC., *et al.*,

           Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## APPLE INC.'S MOTION IN LIMINE TO EXCLUDE THE EXPERT TESTIMONY OF PROFESSORS BAKER AND ASHENFELTER

## I.    PRELIMINARY STATEMENT

Apple moves under Federal Rules of Evidence 702 and 403, and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), to exclude the testimony of Professors Orley Ashenfelter and Jonathan Baker, economic experts sponsored by the Plaintiff States. The evidence in this case proves that e-book prices in the relevant market—as defined by plaintiffs' experts—decreased in the period after Apple's entry. The evidence also establishes that output—the number of e-books sold to consumers—increased in the wake of Apple's entry. Because this evidence contradicts plaintiffs' bleak portrait of the e-books market following Apple's entry, plaintiff States have proffered, through their experts, conclusions that are extraneous, lack foundation and are untethered to any analysis of the underlying market data. Professor Baker's and Ashenfelter's opinions do not satisfy the law's requirement that expert testimony be both relevant and reliable. Their testimony fails *Daubert* and should be excluded.

Professor Baker's testimony should be excluded for at least two reasons. First, although plaintiff States proffer him as an economics expert, he offers no opinion on whether the alleged conspiracy makes economic sense. Instead, Professor Baker advances an opinion that the Apple agency agreements facilitated "coordinated conduct," an economic term that does not appear in the States' Complaint and that Professor Baker defines to include a vast range of perfectly lawful, non-conspiratorial conduct. (Ex. PX-0823 ¶¶3, 48-69.)[1] This is akin to an expert testifying that a defendant robbed a bank by defining "bank robbery" to encompass a lawful withdrawal from the defendant's own account. Such testimony is irrelevant. It is not probative of the ultimate issue in the case. Further, it risks confusion by using loaded language intended to put a conspiratorial gloss on legitimate conduct.

---

[1]    All citations to "PX-XXX" reference Plaintiffs' Exhibit List

Second, despite the fact that every other expert in this case (for both plaintiffs and Apple) recognizes that prices declined in the alleged relevant market in the period after Apple's entry, Professor Baker reaches contrary and unsubstantiated opinions, in direct contradiction of undisputed facts and market reality. (Ex. PX-0823 ¶¶70-73.) This testimony should be excluded because, although he had full access to comprehensive market data, Professor Baker offers no empirical study of his own in support of this flawed conclusion. And he provides no quantification of alleged consumer harm net of benefits resulting from the agency agreements. Rather, he relies on Professor Ashenfelter, who expressly disavows conducting such an analysis: "I haven't drawn any grandiose conclusions like that." Declaration of Orin Snyder ("Snyder Decl."), Exhibit B (Ashenfelter Deposition Transcript) at 161:2-19. Professor Baker's opinions on these topics plainly lack any reasonable or empirical basis, rendering them wholly unreliable.

Professor Ashenfelter's expert opinions relating to purported price increases and a claimed reduction in output fare no better. Professor Ashenfelter concedes that average retail e-book prices declined in the alleged relevant market but "adjusts" prices using a faulty regression analysis to demonstrate that market prices went up. His analysis regarding "adjusted" market prices is both meaningless (because they are not actual prices) and methodologically unsound (because it "adjust[s] away" significant variables). Professor Ashenfelter's opinion that growth in the alleged relevant market was stunted should also be excluded as it is supported by a calculation that fails the test of statistical significance. Simply put, Professor Ashenfelter's opinions are inadequately supported by sound methodology and principled data, and are therefore unreliable.

The expert opinions of Professors Baker and Ashenfelter opinions are irrelevant, unreliable, implausible, and inadmissible, and should therefore be excluded under Federal Rule of Evidence 702.

