**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**This Document Relates to:**

| | |
|---|---|
| **IN RE ELECTRONIC BOOKS ANTITRUST LITIGATION** | No. 11-md-02293 (DLC) ECF Case |
| | **CLASS ACTION** |
| **THE STATE OF TEXAS, et al.,** **Plaintiffs,** **v.** **PENGUIN GROUP (USA) INC., et al.,** **Defendants** | Civil Action No. 12-cv-03394 |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF MACMILLAN AND PENGUIN SETTLEMENTS AND PROPOSED CONSUMER NOTICE AND DISTRIBUTION PLANS**

**TABLE OF CONTENTS**

I. INTRODUCTION ...................................................................................................1

II. PROCEDURAL HISTORY.....................................................................................1

    A. The Plaintiffs' Investigations.......................................................................1

    B. Litigation to Date .........................................................................................3

    C. Settlement Negotiations ...............................................................................3

III. THE PROPOSED SETTLEMENT ........................................................................5

    A. Monetary Payments and Distributions.........................................................5

        1. Consumer Compensation...................................................................5

        2. Plaintiff States' Compensation .........................................................6

        3. Payment of Class Counsel Attorneys' Fees and Costs ......................6

        4. Class Plaintiffs' Compensation.........................................................7

        5. Settlement Notice and Administration Costs.....................................7

    B. Equitable Relief: Injunction.........................................................................7

    C. Release of Claims ........................................................................................7

IV. THE SETTLEMENTS MEET THE STANDARDS FOR JUDICIAL APPROVAL .............................................................................................................8

    A. The Settlements Meet the Standard for Preliminary Approval.....................8

    B. The Settlements Are Fair, Reasonable and Adequate..................................10

V. THE NOTICE PLAN MEETS THE STANDARDS FOR JUDICIAL APPROVAL .............................................................................................................11

    A. Description of the Notice Plan.....................................................................11

        1. Direct Notice......................................................................................12

        2. Nationwide Internet and Publication Campaign ...............................14

    B. The Proposed Notice Plan Meets the Requirements of Due Process....................15

VI.  THE DISTRIBUTION PLAN MEETS THE STANDARDS FOR JUDICIAL
     APPROVAL .................................................................................................16

     A.   Consumer Distribution Plan.................................................................16

     B.   The Distribution Plan Is Fair and Reasonable .......................................18

VII. THE PROPOSED CLASS MEETS ALL THE REQUIREMENTS OF RULE 23...........19

     A.   Definition of the Proposed Macmillan and Penguin Settlement Class.................19

     B.   Certification of the Proposed Class Is Proper for Settlement Purposes.................19

          1.   Plaintiffs Meet the Prerequisites of Rule 23(a).........................................20

               a.   The Class Meets the Numerosity Requirement .............................20

               b.   Questions of Law and Fact Are Common to the Class.................20

               c.   Plaintiffs' Claims Are Typical of the Claims of the Class............21

               d.   The Settlement Class Plaintiffs Will Fairly and Adequately
                    Protect the Interests of the Class....................................................22

          2.   The Requirements of Rule 23(b)(3) Are Satisfied......................................22

               a.   Common Questions Predominate with Respect to Antitrust
                    Claims .............................................................................................23

               b.   A Class Action Is Superior to Other Forms of Adjudication.........24

     C.   Proposed Class Counsel Will Fairly and Adequately Represent the Class ...........25

VIII. CONCLUSION..............................................................................................25

# EXHIBITS

Exhibit A          Macmillan Settlement Agreement
                   Attachment A: Proposed Order and Stipulated Injunction

Exhibit B          Penguin Settlement Agreement
                   Attachment A: Proposed Order and Stipulated Injunction

Exhibit C          Declaration of Professor Wickelgren

Exhibit D          Notice Plan
                   Attachment A: Retailer notices for non-Minnesota consumers
                   Attachment B: Retailer notices for Minnesota consumers
                   Attachment C: Detailed Notices
                   Attachment D: Banner Ad
                   Attachment E: Publication Notice

Exhibit E          Declaration of Katherine Kinsella for Kinsella Media

Exhibit F          Declaration of Kim Schmidt for Rust Consulting

Exhibit G          Consumer Distribution Plan

Exhibit H          Proposed Order Preliminarily Approving Macmillan and Penguin
                   Settlements

### <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### FEDERAL CASES

*Amchem Prods., Inc. v. Windsor*,
    521 U.S. 591 (1997)..................................................................................19, 22, 23

*City of Detroit v. Grinnell Corp.*,
    495 F.2d 448 (2d Cir. 1974)........................................................................10

*Consol. Rail Corp. v. Town of Hyde Park*,
    47 F.3d 473 (2d Cir. 1995)..........................................................................20

*In re Am. Bank Note Holographics, Inc.*,
    127 F.Supp.2d 418 (S.D.N.Y. 2001)...........................................................20

*In re Currency Conversion Fee Antitrust Litig.*,
    2006 U.S. Dist. LEXIS 81440 (S.D.N.Y. Nov. 8, 2006) ............................9

*In re J.P. Morgan Chase Cash Balance Litig.*,
    242 F.R.D 265 (S.D.N.Y. 2007) .................................................................21

*In re Lloyd's Am. Trust Fund Litig.*,
    2002 U.S. Dist. LEXIS 22663 (S.D.N.Y. Nov. 26, 2002) .........................15

*In re Marsh ERISA Litig.*,
    265 F.R.D. 128 (S.D.N.Y. 2010) ...............................................................16

*In re NASDAQ Market-Makers Antitrust Litig.*,
    169 F.R.D. 493 (S.D.N.Y. 1996) ...............................................21, 22, 23, 25

*In re NASDAQ Market-Makers Antitrust Litig.*,
    176 F.R.D. 99 (S.D.N.Y. 1997)..................................................................8

*In re Natural Gas Commodities Litig.*,
    231 F.R.D. 171 (S.D.N.Y. 2005) ...............................................................21

*In re PaineWebber Ltd. P'ship Litig.*,
    171 F.R.D. 104 (S.D.N.Y. 1997) ...............................................................18

*In re Playmobil Antitrust Litig.*,
    35 F. Supp. 2d 231 (E.D.N.Y. 1998) .....................................................21, 23, 25

*In re Prudential Sec. Ltd. P'ships Litig.*,
    164 F.R.D. 362 (S.D.N.Y. 1996) ...............................................................15

*In re Sumitomo Copper Litig.*,
    189 F.R.D. 274 (S.D.N.Y. 1999) ...........................................................24

*In re Telectronics Pacing Systems, Inc.*,
    172 F.R.D. 271 (S.D. Ohio 1997) ..........................................................24

*In re Toys "R" Us Antitrust Litig.*,
    191 F.R.D. 347 (E.D.N.Y. 2000) ........................................................8, 19

*In re Visa Check/Mastermoney Antitrust Litig.*,
    280 F.3d 124 (2d Cir. 2001) .......................................................20, 23, 24

*In re Vitamin C Antitrust Litig.*,
    279 F.R.D. 90 (E.D.N.Y. 2012) .........................................................., 21, 23

*In re Vitamins Antitrust Litig.*,
    2000 U.S. Dist. LEXIS 8931 (D.D.C. Mar. 31, 2000)........................9, 19

*Menkes v. Stolt-Nielsen S.A.*,
    270 F.R.D. 80 (D. Conn. 2010) .............................................................20

