# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br><br>               Plaintiff,<br><br>    v.<br><br>APPLE, INC., *et al.*,<br><br>               Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. 12-cv-2826 (DLC) |
| THE STATE OF TEXAS, *et al.*,<br><br>               Plaintiffs,<br><br>    v.<br><br>PENGUIN GROUP (USA) INC., *et al.*,<br><br>               Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. 12-cv-03394 (DLC) |

**MEMORANDUM OF PROPOSED AMICUS CURIAE KOBO INC. IN SUPPORT OF PROPOSED FINAL JUDGMENT**

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Hertz Corp. v. City of N.Y.,*
    1 F.3d 121 (2d Cir. 1993) ................................................................................................... 3

*Nat'l Soc'y of Prof'l Eng'rs v. United States,*
    435 U.S. 679 (1978) ....................................................................................................... 3, 3

*Rothery Storage & Van Co. v. Atlas Van Lines, Inc.,*
    792 F.2d 210 (D.C. Cir. 1986) ........................................................................................... 5

*Safeway, Inc. v. Abbott Labs.,*
    761 F. Supp. 2d 874 (N.D. Cal. 2011) ............................................................................... 2

*United States v. E.I. du Pont de Nemours & Co.,*
    351 U.S. 377 (1956) ........................................................................................................... 5

*United States v. Microsoft Corp.,*
    253 F.3d 34 (D.C. Cir. 2001) ......................................................................................... 2, 5

**OTHER AUTHORITIES**

Dennis W. Carlton & Jeffrey M. Perloff, *Modern Industrial Organization* (4th ed. 2005) ........... 3

## INTEREST OF THE AMICUS CURIAE

Kobo Inc. (Kobo) is a Toronto-based e-book retailer, and a subsidiary of the Japanese e-commerce retailer, Rakuten Inc.  In addition to distributing its proprietary Kobo e-Book App and selling e-books, Kobo also produces and sells a line of Kobo e-readers and tablets.[1]  Kobo has sold e-books to customers in the United States and other countries since February 2009.[2]  Kobo has an e-book retailing partnership in the United States with the American Booksellers Association, pursuant to which Kobo products are distributed to numerous independent bookstores.

Kobo, as a market participant, has a direct interest in ensuring that the Court adopts a remedy that facilitates competition in the market for e-books, and that ameliorates the harm to competition and consumers caused by the conspiracy between Apple and the Publisher Defendants.  In particular, Kobo urges adoption of Section IV.C of the Proposed Final Judgment (PRJ), which requires Apple for two years to permit e-book retailers to include hyperlinks to their own e-bookstores, without extracting a fee or commission from the participating e-book retailers.

## ARGUMENT

Kobo has long participated in the Apple ecosystem as a seller of E-books via the Apple platform.  Kobo's users were able to purchase e-books via the Kobo iOS app as early as February 2009, over a year before Apple launched its own iBookstore, and has been available since the

---

[1] Kobo supports cross-platform access to e-books purchased through Kobo's eBooks store.  E-books purchased directly from Kobo may be read on a consumer's Kobo e-reader, an Apple iPad, an Android tablet, or any other device on which a Kobo app has been installed.  In contrast, a DRM-protected e-book purchased from the Apple store may only be read in the Apple iBooks app.

[2] Kobo was initially known as Shortcovers until December 2009.  In January 2012, Rakuten acquired Kobo from Indigo Books & Music Inc., a Canadian book retailer.

61413549_18.docx

launch of the iPad in April 2010.[3]  The Kobo apps, as initially approved by Apple, allowed users to browse Kobo's catalog within the Kobo apps and to seamlessly purchase e-books through hyperlinks to Kobo's website (the "Kobo Store Functionality").[4]  In the summer of 2011, however, Apple imposed restrictions on what functionality could be included within an iOs app, which required Kobo to remove the Kobo Store Functionality from its e-book apps.  With this change, Apple effectively excluded Kobo from selling e-books via its Kobo app on Apple devices, and blocked Kobo from providing effective price and selection competition to Apple's e-book sales.[5]  Apple iOS device users who download or access the Kobo app can no longer find, within the Kobo app, any paths for purchasing books or any information even indicating that Kobo is a retailer of e-books, and many prior customers ceased purchasing from Kobo.[6]

Following Apple's change in policy, Kobo experienced a sharp decline in the rate at which new Kobo users who created their Kobo user account via an Apple iOS app, converted into paying customers.[7]  Kobo's rate of new customer conversions fell by approximately 75% in the three months following Apple's change in policy.[8]

---

[3] *See United States v. Microsoft Corp.,* 253 F.3d 34, 55 (D.C. Cir. 2001) (describing the "chicken-and-egg" network effect by which consumers prefer platforms which offer a large number of applications).

