PUBLIC VERSION – CONFIDENTIAL INFORMATION REDACTED PER PROTECTIVE ORDER

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

_____

| | | |
|---|---|---|
| IN RE ELECTRONIC BOOKS ANTITRUST | ) | No. 11-md-02293 (DLC) |
| LITIGATION | ) | ECF Case |
| _____ | ) | |

**This Document Relates to:**
_____

| | | |
|---|---|---|
| | ) | |
| THE STATE OF TEXAS, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No. 12-cv-03394 (DLC) |
| v. | ) | |
| | ) | |
| PENGUIN GROUP (USA) INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| _____ | ) | |

**PLAINTIFF STATES' MEMORANDUM OF LAW IN SUPPORT OF**
**THEIR MOTION TO EXCLUDE OPINIONS OFFERED BY JONATHAN ORSZAG**

PUBLIC VERSION – CONFIDENTIAL INFORMATION REDACTED PER PROTECTIVE ORDER

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND ................................................................................................................... 3

LEGAL STANDARD............................................................................................................. 7

ARGUMENT ....................................................................................................................... 8

    I.    Mr. Orszag's Testimony Related to the "Offsetting Benefits" of Lower Device and Accessory Pricing Must Be Excluded ............................................................. 8

        A.    It is Legally Improper to Offset Price Fixing Damages in One Market (e-Books) by Purported "Pro-Competitive Effects" in Another Market (e-Readers and Accessories). ........................................................................ 8

        B.    There is No Factual Basis for Offsetting Damages to E-Book Purchasers by the "Benefits" of Purportedly Lower E-Reader Devices .................... 12

        C.    Mr. Orszag's Attempt to Offset Damages to e-Book Purchasers by the Benefits to Consumers of Devices and Accessories is also Inadmissible Due to the Unreliability of his Methodology. ........................................... 16

    II.    Mr. Orszag's Testimony Concerning "Other Offsetting Effects" of the Conspiracy Should Also be Excluded (Section VII)................................................................ 19

        A.    It is Both Legally Improper and Factually Incorrect to Reduce Damages from the Conspiracy by the "Offsetting Effects" of the Growth of Self-Publishing and Free e-Books. .................................................................. 19

        B.    Mr. Orszag's Attempts to Decrease Plaintiffs' Damages by Some Portion of E-book Sales from Apple's iBookstore Is Unsupported by the Evidence ............................................................................................................... 22

        C.    Mr. Orszag's Testimony Concerning Barnes & Noble's Likely Exit from the e-book Business Absent Agency is Speculative and Must be Excluded ............................................................................................................... 23

CONCLUSION.................................................................................................................... 25

i

PUBLIC VERSION – CONFIDENTIAL INFORMATION REDACTED PER PROTECTIVE ORDER

# TABLE OF AUTHORITIES

## Cases

*Bailey v. Allgas*, 148 F. Supp. 2d 1222 (N.D. Ala. 2000), *aff'd* 284 F.3d 1237 (11th Cir. 2002) .... ................................................................................................................................ 8, 9

*Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18 (2d Cir. 1996) ............................................. 7, 12

*Buckley v. Deloitte & Touche USA LLP,* 888 F. Supp. 2d 404 (S.D.N.Y. 2012). ........................ 12

*Daubert v. Merrell Dow Pharms.,* 509 U.S. 579 (1993) .................................................. 3, 7, 12, 18

*Hanover Shoe v. United Shoe Mach. Corp.*, 392 U.S. 481 (1968) ........................................... 9, 11

*In re Blood Reagents Antitrust Litig.,* 283 F.R.D. 222 (E.D. Pa. 2012) ..................... 9, 10, 20, 24

*In re Cardizem CD Antitrust Litig.,* 200 F.R.D. 297 (E.D. Mich. 2001) ........................... 9, 10, 24

*In re Executive Telecard, Ltd. Securities Litig.,* 979 F. Supp. 1021 (S.D.N.Y. 1997) ................ 18

*In re Wireless Telephone Services Antitrust Litig.,* 385 F. Supp. 2d 403 (S.D.N.Y. 2005) ...... 7, 18

*Kumho Tire Co. v. Carmichael,* 526 U.S. 137 (1999) ................................................................ 3, 7

*Nat'l Soc'y of Prof. Eng'rs v. United States*, 435 U.S. 679 (1978) ........................................... 24

*New York v. Hendrickson,* 840 F. 2d 1065 (2d Cir. 1988) ............................................................. 9

*Perma Life Mufflers v. Int'l Parts Corp.*, 392 U.S. 134 (1968) ....................................... 11, 20, 24

*Raskin v. Wyatt Co.,* 125 F.3d 55 (2d Cir. 1997) ...................................................................... 7, 18

*Southern Pacific Co. v. Darnell-Taenzer Lumber Co.,* 245 U.S. 531 (1918) .............................. 11

*United States v. Apple,* No. 12 Civ. 2826 (DLC), 12 Civ. 3394 (DLC), 2013 U.S. Dist. LEXIS 96424 (S.D.N.Y. July 10, 2013) ................................................................................. passim

*United States v. Microsoft,* 224 F. Supp. 2d 76  (D.D.C. 2002) .................................................... 8

*United States v. Phila. Nat'l Bank*, 374 U.S. 321 (1963) .............................................................. 9

## Other Authorities

ABA Section of Antitrust Law, *Proving Antitrust Damages,* 2nd Ed. (2010) ................................. 9

Claire Miller, *In Price War, New Kindle Sells for $139*, New York Times, July 28, 2010 ......... 15

## Rules

Fed. R. Evid. 702 ............................................................................................ 3, 7, 12, 17

PUBLIC VERSION – CONFIDENTIAL INFORMATION REDACTED PER PROTECTIVE ORDER

Plaintiffs move to preclude Apple's economic expert, Jonathan Orszag, from offering the opinions set forth in paragraph 10, sections VI and VII (paragraphs 42-123), and paragraphs 126-127 of his Corrected Declaration dated November 25, 2013.[1]

## PRELIMINARY STATEMENT

Mr. Orszag should be precluded from testifying that the excessive prices that consumers paid for electronic books ("e-books") should be "offset" by amounts representing "benefits" that consumers purportedly experienced because of Apple's unlawful conduct.  This testimony is inconsistent with this Court's decision on Apple's liability, the applicable case law, the facts, and basic economics.  It must be excluded.