## II.    LEGAL STANDARD

In considering whether the testimony is reliable under Rule 702, the district court should consider (1) whether the testimony is grounded on sufficient facts or data; (2) whether the testimony "is the product of reliable principles and methods"; and (3) whether "the witness has applied the principles and methods reliably to the facts of the case." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2nd Cir. 2002); Fed. R. Evid. 702. "[W]hen an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Nimely v. City of New York*, 414 F.3d 381, 396-97 (2d Cir. 2005) (quoting *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002)); *see also Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993) ("When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict.").

In assessing admissibility, the district court must determine whether the proffered testimony "ha[s] any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Campbell v. Metropolitan Property and Cas. Ins.*, 239 F.3d 179, 184 (2d Cir. 2001) (citing Fed. R. Evid. 401 and *Daubert*, 509 U.S. at 587). Additionally, expert testimony is subject to Rule 403, and "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." *Nimely*, 414 F.3d

4

at 397; Fed. R. Evid. 403.  Because expert evidence may be misleading and is difficult to evaluate, a judge "exercises more control over experts than lay witnesses" in weighing prejudice against probative value.  *Daubert*, 509 U.S. at 595 (quoting Jack B. Weinstein, *Rule 702 of the Federal Rules Is Sound*, 138 F.R.D. 631, 632 (1991)).

### III.   PROFESSOR BAKER'S TESTIMONY SHOULD BE EXCLUDED

### A.   "Coordinated Conduct"

Professor Baker intends to testify that "the defendant publishers likely coordinated to convert ebook retail outlets to the agency model, and further likely coordinated to set retail ebook prices."  (Ex. PX-0824 ¶ 5.)  Professor Baker concludes that "[c]*oordinated conduct* likely was facilitated by the ebook distribution agreements that the defendant publishers entered into with Apple" (emphasis added).  (Ex. PX-0823 ¶ 3(b).)  Such testimony on "coordinated conduct"—as described in paragraphs 48 through 69 of Professor Baker's Opening Report—should be excluded.

Professor Baker's opinion has no probative value on the key issue in this case—whether Apple participated in the alleged conspiracy.  Instead, Professor Baker employs a special "economic" definition of the term "coordinated conduct" that he admits is *different and distinct* from the legal element of conspiracy or collusion under Section 1 of the Sherman Act.  Snyder Decl., Exhibit C (Baker Deposition Transcript) at 35:10-18, 40:9-12.[2]  The term "coordinated conduct" as used by Professor Baker merely refers to "conduct by multiple firms that is

---

[2]  See also Baker, *Policy Watch: Developments in Antitrust Economics*, 13 J. Econ. Perspectives 181, 184 (1999) (the term "coordination" is used differently from terms like "'collusion' and 'cooperation,' since those terms may carry with them the legal idea of an agreement"); Baker, *Two Sherman Act Section 1 Dilemmas*, 38 Antitrust Bull. 143, 195-96 (1993) (acknowledging that "it is difficult to work up much enthusiasm for the view that the legal idea of an agreement to fix price is or should be equated with this economic idea of coordination....").

profitable for each of them only as a result of the accommodating reaction of the others."[3]  *Id.* at

47:16-48:6.  Absent a reversal of course by the Supreme Court, this economic definition—

according to Professor Baker's own testimony—is "probably not the same" as the legal idea of

an agreement to fix prices.[4]  *Id.* at 50:9-12, 51:1-18.  As Professor Baker freely admits: "My

opinions are not about [a price-fixing] agreement."  *Id.* at 24:6-10; *see also* 25:18-24 (indicating

that his opinions do not address the existence of the alleged agreement in this case), 35:19-36:3

(disclaiming any intention to opine on collusion or agreement), 74:22-75:7 (same).  In other

words, Professor Baker's definition of "coordinated conduct" is fully consistent with the lawful,

unilateral agreements that Apple executed with each publisher.[5]  His conclusion, therefore, that

defendants likely engaged in coordinated conduct, an admittedly broad term that encompasses

perfectly lawful behavior, is unhelpful and irrelevant where plaintiffs' case rests on allegations of

an unlawful conspiracy.  Professor Baker's opinion is not probative of conspiracy, and is

therefore irrelevant and inadmissible.