*Moore v. PaineWebber, Inc.*,
    306 F.3d 1247 (2d Cir. 2002)................................................................23

*Nieves v. Cmty. Choice Health Plan of Westchester, Inc.*,
    2012 U.S. Dist. LEXIS 37720 (S.D.N.Y. Feb. 24, 2012) ........................9

*Robinson v. Metro-North Commuter R.R. Co.*,
    267 F.3d 147 (2d Cir. 2001) .................................................................22

*Sullivan v. DB Invs., Inc.*,
    667 F.3d 273 (3d Cir. 2011)..................................................................23

*Weinberger v. Kendrick*,
    698 F.2d 61 (2d Cir. 1982).....................................................................8

*White v. National Football League*,
    822 F. Supp. 1389 (D. Minn. 1993) .......................................................18

## FEDERAL STATUTES

15 U.S.C.

    § 15.....................................................................................................8, 15

    § 26.........................................................................................................1

§ 26.................................................................................................................................1

## FEDERAL RULES

Federal Rule of Civil Procedure 23 ...................................................................... *passim*

## SECONDARY AUTHORITIES

Herbert B. Newberg & Alba Conte, Newberg on Class Actions § 12.10 (3d ed. 1992) ..............19

## I.      INTRODUCTION

Plaintiff States[1] and Settlement Class[2] ("Plaintiffs") submit this memorandum in support of their motion for preliminary approval of their settlements with Holtzbrinck Publishers, LLC, d/b/a Macmillan ("Macmillan") and Penguin Group (USA), Inc. ("Penguin"), pursuant to Sections 4, 4C, 15 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 15c, 25 and 26. The proposed settlement with Macmillan ("Macmillan Settlement") provides for a $20 million payment to consumers while the proposed settlement with Penguin ("Penguin Settlement") requires payment of $75 million for consumers, (collectively "Settlement Agreements" or "Settlements"). Both Settlements impose injunctive relief and resolve claims for an alleged unlawful agreement to fix the prices of electronic books ("E-books") in violation of federal and state antitrust laws. The proposed settlements are sufficiently fair, reasonable, and adequate to justify notifying affected consumers throughout the United States, provisionally certifying a class of E-book purchasers for settlement purposes, and initiating a procedure under which consumers may qualify for credits or checks.

## II.      PROCEDURAL HISTORY

### A.      The Plaintiffs' Investigations

Plaintiff States' Second Amended Complaint ("Plaintiff States' Complaint") and Settlement Class's Consolidated Amended Class Action Complaint ("Class Plaintiffs' Complaint"; collectively, "Complaints") filed in this action allege that Macmillan, Penguin and

---

[1]     "Plaintiff States" are the States and Commonwealths of Alabama, Alaska, Arizona, Arkansas, Colorado, Connecticut, Delaware, District of Columbia, Idaho, Illinois, Indiana, Iowa, Kansas, Louisiana, Maryland, Massachusetts, Michigan, Missouri, Nebraska, New Mexico, New York, North Dakota, Ohio, Pennsylvania, Puerto Rico, South Dakota, Tennessee, Texas, Utah, Vermont, Virginia, West Virginia, and Wisconsin.

[2]     "Settlement Class" includes all natural persons who have purchased E-books published by the Named Publishers during the period from April 1, 2010 until May 21, 2012, who resided in any U.S. State, Commonwealth or Territory, other than Plaintiff States, at the time of their purchase.

others entered into an unlawful conspiracy to raise and fix the prices of E-books to consumers. Across all E-book outlets, the conspiracy significantly increased prices paid by consumers.

As was previously detailed for this Court,[3] Plaintiff States' Complaint was the culmination of a two-year investigation by the States of Texas and Connecticut, coordinated with a separate investigation by the United States Department of Justice ("DOJ"). To evaluate the conduct at issue, Texas and Connecticut issued civil investigative demands ("CIDs"), reviewed hundreds of thousands of documents and hundreds of interrogatory responses as well as conducted and attended interviews and sworn statements of various interested parties, including the CEOs and other executives of Hachette Book Group, Inc. ("Hachette"), HarperCollins Publishers LLC ("HarperCollins"), Simon & Schuster, Inc. ("Simon & Schuster") Penguin and Macmillan (collectively, "the Agency Five") and Apple, Inc.("Apple").

Settlement Class Counsel began its investigation in about April 2010, after market prices for titles of the E-books that the publisher defendants sold all went up by 30 to 50 percent – nearly simultaneously. This highly suspicious pricing behavior caused Settlement Class Counsel to start analyzing the market and developing the facts pled in the first civil litigation filed, *Petru, et al. v. Apple Inc., et al.*, No. 11-cv-03892-EMC (N.D. Cal.). Class Counsel retained experts and investigators who, collectively, spent more than 200 hours analyzing the market and retrieving electronic pricing information to present robust factual allegations in the *Petru* action. On December 9, 2011, the United States Judicial Panel on Multidistrict Litigation transferred all related actions to the Southern District of New York. On December 21, 2011, this Court appointed Hagens Berman Sobol Shapiro LLP and Cohen Milstein Sellers & Toll PLLC as co-

---

[3]    *Texas, et al. v. Hachette Book Group, Inc. et al.*, No.12-cv-6625 (S.D.N.Y.), States' Memoranda for Preliminary and Final Approval (ECF Nos.11 and 68).

lead counsel for the plaintiff classes, after which they filed the consolidated Class Plaintiffs'
Complaint.

**B.      Litigation to Date**

Macmillan, Penguin and their codefendants moved to dismiss the Class Plaintiffs'
Complaint. The Court denied the motions to dismiss on May 16, 2012, and the parties began
several months of coordinated discovery. Plaintiffs obtained and analyzed more than 1.6 million
additional documents and detailed transactional data from the six defendants and numerous third
parties, and conducted more than 54 depositions in coordination with the DOJ. In advance of the
June 3, 2013 bench trial to determine liability, Plaintiff States, Macmillan and Penguin retained
expert economists who prepared reports analyzing the evidence of a conspiracy.

**C.      Settlement Negotiations**

By June 2011, the investigating States had concluded that the actions of the publishers
and Apple likely constituted an anticompetitive conspiracy in restraint of trade. Accordingly, in
coordination with the DOJ, the States began meeting with the publishers to discuss these
concerns and afford the publishers the opportunity to resolve them. In meetings over the next
nine months, the publishers were represented by some of the most capable and renowned law
firms in the world, as well as expert economists and senior members of their management teams.
By late fall of 2011, the parties were discussing potential changes to business practices to help
alleviate the States' concerns. In a series of conference calls and in-person meetings, the States
engaged the publishers both as to the States' rationale for the demanded injunctive relief and the
appropriate amount of consumer damages. The States presented the publishers with evidence that
their conspiracy had engendered E-book price increases across their catalogues.