[4] Though Kobo users purchased e-books via Kobo's website, the web interface was designed to mimic the appearance of the Kobo app and provide a seamless customer experience.

[5] *See, e.g., Safeway, Inc. v. Abbott Labs.,* 761 F. Supp. 2d 874, 895 (N.D. Cal. 2011) (referring to a 400% price increase as potential evidence of "an offer to deal only on unreasonable terms and conditions").

[6] Kobo's records show that of its customers who create a user account with Kobo through an iOS app, approximately 65% who made at least one purchase prior to July 25, 2011 never made a subsequent purchase of a Kobo e-book.

[7] Kobo's customer conversion rate measures the rate at which individuals who create a user account with Kobo through an iOS app become customers who pay for at least one e-book within the first ninety days after creating their account.

[8] Kobo compared the customer conversion rate for customers who created Kobo accounts on iOS devices in the ninety days preceding Apple's change in policy (*i.e.*, April through June 2011) to the customers conversion rate for customers creating Kobo accounts on iOS devices in the ninety following Apple's

(continued...)

Kobo is a direct competitor to Apple in both the sale of e-books and in providing platforms for consumers to read e-books on dedicated e-readers and on tablets. Kobo directly competes with Apple on both the price of e-books and on the entire e-book experience (*e.g.*, content of the e-book catalog and quality of in-app reader interface).[9] Price competition is rendered meaningless if consumers face significant or unexpected difficulties in determining the price of products available from competing sellers.[10] As the Supreme Court has acknowledged, a rule that prevents comparison shopping "'impedes the ordinary give and take of the market place,' and substantially deprives the customer of 'the ability to utilize and compare prices in selecting [] services.'"[11]

In the current marketplace, a customer who wishes to compare Kobo's e-book price to Apple's e-book price, while using an Apple iOS device, must exit the Kobo app, type in or otherwise navigate to the Kobo URL in an installed internet browser, and search for the e-book title on Kobo's website. Users of the Kobo app on Apple iOS devices quickly determine that

---

change in policy (*i.e.*, July through September 2011). Kobo acquired approximately 75% fewer new customers in latter time period. Kobo notes, however, that it operates in a rapidly-changing market in which various factors could impact it both positively and negatively. Kobo believes the vast majority of the negative impact on Kobo's iOS business at this time was due to Apple's change in policy.

[9] For example, Kobo currently offers U.S. residents the option to purchase approximately 1.42 million e-book titles, including approximately 300,000 titles in languages other than English, and access to content from approximately 20,000 publishers and imprints. Kobo also offers a social reading platform designed to allow readers to share information about the e-books they are reading with their friends.

[10] *See Nat'l Soc'y of Prof'l Eng'rs v. United States,* 435 U.S. 679, 692 (1978) (concluding that an agreement between competitors to refuse to discuss prices with customers until after customers had selected a service provider restricted trade in violation of Section 1 of the Sherman Act); *see also Hertz Corp. v. City of N.Y.,* 1 F.3d 121, 125 (2d Cir. 1993) (describing the agreement to withhold price information in *Prof'l Eng'rs* as an "agreement [that] impeded the ordinary give and take of the market place"). *See also* Dennis W. Carlton & Jeffrey M. Perloff, *Modern Industrial Organization* at 463 (4th ed. 2005) (explaining that where consumers are provided comparative price information, this leads to stores charging a low, competitive price).

[11] *Nat'l Soc'y of Prof'l Eng'rs,* 435 U.S. at 692-693 (quoting with approval the opinion of the District Court).

they cannot purchase or compare prices for e-books within the Kobo app, but do not always realize the multi-step process required for price comparison shopping. The hyperlink requirements of the PRJ would restore the prior, consumer-friendly environment where e-book retailers openly and transparently competed on price, selection, and user experience.