First, Mr. Orszag's opinions about the "offsetting benefits" of Apple's price fixing conspiracy must be excluded because they simply repackage arguments that this Court already heard and rejected in its July 10, 2013 Opinion & Order, *United States v. Apple,* No. 12 Civ. 2826 (DLC), 12 Civ. 3394 (DLC), 2013 U.S. Dist. LEXIS 96424 (S.D.N.Y. July 10, 2013).  The Court held that "Apple has not shown that the execution of the [Agency] Agreements had *any* pro-competitive effects." *Id.*, 2013 U.S. Dist. LEXIS 96424, at *141 (emphasis added).  Mr. Orszag's arguments that these purported offsets – lower e-reader prices, expansion of self-publishing and free e-books, and sales through the iBookstore and Barnes & Noble – were caused by the illegal conspiracy are inconsistent with the Court's prior holdings and findings.  As the Court concluded, "the pro-competitive effects to which Apple has pointed, including its launch of the iBookstore, the technical novelties of the iPad, and the evolution of digital publishing more generally, are phenomena that are independent of the Agreements and therefore

---

[1] *See* Corrected Declaration of Jonathan Orszag, November 25, 2013, attached as Exhibit ("Ex.") A to the Declaration of Robert L. Hubbard, December 18, 2013, in support of this Memorandum of Law ("Hubbard Declaration").  All exhibit references ("Ex.") are to exhibits to the Hubbard Declaration.

PUBLIC VERSION – CONFIDENTIAL INFORMATION REDACTED PER PROTECTIVE ORDER

do not demonstrate any pro-competitive effects flowing from the Agreements." *Id.* While the semantics of the arguments have changed – Apple called them "pro-competitive" effects; Mr. Orszag talks about "inextricably linked" effects – they continue to be irrelevant regardless of how they are packaged.

Second, Mr. Orszag's effort to use "offsetting effects" to reduce damages must be excluded because they are inconsistent with the legal principles that courts have long established to facilitate a streamlined process for estimating damages in price-fixing cases. When estimating damages, courts require that fact finders not stray beyond the specific transactions that were subject to the restraint – in this case, the sales of e-books. Attenuated arguments about a conspiracy's effects on other markets or downstream transactions are not permissible.

Third, Mr. Orszag's proffered opinions must be excluded because they are barren of factual support.[2] Mr. Orszag speculates that because e-books are "inextricably linked" with e-readers and accessories, self-publishing, and free e-books, the higher e-book prices caused by the conspiracy must have had offsetting effects in those other markets. But, Mr. Orszag provides no factual basis for his assumptions. For example, he has no basis for his surprising contention that Amazon reduced its e-reader prices because of the higher e-book prices and not because of the entry of the iPad or the many other developments in the e-reader market. Much of his opinion is also based on the demonstrably false assumption that ██████████████████████████████ ████████████████████████████████████████████████████████ ███████████████████████████████████████████████████ █████████████████████████████████████████████

---

[2] Reply Declaration of Roger G. Noll dated December 18, 2013 at pages 41-83 discusses, critiques, and opposes the Orszag Report. The Noll Reply includes additional factual support and additional economic commentary.

PUBLIC VERSION – CONFIDENTIAL INFORMATION REDACTED PER PROTECTIVE ORDER

Finally, Mr. Orszag's opinions on "offsetting effects" must be excluded because they are based on an unreliable and arbitrary methodology.  Mr. Orszag concedes that he does not have and did not use a reliable methodology for connecting his purported "offsetting effects" to the prices that consumers paid for e-books.  Mr. Orszag also lacks a reliable procedure for disentangling his purportedly offsetting effects from the other market factors that led to the decrease in e-reader prices (such as the entry of the iPad into the market).

Mr. Orszag's analysis simply does not employ "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 152 (1999).  His opinion is contrary to the Court's findings and relevant case law, is irrelevant, and will fail to aid the jury in determining the amount of damages that Apple should pay in this case.  Moreover, his testimony presents a significant risk of confusing the jury. Accordingly, this Court should strike paragraph 10, sections VI and VII (paragraphs 42-123), and paragraphs 126-127 of Mr. Orszag's Corrected Declaration and preclude any testimony regarding those opinions because they fail to meet the standards set forth in Rule 702 of the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharms.,* 509 U.S. 579 (1993).

## BACKGROUND

On July 10, 2013, after a three-week bench trial, the Court held that Apple conspired with publishers to raise the retail prices of e-books in violation of the antitrust laws.  The Court found that Apple directly participated in a horizontal price-fixing conspiracy, and as a result, its conduct was *per se* unlawful.  *Apple*, 2013 U.S. Dist. LEXIS 96424, at *140, *186-7.  The Court's Opinion described in detail how the Publisher Defendants and Apple eliminated retail price competition for e-books through the adoption of Agency Agreements that gave the Publisher Defendants the power to set retail prices at agreed upon levels set by the pricing tiers

PUBLIC VERSION – CONFIDENTIAL INFORMATION REDACTED PER PROTECTIVE ORDER

within the Agreements.  The Court found that Amazon was forced to adopt the Agency model against Amazon's wishes and that e-book prices suddenly and uniformly increased across all retailers after Apple launched its iBookstore and iPad in April 2010.  *Id.*, 2013 U.S. Dist. LEXIS 96424, at *100-116.  The Court also ruled that Apple did not show that the execution of the Agency Agreements had any pro-competitive effects, and that the "pro-competitive effects to which Apple pointed, including its launch of the iBookstore, the technical novelties of the iPad, and the evolution of digital publishing more generally, are phenomena that are *independent* of the Agreements and therefore do not demonstrate any pro-competitive effects flowing from the Agreements."  *Id.,* 2013 U.S. Dist. LEXIS 96424, at *141 (emphasis added).

With Apple's liability decided, the task for the jury in the upcoming damages trial is to estimate the amount that e-book purchasers overpaid on Defendant Publishers' e-books because of the conspiracy.  To aid the jury, Apple seeks to offer the testimony of Mr. Orszag.  Mr. Orszag does not dispute that, even with his proposed (but inappropriate) modifications from Section V of his declaration to Dr. Noll's regression analysis, the conspiracy raised Defendant Publishers' e-book prices about 15%, which corresponds to $231.8 million in overcharges.  Deposition of Jonathan Orszag ("Orszag Dep."), December 7, 2013, Ex. B, at 46:9 – 47:25.