     Professor Baker's anticipated testimony regarding the price caps contained in the Apple

agency agreements provides a prime example of the legal vacuity of his opinions on

"coordinated conduct."  Professor Baker proposes to testify that "the price caps became focal,

---

[3]  Professor Baker has taken this concept from the DOJ/FTC's Horizontal Merger Guidelines, which make clear that the concept of coordinated conduct is not limited to conduct that violates Section 1 of the Sherman Act. Snyder Decl., Ex. C at 48:12-19; Guidelines § 7 ("Coordinated interaction includes conduct not otherwise condemned by the antitrust laws.").  Coordinated conduct includes both actions that facilitate collusion, as well as conduct that is independently rational. *Id.*; *see also* Snyder Decl., Ex. C at 43:3-10.  The concept contemplates actions that are intended to carry out an explicitly agreed-upon outcome as well actions that are not taken pursuant to any prior agreement.  Guidelines § 7.

[4]  Professor Baker admits that "coordinated conduct" can result in higher prices in concentrated markets absent an unlawful agreement. *Id.* at 41:21-42:5.

[5]  Moreover, Professor Baker has no opinion on (and has made to attempt to evaluate) whether Apple had independently rational justifications for its conduct. Snyder Decl., Ex. C at 43:15-44:3, 44:5-10.  Yet, in a price-fixing case, circumstantial evidence of conspiracy must "tend to exclude the possibility" that the alleged conspirators acted independently. *Matsushita Electric Industrial, Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).  Professor Baker has simply made no attempt to evaluate whether the outcomes complained of here could have transpired absent alleged conspiracy. Snyder Decl., Ex. C at 71:23-72:5.

and served as a basis upon which the defendant publishers formed a common understanding with respect to price levels." (Ex. PX-0824 ¶ 58.) But he admits that this testimony actually conveys no "opinion as to agreement" and relates to nothing more than "coordinated conduct in an *economic* sense." *Id.* at 235:11-21 (emphasis added). Professor Baker also makes clear that when he characterizes the price caps as "focal," he is simply saying they were "natural and obvious" price points.[6] *Id.* at 233:13-14. He acknowledges that prices can become "focal" for non-collusive reasons that do not violate Section 1. *Id.* at 233:15-235:2. He does not rule out independent business justifications for the price caps, admitting that they constrained publishers' prices. Snyder Decl., Ex. C at 243:4-21, 244:6-9, 245:19-246:23, 247:13-18. Plainly, Professor Baker's opinions regarding the price caps are not probative of any issue in this case. They do not tend to prove the alleged conspiracy among defendants. Rather, they pose the risk of confusion by injecting loaded terms that allow an unreasonable inference of conspiracy from perfectly lawful behavior.

Expert opinion should be excluded where it does not "tend to make it any more probable that defendants were (or were not) engaged in a price-fixing conspiracy." *Williamson Oil Company, Inc. v. Philip Morris USA, et al*, 346 F.3d 1287, 1322 (11th Cir. 2003) (affirming lower court's exclusion of plaintiffs' expert opinion as irrelevant where expert did not differentiate between lawful behavior and collusive price-fixing). Professor Baker's opinions on "coordinated conduct" should be excluded.

---

[6] He can point to no methodology that economists use to identify such "focal prices." *Id.* at 242:22-243:6; 250:15-25.

**B.    Average Market Price**

Of the seven witnesses who have been designated as experts by the parties in this case, Professor Baker is the only one who intends to testify—really, speculate—to the opinion that the average price in the relevant market was higher after agency.  Professor Baker stands alone amongst the parties' seven experts, because there is no basis for that opinion.  The record confirms that prices went down in the alleged relevant market of trade e-books after Apple's entry.  *See* Burtis Aff. ¶ 17; Snyder Decl., Exhibit A (Gilbert Deposition Transcript) at 370:18-372:6; Snyder Decl., Exhibit B (Ashenfelter Deposition Transcript) at 131:10-18.  Professor Baker's opinion should therefore be excluded for the simple fact that it is directly contradicted by the record facts, including admissions by plaintiffs' own experts.