The States eventually were able to reach settlement agreements with two of the five
publishers, but were unable settle with the others. Accordingly, on April 11, 2012, the States

filed their Complaint against Simon & Schuster, Macmillan, Penguin, and Apple. The States continued negotiations and successfully reached agreement with Simon & Schuster. The settlements between Attorneys General of 55 jurisdictions and Hachette, Simon & Schuster, and HarperCollins were approved by this Court on February 8, 2013 (hereinafter "Previously Approved Settlements").[4]

The States and the remaining publisher defendants, Macmillan and Penguin, continued to communicate regarding potential settlement. In the fall of 2012, Macmillan and the States attended mediation with United States District Judge Kimba Wood. In preparation for that mediation, Macmillan and the States conducted multiple calls between the parties' trial counsel and economics experts. On December 19, 2012, the parties met with Judge Wood for what turned out to be a very fruitful day-long mediation session. While the parties did not reach agreement on that day, negotiations intensified, and, on February 7, 2013, Macmillan and Texas, on behalf of the 33 Plaintiff States, executed a Memorandum of Understanding ("MOU").

Since the summer of 2012, Macmillan had been separately engaged in extensive negotiations with Class Counsel regarding a potential settlement for consumers in the 23 states and territories not represented by Plaintiff States. During these negotiations, both Macmillan and Class Counsel were represented by experienced and knowledgeable lawyers and supported by expert economists who had access to the same data and documents available to the States. On February 7, 2013, Macmillan and Class Counsel finally reached agreement on the terms of the class settlement ("Class Settlement"). In terms of recovery to consumers, the State Settlement and the Class Settlement are identical.

---

[4]   *Id. at* ECF No. 71.

Counsel for the States, Class and Macmillan immediately began work to finalize these settlements. Using the earlier, Court-approved settlement agreements as a template, counsel for the parties executed the Macmillan Settlement on April 25, 2013. That Settlement Agreement was additionally reviewed and executed by each of the 33 Plaintiff States' Attorneys General. An executed copy the Macmillan Settlement is attached as Exhibit A.

On March 7, 2013, the States and Penguin participated in a mediation session with Judge Woods. While they did not reach agreement on that day, the session provided a starting point for more serious negotiations. On May 16, 2013, Penguin, Class Counsel and the States met in Austin and agreed to the terms of a settlement. These terms were immediately memorialized in a settlement agreement almost identical to that used in the Macmillan Settlement. Finally, on May 20, 2013, the parties executed the Penguin Agreement, a copy of which is attached as Exhibit B.

### III.     THE PROPOSED SETTLEMENT

The Settlements with Macmillan and Penguin are comprised of two components: (1) monetary payments and (2) equitable relief in the form of an injunction.

### A.     Monetary Payments and Distributions

#### 1.     Consumer Compensation

The primary component of the Settlements is payment to natural-person consumers who purchased E-books from any Agency Five publisher from April 1, 2010 to May 21, 2012. ("Eligible consumer") Macmillan will pay $20 million and Penguin will pay $75 million into a consumer compensation escrow account established by Plaintiff States' Escrow Agent.[5] The escrow funds are intended to be qualified settlement funds within the meaning of Treas. Reg. Sections 1.468B-1, *et seq.*

---

[5]     The Ohio Attorney General contracted with Fifth Third Bank to act as Escrow Agent in the Previously Approved Settlements and has executed addenda to incorporate the Macmillan and Penguin Settlement Agreements.

These funds, together with any accrued interest, will be distributed according to the Consumer Distribution Plan, described in Section VI. If consumer funds remain after initial distribution, the Settlement Agreement contemplates such funds be reserved for additional future consumer distribution resulting from settlement or judgment. Any residue will be distributed *cy pres* to one or more charitable organization(s) whose purposes relate to reading, literacy or access by the public to electronic books or as otherwise directed by the Court, subject to any applicable state laws mandating a different distribution with respect to any such residue.[6]

### 2.   Plaintiff States' Compensation

Both Macmillan and Penguin also will pay Plaintiff States. These funds will be divided among the Plaintiff States as agreed among themselves for several delineated purposes, including reimbursements for costs of investigation and attorneys' fees, and payments for experts and costs of litigation against the non-settling defendant in the on-going litigation. Macmillan's payment of $3 million and Penguin's payment of $7 million are to be paid into a segregated State Compensation escrow account.

### 3.   Payment of Class Counsel Attorneys' Fees and Costs

Macmillan and Penguin further agree to pay to Counsel for the Settlement Class $2,475,000 and $8 million, respectively, for their attorneys' fees, costs of investigation, litigation and other related costs. This award shall be paid to an account designated by Counsel for Settlement Class within 30 days after the Court executes an order.

---

[6] If such *cy pres* distribution is ultimately made, the percentage of any residue attributable to purchases by class consumers will be distributed to Reading is Fundamental ("RIF"), a non-profit organization dedicated to motivating children to become lifelong readers. The remaining residue attributable to Plaintiff State consumers may also be distributed to RIF and/or additional, appropriate charities as approved by the Court.

### 4.   Class Plaintiffs' Compensation

Macmillan and Penguin will each pay a service award for the 25 Settlement Class Plaintiffs up to a maximum of $1,000 each, or as otherwise awarded by the Court. This amount shall be paid into an account designated by Counsel for the Settlement Class within thirty (30) days after the Court orders them.

### 5.   Settlement Notice and Administration Costs

Finally, Macmillan and Penguin will pay all reasonable costs associated with administering the Settlements, including expert costs and the consumer notice and distribution program. Each one has deposited the sum of $750,000 into a segregated Escrow Account. And each must make additional payments to the Settlement Cost Account, if needed, upon notice from Plaintiffs' counsel.

## B.   Equitable Relief: Injunction

Macmillan and Penguin have each agreed to the entry of injunctions that specifically incorporate the terms and conditions of the DOJ's Proposed Final Judgments for these two defendants in *United States of America v. Apple, Inc., et al.*, Case No. 12-cv-2826 (S.D.N.Y.).[7] The injunctions preclude further conspiratorial conduct, establish a monitoring and reporting program, and impose certain requirements that must be met if the publishers wish to conduct business with retailers under the agency model. These requirements are intended to reestablish price competition in a market free of the taint of the prior conspiracy.

## C.   Release of Claims

Plaintiffs shall release the claims of individual consumers who purchased E-books from any of the Agency Five publishers from April 1, 2010 to May 21, 2012, with the exception of

---

[7]   Exhibits A and B and attachments thereto.  These Injunctions shall be modified to take into account any changes made to DOJ's Proposed Final Judgments so that both injunctions are the same in substance.

claims of individual consumers who exercise the right to exclude themselves from the Settlements. These releases will only be for claims against Macmillan and Penguin.

The Plaintiff States will also release their sovereign enforcement claims against Macmillan and Penguin that arise from the conduct alleged in the Complaints. Finally, the Plaintiff State Attorneys General agree not to seek damages from or otherwise to establish liability against, Macmillan or Penguin based on the conduct set forth in the Complaints.

## IV.    THE SETTLEMENTS MEET THE STANDARDS FOR JUDICIAL APPROVAL

### A.    The Settlements Meet the Standard for Preliminary Approval

Attorneys General of the Plaintiff States brought their complaint in their capacity as *parens patriae* and under the authority of Section 4C of the Clayton Act, 15 U.S.C. § 15c. Settlement Class Counsel brought their action under the authority of Section 4 of the Clayton Act, 15 U.S.C. § 15 and as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure. Settlements in such actions require judicial approval, which will be given if the Court concludes the settlements are fair, reasonable and adequate.[8] Court approval of *parens patriae* and class action settlements is a two-step process. First, the court makes a preliminary evaluation of the fairness of the settlement.[9] "Once preliminary approval is bestowed, the second step of the process ensues; notice is given to the class members of a hearing, at which time class members and the settling parties may be heard with respect to final court approval."[10]

Preliminary approval does not require a full fairness hearing. Rather, "[w]here the proposed settlement appears to be the product of serious, informed, non-collusive negotiations, has no obvious deficiencies, does not improperly grant preferential treatment to class

---

[8]    *See, e.g., In re Toys "R" Us Antitrust Litig.*, 191 F.R.D. 347, 351 (E.D.N.Y. 2000); *Weinberger v. Kendrick*, 698 F.2d 61, 73 (2d Cir. 1982).