Prior to Apple's 2011 rule change, Kobo's monthly sales to U.S. customers through hyperlinks in the Kobo app on Apple iOS devices peaked at nearly 75,000 units in July 2011. These sales benefited *all* consumers who visited the Apple and Kobo e-books app stores by providing price competition and a greater selection of e-books. Following Apple's rule change, Kobo's sales via Apple iOS devices swiftly and expectedly plummeted to fewer than 20,000 units in August 2011 and to fewer than 5,000 units in December 2011, and have since fallen even further.[12] By placing competitors on a level playing field for a two-year transition period, the Department of Justice's proposed remedy will allow consumers to easily compare prices and selections, and will promote competition.

As this Court found, the evidence shows that "Apple violated Section 1 of the Sherman Act by conspiring with the Publisher Defendants to eliminate retail price competition and to raise e-book prices."[13] An appropriate remedy must restore retail price competition by supporting the

---

[12] As legacy Kobo app users update their apps on iOS devices pursuant to the ordinary prompts to download updated version of apps, they lose their prior ability to purchase via the Kobo app. As previously noted, Kobo operates in a dynamic environment; nonetheless, Kobo believes the vast majority of the negative impact on Kobo's iOS business at this time was due to Apple's change in policy.

[13] *See* Opinion & Order at 113, United States v. Apple, Inc., No. 12-2826 (S.D.N.Y. July 10, 2013); *see also id.* at 116 ("Apple included the MFN, or price parity provision, in its Agreements both to protect itself against any retail price competition and to ensure that it had no retail price competition.").

ability of consumers to turn to other suppliers.[14]  Apple protests that this aspect of the PRJ "would dictate terms for e-book retailer *apps* available through the App Store and regulate Apple's dealings with app providers," contending this is an "invasion into [one] of Apple's businesses that w[as] not directly at issue in this lawsuit."[15]  Apple's protest, however, ignores the market structure: e-books are frequently sold through e-book apps, which Apple makes available to customers through its Apple App store.  For Kobo and other e-book retailers to serve as effective competitors to Apple, their potential customers must be able to discover that these retailers *actually sell e-books*, a fact which not readily apparent to an Apple iOS device user who encounters these competitors through apps on Apple iPads and iPhones.  Without price comparisons at the point of sale, there is no effective price competition for sales of e-books.  The hyperlink requirement of  Section IV.C is essential to restoring competition in this market.

## CONCLUSION

The Court should enter the Plaintiffs' Proposed Final Judgment.

---

[14] *See* Apple Inc.'s Memo. in Resp. to Plaintiff United States' Proposed Final Judgment and Plaintiff States' Proposed Order Entering Permanent Injunction at 2, United States v. Apple, Inc., No. 12-2826 (S.D.N.Y. Aug. 2, 2013).

[15] *See Microsoft Corp.*, 253 F.3d at 51-52 ("'Because the ability of consumers to turn to other suppliers restrains a firm from raising prices above the competitive level,' the relevant market must include all products 'reasonably interchangeable by consumers for the same purposes.'" (*quoting Rothery Storage & Van Co. v. Atlas Van Lines, Inc.,* 792 F.2d 210 (D.C. Cir. 1986) and *United States v. E.I. du Pont de Nemours & Co.,* 351 U.S. 377 (1956)).

| | |
|---|---|
| August 8, 2013 | Respectfully Submitted,<br>/s/ Gregory J. Wallance<br>Gregory J. Wallance |
| Of Counsel: | Kaye Scholer LLP<br>425 Park Avenue |
| Nick Catros*<br>SVP Business and Legal Affairs<br>Kobo Inc.<br>135 Liberty Street, Suite 101<br>Toronto, ON M6K 1A7<br>(416) 800-1223 x3440 | New York, NY 10022<br>(212) 836-8878<br>Robert B. Bell* (*pro hac vice pending*)<br>Kaye Scholer LLP<br>901 Fifteenth Street, NW<br>Washington, DC  20005<br>(202) 682-3500 |
| **Not admitted in New York* | *Counsel for Proposed* Amicus Curiae<br>*Kobo Inc.* |