In Sections VI and VII of his Declaration, however, Mr. Orszag opines that these substantial overcharges to e-book consumers should be offset by other effects of the conspiracy. Despite the Court's finding that Apple had not shown that the Agency Agreements had any pro-competitive effects, Mr. Orszag's analysis in Section VI assesses the "impact of the agency contracts on the pricing incentives of e-books *and e-readers* sold via Amazon.com and other retailers," and concludes that the Agency Agreements resulted in substantially lower device prices for consumers.  Orszag Decl., ¶ 10 (emphasis added).  In Section VII, Mr. Orszag also

PUBLIC VERSION – CONFIDENTIAL INFORMATION REDACTED PER PROTECTIVE ORDER

claims that the move to the Agency model and higher e-book prices led to other offsetting benefits, including an increase in self-publishing and free e-book offerings, additional e-book sales on the iBookstore, and sustaining the e-book business of Barnes & Noble as a more profitable enterprise.  Orszag Decl. ¶ 10.

To "inextricably link" higher e-book prices to lower e-reader prices, Mr. Orszag begins with e-books and e-readers being complementary products.  He opines that complementary products are typically consumed together and that thus "the pricing incentives of e-books and e-readers are tightly interconnected."  *Id*. ¶ 43.   Without analyzing how pricing of the two products are connected, Mr. Orszag simply assumes that "higher e-book margins due to agency contracts created an incentive to reduce device prices . . . and helped to expand e-book libraries on multiple platforms (also to the benefit of consumers)."  *Id*. ¶ 46.  Mr. Orszag concludes that the "collusive price increases in e-books had the effect of reducing device prices."  *Id*. ¶ 76 (Heading D); *see also* ¶ 46.

Mr. Orszag's measurement of the offset focuses on certain of Amazon's ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  Mr. Orszag makes various assumptions about how Amazon would react "as a result of increased competition from the new and innovative iPad and the new agency contracts with publishers."  *Id*. ¶ 54.  He contends that higher e-book margins due to the Agency Agreements "incentivized Amazon to lower its prices for devices and invest more in its Kindle business."  *Id*.  ¶¶ 46-47.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  *id*. ¶ 51, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  *Id*. ¶ 55.

PUBLIC VERSION – CONFIDENTIAL INFORMATION REDACTED PER PROTECTIVE ORDER

Mr. Orszag then tries to tie ██████████████████████ with benefits to e-book

consumers. █████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████ *Id.* ¶ 89.  ██

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████ Orszag Decl. at 39 - 41.  He asserts that

"most of the increased prices from Publisher Defendants' e-books in 2010 █████████

████████████████ and concludes that "in the absence of the conspiracy, █████████

████████████████████████████████████████████████████████

██████████████████████████████████████████

██████████████ *Id.* ¶ 92.  Mr. Orszag testified that he could not opine on what would happen

to e-book prices alone.  Orszag Dep. at 297:23-301:5.  He only offers an opinion on what would

happen to e-book, e-reader and device prices combined, but cannot allocate effects between the

different products.  Orszag Dep. at 156:22-158:2.

In Section VII of his declaration, Mr. Orszag turns to other "offsetting effects resulting

from the move to agency."  He evaluates "other offsetting effects" after contending that the

growth in self-publishing and free e-books would not have occurred to the same extent in the

absence of the Agency Agreements.   Orsag Decl. ¶¶ 93-110.  He also seeks to credit the

conspiracy with the continued presence of Barnes & Noble in the e-book market.  According to

Mr. Orszag, higher e-book prices from the conspiracy sustained Barnes & Noble, leading to

PUBLIC VERSION – CONFIDENTIAL INFORMATION REDACTED PER PROTECTIVE ORDER

greater innovation and the introduction of new devices.  *Id.* ¶¶ 117-123.  Mr. Orszag also proposes to offset from the Plaintiffs' damages e-book sales that would not have been made by Apple through its iBookstore and by Barnes & Noble absent a move to the Agency model.  *Id.* ¶¶ 111-116.

## LEGAL STANDARD

To be admissible as evidence, expert testimony must satisfy the standards of Rule 702 of the Federal Rules of Evidence and *Daubert,* 509 U.S. at 579.  The Court has an important "gatekeeping role" to ensure that these standards are met and has "considerable leeway" in deciding whether particular expert testimony may be admitted.  *Kumho Tire Co.,* 526 U.S. at 152.

Under Rule 702 and *Daubert*, expert testimony must rest "on a reliable foundation" and be "relevant to the task at hand."  *Daubert,* 509 U.S. at 597.   The testimony must be "sufficiently tied to the facts of the case that will aid the jury in resolving a factual dispute."  *Id.* at 591.  Accordingly, expert testimony should be excluded if it is "speculative or conjectural." *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996); *see also Daubert,* 509 U.S. at 589-90.  In addition, an expert opinion must account for facts and alternative explanations that could impact its conclusions.  If it fails to do so, the opinion is inadmissible.  *Raskin v. Wyatt Co.,* 125 F.3d 55, 67-68 (2d Cir. 1997) (upholding the exclusion of an economist's report on the basis that it failed to control for factors that could have impacted his conclusions); *In re Wireless Telephone Services Antitrust Litig.,* 385 F. Supp. 2d 403, 427-28 (S.D.N.Y. 2005) (expert's regression analysis was "methodologically unsound" because it lacked independent variables to account for alternative explanations that could have affected the analysis).

Expert testimony should also be tied to the law that applies to the case. Otherwise, it is irrelevant and should be excluded. *Bailey v. Allgas*, 148 F. Supp. 2d 1222, 1242-46 (N.D. Ala. 2000) (excluding testimony concerning the relevant market because the expert based his conclusions solely on the facts as he understood them, which were contrary to Eleventh Circuit case law regarding the market) *aff'd* 284 F.3d 1237 (11th Cir. 2002); *see also United States v. Microsoft,* 224 F. Supp. 2d 76, 151 (D.D.C. 2002) (affording "little, if any, weight to" portions of the expert's testimony during proceedings on remand because many of the conclusions reached by the expert "cannot be reconciled logically with significant portions of the appellate court's opinion.")

For the reasons that follow, paragraph 10, sections VI and VII (paragraphs 42-123), and paragraphs 126-127 of Mr. Orszag's corrected report fail to meet these standards.