The Supreme Court has instructed that "[e]xpert testimony is useful as a guide to interpreting market facts, but it is not a substitute for them."  *Brooke Group*, 509 U.S. at 242.  An expert opinion is not probative when "indisputable record facts contradict or otherwise render the opinion unreasonable."  *Id.*  Here, there is no dispute that the average price of e-books in the alleged relevant market declined in the post-agency world.  This fact has been quantified by Apple's economic expert, Dr. Burtis, *see infra* at 11, accepted by defendants' other three experts, conceded by Professor Ashenfelter, *see id.*, and conceded by the DOJ's expert, Professor Gilbert, *see* Snyder Decl., Ex. A at 370:18-372:6.  Professor Baker's opinion to the contrary is in direct conflict with this uniform expert testimony and actual market reality.

It is not surprising that Professor Baker's opinion is factually and demonstrably incorrect. He admits that he has performed no empirical analysis of the effects of agency on market prices. Snyder Decl., Ex. C at 272:18-273:2, 279:20-280:4.  Rather, the only "analysis" he has done on overall price is a cursory review of work performed by a defense expert.  *Id.* at 272:273:2. Rather than undertake any factual investigation, Professor Baker instead purports to rely on an

analysis performed by Professor Ashenfelter.  As demonstrated below, however, Professor

Ashenfelter concedes facts showing that Professor Baker's reliance is utterly misplaced.  For

example, Professor Ashenfelter concedes that average retail prices of e-book declined post-

agency. *See infra*, at 11.  Further, Professor Baker has undertaken no review of prices charged

by Amazon.  Snyder Decl., Ex. C at 273:20-275:9,127:8-19-128:9, 129:3-10.  He has ignored the

entry and growth of new publishers and self-publishers in the post-agency world, even though

the prices charged by these additional market participants bear directly on the question of prices

in the relevant market.  *Id*. at 283:11-18.  His failure to conduct *any* empirical analysis is not

only clear from his testimony and report but made manifestly plain by what he admits he does

not know:  he does not know the magnitude of this market price increase he contends happened,

or how long it supposedly lasted.  *Id*. at 275:10-16, 275:17-276:12.  Without factual foundation,

Professor Baker's opinion is rank speculation at best, and nothing more.

## C.   Output

No party disputes the rapid growth of output (eBook sales) in the relevant market before

and after agency.  In such a setting, output "can only have been restricted in the sense that it

expanded at a slower rate than it would have" absent the agency model. *Brooke Grp. Ltd. v.

Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 233 (1993).  "Such a counterfactual

proposition is difficult to prove in the best of circumstances." *Id*. at 233.  However, Professor

Baker intends to offer the opinion that "the unit sales of all trade ebooks sold in the U.S. were

lower than they would have been absent the coordination among defendants."  (Ex. PX-0823

¶72.)

Professor Baker's opinion on output suffers from the same foundational flaws as his

opinion on increased average market price, as discussed above.  Professor Baker cannot offer a

reliable conclusion on changes in market output because he has not actually performed any

statistical study of data reflecting all sales in the relevant market, other than a cursory review of a defense expert's analysis on a different issue. Snyder Decl., Ex. C at 279:20-280:4; *cf. Brooke Group Ltd.*, 509 U.S. at 242 (expert opinion must be "supported by sufficient facts to validate it in the eyes of the law"). Instead, as in the case of his speculative opinion on market price, the only (purported) empirical basis for Professor Baker's opinion on market output is Professor Ashenfelter's analysis. Professor Baker himself acknowledges, however, that there is disconnect between his conclusions "about the relevant market" and Professor Ashenfelter's analysis, which is "limited to defendant publishers." Snyder Decl., Ex. C at 279:14-16 ("So his analysis is limited to defendant publishers, and my analysis is about the relevant market."). And as established below, Professor Ashenfelter admits that his own work provides no empirical basis to conclude that market output has contracted overall. *See infra,* at 12-13. "Expert testimony relying on the opinions of others should, of course, be rejected if ... the underlying basis is faulty." *Walker v. Soo Line R.R. Co.*, 208 F.3d 581, 588 (7th Cir. 2000).