[9]    *In re NASDAQ Market-Makers Antitrust Litig.*, 176 F.R.D. 99, 102 (S.D.N.Y. 1997).

[10]    *Id.*

representatives or segments of the class and falls within the range of possible approval, preliminary approval is granted."[11] "Preliminary approval of a class action settlement, in contrast to final approval, 'is at most a determination that there is what might be termed 'probable cause' to submit the proposal to class members and hold a full-scale hearing as to its fairness.'"[12]

Requirements for preliminary approval have been met for both the Macmillan and Penguin Settlements. All counsel were well-informed of the issues; extensive investigations had been conducted by the States, DOJ and Class Counsel before settlement negotiations proceeded in earnest in late 2011 and the investigations continued during months of sporadic negotiations. Settlement negotiations and mediation continued as Plaintiffs pursued litigation. Each side fully articulated its positions on numerous occasions. Ultimately, these negotiations resulted in the Settlement Agreements now submitted for this Court's approval.

The $95 million combined settlement amount for Consumers is a recovery of more than the estimated single damages and, therefore, is within the range of possible approval. Further, these Settlements have no "obvious deficiencies" nor do they grant preferential treatment. To the contrary, these Settlements provide extra protections for consumers as no part of the combined $95 million consumer funds will be used for attorneys' fees or administrative costs.[13] Separate funds totaling $10 million will be used by Plaintiff States for payment of investigation and litigation costs, attorneys' fees and/or any of the other purposes specifically identified in the Settlement Agreements. Class Counsel's attorneys' fees and costs and Class representatives'

---

[11]   *In re Currency Conversion Fee Antitrust Litig.*, No. 1409, 2006 U.S. Dist. LEXIS 81440, at *13 (S.D.N.Y. Nov. 8, 2006) (quoting *In re NASDAQ*, 176 F.R.D. at 102.).

[12]   *Nieves v. Cmty. Choice Health Plan of Westchester, Inc.*, No. 08 CV 321 (VB)(PED), 2012 U.S. Dist. LEXIS 37720, at *12 (S.D.N.Y. Feb. 24, 2012) (quoting *Menkes v. Stolt-Nielsen S.A.*, 270 F.R.D. 80, 101 (D. Conn. 2010)).

[13]   A separate fund for payment of attorneys' fees provides the beneficiaries of the settlement greater certainty because the amount of money each will receive is not reduced by an award of attorneys' fees. *In re Vitamins Antitrust Litig.*, No. 99-197 (TFH), 2000 U.S. Dist. LEXIS 8931, at *21 n.3 (D.D.C. Mar. 31, 2000).

service awards also will be paid separately. Separate accounts have already been established, and initially funded, to pay for settlement administrative costs. The Consumer Compensation funds will be used solely to pay Eligible Consumers throughout the United States, maximizing consumer benefit.

**B.    The Settlements Are Fair, Reasonable and Adequate**

No further evaluation of the Settlements is needed at this time to grant preliminary approval. If the Court grants preliminary approval, a complete review of all applicable standards for final approval will be provided after notice has been given. However, this Court has the additional benefit of knowing now that these Settlements sufficiently satisfy the more comprehensive requirements for final approval as well. This Court reviewed the eight relevant *Grinnell*[14] factors as they related to the Previously Approved Settlements before granting final approval to those settlements.[15] The factual and legal basis supporting the final approval for the Previously Approved Settlements apply at least as clearly to the Macmillan and Penguin Settlements: the underlying investigation and related, complex litigation focused on all settling defendants and has proceeded with significant, additional discovery, and the anticipated response of class members is expected to be at least as positive as it was to the Previously Approved Settlements.

Significantly, the settlement amounts for both the Macmillan and Penguin Settlements are superior recoveries to the Previously Approved Settlements based on the percentage of

---

[14]    The nine Grinnell factors are 1) complexity, expense and likely duration of the litigation, 2) reaction of the class to settlement, 3) state of the proceeding and amount of discovery completed, 4) risks of establishing liability, 5) risks of establishing damages, 6) risks of maintaining the class action through the trial, 7) ability of defendant to withstand a greater judgment, 8) range of reasonableness of settlement fund in light of best possible recovery, and 9) range of reasonableness of settlement fund to a possible recovery in light of the attendant risks of litigation. *City of Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir. 1974). The sixth factor, maintenance of the class, was not an issue in the prior *parens*-only settlements.

[15]    See *Texas v. Hachette*, Case No.12-cv-6625,Transcript of February 8, 2013 fairness hearing for Final Approval of Settlements with HarperCollins, Simon & Simon and Hachette, ("Hearing Tr.")

publisher-specific damages. In approving the Previously Approved Settlements, the Court found the settlement funds provided consumers "slightly over half of the calculated damages based on the sales made by the three settling publishers…" The Court then found the total amount was an "utterly reasonable settlement amount" under the circumstances of the case.[16]

Using the same data and methodology as he used in evaluating the Previously Approved Settlements, Professor Wickelgren has calculated that the Macmillan and Penguin Settlements would provide approximately 118% of estimated damages attributable to the Macmillan and Penguin sales.[17] These Settlements provide a larger percentage recovery than the previously approved settlements, while avoiding the risks of litigation. As such, these Settlements similarly deserve a finding of being fair, reasonable and adequate.

## V.   THE NOTICE PLAN MEETS THE STANDARDS FOR JUDICIAL APPROVAL

The proposed Consumer Notice Plan is attached as Exhibit D. Because the Notice Plan used in the Previously Approved Settlements provided an unprecedented level of direct notice to eligible consumers, Plaintiffs' current Notice Plan proposes to employ the same processes, customer information, notice format and notice venues.

### A.   Description of the Notice Plan

The Notice Plan proposes both direct and indirect notice:  direct notice to approximately 99 percent of class members through an e-mail campaign, and indirect notice through an Internet and publication campaign.[18]

---

[16]   *Id.* at 8.

[17]   Exhibit C, Declaration of Abraham Wickelgren, ¶ 21.

[18]   Exhibit E, Declaration of Katherine Kinsella for Kinsella Media.

### 1.    Direct Notice

For the Previously Approved Settlements, the States worked with E-books retailers Amazon, Barnes & Noble, Apple, Kobo, Sony and Google, each of which identified a list of their customers meeting the criteria to be an Eligible Consumer under those settlements: any individual who bought an E-book from any of the Agency Five publishers from April 1, 2010 through May 21, 2012 and who was a resident of any U.S. State, Commonwealth or Territory (except Minnesota) at the time of their purchase.  Amazon, Barnes & Noble, Kobo and Google sent direct email notice to each of their eligible consumers, while the Claims Administrator, Rust Consulting ("Claims Administrator") contracted with a vendor to email notices to eligible customers identified by Apple and Sony. These email notices informed customers clearly about the Previously Approved Settlements, the right to object to or opt out during a 60-day notice period, and a link to the Settlement website. The notice also informed consumers whether they were eligible for an automatic payment by credit or check, or would have to file a claim form in order to receive a check. All consumers were also informed of their right to request a check in lieu of any applicable credit.