## ARGUMENT

I.     **Mr. Orszag's Testimony Related to the "Offsetting Benefits" of Lower Device and Accessory Pricing Must Be Excluded**

In Section VI of his report, Mr. Orszag opines that Plaintiffs' damages expert, Dr. Roger Noll, failed to consider and deduct the offsetting effects of e-book price fixing on e-reading devices and accessories. This opinion should be excluded because (1) it is contrary to the Court's decision, contradicts applicable law in price-fixing cases and is thus, irrelevant; (2) it is founded on speculation unsupported by the facts; and (3) it applies an unreliable methodology for calculating offsetting effects, and is thus, unreliable.

A.     **It is Legally Improper to Offset Price Fixing Damages in One Market (e-Books) by Purported "Pro-Competitive Effects" in Another Market (e-Readers and Accessories).**

The standard for estimating damages caused by an illegal price fixing conspiracy is well-established in this Circuit: "Where the antitrust violation is a price-fixing conspiracy, the

PUBLIC VERSION – CONFIDENTIAL INFORMATION REDACTED PER PROTECTIVE ORDER

measure of damages to one of the coconspirators' customers is the difference between the prices actually paid and the prices that would have been paid absent the conspiracy." *New York v. Hendrickson,* 840 F. 2d 1065, 1077 (2d Cir. 1988) (citing *Hanover Shoe v. United Shoe Mach. Corp.*, 392 U.S. 481, 489 (1968)).

> The measure of damages that is commonly used in price fixing cases is based on the overcharge itself. Simply put, the plaintiff's damages depend on the differences between the actual price paid and the competitive price, or the price that would have been charged absent the illegal agreement. Early on, the Supreme Court recognized the overcharge as the principal measure of harm in price fixing cases. The overcharge measure has the virtues of conceptual simplicity, theoretical justification, even if imperfect, and relative ease of calculation.

*In re Cardizem CD Antitrust Litig.,* 200 F.R.D. 297, 312 (E.D. Mich. 2001) (*quoting* ABA Section of Antitrust Law, *Proving Antitrust Damages,* 2nd Ed. (2010), at 171).

Mr. Orszag's attempt to offset damages from higher e-book prices with lower prices for e-reader devices is contrary to this legal precedent and the Court's decision; it is therefore irrelevant. *Bailey,* 148 F. Supp. 2d at 1242-43. First, the Court has already found that Apple violated Section 1 of the Sherman Act by facilitating an illegal, horizontal price fixing conspiracy that had no pro-competitive benefits. *Apple,* 2013 U.S. Dist. LEXIS 96424, at *141, *185. Second, a defendant cannot justify and offset the anticompetitive effects of a horizontal price fixing conspiracy suffered by consumers in one market by asserting supposed pro-competitive effects in *another market. United States v. Phila. Nat'l Bank*, 374 U.S. 321, 370 (1963). Courts have flatly rejected attempts by defendants to offset price fixing damages by the alleged pro-competitive effects in other markets. *See In re Blood Reagents Antitrust Litig.,* 283 F.R.D. 222 (E.D. Pa. 2012).

In *In re Blood Reagents*, the two leading producers of blood reagents allegedly conspired to fix the prices of their traditional blood testing products ("reagents"). 283 F.R.D. at 229.

PUBLIC VERSION – CONFIDENTIAL INFORMATION REDACTED PER PROTECTIVE ORDER

Defendant Ortho Clinical Diagnostics, Inc. ("Ortho") argued that when assessing antitrust damages, "it is not enough for Plaintiffs to show that a customer paid more than the but for price for at least one item in at least one transaction.  Instead, . . .Plaintiffs must analyze whether the net effects of the alleged antitrust violation is positive or negative." *Id.* at 239 (internal quotes omitted).  Ortho argued that when calculating overcharges in the prices for traditional blood reagents, plaintiff's expert wrongly failed to take into account that "higher prices for traditional reagents led to lower prices or lower price increases for proprietary reagents and equipment." *Id.*

The Court flatly rejected Ortho's argument.  It noted that it was not "plausible" that "a price-fixing conspiracy would have offsetting benefits to consumers." *Id.* (citations omitted).  The court also noted the absence of any legal precedent for performing the "offset" calculation that Ortho was seeking.  *See id.*  ("Ortho cites no case in which a court required plaintiffs to account for potential decreases in the price of some products as the result of an alleged horizontal price-fixing conspiracy.")

The decision in *In re Cardizem*, 200 F.R.D. at 297, similarly rejected an attempt by defendants to deduct the purported "benefits" of a conspiracy from the plaintiffs' overcharges.  In opposing class certification, the defendants in *In re Cardizem* argued that "individual issues will predominate under Plaintiffs' overcharge theory because Plaintiffs must offset from their overcharge damage estimate any benefits they may have received as a result of Defendants' illegal price-fixing conspiracy." *Id.* at 311.  The defendants contended that "individual inquiry is necessary to determine how much of a benefit is to be deducted from each class member's overcharge estimate," and "if the 'benefit' proves to be greater than the overcharge damage estimate, then there is no injury in fact and thus no antitrust liability." *Id.*  The court rejected the

PUBLIC VERSION – CONFIDENTIAL INFORMATION REDACTED PER PROTECTIVE ORDER

defendants' "offsetting benefits" argument because they were contrary to prevailing case law.
*Id.*

It is not surprising that courts have rejected attempts like Mr. Orszag's to offset damages suffered by higher prices by purported beneficial effects – because requiring such an analysis would be inconsistent with the policies underlying damages law in *per se* unlawful price-fixing cases. Attempts to measure "offsetting benefits" would dramatically complicate price-fixing litigation, discourage actions like this one, and ultimately allow wrongdoers to keep the fruits of their illegal actions. *See, e.g., Perma Life Mufflers v. Int'l Parts Corp.*, 392 U.S. 134, 139, 152-53 (1968) (citing *Hanover Shoe*, 392 U.S. at 481). The Supreme Court's decision in *Hanover Shoe* is illustrative. That decision upholds the longstanding policy of the Court that the measurement of damages in price-fixing cases should be as streamlined as possible to encourage enforcement of the antitrust laws. To achieve that goal, the Supreme Court in *Hanover Shoe* rejected the defendant's attempt to reduce the amount of damages suffered by Hanover Shoe because Hanover Shoe had "passed on" some of the overcharges to its customers. *Hanover Shoe,* 392 U.S. at 490 (citing *Southern Pacific Co. v. Darnell-Taenzer Lumber Co.,* 245 U.S. 531 (1918)). The Court held that "'the general tendency of the law, in regard to damages at least, is not to go beyond the first step' and to exonerate a defendant by reason of remote circumstances." *Hanover Shoe,* 392 U.S. at 488 fn. 6 (*quoting Southern Pacific Co.,* 245 U.S. at 533-34.). Similarly, Mr. Orszag should not be permitted to testify about "remote circumstances" in a different market.