**D.    Consumer Harm**

Finally, Professor Baker also intends to offer an opinion that "consumers were harmed, after accounting for possible efficiency benefits of the introduction of the iBookstore." Snyder Decl., Ex. C at 278:4-279:3. In drawing this conclusion, he relies on "[what] Professor Ashenfelter's analysis of the price and output effects of the challenged conduct demonstrated." *Id.* However when Professor Baker's precise words were put to Professor Ashenfelter, Professor Ashenfelter rejected this characterization, and testified that he has not actually "drawn any grandiose conclusions like that." Synder Decl., Ex. B at 161:2-19 ("I wasn't asked to study that question and I haven't."). Professor Ashenfelter testified that such conclusion is "grandiose compared to [his] assignment." *Id.* at 161:23-162:11 (also describing his assignment as "much narrower than that"). Accordingly, the conclusions that Professor Baker draws rely on a false

and unfounded characterization of Professor Ashenfelter's analyses and are therefore

unreasonable and inadmissible. *Elcock v. Kmart Corp.*, 233 F.3d 734, 738 (3rd Cir. 2000)

("[W]e conclude that [the expert economist's] opinion should have been excluded because his

economic model relied on assumptions wholly without foundation in the record."); *Tyger Constr.*

*Co. v. Pensacola Constr. Co.*, 29 F.3d 137, 144 (4th Cir. 1994) ("When the assumptions made by

an expert are not based on fact, the expert's testimony . . . should be excluded by the district

court."). It is bad enough that Professor Baker has conducted no analysis of his own. It is even

worse that he purports to rely on "opinions" of Professor Ashenfelter that do not even exist.

## IV.   PROFESSOR ASHENFELTER'S TESTIMONY SHOULD BE EXCLUDED

### A.   "Coordinated Conduct"

Professor Ashenfelter simply assumed the existence of a conspiracy for purposes of his

work in this case and reached no independent opinion on the subject. Snyder Decl., Ex. B at

33:9-35:8. Accordingly, he should be excluded from offering any testimony on the subject.

### B.   "Adjusted" Market Price

Professor Ashenfelter agrees that the average price in the alleged relevant market fell

from the pre-agency to the post-agency time period. Snyder Decl., Ex. B at 131:10-18. Despite

this, Professor Ashenfelter proposes to testify that "adjusted" average market prices increased

after agency. This testimony should be excluded.

Professor Ashenfelter replicated and validated the average price calculations of

Defendants' expert, Dr. Burtis, which quantify the decrease in prices after Apple's entry. *Id.* at

131:4-14, 139:11-140:17; see Burtis Aff. ¶ 17 ($7.97 pre-agency price compared to $7.34 post-

agency price). Because these data contradict plaintiffs' claims of harm to consumers, Professor

Ashenfelter has constructed a regression model to determine "adjusted" average market prices.

These "adjusted" prices are meaningless. They are not calculations of actual prices, and

Professor Ashenfelter does not consider them to be average prices "but-for" the adoption of agency. Snyder Decl., Ex. B at 140:18-141:12. Rather, these prices are dubious and litigation-driven, extracted from a concededly faulty regression. For example, Professor Ashenfelter's result-oriented approach "adjust[s] away" the pricing of all self-publishers who signed up to Apple's agency agreement and ignores the extent to which publishers have shifted the mix of their releases toward lower price e-books in the post-agency period. *Id.* at 144:13-145:20. This is exactly the type of methodologically unsound economic junk science that should be excluded on grounds of lack of relevance, reliability and potential to mislead. *See Nimely v. City of New York*, 414 F.3d 381, 396 (2d Cir. 2005) ("'when an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony.'") (quoting *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002)).