Plaintiffs' current Notice Plan proposes that a very similar direct notice regarding the Macmillan and Penguin Settlements be sent by the same means to individuals who are Eligible Consumers under any of the current six settlements, which include the three Previously Approved Settlement, the Macmillan Settlement, the Penguin Settlement and the recently – executed settlement between Class Plaintiffs for Minnesota residents and publishers HarperCollins, Simon & Schuster and Hachette ("Minnesota-only Settlement")[19] (collectively "Six Settlements"). The proposed notices will contain an explanation that consumer funds from

---

[19]    A separate Motion for Preliminary Approval of the Minnesota-only Settlement is being filed by Class Counsel contemporaneously with the Plaintiffs' Motion herein.

the Six Settlements will be aggregated so consumers can receive a single payment for purchases from any given retailer.

However, the current Notice Plan proposes several modifications to the Plan approved in the Previously Approved Settlements. First, Plaintiffs propose to reduce the notice period to 45 days to allow consumers to receive their payments more quickly. The shortened notice period will not be detrimental to consumers, as few consumers will need to file a claim form to receive payment, and, to the extent that any consumers need to file additional claims, they can quickly obtain all necessary information.

Second, any eligible consumer who filed a valid claim form in the Previously Approved Settlements will not have to again file a claim form for the same purchases in order to receive their share of the consumer fund from the current Settlements. Because the Previously Approved Settlements provided for consumer fund distribution based on the purchase of E-books from any of the five alleged co-conspirator publishers, any valid claim form filed in the Previously Approved Settlements included a list of all eligible books purchased by a consumer.

Plaintiffs propose an additional, related change to the proposed claim process: even though the claims period for filing claims for the Previously Approved Settlements has closed, consumers who file valid, first-time claims forms in either the Macmillan or Penguin Settlements will be allowed to share in the distribution of funds established by the Previously Approved Settlements. This proposal is made to provide more parity between the vast majority of eligible consumers who do not have to take any action to benefit from all of the settlements and those very few eligible consumers who have to file a claim form to secure the same benefits.

Finally, a separate accommodation is made for eligible Minnesota consumers. Although Minnesota consumers were *not* eligible under the Previously Approved Settlements,[20] they are class members in the Macmillan and Penguin Settlements and are the only eligible consumers in the Minnesota-only Settlement. Because the parties to all Six Settlements wish to integrate the administration and distribution of the settlements to the fullest extent possible, Minnesota residents will be identified and provided direct notice from retailers and/or the Claims Administrator in the same manner as all other consumers. The content of the notices will be slightly different. The cooperating E-book retailers will each create a separate list of eligible Minnesota consumers, who will then receive direct email notice with all the same information regarding their rights under the Macmillan and Penguin Settlements, as well as additional information about their rights and responsibilities related to the Minnesota-specific Settlement.[21] The description of the aggregated funds from multiple settlements will also be different because the amount and source of funds being distributed to Minnesota residents are slightly different than those for other consumers. (*See* Section VI, *infra*.)

## 2.   Nationwide Internet and Publication Campaign

Although direct notice is expected to account for approximately 99% of eligible E-book purchases, additional notices, similar to those provided by Kinsella Communications, Ltd. in the Previously Approved Settlements, are included in Plaintiffs' Notice Plan. Upon Court approval, Kinsella will place internet banner advertising on numerous online resources to alert eligible

---

[20]   The Attorney General for Minnesota chose not to join in the Previously Approved Settlements therefore Minnesota residents were not eligible for compensation under those settlements.

[21]   Exhibit D, Notice Plan, Attachment B.

consumers about the current Settlements. A summary notice published in the territories will inform consumers of the proposed Settlements.[22]

Both the direct and indirect notices will provide the Claims Administrator's toll-free telephone number and Settlement website address, where consumers can obtain answers to questions or receive mailed copies of forms or notice materials. The Settlement website will contain links to the States' and Class Complaints, the Settlement Agreements, other court filings, claim forms, exclusion forms and other information related to the Settlements. Minnesota residents will be directed to a Minnesota-specific area of the website for information specific to their claims.[23]

## B.    The Proposed Notice Plan Meets the Requirements of Due Process

Eligible consumers are entitled to notice of the proposed settlement and their rights thereunder, including the right to exclude themselves and the opportunity to be heard.[24] The mechanics of the notice process, however, are within the discretion of the Court subject only to the "broad 'reasonableness' standards imposed by due process."[25]

The Plaintiffs believe that the combination of direct email notice, internet notice and published notice will result in a very high percentage of actual notice to millions of affected consumers, ensuring that the Notice Plan not only meets, but exceeds the mandates of due process and Rule 23. The Notices "fairly, accurately, and neutrally describe the claims and parties in the litigation, as well as the terms of the proposed settlement[s] and the identity of

---

[22]    Exhibit E, Declaration of Kathy Kinsella for Kinsella Media.

[23]    Exhibit F, Declaration of Kim Schmidt for Rust Consulting.

[24]    *See* 15 U.S.C. § 15c(b)-(c); *In re Lloyd's Am. Trust Fund Litig.*, No. 96 Civ. 1262 (RWS), 2002 U.S. Dist. LEXIS 22663 (S.D.N.Y. Nov. 26, 2002).

[25]    *In re Prudential Sec. Ltd. P'ships Litig.*, 164 F.R.D. 362, 368 (S.D.N.Y. 1996), *aff'd, Toland v. Prudential Sec., Inc.*, 521 U.S. 1119 (1997).

persons entitled to participate in [them]," as well as apprising affected consumers of their options with regard to the proposed Settlements.[26]

## VI.    THE DISTRIBUTION PLAN MEETS THE STANDARDS FOR JUDICIAL APPROVAL

The proposed Consumer Distribution Plan generally tracks the provisions of the Distribution Plan approved in the Previously Approved Settlements,[27] with two main additions: (1) distribution amounts will be based on aggregating consumer funds from the Six Settlements; and (2) an accommodation is made for Minnesota residents. This process will provide a high claim rate for consumers while minimizing administrative expenses. This Consumer Distribution Plan is attached as Exhibit G.

### A.    Consumer Distribution Plan

Plaintiffs propose that distribution shall be made to all identified Eligible Consumers. Based on differing estimated overcharges, different compensation amounts will be given for purchases of New York Times Bestsellers as opposed to non-New York Times Bestsellers. The technology associated with the purchase of E-books provides multiple avenues for consumers to realize the value of their specific distribution amounts. Consumers may choose to receive the value of their distribution by applying it to additional purchases of either E-books or print books in the form of credits on their current accounts, or by requesting a check for the same amount.

The largest E-book retailers have now identified all Eligible Consumers, including Minnesota customers. Some of these retailers created internal systems to calculate distribution amounts and apply credits to customer accounts. Since Amazon, Barnes & Noble, Apple and Kobo have agreed to cooperate in the Consumer Distribution Plan, up to 98% of all consumers

---

[26]   *In re Marsh ERISA Litig.*, 265 F.R.D. 128, 145 (S.D.N.Y. 2010) (citing *Foe v. Cuomo*, 700 F. Supp. 107, 113 (E.D.N.Y. 1988), aff'd, 892 F.2d 196 (2d Cir. 1989)).