Accordingly, Mr. Orszag's testimony regarding e-reader devices in Section VI of his report is contrary to law and this Court's opinion and should be excluded.

PUBLIC VERSION – CONFIDENTIAL INFORMATION REDACTED PER PROTECTIVE ORDER

**B.      There is No Factual Basis for Offsetting Damages to E-Book Purchasers by the "Benefits" of Purportedly Lower E-Reader Devices**

In addition, Mr. Orszag's opinion about the offsetting effects of lower e-reader profits and prices should be excluded because it has no basis in fact and is, therefore, unreliable.  Expert testimony must be "based on sufficient facts or data," Fed. R. Evid. 702, and must have sufficient factual foundation before it is submitted to the jury.  *Boucher*, 73 F.3d at 22; *Daubert,* 509 U.S. at 597 (expert testimony must rest on a "reliable foundation.").  Such testimony should be excluded if it is based on speculation or conjecture. *Buckley v. Deloitte & Touche USA LLP,* 888 F. Supp. 2d 404, 413 (S.D.N.Y. 2012).   Here, Mr. Orszag's testimony relies on several factual flaws, among them: (1) he presumes that higher Amazon e-book prices would allow Amazon to lower device prices because the consumers are the same, despite the fact that consumers can purchase e-books from Amazon on the iPad and other e-reader devices; and (2) he presumes that Amazon would have insisted on ███████████████████████ ████████████ in the but-for world, when Amazon's actual business ████████████ ███████████████████████████████████████████████████████ ████████████

Mr. Orszag suggests that higher e-book prices after the conspiracy led to Amazon's ████ ████████████████████ He observes that e-reader devices and e-books are complementary products and that Amazon ████████████████████ He then speculates about Amazon's business strategy and concludes that Amazon ████████████ ████████████████████████ Therefore, he erroneously concludes Amazon would have necessarily ████████████ ███████████████████████████████████████████████████ ████████████████████████████████████████

PUBLIC VERSION – CONFIDENTIAL INFORMATION REDACTED PER PROTECTIVE ORDER

███████████████████████████████████████████████████████

████████████████████████████████████████████ *See* Orszag

Decl. Table VI-2, at 41.

Mr. Orszag's conflation of e-book prices with e-reader device profits and market trends depends on him rigidly and inaccurately applying the economics of complementary products.  E-books and e-reader devices are complementary products, but they are not perfectly complementary like right and left shoes, when the price and demand for one is almost perfectly linked to the price and demand of the other.  E-book and e-reader (or Kindle) purchasers are often not the same customers.  As Mr. Orszag himself acknowledges, customers may read e-books formatted for the Kindle on devices *other than a Kindle*.  Before the launch of the iPad, customers could read Kindle books on their smartphones and computers.  Orszag Decl. ¶ 63.  After the launch of the iPad, customers could download the Kindle App from iTunes and read Kindle books on the iPad and other Apple devices.  Mr. Orszag simply does not account for sales of e-books to customers who read Kindle e-books on non-Kindle devices.

Moreover, the e-reader market was very dynamic and Kindles were far from perfect complements of e-books during the conspiracy period.  Amazon was releasing new versions of the Kindle device and lowering the price of older Kindle versions.  The market was expanding rapidly.  Manufacturing processes were being developed and implemented.  Consumers who paid higher e-book prices because of the conspiracy may or may not have purchased a lower priced Kindle device after Amazon lowered its prices.  Yet, Mr. Orszag would offset Amazon's ████

█████████████████████████████████████████████████████

████████████████████████████████

PUBLIC VERSION – CONFIDENTIAL INFORMATION REDACTED PER PROTECTIVE ORDER

Further, Mr. Orszag's examination of the effects in the device market from the conspiracy is also based on incorrect assumptions regarding Amazon's device pricing, profit incentives and business strategy.  Mr. Orszag's assumptions lead him to conclude that ███

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████████████ Orszag Decl. ¶ 88.

But this analysis is flawed because its underlying assumption is that Amazon would have

███████████████████████████████████████████████████████████████

*see id.* ¶ 51 – when this is not true.  To the contrary, the ███████████████████████

███████████████████████████████████  As Mr. Orszag points out in his

report, ███████████████████████████████████████████████

███████████████████████, *id.* ¶ 88, ███████████████████████

███████████████████████████████████████████████████

█████████████████ *Id.* ¶ 54; *see also* Orszag Decl. Table VI-1, at 39.  This resulted in a

███████████████████████████████████████████████████████████████

█████████████████████ Orszag Decl. ¶ 54.  Thus, Amazon's actual results in 2010

conclusively show that it was more than willing to ██████████████████████████

██████████████████ – and in fact, that is exactly what Amazon did in 2010.  Mr. Orszag himself

acknowledges that "Amazon's goal was *not* to use sales of e-books to 'subsidize' the Kindle

device," *id.* ¶ 87 (emphasis added).  Nothing in the record indicates that ██████████████████

███████████████████████████████████████ in the "but-for" world if Amazon was

PUBLIC VERSION – CONFIDENTIAL INFORMATION REDACTED PER PROTECTIVE ORDER

able to continue charging its preferred e-book prices.  Mr. Orszag fails to consider alternative explanations for Amazon's device pricing, for example, that Amazon was taking a long-term perspective and ███████████████████████████████████████.

Mr. Orszag's speculation that Amazon had the incentive to reduce its device prices because ██████████████████████████████████████ (*Id.* ¶ 88) is also unsupported by other evidence.  He ignores that Amazon had been lowering its device prices annually even prior to the Agency model.  In fact, Amazon had dropped the price of the Kindle from $399 in late 2007 to $259 in 2009.  Its average yearly drop from 2007 to 2009 was $70, the same amount as from 2009 to 2010.  *See* Claire Miller, *In Price War, New Kindle Sells for $139*, New York Times, July 28, 2010 (*available at* http://www.nytimes./2010/07/29/technology/ 29kindle.html).  He fails to acknowledge testimony that Amazon "had been lowering device prices before and after the iPad was launched," (s*ee* Deposition of Russell Grandinetti, January 28, 2013, Ex. C, at 280:25 – 281:5), and that device prices had been generally declining.  In fact, it is error for Mr. Orszag to opine that the conspiracy contributed to Amazon's price decreases in its devices.  Mr. Orszag himself says that Amazon would have decreased its device prices as a result of the introduction of the iPad, regardless of the Agency Agreements and launch of the iBookstore.  Orszag Decl. ¶ 75.