## C.   Output

As discussed above, it is undisputed that e-books sales have surged in the aftermath of Apple's entry. Professor Ashenfelter, however, proposes to testify that "e-book unit sales were seven percent below trend" during the post-agency period. (Ex. PX-0826 ¶8.) In other words, Professor Ashenfelter offers the unremarkable opinion that in a dynamic, rapidly expanding market the rate of growth decreases over time, even as the market continues to flourish and grow. Such testimony should be excluded.

A slowing of growth from the meteoric pre-agency rate of 406% (per Professor Ashenfelter's calculations) is inevitable since such an "'internal' rate of growth would inevitably slow as the base volume against which it was measured grew." *Brooke Group*, 509 U.S. at 535, n. 2. As Professor Ashenfelter admits, unabated growth above 400% would have yielded an absurd $125 billion in e-book sales by 2013; "at some point at that growth rate all of GDP would

be e-books." Snyder Decl., Ex. B at 151:25-154:14.  Further, Professor Ashenfelter's analysis

fails to show that market output was restricted by agency; indeed he concedes he has measured

no such thing.  *Id.* at 160:11-25; 123:22-124:7.  Moreover, the 7% figure is not statistically

significant, meaning that "you could certainly say [e-book sales] were not statistically

significantly below the trend."  *Id.* at 155:23-158:18; Burtis Aff. ¶ 35.

  Professor Ashenfelter also intends to testify that "consumers either bought fewer e-books

from the conspiring publishers or bought a different mix of e-books as a result of the

conspiracy," based on a regression analysis he conducted using Random House, which did not

adopt agency during that time, as a statistical control.  This testimony too should be excluded.

To start with, it is highly misleading since Professor Ashenfelter's analysis cannot differentiate

between the two possibilities.  *Id.* at 121:20-122:14.  He is thus unable to conclude that

consumers bought fewer e-books from the publisher defendants.  *Id.* at 122:15-123:3.  Moreover,

Professor Ashenfelter's underlying regression analysis relies on use of Random House e-book

titles as a "control," yet he recognizes that following the implementation of the agency model,

Random House titles were promoted more favorably by Amazon than titles from the publisher

defendants.  *Id.* at 111:6-14.  This biases his results, overstating the supposed negative impact of

agency on the publisher defendants' sales.  *Id.* at 110:15-111:21; 109:5-15.  Professor

Ashenfelter's failure to adequately account for such bias leaves his methodology unreliable and

warrants exclusion of his testimony.

## V.    CONCLUSION

For the foregoing reasons, the Court should grant Apple's motion in limine.


Dated: New York, New York
        April 26, 2013

By:    _____

Orin Snyder
Lisa H. Rubin
Gibson, Dunn & Crutcher, LLP
200 Park Avenue, 47th Floor
New York, NY 10166
(212) 351-4000
osnyder@gibsondunn.com

Daniel S. Floyd (*Pro Hac Vice*)
Daniel G. Swanson (*Pro Hac Vice*)
Gibson, Dunn & Crutcher, LLP
333 South Grand Avenue
Los Angeles, CA 90071
(213) 229-7000
dfloyd@gibsondunn.com

Cynthia Richman (*Pro Hac Vice Admission Pending*)
Gibson, Dunn & Crutcher, LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036
(202) 955-8500
crichman@gibsondunn.com

Howard E. Heiss
Edward N. Moss
O'Melveny & Meyers LLP
Times Square Tower
7 Times Square
New York, NY 10036
(212) 326-2000
hheiss@omm.com

*On behalf of Defendant Apple, Inc.*

14