[27]   While approving the earlier settlements, the Court also granted Plaintiff States' request to delay actual distribution pending future settlements.

will be eligible to automatically receive a credit to their Kindle, Nook, iBookstore or Kobo accounts without taking any action. Any consumer who wishes to receive a check instead of a credit may request one from the Claims Administrator.[28] The Claims Administrator will provide a list of customers who have elected either to opt-out or to receive a check to each retailer participating in the distribution of credits.

Sony is not technologically able to provide automatic credits but can provide data on eligible purchases to the Claims Administrator who will automatically send checks to eligible consumers. Google can only send notices to eligible customers, telling them how to submit claims on the Settlement website.

After final approval, crediting retailers will credit customers' accounts and inform such customers that their credits are available to use. These retailers will also send an email reminder after six months to customers that have not used their credits. After a retailer has properly invoiced the credits used by its customers, the Claim Administrator will reimburse that retailer from the Escrow funds. Unused credits shall expire one year after they were made available.

Funds from all current settlements will be aggregated and, because of the unique position of Minnesota residents as explained above, accommodation will be made in the Distribution Plan to ensure they receive their fair share of related settlements.[29] Therefore, from the settlement funds, $162,249,426 will be made available for distribution to non-Minnesota residents. This includes all consumer funds from the Previously Approved Settlements and all consumer funds from the Macmillan and Penguin Settlements, less the amounts attributable to Minnesota sales. For Minnesota residents, $3.909 million from the settlement funds will be made available for

---

[28] Exhibit G, Distribution Plan, ¶A.4.

[29] A Distribution Plan that generally tracks the language Exhibit G but which also identifies the Minnesota-specific differences will be available for Minnesota consumers on the Settlement website.

distribution. This includes all consumer funds from the Minnesota-only settlement, and consumer funds from the Macmillan and Penguin Settlements that are attributable to Macmillan and Penguin sales to eligible Minnesota residents.

Distributions to all consumers will employ the same processes, terms, conditions and limitations. And the method of calculating payment for each book will be the same. All consumers will receive an amount for each eligible New York Times Bestseller, and will receive a slightly lower amount for each eligible non-New York Times Bestseller. However, because the proportion of eligible books to the total amount of funds is different for Minnesota residents, the payments related to Minnesota purchases will be slightly different from the non-Minnesota payments.[30]

The per book amounts to be distributed were calculated based on the number of eligible E-books identified by the retailers and on the claims filed in the Previously Approved Settlements. Following completion of the claims period for the current Settlements, the per-unit recoveries will be recalculated to insure the distribution of as much of the consumer funds as possible in accordance with the requirements of the Plan.

## B.   The Distribution Plan Is Fair and Reasonable

The fair, adequate and reasonable standard also applies to the plan of distribution.[31] The Distribution Plan is intended to partially compensate all eligible consumers for overcharges incurred on their purchases of New York Times Bestseller E-books and non-New York Times Bestseller E-books proportionate to the estimated harm. Settlement distributions which apportion

---

[30]   Exhibit C, Declaration of Professor Wickelgren, ¶¶23-28.

[31]   *In re PaineWebber Ltd. P'ship Litig.*, 171 F.R.D. 104, 132-33 (S.D.N.Y. 1997); *White v. National Football League*, 822 F. Supp. 1389, 1417 (D. Minn. 1993).

available funds relative to damages have repeatedly been deemed fair and reasonable by courts.[32]

Moreover, all E-book consumers, now and in the future, benefit from the settlement as

beneficiaries of the injunctive relief to which Macmillan and Penguin have agreed.[33]

## VII.   THE PROPOSED CLASS MEETS ALL THE REQUIREMENTS OF RULE 23

### A.   Definition of the Proposed Macmillan and Penguin Settlement Class

The Macmillan and Penguin Settlement Class consists of natural persons who purchased

E-books published by the Agency Five from April 1, 2010 until May 21, 2012, who resided in

one of the following states, territories or commonwealths at the time of their E-book purchase:

American Samoa, California, Florida, Georgia, Guam, Hawaii, Kentucky, Maine, Minnesota,

Mississippi, Montana, Nevada, New Hampshire, New Jersey, North Carolina, Northern Mariana

Islands, Oklahoma, Oregon, Rhode Island, South Carolina, U.S. Virgin Islands, Washington, or

Wyoming.[34] Except for geographical distinctions, this Class mirrors that of the *parens patriae*

action for the 33 other states, commonwealths and territories.

### B.   Certification of the Proposed Class Is Proper for Settlement Purposes

The Court must first determine whether the proposed settlement class is a proper class for

settlement purposes.[35] The Court may certify a class where plaintiffs demonstrate that the

proposed class and proposed class representatives meet the prerequisites in Rule 23(a) –

numerosity, commonality, typicality and adequacy of representation – and one of the three

---

[32]   *Vitamins Antirust Litig.*, 2000 U.S. Dist. LEXIS 8931, at *32 (citing *Beecher v. Able*, 575 F.2d 1010, 1013-14 (2d Cir. 1978)); *see also* Herbert B. Newberg & Alba Conte, Newberg on Class Actions § 12.10 (3d ed. 1992) (noting that settlement agreements may provide for pro rata distributions based on the fraction of a claimant's loss to the total aggregate recognized loss); Fed. Judicial Ctr., Manual for Complex Litig., 246-48 (3d ed. 1995).

[33]   *See Toys R Us*, 191 F.R.D. at 353 (the toy-consuming public will benefit from the injunctive relief and from the antitrust deterrent inherent in the successful and expeditious conclusion of this litigation).

[34]   *See* Exhibit A (Settlement Agreement by and Among Holtzbrinck Publishers, LLC, D/B/A Macmillan and Plaintiff States and Settlement Class, at 2 (definition of Plaintiff States), at 3 (definition of Consumers) and at 7 (definition of Settlement Class)).

[35]   *See e.g.*, *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997) (courts examine whether the proposed class would be adequately represented and fairly treated by a class action settlement).

requirements of Rule 23(b).[36] To establish a class under Rule 23(b)(3), it must be shown that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."[37] In certifying a settlement class, the court is not required to determine whether the action, if tried, would present intractable management problems.[38] Rather, whether to certify a class rests in the court's discretion.[39]

### 1.     Plaintiffs Meet the Prerequisites of Rule 23(a)

The class meets the four requirements of Rule 23(a) – numerosity, commonality, typicality and adequacy.

#### a.     The Class Meets the Numerosity Requirement

Based on information provided by six E-book retailers, it is estimated that the class (which represents approximately 40% of eligible consumers) consists of over 9 million members, which makes joinder of all settlement class members impracticable.[40]

#### b.     Questions of Law and Fact Are Common to the Class

The Rule 23(a)(2) requirement of common questions of law or fact is "not a demanding standard" and "is established so long as the plaintiffs can identify some unifying thread among the [class] members' claims."[41] Commonality does not require a showing that all the questions

---

[36]   Fed. R. Civ. P. 23; *In re Visa Check/Mastermoney Antitrust Litig.*, 280 F.3d 124, 132-33 (2d Cir. 2001).

[37]   Fed. R. Civ. P. 23(b)(3).