Mr. Orszag similarly contends that a change in business strategy at Amazon and other retailers would have occurred absent the alleged conspiracy because even in the "but-for" world, Apple would have still introduced the iPad, presumably without the iBookstore.  *Id.* ¶ 59.  He claims that the introduction of the iPad in the "but-for" world would have caused Amazon to decrease the pricing of its devices and the resulting losses would have created a greater incentive for retailers like Amazon to raise prices on e-books.  *Id.*  Thus, Mr. Orszag speculates that it was

PUBLIC VERSION – CONFIDENTIAL INFORMATION REDACTED PER PROTECTIVE ORDER

no longer an optimal strategy for Amazon to sell e-books ███████████████. *Id.* ¶ 60.

Mr. Orszag's opinion is based on hearsay from third party analysts and his own speculation about Amazon's pricing and profit incentives. The testimony from Amazon's own executives is that Amazon had no intention of raising e-book prices because of e-reader prices or otherwise. *See, e.g.,* Direct Testimony of Rusell Grandinetti, April 24, 2013, (PX-0835), Ex. D, ¶ 27 ("We refused to raise prices in response to [publishers'] complaints; we always set our prices unilaterally until the agency model was introduced."). Mr. Orszag's analysis also ignores testimony that the Publisher Defendants expected Amazon to demand lower wholesale prices, rather than raise retail prices. *See* Declaration of David Young (of Hachette), April 26, 2013 (DX-702), Ex. E, ¶ 14 ("We believed that Amazon eventually would demand substantially lower wholesale prices so that it could make money selling e-books."); *see also* Declaration of Carolyn Reidy (of Simon & Schuster), April 26, 2013 (DX-552), Ex. F, ¶ 8 ("First, we believed that Amazon would eventually refuse to sell e-books below their wholesale cost and would demand lower wholesale prices.").

Because Mr. Orszag relies on speculation and baseless factual assumptions, his testimony is not "sufficiently tied to the facts of the case" and will not "aid the jury in resolving a factual dispute." *Daubert,* 509 U.S. at 591. It is inadmissible because it is based on "subjective belief or unsupported speculation." *Id.* at 589-90.

### C. Mr. Orszag's Attempt to Offset Damages to e-Book Purchasers by the Benefits to Consumers of Devices and Accessories is also Inadmissible Due to the Unreliability of his Methodology.

Mr. Orszag's testimony regarding e-reader devices should also be excluded because his methodology and analysis are unreliable. Expert testimony must be the "product of reliable

16

principles and methods." Fed. R. Evid. 702. However, Mr. Orszag's method of calculating the offsetting consumer benefits from device prices set forth in Table VI-2 on page 39 of his Declaration is unsound on many levels. Orszag Decl. Table VI-2, at 39.

First, Mr. Orszag wrongly assumes that ██████████████████████████ lead to direct benefits for consumers that are a result of the Agency model and that he is able to calculate that amount. From 2009 to 2010, ████████████████████████ ████████████████████████ Mr. Orszag opines that ██████████████ ███████████████████████████████ ████████████████████████████████████ ████████████████████████ Orszag Decl. ¶ 88. He then opines that the ████ ██████████████████ – must have been caused by higher e-book prices as a result of the conspiracy. *See id.* ¶ 88 ████████████████████████████ ███████████████████████████████ ███████████████████████████ █████████████████████████████████ ████████████████████

This attempt to distinguish between device price reductions from the conspiracy, and reductions caused by other market factors, is completely arbitrary. Mr. Orszag provides no methodology at all for distinguishing between the ██████████████ in device profits and the ████████████. He provides no basis for why one number should be attributed to the conspiracy whereas the other number should be attributed to price declines due to non-Agency Agreement causes such as the launch of the iPad. He does not cite a single Amazon document that treats accounting profits in that way. In fact, ██████████████████████ could

PUBLIC VERSION – CONFIDENTIAL INFORMATION REDACTED PER PROTECTIVE ORDER

have been attributable to more competition in the device market after the iPad launched – or not.

His results depend entirely on how Amazon priced its devices in 2009 compared with its pricing

strategy in 2010, with no consideration whatsoever of any changing costs or other strategic

pricing changes from one year to the other.  Mr. Orszag's speculation and his failure to account

for alternative explanations as to why ███████████████████████ render his related

opinions inadmissible.  *See Raskin,* 125 F.3d at 67-68 (upholding the exclusion of an

economist's report because the expert failed in his analysis to exclude for factors that could have

impacted his conclusions); *Daubert,* 509 U.S. at 589-90 (testimony inadmissible because it is

based on "subjective belief or unsupported speculation.").

Second, Mr. Orszag presents no reliable methodology for disentangling the proportion of

reduced device prices that are purportedly attributable to the increase in e-book prices because of

the conspiracy as opposed to the launch of the iPad, e-reader manufacturing innovations, rapid

market growth, ongoing price decreases, and other contributing factors that were already taking

place in the e-reader market prior to the negotiation of the Agency Agreements.  Absent from his

analysis are the usual regression calculations which might control for non-Agency Agreement

influences on device and accessory prices and profits.   Accordingly, Mr. Orszag's testimony is

inadmissible because it fails to distinguish between the Agency influences on device and

accessory prices and profits and non-Agency-related influences or strategies.  *In re Executive

Telecard, Ltd. Securities Litig.,* 979 F. Supp. 1021, 1025-26 (S.D.N.Y. 1997) (experts analysis

was inadmissible because the expert failed to distinguish between fraud-related and non-fraud-

related company specific influences on the company's stock price); *In re Wireless Telephone

Services,* 385 F. Supp. 2d at 427-28 (expert's regression analysis was "methodologically

unsound" and inadmissible under Rule 702 because the expert failed to introduce independent

PUBLIC VERSION – CONFIDENTIAL INFORMATION REDACTED PER PROTECTIVE ORDER

variables into his analysis to account for alternative explanations that could have affected his analysis).