[38]   *Amchem Prods.*, 521 U.S. at 620 ("Confronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems . . . for the proposal is that there be no trial") (internal citations omitted).

[39]   *See In re Am. Bank Note Holographics, Inc.*, 127 F.Supp.2d 418, 429 (S.D.N.Y. 2001) ("All aspects of settlement approval . . . rest in the sound discretion of the district court.").

[40]   Exhibit F, Declaration of Kim Schmidt for Rust Consulting, ¶7; *see also Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995) (numerosity is presumed at a level of 40 members).

[41]   *Menkes v. Stolt-Nielsen S.A.*, 270 F.R.D. 80, 90 (D. Conn. 2010) (alteration in original).

raised by the class are identical; it is sufficient if a single common issue is shared by the class.[42]

Antitrust price-fixing cases inherently present common questions that satisfy the requirement of

Rule 23(a)(2).[43] Here, the alleged scheme to eliminate retail price competition and elevate retail

prices for the sale of E-books plainly presents common questions of fact and law.[44]

### c.   Plaintiffs' Claims Are Typical of the Claims of the Class

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical

of the claims or defenses of the class." Typicality "does not require 'that the factual background

of each named plaintiff's claim be identical to that of all class members.'"[45] Rather, the named

plaintiff's claims must "arise from the same course of events."[46] Here, there are 25 proposed

Settlement Class Plaintiffs, each with claims typical of the entire Settlement Class.[47] Each

plaintiff purchased E-books from one or more of the Publisher Defendants; each alleges a

common course of unlawful conduct by defendants directed against all class members; and each

---

[42]   *In re Natural Gas Commodities Litig.*, 231 F.R.D. 171, 180 (S.D.N.Y. 2005) (noting that the "common question" requirement is a "low hurdle").

[43]   *See In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493, 509 (S.D.N.Y. 1996) ("*In re NASDAQ II*") ("Numerous courts have held that allegations concerning the existence, scope, and efficacy of an alleged antitrust conspiracy present important common questions sufficient to satisfy the commonality requirement of Rule 23(a)(2).") (collecting cases); *In re Vitamin C Antitrust Litig.*, 279 F.R.D. 90, 99 (E.D.N.Y. 2012) ("The most significant question posed by this lawsuit will generate common answers among all class members: did the defendants' price-fixing agreement cause an artificial increase in the market price of vitamin C?").

[44]   *See* Consolidated Amended Class Action Complaint ("Class Complaint") at ¶¶ 10-20, Case No. 11-md-02293 (S.D.N.Y.), Jan. 20, 2012, ECF No. 47.

[45]   *In re J.P. Morgan Chase Cash Balance Litig.*, 242 F.R.D 265, 272-73 (S.D.N.Y. 2007). *See also In re Playmobil Antitrust Litig.*, 35 F. Supp. 2d 231, 242 (E.D.N.Y. 1998) ("Typicality refers to the nature of the claims of the representative, not the individual characteristics of the plaintiff[s]. Personal traits or variables . . . are irrelevant to the typicality criterion.'").

[46]   *In re Vitamin C*, 279 F.R.D. at 105.

[47]   The Proposed Settlement Class Plaintiffs are those named in the Class Complaint: Anthony Petru, Marcus Mathis, Christian Gilstrap, Cynthia J. Tyler, Thomas Friedman, Jeremy Sheppeck, Aloysius J. Brown, III, Anne M. Rinaldi, Laura J. Warner, Barbara Heath, Kathleen Linda Pitlock, Kathleen Weiss, Matthew A. Hosking, Diane Urbanec, Ed Macauley, Ronna Hamelin, James L. Nesmith, Lauren Albert, Sue Roberts, Shane S. Davis, Sue Ellen Gordon, Charles Leonard Pelton, Sr., Kimberly Whiteside Brooks, Steven D. Campbell, and Jessica Moyer.

claims that he or she was injured by paying unlawfully inflated prices as a result of defendants' anticompetitive scheme.[48] Nothing more is required.

> **d.    The Settlement Class Plaintiffs Will Fairly and Adequately Protect the Interests of the Class**

Rule 23(a)(4) requires that the "representative parties will fairly and adequately protect the interests of the class."[49] Courts generally consider two factors when analyzing the adequacy of the named plaintiffs: "(1) absence of conflict and (2) assurance of vigorous prosecution."[50] Certification will only be defeated by "fundamental" conflicts between the named parties and the class.[51] The proposed Settlement Class Plaintiffs readily meet the requirements of Rule 23(a)(4). They have no interests antagonistic to the unnamed class members; rather, they share the same interest in proving and recovering the damages caused by defendants' conspiracy. Additionally, they have demonstrated that they can and will pursue the action vigorously, having reviewed pleadings, submitted declarations in opposition to Penguin's motion to compel arbitration, and responded to discovery requests.[52] In sum, the Settlement Class Plaintiffs have demonstrated they can and will represent the class fairly and adequately.

> **2.    The Requirements of Rule 23(b)(3) Are Satisfied**

The proposed class's claims also meet the standards of Rule 23(b)(3), which requires the plaintiff to show that questions of law or fact common to the members of the class predominate and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

---

[48]   Class Complaint, ¶¶ 22-47.

[49]   Fed. R. Civ. P. 23(a)(4).

[50]   *Robinson v. Metro-North Commuter R.R. Co.*, 267 F.3d 147, 170 (2d Cir. 2001).

[51]   *Id.* at 35.

[52]   *See, e.g.*, Declaration of Kit A. Pierson in Support of Plaintiffs' Opposition to Defendant Penguin Group (USA), Inc.'s Motion to Stay Proceedings and Compel Arbitration, Mar. 30, 2012, ECF No. 112, Exhibits N-GG (submitting declarations from 20 of the class representatives opposing Penguin's motion to compel arbitration).

### a.    Common Questions Predominate with Respect to Antitrust Claims

"In order to meet the predominance requirement of Rule 23(b)(3), a plaintiff must establish that the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole, . . . predominate over those issues that are subject only to individualized proof."[53] "Class-wide issues predominate if resolution of some of the legal or factual questions . . . can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof."[54] Unless "it is clear that individual issues will overwhelm the common questions," the predominance requirement is satisfied.[55] The Supreme Court has stated that this test is "readily met in certain cases alleging . . . violations of the antitrust laws,"[56] because "the existence and effect of the conspiracy are the prime issues in the case and are common across the class."[57]

This case is a classic example. The overwhelming focus of Plaintiffs' evidence and theory of the case is the defendants' conscious commitment to a common scheme to elevate the prices of E-books, and each individual defendant's participation in that scheme. The documents, testimony, and data demonstrate that defendants agreed to raise retail prices for E-books and eliminate competition – and each piece of evidence focuses on the actions of defendants, rather than any individual class member.[58] Such evidence "will not vary among class members."[59]

---

[53]    *In re Visa Check*, 280 F.3d at 136 (alterations in original; internal citations omitted).

[54]    *Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1252 (2d Cir. 2002).

[55]    *In re Playmobil*, 35 F. Supp. 2d at 245.

[56]    *Amchem*, 521 U.S. at 625.