Because Mr. Orszag's methodology is unreliable, his "straight forward" calculation in Table VI-2 will only mislead the jury.  Orszag Decl. Table VI-2, at 39.  In Table VI-2, he translates Amazon's ███████████████████ (attributable to the conspiracy) to a ██████ offsetting benefit to e-book purchasers based on his unreliable methodology.  *Id.*  His conclusion that the "██████████████████████████████████████████████ ██████████████████████████████████████," *id.* ¶ 92, is pure speculation, misleading and should be excluded.

## II.    Mr. Orszag's Testimony Concerning "Other Offsetting Effects" of the Conspiracy Should Also be Excluded (Section VII)

### A.    It is Both Legally Improper and Factually Incorrect to Reduce Damages from the Conspiracy by the "Offsetting Effects" of the Growth of Self-Publishing and Free e-Books.

Mr. Orszag maintains that Dr. Noll "ignores other effects that mitigated the impact of higher content prices for many consumers," such as the expansion of self-published titles and sales and more free e-books.  Orszag Decl. ¶ 93.  He states that "the move to agency was followed by a substantial increase in self-published titles and sales" *id.* ¶ 93, and credits the launch of Apple's iBookstore with incentivizing retailers "to invest in their platforms by expanding the selection of free e-books."  *Id.* ¶ 104.

As with the other arguments in VI of his Declaration, these "offsetting effects" are irrelevant and should be excluded because they are inconsistent with the law and the Court's Opinion.  The Court found that Apple had not shown any pro-competitive effects that should be weighed against the higher price of e-books caused by the conspiracy.  *Apple*, 2013 U.S. Dist. LEXIS 96424, at *141.  Furthermore, and as set forth in Section I. A. 1, deducting such

PUBLIC VERSION – CONFIDENTIAL INFORMATION REDACTED PER PROTECTIVE ORDER

"offsetting effects" from price fixing damages is legally impermissible.  *See In re Blood Reagents, 283 F.R.D.* at 239; *Perma Life Mufflers*, 392 U.S. at 139.

In addition, Mr. Orszag's opinions on these purported benefits and his quantification of them should be excluded because they are similarly speculative, contrary to facts in this case, and not based on a reliable economic analysis.  First, the conspiracy and the launch of Apple's iBookstore did not cause the growth of self-publishing.  Mr. Orszag contends, incorrectly, that Amazon increased the royalties it paid to self-publishing authors, from 35% royalty price pre-agency to a 70% royalty in January 2010, in response to Apple's launch of its iBookstore which included an e-book platform open to self-publishers.  This is contrary to the record, which shows that self-publishing had been rapidly expanding prior to the adoption of the Agency model.  The evidence clearly shows that self-publishing would have increased regardless of the move to an Agency model.  As early as December 10, 2009, prior to any discussion of a move to the Agency model, Jeff Bezos, Amazon's CEO, asked his team at Amazon:  "How about we do a bigger revenue share on DTP at the same time we require DTP books to be lendable. . . and give them [the self-publishers] 70% of revenues."  Email from Jeff Bezos, December 10, 2009, AMZN-MDL-00044064, (DX-071), Ex. G.  In addition, Amazon was planning to launch a new self-publishing pricing structure at least as early as January 11, 2010, a week before it learned that the publishers were planning a move to agency.  Email from Jeff Tollefson of Amazon, January 11, 2010, AMZN-MDL-0154056-58, Ex. H.  Similarly, Barnes & Noble planned to increase self-publishing as part of its entry into the market.  As Anthony Astarita of Barnes & Noble stated, "the thinking was that it would present opportunities for individuals to self-publish and essentially be empowered to create and author product that wouldn't necessarily go through traditional publishing channels."  Deposition of Anthony Astarita ("Astarita Dep."), February 27,

PUBLIC VERSION – CONFIDENTIAL INFORMATION REDACTED PER PROTECTIVE ORDER

2013, Ex. I, at 21:4 – 21:9.  The retailers' interest in increasing self-publishing opportunities was more about gaining some freedom from the powerful publishers than with competing with Apple or anyone else.  Mr. Orszag fails to acknowledge or account for these facts, which makes his analysis unreliable.

Mr. Orszag further maintains that Dr. Noll failed to consider the "offsetting benefit" of the expansion in free e-book offerings.  Mr. Orszag credits Apple and its launch of the iBookstore with the increase, asserting that the increased profitability of e-books from the conspiracy gave retailers the incentive to increase the number of free e-books available on their platforms.  This assertion, once again, is unsupported and unreliable.

The free e-books for which Mr. Orszag credits Apple and the conspiracy were available long before Apple entered the e-book market.  In the first month following the launch of Apple's iBookstore, the top 20 free e-books downloaded were all public domain books published by Gutenberg, which has been publishing free public domain e-books since 1971.  Every one of those top 20 free e-books was available online at www.gutenberg.org before 2010.  *See* Project Gutenberg, www.gutenberg.org (web site hosting free e-books).  Moreover, Mr. Orszag's quantification of the consumer benefits attributable to these "offsetting effects" is only "illustrative" and would only mislead the jury into believing that his calculations should be a measurement of offsetting benefits.  Orszag Decl. ¶ 103, 110; Orszag Dep. 129:23-25, 130:1-3, 131:6-20.  He did not perform any empirical analysis that connected higher e-book prices to the benefit consumers would have felt and presented no regression to account for the non-conspiratorial influences on free-books.  Mr. Orszag's opinions on these matters are unreliable and should be excluded.