[57]    *In re Vitamin C*, 279 F.R.D. at 109; *see also Sullivan v. DB Invs., Inc.*, 667 F.3d 273 (3d Cir. 2011) (*en banc*) (predominance requirement satisfied by allegations of a price-fixing scheme and resultant inflated prices), *cert. denied, Murray v. Sullivan*, _U.S._, 132 S. Ct. 1876 (2012); *In re NASDAQ II*, 169 F.R.D.at 518 (collecting cases).

[58]    *See, e.g.*, Class Complaint, ¶¶ 5, 6, 18-19, 70, 79-82 (using defendants' public statements to demonstrate coordinated activities); ¶¶ 84-89 (using pricing data common to the class to demonstrate injury and damages); ¶¶ 152, 164 (meetings between defendants to implement the E-book price fix – evidence common to the class).

### b.  A Class Action Is Superior to Other Forms of Adjudication

Rule 23(b)(3) also requires a finding that "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." The Second Circuit has identified four factors which guide the superiority analysis: (i) the interest of class members in individually controlling separate actions; (ii) the extent of any litigation concerning the controversy already commenced; (iii) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (iv) the difficulties encountered in the management of a class action.[60] The Court should balance, "in terms of fairness and efficiency, the merits of a class action against those of 'alternative available methods' of adjudication."[61]

This case plainly satisfies the four factors outlined in *In re Visa Check*. First, no class member has demonstrated any interest in litigating her claims individually. And even if they had such an interest, as the Court recognized in denying Penguin's motion to compel arbitration, the value of an individual claim is too small for individual class members to prosecute a separate action.[62] As to the second, third and fourth factors, as is clear from this joint settlement with 33 State Attorneys General, plaintiffs have coordinated the litigation and settlement of the actions with these governmental entities. The ability to concentrate these claims in a single forum also demonstrates the superiority of a class action. It would be enormously inefficient – for both the Court and the parties – to fracture this case into countless individual actions.[63]

---

[59] *In re Sumitomo Copper Litig.*, 189 F.R.D. 274, 279 (S.D.N.Y. 1999).

[60] *In re Visa Check*, 280 F.3d at 133.

[61] *In re Telectronics Pacing Systems, Inc.*, 172 F.R.D. 271, 290 (S.D. Ohio 1997).

[62] Opinion & Order at 9, June 27, 2012, ECF No. 190 ("Plaintiffs' affidavits demonstrate that it would be economically irrational for any plaintiff to pursue his or her claims through an individual arbitration.").

[63] *See, e.g.*, *In re NASDAQ II*, 169 F.R.D. at 527 ("Multiple lawsuits would be costly and inefficient, and the exclusion of class members who cannot afford separate representation would be neither 'fair' nor 'an adjudication' of their claims.").

## C.   Proposed Class Counsel Will Fairly and Adequately Represent the Class

Pursuant to Rule 23(g), a court must appoint class counsel, who can "fairly and adequately represent the interests of the class."[64] The court should review counsel's (1) work in identifying and investigating plaintiffs' claims, (2) experience in similar litigation, (3) knowledge of applicable law, and (4) resources they will commit to prosecuting the action.[65] Each of these criteria is met by the two proposed class counsel firms, Hagens Berman Sobol Shapiro LLP and Cohen Milstein Sellers & Toll PLLC. Both firms are composed of highly experienced counsel with decades of experience litigating antitrust class actions.[66] They have vigorously and effectively prosecuted this case on behalf of the class, conducting a comprehensive pre-filing investigation, preparing detailed amended complaints, retaining experts to evaluate the economic realities of this case, opposing and defeating defendants' motions to dismiss and to compel arbitration, and collaborating closely with DOJ and the Plaintiff States in executing an accelerated discovery schedule, including deposing several key witnesses.

## VIII.   CONCLUSION

For the foregoing reasons, the Plaintiffs respectfully request that the Court (1) grant preliminary approval of the Settlement Agreements with Macmillan and Penguin, the Consumer Notice Plan and the Consumer Distribution Plan; (2) grant conditional class certification for settlement purposes only; and (3) order that notification to eligible consumers may begin within thirty (30) days of the entry of the Court's Order. A proposed Preliminary Approval Order for the Court's consideration is appended as Exhibit H.

---

[64]   Fed. R. Civ. P. 23(g)(1)(B).

[65]   Fed. R. Civ. P. 23(g)(1)(A)(i).

[66]   *See* Application to Appoint Hagens Berman Interim Lead Counsel, Dec. 19, 2011, ECF No. 19; Application of Cohen Milstein Sellers & Toll PLLC Seeking Appointment to Represent Consolidated Putative Class, Dec. 19, 2011, ECF No. 11.

DATED: June 21, 2013                          Respectfully submitted,

STATE OF TEXAS
GREG ABBOTT, ATTORNEY GENERAL

DANIEL HODGE
First Assistant Attorney General
JOHN B. SCOTT
Deputy Attorney General for Civil Litigation
JOHN T. PRUD'HOMME
Chief, Consumer Protection Division
KIM VAN WINKLE
Section Chief, Antitrust Section
Consumer Protection Division
GABRIEL R GERVEY
Assistant Attorney General

By _____
      REBECCA FISHER

Senior Assistant Attorney General
P.O. Box 12548
Austin, Texas 78711-2548
Phone (512) 463-1265
Rebecca.Fisher@texasattorneygeneral.gov

**ATTORNEYS FOR THE STATE OF TEXAS**
**LIAISON COUNSEL FOR PLAINTIFF**
**STATES**

STATE OF CONNECTICUT
GEORGE JEPSEN, ATTORNEY GENERAL

MICHAEL E. COLE
Chief, Antitrust Department
W. Joseph Nielsen

By _____
      GARY M. BECKER (GB8259)

Assistant Attorney General
55 Elm Street
Hartford, CT 06106
PH: (860) 808-5040
Gary.Becker@ct.gov

**ATTORNEYS FOR THE STATE OF
CONNECTICUT
LIAISON COUNSEL FOR PLAINTIFF
STATES**

STATE OF OHIO
R. MICHAEL DEWINE,
ATTORNEY GENERAL

By _____
      DOREEN JOHNSON

Assistant Chief, Antitrust Section
Office of the Ohio Attorney General
150 E. Gay St. – 23rd Floor
Columbus, OH 43215
Tel: (614) 466-4328
Doreen.Johnson@ohioattorneygeneral.gov

**ATTORNEYS FOR THE STATE OF OHIO
LIAISON COUNSEL FOR PLAINTIFF
STATES**

-27-

HAGENS BERMAN SOBOL SHAPIRO LLP
STEVE W. BERMAN
SHANA E. SCARLETT

By _____
    JEFF D. FRIEDMAN

715 Hearst Ave., Suite 202
Berkeley, CA 94710
Tel: (510) 725-3000
jefff@hbsslaw.com

Kit A. Pierson (*Pro Hac Vice*)
Jeffrey Dubner (4974341)
COHEN, MILSTEIN, SELLERS & TOLL, PLLC
1100 New York Avenue, N.W.
South Tower, Suite 500
Washington, D.C. 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
KPierson@cohenmilstein.com
jdubner@cohenmilstein.com

**ATTORNEYS FOR SETTLEMENT CLASS**

## CERTIFICATE OF SERVICE

I hereby certify that on June 21, 2013, I electronically filed the foregoing document using the CM/ECF system which will send notification of such filing to the e-mail addresses registered in the CM/ECF system, as denoted on the Electronic Mail Notice List.

REBECCA FISHER