PUBLIC VERSION – CONFIDENTIAL INFORMATION REDACTED PER PROTECTIVE ORDER

      **B.**      **Mr. Orszag's Attempts to Decrease Plaintiffs' Damages by Some Portion of E-book Sales from Apple's iBookstore Are Unsupported by the Evidence**

Mr. Orszag suggests that Plaintiffs' damages also be decreased by sales of e-books from the iBookstore that would not have occurred absent the switch to the Agency model.  This contention is built on the assumption that Apple would not have launched the iBookstore in the absence of the conspiracy, *id.* ¶ 111, and that in the "but-for" world, a certain percentage of iBookstore customers – the 60-67% of iPad owners who do not own a Kindle device – would not have purchased e-books (e.g., by downloading the Kindle app on the iPad).  *Id.* ¶ 116.  Based on his analysis, Mr. Orszag would reduce consumers' damages by $3 million to $8 million depending on various assumptions.  *Id.*

Mr. Orszag's argument is flawed and misleading on several levels.  First, Mr. Orszag's contention that, in the absence of the conspiracy, a certain percentage of current iBookstore customers who do not own a Kindle device would not have downloaded the Kindle app on the iPad is pure speculation and indeed, illogical.  It is more likely that current iBookstore customers without a Kindle device in the "but-for" world would have wanted to read e-books on their iPad – since they do that now – and would find a way to do so, such as by downloading the Kindle app or another e-reader app on their iPad.  (In fact, in the "but for" world, they would actually have paid *less* money for an e-book in the absence of the price-fixing conspiracy and the iBookstore and so would be *more* encouraged to purchase e-books.)  Second, Mr. Orszag does not explain why he bases his analysis on the 60-67% of iPad owners who do not own a Kindle device.  Such customers likely do not own a Kindle device because they can read e-books on their iPads and do not need a Kindle.  Yet, Mr. Orszag assumes that those customers would not buy e-books in the "but-for" world, so he offsets damages by a percentage of sales to those customers.  Third, Mr. Orszag ignores that higher e-book prices caused by the conspiracy

22

PUBLIC VERSION – CONFIDENTIAL INFORMATION REDACTED PER PROTECTIVE ORDER

lessened the demand for e-books.  Demand for e-books likely would have been greater in the "but for" world, and sales of e-books to iPad customers would have been *higher*, not lower.

Finally, Mr. Orszag's contention that some sales of e-books from the iBookstore would not have been made in the "but-for" world, is contrary to the evidence.  Apple's own Keith Moerer confirmed that if Apple had not launched an iBookstore, iPad owners would still have been able to purchase e-books for use on their iPad.  Deposition of Keith Moerer ("Moerer Dep."), December 13, 2012, Ex. J, at 60:21-61:15 ("I believe that e-readers would continue to exist on the – on Apple devices.")   When asked if it is true that regardless of what Apple ultimately decided to do with its own iBookstore, individuals would still have been able to read books through the Kindle application or other similar application, Mr. Moerer stated "to the extent that e-reader apps were in compliance with Apple's policy, that would be true…and that certainly has proven to be the case."  Moerer Dep. at 60:21-65:14.  Accordingly, even if Apple had decided to not launch its iBookstore, iPad owners had the ability to purchase e-books from other retailers.  Thus, there is simply no basis for excluding from the damage estimate sales of e-books made through the Apple iBookstore, and such testimony must be excluded.

## C.   Mr. Orszag's Testimony Concerning Barnes & Noble's Likely Exit from the e-book Business Absent Agency is Speculative and Must be Excluded

In his continued search for "offsetting effects" accruing from the conspiracy, Mr. Orszag makes the remarkable argument that "the increase in e-book prices under the agency agreements allowed Barnes & Noble to stay in business and continue to invest in new devices and other services."  Orszag Decl. ¶ 117.  This contention is contrary to how damages should be determined in price-fixing cases, is speculative, lacks any basis in fact, and lacks any reliable methodology.

PUBLIC VERSION – CONFIDENTIAL INFORMATION REDACTED PER PROTECTIVE ORDER

First, an antitrust violator is not entitled to a credit for how overcharges might purportedly benefit consumers. *Perma Life Mufflers*, 392 U.S. at 139.   An antitrust violation cannot be justified by arguing that competition itself is unreasonable. *Nat'l Soc'y of Prof. Eng'rs v. United States*, 435 U.S. 679, 698 (1978).  An acceptance of this notion would provide carte blanche to any struggling business to conspire to charge higher prices so that it may stay afloat, a concept abhorrent to the very purpose of the antitrust laws, which is to preserve competition. And as stated herein, attempts to deduct the pro-competitive benefits resulting from an illegal conspiracy have been rejected by the courts. *See Blood Reagents*, 283 F.R.D. at 239*; In Re Cardizem,* 200 F.R.D. at 297.

In addition, Mr. Orszag has no factual support for the assertions that (a) Barnes & Noble would have exited the e-books market absent the transition to the agency model, and (b) even if Barnes & Noble had exited this business, its customers would have not purchased e-books.  His opinion on the matter is pure speculation and fails to account for contrary evidence such as testimony from Mr. Astarita that Barnes & Noble did not weigh the Agency model in its decision to move forward with devices.  Astarita Dep. at 139:12-18.  In addition, if Barnes & Noble's e-book business became financially unsustainable, there is no reason why it could not enter into a strategic partnership or sell its valuable patents and assets to another company rather than have the assets exit the market altogether and obtain zero value for them.

Equally without merit is Mr. Orszag's claim that some portion of the damages attributable to purchasers of e-books from Barnes & Noble can be quantified and should be deducted from Plaintiffs' damage model.  In his quest to reduce Plaintiffs' damages, Mr. Orszag claims that Dr. Noll's "potential overstatement" "may be between approximately $6 million and $18 million" that are attributable to Barnes & Noble exiting the market.  Orszag Decl. ¶ 123.

PUBLIC VERSION – CONFIDENTIAL INFORMATION REDACTED PER PROTECTIVE ORDER

However, Mr. Orszag has no empirical evidence to show that fewer e-books would be sold if Barnes & Noble had exited the market. Accordingly, his quantification of the "overstatement" is based on wholly speculative assumptions and also should be excluded.

## CONCLUSION

The Court should strike paragraph 10, sections VI and VII (paragraphs 42-123), and paragraphs 126-127 of Mr. Orszag's Corrected Declaration and exclude testimony based on those paragraphs and sections.

Dated: December 18, 2013
      New York, New York

STATE OF NEW YORK
ERIC T. SCHNEIDERMAN
ATTORNEY GENERAL
Eric J. Stock
Bureau Chief

By: _/s/ Robert L. Hubbard_____
Robert L. Hubbard (RH 3821)
Geralyn J. Trujillo (GT 2586)
Assistant Attorneys General
Antitrust Bureau
120 Broadway, 26th Floor
New York, NY 10271
(212) 416-8267
robert.hubbard@ag.ny.gov
geralyn.trujillo.ag.ny.gov

*Counsel for the State of New York*
*On Behalf of Plaintiff States*

Of counsel:
      Linda Gargiulo
      George Laevsky