**NON-CONFIDENTIAL VERSION**

**Fourth Report of the External Compliance Monitor**

**United States v. Apple, Inc., et al., No. 1:12-CV-2826, and**

**The State of Texas, et al. v. Penguin Group (USA) Inc., et al., No. 1:12-CV-3394**

**Michael R. Bromwich**
**External Compliance Monitor**
**October 5, 2015**

NON-CONFIDENTIAL VERSION

## Executive Summary

This is the fourth semi-annual Report submitted pursuant to Section VI.C of the Final Judgment issued in *United States v. Apple, Inc., et al.*, No. 12-cv-2826, and *State of Texas et al. v. Penguin Group (USA) Inc., et al.*, No. 12-cv-3394 (the "ebooks Litigation").

In the September 5, 2013 Final Judgment and Order Entering Permanent Injunction (the "Final Judgment"), this Court ordered the Monitor to submit reports every six months "setting forth his . . . assessment of Apple's internal antitrust compliance policies, procedures, and training and, if appropriate, making recommendations reasonably designed to improve Apple's policies, procedures, and training for ensuring antitrust compliance."[1] The Monitor is required to evaluate whether Apple's policies and procedures are "reasonably designed to detect and prevent violations of the antitrust laws" and whether Apple's antitrust training program is "sufficiently comprehensive and effective."[2]

During the fourth reporting period, which ran from March 1, 2015 through September 4, 2015,[3] we made additional progress in our efforts to assess Apple's Antitrust Compliance Program. As set forth at more length below, our assessment is that the Program is substantially stronger than it was when the monitorship began, and stronger than when we issued our Third Report. We did, however, continue to experience difficulties in obtaining information we needed to assess the Program. Apple continued to object to our requests for information about aspects of its antitrust compliance efforts, sometimes on the ground that the information we sought was privileged and sometimes on the ground that the requests exceeded the scope of our duties under the Final Judgment. Strangely, Apple refused to provide even some information that would cast the Program in a positive light; it produced some requested information only very late in the reporting period, and additional relevant information was discovered during interviews at the very end of the reporting period, hobbling our ability to conduct appropriate follow-up.

---

[1] Final Judgment § VI.C.

[2] *Id.*

[3] Under our established schedule, the fourth reporting period would have ended on August 31. However, Apple scheduled its Board and Executive Team ("ET") training sessions for the week beginning August 31, so we extended the reporting period to the end of that week in order to monitor the training sessions and interview a select group of Board and ET members about their training and other issues.

NON-CONFIDENTIAL VERSION

Despite these obstacles, we made significant progress.  Among other things, we completed important interviews, including follow-up interviews of three of Apple's independent directors, four members of its Executive Team ("ET")—including Chief Executive Officer Tim Cook—and Apple's Chief Compliance Officer.  We also interviewed several business people and in-house attorneys.  In addition, we monitored several antitrust training sessions, met twice with Apple's Antitrust Compliance Officer ("ACO"), and reviewed a number of relevant documents that Apple produced.

These activities, although significantly constrained by Apple's continuing objections, show that there has been significant progress in the development and implementation of Apple's Antitrust Compliance Program.  In particular, the company began the monitorship with no formal procedures related to antitrust compliance and, as of the Third Report, had drafted only a few procedures, which we found vague and insufficient to implement its program.  In this reporting period, however, after we provided several rounds of feedback, Apple has created a set of procedures that we believe are "reasonably designed to detect and prevent violations of the antitrust laws"[4]—at least on paper.  Critically, because Apple has provided us with no information regarding whether or how it has implemented the procedures thus far, we cannot assess whether they will be effective in practice.[5]

Second, we observed a marked improvement in the engagement of Apple's senior executives in the Antitrust Compliance Program.  Near the end of the reporting period, we interviewed four members of the Executive Team ("ET"); we learned from them that the ET has begun to discuss antitrust issues more frequently when planning business initiatives and engaging in business activities.  We also learned that certain ET members have taken concrete steps to reinforce the importance of antitrust compliance within their business groups, including by requesting special antitrust training for their employees.  We also saw an improvement in the engagement of the Board and its Audit and Finance Committee ("AFC") in the Program, although the change was not as significant as the change we observed in the ET.

---

[4] Final Judgment § VI.C.

[5] In its comments on a draft of this Executive Summary, Apple asserted that this statement is misleading because "Apple in general finalized a complete set of procedures near the end of the monitorship."  But that is precisely our point.  Apple has had two full years to develop and implement an antitrust compliance program that is comprehensive and effective and that includes an adequate set of procedures.  That it did not complete many of them until the latter part of this reporting period does, as a simple matter of fact, prevent us from determining whether they are effective in practice.

**NON-CONFIDENTIAL VERSION**

In the Assessment and Recommendations section of this Report, we evaluate the status of Apple's progress in light of the criteria set forth in the Final Judgment.  We also describe Apple's progress in implementing our recommendations, which have been designed to assist Apple in satisfying those criteria.  Importantly, under the Final Judgment, the Court designed the monitorship to last for a presumptive two-year term, although the Court reserved the discretion to extend it by one or more additional one-year periods.  We have therefore also focused during this reporting period on assessing whether Apple's Antitrust Compliance Program is sufficiently well developed that it will continue to develop even without the presence of an external monitor.

*Risk Assessment*

In our previous reports, we recommended that Apple conduct a formal antitrust risk assessment and make that assessment a central component of its Antitrust Compliance Program.[6]  Specifically, we advised the company that the risk assessment should take the form of a "systematic assessment of the risks that arise from Apple's businesses, the activities of its employees, and its third-party interactions"; that the assessment should include consideration of the company's historical antitrust concerns; and that it should include a "formal . . . process that is dynamic, so that Apple's Antitrust Compliance Program continues to develop as Apple's business changes and expands and as the antitrust regulatory environment changes."[7]

During the third reporting period, Apple stated that it would not provide us with the substantive conclusions it reached in the risk assessment.  In the interest of avoiding a stalemate and further delays, we agreed instead to accept information about Apple's risk assessment process and about the ways in which the risk assessment affected the Antitrust Compliance Program.  The company subsequently claimed that it had not, in fact, offered to provide specific information about those effects.  In the Third Report, we described the basic information we had received about whom Apple interviewed as part of the risk assessment, general topics discussed in those interviews, and the stakeholders— the AFC and ET—designated to receive presentations on the results of the risk assessment.  We concluded that that information left us with an insufficient basis to assess whether Apple had satisfied our recommendations.

Apple gave us little additional information during the first five months of this reporting period regarding the risk assessment, other than general

---

[6] *See* First Report 45-47; Second Report 74-84; Third Report 36-46.

[7] Second Report 74.

NON-CONFIDENTIAL VERSION

information about the process followed in conducting it. Towards the end of the reporting period, we obtained two categories of information about the risk assessment, one far more valuable than the other. [*]

[8] Second, and far more significantly, we interviewed three members of the AFC and three members of the ET regarding the risk assessment presentations made by Apple's General Counsel, in addition to interviewing the General Counsel. The members of the AFC and the ET whom we interviewed generally agreed that the risk assessment was a valuable exercise; one of them, the Chairman of Apple's Board, said that the assessment Even those AFC members who told us [**]

Because we received relatively little additional information from Apple regarding the risk assessment during this reporting period, we again cannot assess whether Apple's efforts have fully satisfied our recommendations. We are concerned that Apple has been able to identify so few ways in which the risk assessment has affected the Antitrust Compliance Program. This Report makes one further recommendation regarding Apple's antitrust risk assessment. It is widely recognized that, to be effective, a risk assessment must be repeated periodically, not conducted once and then not updated. Indeed, one of the grounds on which Apple advanced its objections to conducting a risk assessment was that it would be outdated the day it was completed. We disagree that this proves the futility of conducting a risk assessment but agree that the assessment must be done frequently enough to prevent staleness. We therefore recommend that Apple repeat its formal antitrust risk assessment on an annual basis at least until the Final Judgment expires, and thereafter no less frequently than every two years.

---

[*] The redacted material discusses statements describing the impact of the risk assessment on specific aspects of Apple's antitrust compliance program.

[8] This was far less than the detailed information Apple had originally agreed to provide.

[**] The redacted material summarizes the reaction of the AFC members to the risk assessment.

NON-CONFIDENTIAL VERSION

*Policies*

Our assessment is that Apple's policies related to antitrust compliance are generally satisfactory and appropriate, and we make few additional recommendations related to them in this Report. In prior reports, we recommended that Apple expand the substantive scope of its Antitrust and Competition Law Policy—the primary substantive antitrust guide available to employees—and also improve its dissemination throughout the company. Apple has taken useful steps to implement those recommendations, such as by including the full text of the Policy in the online antitrust training course that many employees are required to take. We recommend, however, that Apple take steps to further highlight and explain the Policy in the online training.

We also make a recommendation related to the Antitrust and Competition Law Policy's reference to Apple's Standards Legal Policy, Apple's guide for employees who are contemplating engaging in standards-related activity, such as joining or forming a standards organization or implementing a technology standard. We recommend that employees be directed to the Standards Legal Policy in a broader range of circumstances than is currently recommended in the Antitrust and Competition Law Policy.

*Procedures*

As noted above, one of our significant concerns throughout this monitorship has been the lack of formal procedures associated with Apple's Antitrust Compliance Program. No corporate compliance program is self-executing, and it is therefore critical that a company have in place a set of procedures to implement its compliance policies and, together with training, constitute a comprehensive program. When the monitorship began, Apple had few formal antitrust compliance procedures of any kind. When we issued the Third Report, Apple had begun to develop such procedures, but we identified serious deficiencies in the procedures the company had prepared, and additional procedures to fill existing gaps.

<u>First</u>, we expressed particular concern about Apple's draft procedure for detecting, investigating, and reporting potential antitrust concerns; the Third Report offered a number of recommendations to strengthen that procedure. We have now provided Apple with several rounds of comments on the procedure, and it is substantially improved. It contains relatively detailed guidance regarding the methods for detecting and reporting potential violations, and it includes a step-by-step investigations checklist that we have concluded is sufficient. The critical qualification to that assessment is that we have no insight into how effective the procedure will be in practice. It is newly drafted, and

Apple has not provided us with information about how it has been applied, if it has been applied at all.  Nonetheless, we believe that, at least on its face, the procedure is sufficient.

Second, we have also sought information about the incentives Apple provides for employees to abide by the antitrust laws and the company's antitrust compliance policies.  In the Second Report, we recommended that Apple take further steps to use incentives and disincentives to encourage awareness of, and compliance with, the Antitrust Compliance Program and to communicate expectations that company personnel will comply with the law and with company policies; we also recommended that Apple further disseminate information within the company about those incentives and disincentives.

During this reporting period, in response to our recommendations, Apple agreed to add new language to its personnel evaluations, advising managers to consider whether employees ███████████████████████████████ █████████████████  We think this addition is an appropriate start, but we believe Apple can and should do more to emphasize to employees the importance of ethical and compliant behavior, and the direct effects that compliance or noncompliance can have on their success at the company.  For example, Apple could add content to its training materials that would remind employees of the consequences of compliance and noncompliance.  Apple should also consider adding ethics and compliance to the formal factors on which employees are evaluated, rather than simply mentioning ethical issues in the background guidance that is provided to managers.

Third, we have been concerned throughout the monitorship about Apple's procedures for auditing the Antitrust Compliance Program.  Section V.E of the Final Judgment requires the Antitrust Compliance Officer ("ACO") to conduct an audit regarding specified individuals within the company ("Section V.E Audit").  During the second reporting period, the ACO proposed a plan for that audit, which we found insufficient; we made specific recommendations for its improvement during the second and third reporting periods.  We also recommended in the Second Report that the ACO conduct regular programmatic audits of the Antitrust Compliance Program, which would be broader than the Section V.E Audit.  During this reporting period, in response to multiple rounds of feedback from the Monitor, the ACO significantly enhanced her procedure for conducting the Section V.E audit; in our view, it is now sufficient.

The ACO provided a draft procedure for the broader, programmatic audit in late July 2015 but, shortly thereafter, decided to engage an outside firm to conduct the audit instead of doing so herself.  Apple did not disclose that decision to us until the last week of the reporting period, and we therefore have

NON-CONFIDENTIAL VERSION

very little information about it. We support, as a general matter, the decision to retain an outside firm to conduct the review, but we have insufficient information about the nature of the audit to conclude that Apple has satisfied our recommendation. We recommend that Apple repeat the audit on a periodic basis to ensure that the Program remains consistent, over time, with industry practices and the Sentencing Guidelines.

*Training*

During this reporting period, we monitored six antitrust training sessions in person and five sessions by video. These training sessions were a significant improvement over the sessions we monitored in 2014. In the Second and Third Reports, we recommended, among other things, that Apple incorporate into its live training more "real-life," Apple-specific examples and discussion; hold its training sessions in a more informal setting that would encourage more interaction between the trainer and trainees; arrange to train employees whose activities created a moderate to high level of antitrust risk in person, rather than remotely; and provide specialized antitrust training to its in-house lawyers. We also recommended that Apple expand the content of the training sessions for its Board and ET members to include a more comprehensive discussion of Board and executive oversight responsibilities with respect to antitrust compliance.

Apple implemented these recommendations during the fourth reporting period. During this six-month period, Apple held its training sessions in small conference rooms with an informal atmosphere, and we observed that participants asked more questions. The in-house Apple lawyers who conducted the training sessions also made efforts to tie the antitrust concepts they were discussing to examples and hypothetical scenarios related to Apple's lines of business and, where possible, to the specific lines of business in which members of the training audience were engaged. Apple also held two training sessions in Los Angeles so that employees based there could receive training in person, rather than remotely. The company provided live training to its in-house lawyers, as we recommended, and expanded the content of its Board and ET training sessions to address oversight responsibilities. Our assessment is that Apple's live training program has improved substantially.

In addition to live training, Apple has assigned an online, antitrust-specific training course to approximately 10,000 employees since 2014. We continue to believe, as we have stated in prior reports, that the online course meets the need for broad-based antitrust training that can be offered to large numbers of Apple employees—both to provide additional education to employees who participate in live training and to provide a general introduction

to antitrust compliance for employees whose activities create less exposure to antitrust risk.

*Senior Commitment to Compliance*

In the Second and Third Reports, we made a series of recommendations aimed at increasing the engagement of Apple's ET and other managers in the Antitrust Compliance Program. Because what senior leaders say and do—and what they fail to say and do—affects the importance employees will attach to antitrust compliance, it is critical for senior leadership to demonstrate a visible and continuing commitment to compliance. In our prior reports, we therefore recommended that senior executives devote more time and attention to compliance matters and address compliance issues more directly and specifically.[9]

We observed significant improvement on this issue during the fourth reporting period. Our interviews late in the reporting period with four members of the ET were particularly useful in providing a basis on which to conclude that key members of the executive team are more appropriately engaged in Apple's antitrust compliance efforts. Multiple people we interviewed informed us that the members of the ET are now more attuned to potential antitrust issues than they were before, that some proactively seek the advice of counsel when they believe actions they are considering could create antitrust risk, and that at least some ET members have instructed their employees to take a similarly cautious approach in their activities. In addition to this heightened awareness of antitrust issues, we learned that key senior executives had taken additional steps to highlight antitrust compliance, including by providing their team members with additional antitrust training and having discussions with their employees about the importance of antitrust compliance. We recommend that Apple build on these efforts through having its senior personnel take concrete steps that emphasize the importance of antitrust compliance.[10]

---

[9] Throughout the monitorship, Apple has made it clear that it disagrees with the assessments contained in our prior reports that its senior leaders have shown an insufficient commitment to antitrust compliance.

[10] We also recommend that, during the duration of the Final Judgment, Apple do a better job of documenting and tracking when senior leaders address antitrust compliance issues with their teams and staff.

NON-CONFIDENTIAL VERSION

*Oversight*

This Report addresses three sources of oversight for the Antitrust Compliance Program: the ACO, the Competition Law and Policy Group ("CLPG"), and the AFC.

With respect to the ACO, we have expressed concern in previous reports about whether her role was taking shape in the way the Court envisioned when it issued the Final Judgment. For example, we emphasized in the Second Report that the ACO, Deena Said, must carry out her duties with independence and authority, given the Final Judgment's requirement that Apple "designate a person not employed by Apple . . . to serve as the Antitrust Compliance Officer," to "report to the Audit and Finance Committee," and to "supervis[e] Apple's antitrust compliance efforts."[11] Although Ms. Said is diligent and able, we have been concerned that, because of the way Apple structured her role within the company, she may not have the level of independence the Court expected. In an effort to ameliorate these concerns, we recommended in the Third Report that Ms. Said be given full information regarding undisclosed products and projects, that a member of the AFC conduct Ms. Said's performance evaluation, and that Apple consider making the AFC, rather than Apple management, responsible for setting Ms. Said's compensation. Apple objected to all of these recommendations, although it agreed that the Chair of the AFC would be consulted regarding the ACO's evaluations and compensation.

During this reporting period, we continued to observe that the ACO was working diligently on the Antitrust Compliance Program; her efforts have contributed substantially to the strengthening of the Program during the six months covered by this report. The ACO deserves recognition for her contributions. We nonetheless continue to have concerns about the way Apple has structured her role. Although the ACO provides quarterly reports to the AFC and confers with the Chair of the AFC at least once a month, her manager is Apple's Chief Compliance Officer, and she has clearly become integrated with Apple employees. The ACO does appear to have decision-making authority regarding the Antitrust Compliance Program, but we have not seen evidence that her authority has ever been truly tested or about what would happen if it were. Because of these concerns, we cannot conclude that Apple has satisfied our recommendations regarding the ACO's independence and authority.

---

[11] Final Judgment § V.

**NON-CONFIDENTIAL VERSION**

With respect to the CLPG, as we have described in prior reports, we believe the CLPG is playing an appropriate role within Apple, and we have no further recommendations regarding that group's activities.

Finally, with respect to the Board and its AFC, we have emphasized in all of our reports that oversight of a compliance program is one of the Board's critical functions. We have highlighted the need for a strong, direct, and genuine reporting relationship between the ACO and the AFC, and we have made clear that the AFC must be "fully informed regarding high-risk areas, the effectiveness of reporting mechanisms, protocols for detecting violations and investigating complaints, and other important aspects of the program."[12] As of the Third Report, we concluded that there had been an increase in Board oversight over the Program, but we concluded that the Board should do more. Apple disagreed strongly with that assessment.

During this reporting period, we received additional information regarding the Board's oversight of the Program, including from interviews at the end of the reporting period with three of Apple's independent directors and its CEO, who sits on the Board. We learned that the ACO provided quarterly updates to the AFC regarding the Program, and she continued to speak at least once per month with the Chair of the AFC. In addition, two members of the AFC asked to review the updated version of the online training course. Through our interviews, we learned that the AFC discusses the Antitrust Compliance Program, at least to some extent, during each of its quarterly meetings; and that the full Board has actively questioned Apple management regarding potential antitrust issues related to new initiatives. We also monitored the Board training session, during which Board members asked questions that suggested they were engaged and interested in Apple's antitrust compliance. Based on all of the information we gathered during this reporting period, we conclude that there has been significant improvement in the Board's efforts to oversee the Antitrust Compliance Program. Nonetheless, we still have some concerns; for example, the AFC members seemed to be familiar with the live and online training but not with any of the procedures that govern the Program. We therefore recommend that the Board exercise rigorous oversight regarding antitrust-related issues and make more diligent efforts to obtain knowledge about the elements of the Antitrust Compliance Program.[13]

---

[12] Second Report 126.

[13] In its comments on a draft of this report, Apple has agreed in substance to accept and implement all of the report's recommendations, except for the recommendation that Apple improve its documentation and tracking of those occasions when senior leaders address antitrust compliance issues with their teams and staff.

NON-CONFIDENTIAL VERSION

*       *       *

During this reporting period, Apple made substantial progress in developing and improving its Antitrust Compliance Program and in implementing the numerous recommendations we made in our previous reports. In particular, Apple has worked diligently during this reporting period to improve the procedures associated with its Program, which had been one of our primary areas of concern in prior reports. Although the procedures remain untested, we think that, at least on paper, they are much better than they were even a few months ago. We also noted a significant improvement in the engagement and involvement of Apple's ET in antitrust issues; we were favorably impressed in our most recent interviews, at the end of the reporting period by the extent to which the ET now appears to be attuned to antitrust risk and accustomed to seeking legal advice.

Regrettably, one of the constants over the past two years has been Apple's lack of willing cooperation with our court-mandated efforts. We continued to have requests rejected on a regular basis during this reporting period for no good reason; indeed, it turns out that Apple had a positive story to tell about the attention it paid to antitrust considerations in connection with Apple Music—a positive story that appears to reflect well on its ET, its Board, its lawyers, and its business personnel. And yet, our efforts to obtain basic information about how Apple handled antitrust issues relating to Apple Music were met with objections, resistance, and the provision of minimal information in response to repeated requests. In this respect, Apple has been its own worst enemy.

This lack of cooperation has cast an unnecessary shadow over meaningful progress in developing a comprehensive and effective antitrust compliance program. This point was noted in some fashion by most of the ET members and all the Board members we interviewed the week of August 31, all of whom were familiar with the access problems we continued to experience but who at the same time apparently believed it was not their responsibility to put a stop to it. That was indeed unfortunate. What weight to give this lack of cooperation, and the resulting lack of access to material information, in the context of substantial advances in the development and implementation of a credible antitrust compliance program, is ultimately for the Court to decide.

Because this report may be the last one we file with the Court, we wish to thank the Court for the trust it has placed in us. It has been an honor and a privilege to serve in this important role.

**NON-CONFIDENTIAL VERSION**

## TABLE OF CONTENTS

Page

I.    Introduction ....................................................................................1

II.   Background of the Monitorship....................................................2

III.  The Final Judgment ......................................................................3

    A.    Sections III and IV: Prohibited Conduct and Affirmative Obligations .........3

    B.    Section V: Antitrust Compliance Officer....................................4

    C.    Section VI: External Compliance Monitor ................................6

IV.   First Reporting Period: September 2013 to March 2014 ............8

    A.    Selection of the External Compliance Monitor .........................8

    B.    The Beginning of the Monitorship: October and November 2013 ................8

    C.    Interviews and Challenges to the Monitorship: December 2013 to February 2014 ...........................................................11

        1.   December Interviews ....................................................11

        2.   Subsequent Correspondence in December................................11

        3.   Apple's December 12, 2013 Motion to Stay ................................12

        4.   Subsequent District Court Proceedings ....................................13

        5.   Proceedings Before the Second Circuit ....................................14

    D.    Resumption of Monitoring Activities: February to March 2014....................15

    E.    First Report....................................................16

V.    Second Reporting Period: March to August 2014 ....................16

    A.    Interviews and Meetings....................................................17

        1.   Board of Directors ....................................................17

        2.   Executive Team ("ET") ................................................17

        3.   Personnel in Content Businesses........................................18

        4.   Compliance and Legal Personnel........................................18

    B.    Challenges and Obstacles....................................................19

    C.    Second Report....................................................19

VI.   Third Reporting Period: September 2014 to February 2015....................20

**NON-CONFIDENTIAL VERSION**

A. Interviews and Meetings ........................................................................20

 1. Board of Directors ........................................................................20

 2. ET ....................................................................................................20

 3. Business, Compliance, and Legal Personnel ...........................21

 4. Meetings........................................................................................21

B. Implementation Plan ...........................................................................22

C. Challenges and Obstacles....................................................................22

 1. Risk Assessment ..........................................................................22

 2. 2015 Training Plan .......................................................................25

 3. Dispute Regarding the Scope of the Monitorship .................25

 4. Scheduling of Employee Interviews .........................................26

D. Third Report...........................................................................................26

VII. Fourth Reporting Period: March 2015 to September 2015 .......................27

A. Interviews, Meetings, Documents, and Training...............................27

 1. Interviews and Meetings ............................................................27

 2. Documents ....................................................................................31

 3. Board and ET Training Sessions ...............................................31

B. Challenges and Obstacles....................................................................32

 1. Risk Assessment ..........................................................................32

 2. Monitoring of Training................................................................35

 3. Disputes Regarding the Scope of the Monitorship.................37

 4. Scheduling of Employee Interviews .........................................41

VIII. Assessment and Recommendations.............................................................43

A. Context of the Assessment ..................................................................43

B. Antitrust Risk Assessment ..................................................................45

 1. Recommendations from Our Prior Reports..............................45

 2. Apple's Response to the Recommendations .............................47

 3. Further Assessment and Recommendations............................48

C. Apple's Antitrust Compliance Policies ...............................................50

 1. Antitrust and Competition Law Policy....................................50

NON-CONFIDENTIAL VERSION

2. Business Conduct Policy (Competition and Trade Practices Section) ..................................................................53

3. Business Conduct ebook (Antitrust and Competition Law Chapter) ....................................................................53

4. Standards Legal Policy ..........................................................54

D. Apple's Antitrust Compliance Procedures......................................55

1. Procedures for Reviewing and Updating the Antitrust Compliance Program ...........................................................55

2. Detection, Investigation, and Reporting of Violations.............................57

3. Development of Procedures for Particularly Risky Business Activities ..................................................................64

4. Incentives and Disciplinary Procedures ......................................65

5. Formal Feedback Procedures.................................................67

6. Identification of Critical Employees .........................................70

7. Review of Publisher Agreements.............................................73

8. Audits..........................................................................73

9. Communications Regarding the Antitrust Compliance Program ..........77

10. Business Conduct Helpline ....................................................79

11. Record-Keeping ...............................................................81

E. Apple's Revised Antitrust Compliance Training Program..........................82

1. Overview .......................................................................82

2. Recommendations from Our Prior Reports...................................83

3. Apple's Response to the Recommendations .................................84

4. Further Assessment and Recommendations .................................86

F. Senior Commitment to Compliance .............................................87

1. Recommendations from Our Prior Reports...................................87

2. Apple's Response to the Recommendations .................................89

3. Further Assessment and Recommendations .................................90

G. Oversight of the Antitrust Compliance Program ...............................91

1. Role of the ACO ...............................................................91

2. Role of the CLPG ..............................................................97

3. Role of the Board ..............................................................97

NON-CONFIDENTIAL VERSION

IX.    Elements of an Effective Compliance Program Under the United States
       Sentencing Guidelines...........................................................................101

X.     Conclusion ..........................................................................................107

<u>Exhibit Title</u>                                                    <u>Exhibit Letter</u>

Second Report Implementation Plan (August 2015)............................................ A

Third Report Implementation Plan (August 2015) ............................................. B

Letter from Matthew Reilly dated July 24, 2015.................................................C

Apple Music–related correspondence with Gibson Dunn ................................... D

Antitrust Compliance Program Review Procedure (updated September 2015)................ E

Final Judgment Live Training Procedure .......................................................... F

Non-Final Judgment Live Training Procedure.................................................... G

Online Training Procedure ............................................................................ H

Updated Investigation Procedure .....................................................................I

Feedback Procedure......................................................................................J

Audit Procedure...........................................................................................K

Training slides—Executive Team training session ............................................. L

Training slides—App Store employees .............................................................M

Memo from Deena Said to the Audit and Finance Committee (March 2015)................... N

Memo from Deena Said to the Audit and Finance Committee (June 2015) ..................... O

Memo from Deena Said to the Audit and Finance Committee (August 2015) .................P

Email from Deena Said to the Executive Team, dated May 20, 2015 ................................Q

NON-CONFIDENTIAL VERSION

## I.   Introduction

The External Compliance Monitor ("Monitor") respectfully submits this Fourth Report pursuant to Section VI.C of the Final Judgment in *United States v. Apple, Inc., et al.*, No. 12-cv-2826, and *State of Texas et al. v. Penguin Group (USA) Inc., et al.*, No. 12-cv-3394 (the "ebooks litigation").

Section VI.C of the Final Judgment requires the Monitor, within 180 days of appointment, to "provide a written report to Apple, the United States, the Representative Plaintiff States, and the Court setting forth his . . . assessment of Apple's internal antitrust compliance policies, procedures, and training and, if appropriate, making recommendations reasonably designed to improve Apple's policies, procedures, and training for ensuring antitrust compliance." Section VI.C further requires the Monitor to provide written reports at six-month intervals for the duration of the monitorship. The initial report ("First Report") was filed with the Court on April 14, 2014. The second report ("Second Report") was filed with the Court on October 14, 2014, and the third report ("Third Report") was filed on April 14, 2015. This Fourth Report covers the period from March 1, 2015, through September 4, 2015.

Our First Report provided a detailed account of some of the obstacles and challenges we[1] faced at the outset of the monitoring assignment. Those obstacles and challenges necessarily limited our substantive assessment of Apple's antitrust compliance policies, procedures, and training programs, which at that time were at an early stage of development. During the period covered by our Second Report, Apple provided us with sufficient access to personnel and materials that we could begin to discharge our central responsibilities under the Final Judgment. Apple also took a number of significant steps to enhance its antitrust compliance program: it developed revised antitrust compliance materials and provided live and online antitrust training to many of its employees. In the Third Report, we continued to review the elements of Apple's revised antitrust compliance program, including Apple's efforts to implement the recommendations we made in the First and Second Reports.

During the period covered by this Fourth Report, we have continued to monitor the development of Apple's antitrust compliance program, including the company's implementation of our recommendations from prior reports. As in prior reporting periods, Apple's objections to many of our requests (and its delays in responding to others) have limited the activities we have been able to

---

[1] Throughout this report, the use of pronouns such as "he," "we," and "our" refer in some instances to the Monitor individually and in other cases to the monitoring team.

NON-CONFIDENTIAL VERSION

complete.  Our overall assessment is that Apple's antitrust compliance program is much stronger and more complete than it was when the Court issued the Final Judgment, although there remain some gaps in our information.  In addition, we have some concerns about whether the program will have the same emphasis and focus when the monitorship ends.

Although this Report will focus primarily on our activities over the past six months, we have prepared the Report so that it can stand on its own, without requiring frequent reference to our prior reports.  Accordingly, we have included brief sections on the background of the monitorship, the Final Judgment, and relevant events from the three previous reporting periods.

## II.     Background of the Monitorship

On July 10, 2013, after a three-week bench trial, this Court ruled that Apple had violated Section 1 of the Sherman Act.[2]  The Court concluded that Apple "facilitat[ed] and encourag[ed]" a "collective, illegal restraint of trade" by five major publishers when it simultaneously negotiated agency agreements to sell the publishers' ebooks through its iBooks Store in late 2009 and early 2010.[3]

The Court concluded that the plaintiffs—the United States Department of Justice ("DOJ") and thirty-three U.S. states and territories (the "Plaintiff States" and, collectively with DOJ, the "Plaintiffs")—were entitled to injunctive relief. After hearings in August 2013 on the contours of the injunction, the Court created the position of external compliance monitor.  As the Court would later explain in a January 16, 2014 opinion, it decided a monitorship was necessary because

> Apple made little showing at or before the August 9 conference that it had taken to heart the seriousness of the price fixing conspiracy it orchestrated.  Nor did Apple provide the Court with any evidence that it was seriously reforming its internal antitrust compliance policies to prevent a repeat of its violation.  Apple's submissions failed to demonstrate that it took seriously the burden that its participation in the price fixing conspiracy imposed on consumers and on the resources of the federal and state

---

[2] *See* 15 U.S.C. § 1.

[3] *United States v. Apple Inc.*, 952 F. Supp. 2d 638, 709 (S.D.N.Y. 2013).  The five publishers, also defendants in the litigation, reached settlements with the Department of Justice and the plaintiff states before trial.  *See id.* at 645.  Apple appealed the District Court's finding of liability, and, on June 30, 2015, the Second Circuit affirmed the District Court's judgment.  *See United States v. Apple, Inc.*, No. 13-3741-cv, 2015 WL 3953243 (2d Cir. June 30, 2015).

governments that were compelled to bring Apple and the publishers into federal court to put an end to that harm.[4]

At an August 27, 2013 hearing, the Court explained that the monitor would be responsible for evaluating Apple's internal antitrust compliance policies, procedures, and training program, and the Court set the external compliance monitor's presumptive term at two years.[5]  The Court held an additional proceeding on September 5, 2013, during which the terms of the injunction were finalized.  It issued the Final Judgment later that day.

## III.    The Final Judgment

Among other things, the Final Judgment (1) prohibits Apple from engaging in certain types of conduct; (2) requires Apple to take specified actions, including revising its antitrust compliance policies and training and hiring an internal Antitrust Compliance Officer; and (3) defines the responsibilities of the Monitor.

### A.    Sections III and IV: Prohibited Conduct and Affirmative Obligations

Section III of the Final Judgment prohibits Apple from engaging in specified activities and communications with ebook publishers.  Sections III.A through III.C bar Apple from "enforc[ing] any Retail Price MFN in any agreement with an E-book Publisher relating to the sale of E-books,"[6] from "enter[ing] into any agreement with an E-book Publisher relating to the sale of E-books that contains a Retail Price MFN," and from "enter[ing] into or maintain[ing] any agreement with a Publisher Defendant that restricts, limits, or impedes Apple's ability to set, alter, or reduce the Retail Price of any E-book or to offer price discounts or any other form of promotions to encourage consumers to purchase one or more E-books."

---

[4] *United States v. Apple Inc.*, 992 F. Supp. 2d 263, 267 (S.D.N.Y. 2014).

[5] 8/27/13 Tr. 17-18, 20.   Unfortunately, due to disputes with Apple, we were able to complete very little work during the first six months of the two-year term.  Unless the Court decides to extend the monitorship by one or more one-year periods, as the Final Judgment authorizes, this will be the Monitor's final report in this matter.  *See* Final Judgment § VI.A.

[6] An "MFN" is a "most-favored nation" clause—a clause under which one party to a contract typically promises to treat the other party as favorably as it treats any other entity.  The Court found that, although the inclusion of an MFN clause in a contract is not necessarily unlawful, the MFN clauses incorporated in Apple's contracts with the publisher defendants were an important element of Apple's unlawful conduct in this case, as they were "the term that effectively forced the Publisher Defendants to eliminate retail price competition and place all of their e-tailers on the agency model."  *See Apple*, 952 F. Supp. 2d at 698-701.

Section III.D of the Final Judgment prohibits Apple from retaliating against or punishing an ebook publisher "for refusing to enter into an agreement with Apple relating to the sale of E-books or for the terms on which the E-book Publisher sells E-books through any other E-book Retailer." It also bars Apple from threatening such retaliation or punishment or urging another party to engage in such retaliation or punishment. Section III.E prohibits Apple from sharing with any ebook publisher information related to its negotiations and contractual agreements with another ebook publisher. Finally, Sections III.F and III.G prohibit Apple from "enter[ing] into or maintain[ing] any agreement" with an ebook publisher or retailer "where such agreement likely will increase, fix, or set the price" at which other ebook retailers can acquire or sell ebooks or affect other terms on which ebooks are sold.

The Final Judgment also imposes affirmative obligations on Apple. Section IV.A requires Apple to modify or terminate its agreements with the publisher defendants as necessary to bring the agreements into compliance with the Final Judgment. Section IV.B requires Apple to "apply the same terms and conditions to the sale or distribution of an E-book App through Apple's App Store as Apple applies to all other apps sold or distributed through Apple's App Store." Finally, Section IV.C provides that Apple must "furnish to the United States and the Representative Plaintiff States, within ten business days of receiving such information, any information that reasonably suggests to Apple that any E-book Publisher has impermissibly coordinated or is impermissibly coordinating the terms on which it supplies or offers its E-books to Apple or to any other Person."

B.     Section V: Antitrust Compliance Officer

Section V of the Final Judgment requires Apple to appoint an internal Antitrust Compliance Officer ("ACO") to oversee the company's antitrust compliance efforts and the company's specific responsibilities under the Final Judgment. Under Section V, Apple's Audit Committee was obligated, within thirty days of the effective date of the Final Judgment, to "designate a person not employed by Apple as of the Effective Date of the Final Judgment to serve as Antitrust Compliance Officer, who shall report to the Audit Committee or equivalent committee of Apple's Board of Directors and shall be responsible, on a full-time basis until the expiration of [the] Final Judgment, for supervising Apple's antitrust compliance efforts." The ACO is to remain in her position until

the Final Judgment expires,[7] which is presumptively five years after October 5, 2013, the date it became effective.[8]

Section V requires the ACO to (1) provide copies of the Final Judgment to certain Apple personnel and their successors ("Section V.A Personnel");[9] (2) ensure that Section V.A Personnel, as well as "appropriate employees in [the] Apple iTunes and App Store business," receive "comprehensive and effective training annually" regarding the Final Judgment and the antitrust laws;[10] and (3) obtain annual certifications affirming that Section V.A Personnel have read and understand the Final Judgment and are not aware of unreported potential violations of the Final Judgment or the antitrust laws.[11] "[I]n consultation with" the Monitor, the ACO must conduct an annual antitrust compliance audit covering all Section V.A Personnel.[12]

The ACO is also required to inform Apple employees annually of their right to disclose to her, without fear of reprisal, information regarding potential violations of the Final Judgment and the antitrust laws.[13] If she discovers or receives credible information concerning an actual or potential violation, the ACO must "tak[e] appropriate action . . . to terminate or modify Apple's conduct to ensure compliance with" the Final Judgment, and she must provide the Plaintiffs with information regarding the actual or potential violation and the subsequent corrective action.[14]

The ACO is required to communicate certain additional information to the Plaintiffs: on a quarterly basis, she must give the Plaintiffs all non-privileged communications containing allegations of noncompliance with the Final Judgment or antitrust violations,[15] as well as a log of communications between

---

[7] Final Judgment § V.

[8] *See id.* § VIII.C ("This Final Judgment shall expire by its own terms and without further action of this Court five years after its Effective Date, provided that, at any time prior to its expiration, the Court may *sua sponte* or on the application of the United States or any Plaintiff State extend the Final Judgment by one or more one-year periods, if necessary to ensure effective relief.").

[9] *Id.* §§ V.A-V.B.

[10] *Id.* § V.C.

[11] *Id.* § V.D.

[12] *Id.* § V.E.

[13] *Id.* § V.F.

[14] *Id.* § V.G.

[15] *Id.* § V.H.

Section V.A Personnel and certain persons associated with ebook retailers and publishers.[16]  Finally, each year, the ACO must provide the Plaintiffs with a written statement regarding Apple's compliance with Sections III, IV, and V of the Final Judgment.[17]

> C.  Section VI: External Compliance Monitor

Section VI of the Final Judgment provides for the appointment of an External Compliance Monitor for a two-year term, which the Court may extend either *sua sponte* or on the application of any Plaintiff "if necessary to ensure effective relief."[18]  The Monitor is required "to review and evaluate Apple's existing internal antitrust compliance policies and procedures and the training program required by Section V.C . . . , and to recommend to Apple changes to address any perceived deficiencies in those policies, procedures, and training."[19]

The specific duties of the Monitor are:

- To "conduct a review to assess whether Apple's internal antitrust compliance policies and procedures, as they exist 90 days after his . . . appointment, are reasonably designed to detect and prevent violations of the antitrust laws."[20]

- To "conduct a review to assess whether Apple's training program, required by Section V.C of [the] Final Judgment, as it exists 90 days after his . . . appointment, is sufficiently comprehensive and effective."[21]

- Within 180 days of appointment and, at six-month intervals thereafter, to "provide a written report to Apple, the United States, the Representative Plaintiff States, and the Court setting forth his . . . assessment of Apple's internal antitrust compliance policies, procedures, and training and, if appropriate, making recommendations reasonably designed to improve Apple's policies, procedures, and training for ensuring antitrust compliance."[22]

---

[16] *Id.* § V.I.

[17] *Id.* § V.J.

[18] *Id.* § VIII.C.

[19] *Id.* § VI.B.

[20] *Id.* § VI.C.

[21] *Id.*

[22] *Id.*

- To provide the Plaintiffs promptly with any evidence the Monitor "discovers or receives" that suggests "that Apple is violating or has violated [the] Final Judgment or the antitrust laws."[23]

Apple is required to "assist the External Compliance Monitor in performance" of his duties and to refrain from "interfer[ing] with" or "imped[ing]" the Monitor's work.[24]  The Final Judgment specifically authorizes the Monitor, "in connection with the exercise of his . . .  responsibilities under . . . Section VI, and on reasonable notice to Apple,":

- To "interview, either informally or on the record, any Apple personnel, who may have counsel present; any such interview to be subject to the reasonable convenience of such personnel and without restraint or interference by Apple."[25]

- To "inspect and copy any documents in the possession, custody, or control of Apple."[26]

- To "require Apple to provide compilations of documents, data, or other information, and to submit reports to the External Compliance Monitor containing such material, in such form as the External Compliance Monitor may reasonably direct."[27]

The Final Judgment provides a mechanism for the resolution of objections that Apple may have to the Monitor's activities: "[a]ny objections by Apple to actions by the External Compliance Monitor in fulfillment of the External Compliance Monitor's responsibilities must be conveyed in writing to the United States and the Representative Plaintiff States within ten calendar days after the action giving rise to the objection."[28]  If the parties are unable to reach an agreement, the Court will schedule a conference to resolve the dispute.[29]

---

[23] *Id.* § VI.F.

[24] *Id.* § VI.G.

[25] *Id.* § VI.G.1.

[26] *Id.* § VI.G.2.

[27] *Id.* § VI.G.3.

[28] *Id.* § VI.H.

[29] *See, e.g., Apple*, 992 F. Supp. 2d at 277.  By Order dated February 19, 2014, the Court referred this matter to Magistrate Judge Michael H. Dolinger for resolution of any disputes that might arise, subject to appeal to the Court.

### IV.      First Reporting Period: September 2013 to March 2014

This section of the Report provides a brief overview of our activities during the first reporting period, which lasted from the Monitor's appointment in October 2013 through early March 2014.  A more comprehensive account of our activities during that period appears at pages 11 to 41 of the First Report.

#### A.       Selection of the External Compliance Monitor

On October 16, 2013, the Court issued an order ("October 16 Order") appointing Michael R. Bromwich as the Monitor and providing that Bernard A. Nigro Jr. of Fried, Frank, Harris, Shriver & Jacobson LLP ("Fried Frank") would assist him.  The Monitor assembled a small team to help him and Mr. Nigro,[30] including Maria R. Cirincione of Fried Frank and Sarah W. Carroll of Robbins, Russell, Englert, Orseck, Untereiner & Sauber LLP ("Robbins Russell").  Lee Turner Friedman and Jack Herman, both of Robbins Russell, joined the monitoring team in June 2014 and August 2015, respectively.[31]

#### B.       The Beginning of the Monitorship: October and November 2013

On October 22, 2013, after initial communications between Apple and the Monitor, members of the monitoring team met with Apple representatives in New York.  At the meeting, the Monitor described his approach to the monitoring assignment.  He explained that he planned to use the initial 90-day period under the Final Judgment[32] to gather background information that would be necessary to undertake a meaningful assessment of Apple's antitrust compliance program.  Mr. Bromwich explained that the monitoring team needed to understand (1) the identities of organizations and individuals at Apple who are responsible for the company's antitrust compliance; (2) Apple's existing antitrust policies, procedures, and training programs; (3) the ongoing efforts to revise and update Apple's policies and procedures; and (4) the roles of the company's Audit and Finance Committee ("AFC") and Risk Oversight

---

[30] *See* Final Judgment § VI.I ("The External Compliance Monitor may hire, subject to the approval of the United States, after consultation with the Representative Plaintiff States, any persons reasonably necessary to fulfilling the External Compliance Monitor's responsibilities.").

[31] Ms. Cirincione went on leave in June 2015, and Ms. Carroll entered government service at the end of September 2015.  The Monitor wishes to thank them for their enormous contributions to this matter.

[32] Section VI.C of the Final Judgment required the Monitor to evaluate Apple's antitrust compliance policies, procedures, and training as they existed 90 days after the Monitor's appointment, or on January 14, 2014.

Committee ("ROC") in compliance matters.  We asked Apple to provide us with documents relevant to those issues.[33]

We also asked to schedule some brief, preliminary meetings or interviews with Apple personnel who could help us understand the company's lines of business and reporting structure.  Because the Court had specifically expressed concern with Apple's compliance at the highest levels of the company, the Monitor asked to schedule interviews for the week of November 18, 2013 with members of Apple's Board of Directors ("Board"), senior management, and senior personnel responsible for the iBooks Store, iTunes, and the App Store. Apple's representatives responded, in substance, that the proposed interviewees were busy and that there remained "a lot of anger" regarding the ebooks litigation.  Apple objected to interviews of its senior personnel early in the monitorship and expressed concern when the Monitor mentioned his desire to observe antitrust compliance training in person.

In an October 31, 2013 letter, Apple's lawyers outlined the company's objections to the timing and scope of our proposed activities, asserting that we should not interview senior Apple employees or Board members until at least 90 days after the monitorship began (that is, after January 14, 2014).  The Monitor replied by letter the next day and enclosed a separate letter addressed to Tim Cook, Apple's Chief Executive Officer, and D. Bruce Sewell, Apple's General Counsel, in which he described his responsibilities and the principles to which the monitoring team would adhere.  In the Cook-Sewell letter, the Monitor expressed disappointment that Apple had failed to provide any of the documents he had requested or to schedule any interviews.  In a November 4 response, Mr. Sewell promised that, on some later date, he would provide a "comprehensive update on [Apple's] progress" and would "facilitate whatever meetings [were] appropriate for [the Monitor] to fully and completely discharge [his] responsibilities."  He explained, however, that the newly hired ACO would "dedicate the next two months to developing new training materials and redesigning [Apple's] compliance program," and that she needed to work "uninterrupted" during that period.

Approximately a week later, after much additional back and forth, Apple agreed to schedule interviews with two Apple employees—Tom Moyer, the company's Chief Compliance Officer; and Gene Levoff, Senior Director and Associate General Counsel.  On November 18, we conducted one-hour interviews with Mr. Moyer and Mr. Levoff, who provided helpful background

---

[33] As described below, we reiterated this October 22 request on numerous occasions.

**NON-CONFIDENTIAL VERSION**

about the company, its compliance program, and its risk management system. But Apple rejected our requests for any additional interviews at that time.

On November 22, 2013, we sent a letter to Apple's Board of Directors regarding Apple's lack of cooperation.  In the month since we had assumed our responsibilities, Apple had scheduled only two interviews out of the many we had requested, and even those required extensive negotiations.  We thought it was important to promptly bring our concerns to the attention of Apple's oversight body.  The letter to the Board explained our responsibilities under the Final Judgment, described our disappointment at Apple's lack of cooperation, and concluded by expressing hope that our relationship with Apple would become more productive.  We never received any response from the Board or any of its members.[34]

On November 20, 2013, the Court issued an order ("November 20 Order"), pursuant to Federal Rule of Civil Procedure 53(b)(2), proposing an amendment to the October 16 Order that appointed the Monitor.  The November 20 Order included a proposal that the Court receive periodic *ex parte* briefings from the Monitor.  On November 27, Apple objected to the November 20 Order, alleging that the monitoring team was "operating in an unfettered and inappropriate manner, outside the scope of the Final Judgment," and otherwise "trampling Apple's rights."   In addition, Apple (1) objected to our requests to interview Board members and senior executives, most of whom Apple claimed were "not . . . relevant to [our] mandate"; (2) objected to our attempts to begin work before the expiration of the 90-day period for revision of Apple's antitrust compliance policies and training; and (3) alleged that we had a "personal financial interest [in conducting] as broad and lengthy an investigation as possible."

In response to Apple's November 27 filing, the Court issued an order on December 2, 2013 ("December 2 Order"), stating that neither the parties nor the Monitor had "informed the Court about the Monitor's fees, the work of the Monitor or of any problems associated with that work.  There has been no *ex parte* communication between the Court and the Monitor or between the Court and any of the parties about these issues."  The December 2 Order provided that, because of Apple's objection, the Court would not receive *ex parte* briefings or

---

[34] In subsequent interviews, members of the Board advised us that the Board had concluded that the issues raised in the November 22 letter were "a management matter," rather than a Board oversight matter, and that it was therefore unnecessary for the Board to respond. We viewed management's lack of cooperation as a matter very much within the purview of the Board's oversight.

reports from the monitoring team,[35] and that Apple must resolve its additional objections to the monitorship in accordance with Section VI.H of the Final Judgment.[36]

     C.     Interviews and Challenges to the Monitorship: December 2013 to February 2014

          1.     December Interviews

In early December 2013, we interviewed nine people affiliated with Apple, including the head of Apple's internal audit function, the head of its Competition Law and Policy Group, and the Chair of the Audit and Finance Committee of Apple's Board.  The December 2013 interviews provided information about each interviewee's responsibilities, some information about Apple's organizational structure and business operations, and preliminary information about Apple's compliance programs, including the roles of Apple's Audit and Finance Committee, its Risk Oversight Committee, and its Helpline.[37]  Some of the interviews also helped us to begin to understand Apple's general practices in negotiating contracts with publishers.  On December 10, 2013, we interviewed Apple's General Counsel, Mr. Sewell, by telephone.

          2.     Subsequent Correspondence in December

On December 17, Apple's outside counsel sent a letter to Plaintiffs, addressing, among other things, the scope of our responsibilities and proposing that we adhere to a monitoring plan prepared by Apple.[38]  Apple's proposal

---

[35]  In retrospect, Apple's objection to the Court's proposal, and the withdrawal of the proposal, led to unfortunate consequences, preventing the Monitor from more promptly bringing issues to the Court's attention.  These developments left in place a structure that served to multiply and elongate disputes that could have been solved more effectively and efficiently by the Court.

[36] Section VI.H provides that "[a]ny objections by Apple to actions by the External Compliance Monitor in fulfillment of the External Compliance Monitor's responsibilities must be conveyed in writing to the United States and the Representative Plaintiff States within ten calendar days after the action giving rise to the objection."

[37] The Helpline provides an avenue for employees to submit compliance-related concerns and questions, either by telephone or online.

[38] The plan Apple proposed provided that "there [would] be no further interviews of Apple employees or Board members by Mr. Bromwich prior to his review of Apple's revised antitrust compliance policies, procedures, and training materials"; that after January 14, 2014, Apple would provide us with certain materials required by the Final Judgment and we would, in turn, provide Apple with recommendations regarding those materials; that Apple would make "certain Apple executives and employees" available for interviews after January 14, 2014; and

*(footnote continued on next page)*

NON-CONFIDENTIAL VERSION

would have put Apple in charge of determining whom we could interview and which documents Apple would provide.  These conditions were antithetical to the notion of an independent monitor.

### 3.    Apple's December 12, 2013 Motion to Stay

Several days earlier, on December 12, 2013, Apple had filed a Motion by Order to Show Cause for a Stay of the Injunction Pending Appeal ("Motion to Stay").  Apple contended that we were "conducting a roving investigation that [was] interfering with Apple's business operations," as well as "risking the public disclosure of privileged and confidential information" and "imposing substantial and rapidly escalating costs" that Apple would be unable to recover if it prevailed on appeal.  Among other things, Apple claimed that our "inappropriate demand for access to Apple's senior leadership—including officers, directors, and employees who have little or nothing to do with antitrust compliance or the iBooks Store—ha[d] already inflicted significant and irreparable harm by interfering with Apple's ability to manage its business."[39]  Apple also contended that, without a stay, it would suffer irreparable injury through the disclosure of privileged or confidential information and through its payment of costs and expenses associated with the monitorship.

On December 30, 2013, the Plaintiffs filed their opposition to Apple's Motion to Stay, arguing that Apple had shown neither a likelihood of success on the merits nor irreparable harm.  Attached as an exhibit to the Plaintiffs' brief was a seventeen-page declaration by the Monitor, which provided the Court with factual responses to the assertions in Apple's December 17 filing and attached as exhibits a number of our communications with Apple.  On January 7, 2014, Apple filed a letter with the Court arguing that the Monitor should be disqualified because submission of the declaration allegedly showed impermissible bias against Apple.

---

that "Mr. Bromwich [would] not seek interviews with Apple's employees and Board members who are not relevant to his mandate of assessing Apple's revised antitrust compliance policies and procedures and Apple's antitrust training program."  Letter from Noreen Krall, Apple Inc., to Lawrence J. Buterman, Dep't of Justice, & Eric Lipman, Office of the Tex. Attorney Gen. (Dec. 17, 2013).

[39] Judging by Apple's financial performance over the past two years, the activities of the monitoring team do not seem to have adversely affected the operations of the company.  The company's recent financial performance suggests that Apple has been able to deal with the activities of the monitor without serious damage to its business, much less irreparable harm.  *See, e.g.*, Press Release, Apple, Apple Reports Record Third Quarter Results (July 21, 2015), *available at* https://www.apple.com/pr/library/2015/07/21Apple-Reports-Record-Third-Quarter-Results.html.

4.      Subsequent District Court Proceedings

On January 13, 2014, this Court held a hearing on Apple's Motion to Stay and its request to disqualify the Monitor.  The Court expressed its disappointment at the acrimonious relationship between Apple and the monitoring team, noting that it had been unaware "that the monitor was making all these requests and Apple was doing its best to slow down the process if not stonewall the process."[40]  The Court described the 90 days before Apple implemented its revised policies and training as

> the period when the monitor could be expected to want to get the documents he needs and conduct the interviews he needs so that he would be in a position, on the 90th day, to look at whatever Apple submitted to him as its revised, improved new procedures and training program and practices, so that he could efficiently and effectively, and hopefully in a way to Apple helpfully, comment on it and give Apple the benefit of his best advice and counsel so that Apple could have the kind of program put in place that's required by Article VI.[41]

The Court also emphasized that the Final Judgment, not Apple, controlled the monitorship and that the monitoring team must be able to gather enough information about the company to understand its structure and its business:

> In terms of practices and policies and training programs, it's not one size fits all.  This is to be an effective program within Apple.
>
> [The Monitor] has to understand enough about Apple and its business and these practice[s], policies, and training programs in order to recommend to Apple changes to address any perceived deficiencies in those policies, procedures, and training.  And looking at paragraph C, these policies and procedures, which are antitrust compliance policies and procedures, have to be reasonably designed to detect and prevent violations of the antitrust law,

---

[40] 1/13/14 Tr. 41.

[41] *Id.* at 42.  In retrospect, Apple's arguments about the significance of the 90 days the Final Judgment provided it to revise its antitrust compliance policies, procedures, and training are ironic.  Although Apple did, as the Court suggested, submit some draft materials for the Monitor to review in late February, the revisions to Apple's antitrust policies, procedures, and training, including materials that the Monitor had not previously reviewed, were not completed until June 30, more than five months after the 90-day period expired.  And none of the draft materials were provided until well after the 90-day period.

within Apple, within its business.  They have to be comprehensive and effective within Apple, within its business.[42]

The Court denied Apple's Motion to Stay and rejected its attempt to disqualify the Monitor, stating that it would file an opinion explaining further its reasoning and analysis.  The Court granted a 48-hour stay from the filing of that opinion to allow Apple to appeal to the Second Circuit.

On January 16, the Court issued its opinion on Apple's pending motions. The Court further explained its reasons for denying Apple's Motion to Stay, holding that some of Apple's arguments had been waived or had become moot, that the dispute resolution mechanisms under the Final Judgment were sufficient to ensure that the Monitor's activities did not exceed the bounds of the Final Judgment, and that Apple had made no showing that the Monitor should be disqualified or that Apple would suffer irreparable harm if the stay were denied.[43]  Although the Court denied Apple's Motion to Stay, the parties agreed that the Court would give Apple until January 21, 2014 to appeal the Court's rulings to the Second Circuit.

5.    Proceedings Before the Second Circuit

On January 17, 2014, Apple noticed its appeal from the District Court's rulings.  On January 21, the Second Circuit issued an order establishing a briefing schedule and granting the administrative stay Apple had requested until a panel resolved Apple's motion for a stay pending appeal.  On February 4, 2014, a three-judge motions panel heard argument on Apple's motion to stay the injunction pending appeal, and on February 10, 2014, the panel issued an order ("February 10 Order") denying the motion.  The February 10 Order explained that, as the parties had agreed at oral argument, the Final Judgment assigns the Monitor the task of "assess[ing] the appropriateness of the compliance programs adopted by Apple and the means used to communicate those programs to its personnel," including ensuring that "Apple's employees particularly, senior executives and board members are being instructed on what those compliance policies mean and how they work."[44]  With the issuance of the February 10 Order, the administrative stay was lifted, and we resumed our monitoring activities.

---

[42] *Id.* at 45-46.

[43] *Apple*, 992 F. Supp. 2d at 266.

[44] *Id.* at 2 (internal modifications omitted).  Apple has repeatedly relied on the February 10 Order, as well as statements that the Plaintiffs made at oral argument, as grounds for objecting to our requests and limiting the scope of our activities.

NON-CONFIDENTIAL VERSION

On March 10, 2015, the Second Circuit heard argument on Apple's disqualification motion and its claim that this Court had improperly modified the Final Judgment to expand the Monitor's role.  The appeals court issued an opinion May 28, 2015, denying the relief that Apple sought.  The court held unanimously that this Court had not abused its discretion in declining to disqualify the Monitor and that this Court had not modified the injunction to expand the Monitor's role.[45]

D.    Resumption of Monitoring Activities: February to March 2014

We resumed our monitoring activities after the Second Circuit's February 10 Order ended the administrative stay.  On March 4, 2014, we met with Doug Vetter, Apple's Vice President and Associate General Counsel; Kyle Andeer, Apple's Senior Director, Competition Law & Policy; Tom Moyer, Apple's Chief Compliance Officer; Deena Said, Apple's ACO; and Matt Reilly, one of Apple's outside attorneys from Simpson Thacher & Bartlett LLP ("Simpson Thacher") ("March 4 Meeting").  The purpose of the meeting was for Apple to share with us the progress it had made in revising its antitrust compliance policies, procedures, and training over the previous several months, the period during which litigation initiated by Apple had halted our activities.

At the March 4 Meeting, Apple provided a summary of the steps it had taken to comply with the Final Judgment.  Much of the meeting focused on draft documents that Apple had prepared as part of its efforts to revise its antitrust compliance program.  These included a revised Antitrust and Competition Law Policy, a revised antitrust section of Apple's Business Conduct Policy, and proposed revisions to Apple's Business Conduct Policy ebook.  Apple also showed us an online compliance training program addressed to corruption issues, which as a matter of style and aesthetic would serve as the model for the online antitrust training program still in development, as well as some proposed text of the online antitrust course.  We were surprised to learn that so many components of Apple's antitrust compliance program were incomplete and far from ready for review.  Apple's representatives informed us that some of the policy and training documents were ready to be circulated to employees, but that they planned to wait to introduce them until late June 2014, when all of the relevant documents would be ready, so that they could make a "big splash" that would catch employees' attention.[46]  Later in the meeting, Mr. Andeer provided

---

[45] As discussed at more length in the Appendix attached to this Report, we are concerned that the parties' briefing and argument may have left the panel with some misunderstandings regarding our activities.

[46] Apple later clarified that this timing was dictated by the company's desire to release all elements of the program at the same time, rather than issue them piecemeal.

NON-CONFIDENTIAL VERSION

us with abbreviated oral summaries of the two live training presentations he had made to employees since the issuance of the Final Judgment.

E.    First Report

The March 4 Meeting was the last substantive contact between Apple and the monitoring team before we began to prepare the First Report, which we filed with the Court on April 14, 2014.  Before we filed the First Report with the Court, we permitted Apple to review a draft to identify confidential information that the company believed should not be made public.  We then gave Apple and the Plaintiffs an opportunity to review a subsequent draft and inform us of any factual errors they identified.

In the First Report, we recommended that Apple conduct a thorough and comprehensive antitrust risk assessment, that the Antitrust Compliance Officer and the AFC have a direct and meaningful reporting relationship, and that Apple improve the record-keeping procedures associated with its antitrust compliance efforts.  Because we had encountered significant obstacles and extended delays during the first reporting period, and because Apple had not yet completed most of the components of its revised antitrust compliance program, we lacked sufficient information to provide a meaningful assessment of Apple's antitrust compliance program.[47]

## V.    Second Reporting Period: March to August 2014

This section of the Report provides a brief overview of our activities during the second reporting period.  A more comprehensive account of our activities during that period appears at pages 22 to 39 of the Second Report.

We made significant progress during the second reporting period, which included the period from the March 4 Meeting through the end of August 2014.  We obtained far more information than during the first reporting period, which aided us significantly in fulfilling our responsibilities under the Final Judgment.  Even so, we continued to deal with delays in our receipt of requested materials and with Apple's rejection of certain requests for information.  Our primary objectives during the second reporting period were to develop a better understanding of Apple's business, to learn more about Apple's Legal and Compliance functions and their role within the company, and, most importantly, to review and assess the revised antitrust policies, procedures, and training that

---

[47] *See generally* First Report 41-67.  Again, it is worth noting that, after Apple claimed it needed the initial 90 days of the monitorship to complete the revisions of its antitrust compliance program, the program remained far from complete six months after the monitorship began.

were introduced to Apple employees as part of the new Antitrust Compliance Program rollout on June 30, 2014 (the "June 30, 2014 Rollout").

A.    Interviews and Meetings

Between March 2014 and August 2014, we interviewed thirty-six people, including one outgoing Apple Board member (by telephone); seven of the ten members of Apple's Executive Team ("ET"), including CEO Tim Cook; ten Apple employees who report directly to Eddy Cue in his Internet Software and Services group, which had important involvement in the events underlying the ebooks litigation; and four members of Apple's legal team, among others.

1.    Board of Directors

On July 30, we conducted a telephone interview with William V. Campbell, who had resigned in mid-July from Apple's Board of Directors.  Mr. Campbell, who served on Apple's AFC from 2006 until his resignation, discussed his views on the compliance-related responsibilities of the AFC and provided us with information regarding the types of oversight the Board exercises, his own interactions with Apple's compliance function, and his perception of Apple's response to the Final Judgment and other matters related to antitrust compliance.

2.    Executive Team ("ET")

During the second reporting period, we interviewed seven of the ten members of Apple's ET, including Tim Cook, Apple's CEO, and Eddy Cue, Apple's Senior Vice President of Internet Software and Services.  As previously mentioned, we had interviewed an eighth member of the ET, Mr. Sewell, by telephone during the previous reporting period.

From the outset, we viewed the ET interviews as particularly important to the fulfillment of our mandate under the Final Judgment, given this Court's specific concerns regarding compliance among Apple's lawyers and highest-level executives.[48]  The ET interviews enhanced our understanding of Apple's business, the antitrust risks the company faces, and the ways in which the company has responded to those risks.  The interviews provided overviews of specific areas of Apple's business, as well as insight into the perspectives of ET members concerning compliance at Apple.

---

[48] *See, e.g.*, 8/27/13 Tr. 17 (noting that the conduct underlying the ebooks litigation "demonstrated a blatant and aggressive disregard at Apple for the requirements of the law," including among "Apple lawyers and its highest level executives").

NON-CONFIDENTIAL VERSION

### 3. Personnel in Content Businesses

During the second reporting period, we also interviewed several senior but non-ET Apple employees whose work relates to the company's content businesses.  We interviewed ten of Mr. Cue's direct reports, as well as a number of less senior employees within Mr. Cue's Internet Software and Services organization.[49]  Like the ET interviews, these interviews provided us with relevant and helpful information regarding Apple's business and the antitrust risks its activities might pose—information that has been central to our ability to assess whether Apple's Antitrust Compliance Program is comprehensive and effective.  We learned about the steps Apple had taken, both before and after issuance of the Final Judgment, to mitigate the antitrust risks associated with its content businesses.  For example, we interviewed Mr. Cue's direct reports about their access to legal and compliance resources when confronted with situations they view as presenting potential compliance risks, the ways in which Apple lawyers are embedded in business units and assist in the day-to-day decision-making of non-attorney employees, and the availability and sufficiency of antitrust compliance training and other resources both before and after issuance of the Final Judgment.

### 4. Compliance and Legal Personnel

In April 2014, we interviewed Sean Dillon and Brendan McNamara, two of the three attorneys whom Apple had hired to work with Mr. Andeer in Apple's Competition Law & Policy Group ("CLPG").[50]  Those interviews enhanced our understanding of how the CLPG interacts with Apple's business personnel, the steps the CLPG had taken to assess and mitigate the antitrust risks Apple faces, and the CLPG's involvement in the development of Apple's revised and updated antitrust compliance program.

During the second reporting period, we also interviewed several compliance and legal personnel who are not members of the CLPG.  The goal of

---

[49] Apple selected many of the Apple personnel we interviewed in November and December 2013 and April 2014 based on its view that speaking with them would help us understand the company's content businesses.  In April 2014, we also interviewed several people with whom we had specifically requested to speak.  Starting with the June 2014 interviews, we asked to interview particular individuals based on information we had obtained about their roles during the course of our work.

[50] The third attorney is based in Europe and specializes in European competition law; we have not sought to interview him because our focus has been on Apple's activities in the U.S.  Apple has told us the CLPG is hiring an additional attorney in Europe and that it has hired a project manager in the United States.

NON-CONFIDENTIAL VERSION

these interviews was to gather additional information regarding how these Apple compliance and legal personnel work with Apple's businesses, as well as with Apple's antitrust specialists, and to track the development of Apple's antitrust compliance program.

### B.      Challenges and Obstacles

Although our Second Report noted the development of a more constructive working relationship with Apple, the Report also described continuing difficulties we had encountered.  These included attacks on the scope and length of our First Report and challenges to our ability to specify which Apple personnel we needed to interview.  Magistrate Judge Michael Dolinger rejected those challenges after a May 9, 2014 hearing, emphasizing the discretion that is inherent in a monitorship such as this one.  Apple also disputed the extent to which we would be able to monitor antitrust compliance training sessions in person.  (These issues and others are described in more detail at pages 31 to 37 of our Second Report.)

In addition, our Second Report discussed in some detail the aftermath of our recommendation, set forth in our First Report, that Apple conduct an antitrust risk assessment.  Issues related to the risk assessment, and the degree to which Apple would provide information about it, persisted well after this reporting period, as described at greater length below.

### C.      Second Report

As with the First Report, before we filed the Second Report, we gave Apple an opportunity to review a draft for confidential information and then permitted both Apple and the Plaintiffs to review a subsequent draft for factual errors.  Since we obtained significantly more information during the second reporting period than during the first, we were able to make a number of recommendations regarding Apple's Antitrust Compliance Program.  We recommended, among other things, that Apple conduct a formal antitrust risk assessment; that Apple increase the dissemination and substantive scope of its primary antitrust policy document; that Apple strengthen the procedures associated with the Antitrust Compliance Program, including procedures aimed at detecting, investigating, and reporting potential antitrust violations; that Apple take steps to make the live antitrust training sessions it provided to employees more interactive and relevant to participants' experiences at Apple; and that Apple's Board and ET take a more active role in overseeing the company's antitrust compliance.

NON-CONFIDENTIAL VERSION

## VI.    Third Reporting Period: September 2014 to February 2015

We continued to make substantive progress during the third reporting period, which lasted from September 1, 2014 through the end of February 2015. We focused during that reporting period on reviewing and assessing Apple's revised Antitrust Compliance Program in light of the company's efforts since we issued the Second Report in October 2014. We also sought to further enhance our understanding of Apple's business, its Legal and Compliance groups, and the antitrust risks associated with the company's activities, and to evaluate Apple's implementation of the recommendations contained in our Second Report.

A.    Interviews and Meetings

Between September 2014 and February 2015, we interviewed thirty-two people affiliated with Apple, including, nearly a year after we first requested them, initial interviews of several Apple Board members and interviews of three members of the ET, two of whom we had not previously interviewed.

1.    Board of Directors

By the time we issued the Third Report, we had interviewed Apple's full Board. We conducted 90-minute interviews with Al Gore, Andrea Jung, and Millard Drexler[51] in October 2014; with Ronald Sugar, Robert Iger, and Susan Wagner in December 2014; and with Board Chair Arthur Levinson in January 2015. These interviews, though belated, were extremely useful, providing us with important information regarding Board oversight of Apple's Antitrust Compliance Program.

2.    ET

During the third reporting period, we also interviewed the two members of Apple's ET with whom we had not met during the second reporting period—Phil Schiller, Apple's Senior Vice President of Worldwide Marketing; and Jonathan Ive, Apple's Senior Vice President of Design. We also conducted a second interview of Mr. Sewell, Apple's General Counsel, and the member of the ET to whom Apple's compliance function reports.

---

[51] Mr. Drexler has since retired from Apple's Board. As of the date of this Report, the vacancy created by his departure has not been filled.

### 3.  Business, Compliance, and Legal Personnel

We also interviewed a number of business people whose activities could create the potential for antitrust risk.  During the first two reporting periods, we had focused our interviews of business personnel on the Internet Services and Software group, which was the primary group involved in the events underlying the ebooks litigation.  During the third reporting period, we extended our interviews to personnel in other groups that we had determined might encounter antitrust issues in conducting the company's business.  As in the second reporting period, we interviewed these employees about their business activities, the nature of their communications with third parties, and their knowledge of Apple resources available to educate and assist them in dealing with antitrust issues.

We also interviewed several Apple lawyers whom business personnel had identified as resources they frequently consulted regarding the legal issues associated with their business activities and potential antitrust issues; and we interviewed the lawyer who oversees Apple's participation in standard-setting organizations ("SSOs").[52]  On the compliance side, we interviewed Chris Keller, Apple's Vice President of Internal Audit and an important participant in Apple's Enterprise Risk Management program.  We also met for the first time with Joe Santosuosso, Apple's Director of Business Conduct and Global Compliance.

### 4.  Meetings

During the third reporting period, we met with Apple personnel regarding various issues.  Most significantly, on January 14, 2015, we met with Ms. Said, Mr. Andeer, Mr. McNamara, and Mr. Reilly at Simpson Thacher's Washington, D.C., office ("January 14 Meeting").  At that time, we had anticipated that Apple would provide us with a detailed, substantive overview of Apple's view of the then-current status and the future of the Antitrust Compliance Program.  That did not occur; Apple was not prepared to make such a presentation.  During the meeting, Ms. Said provided us with an overview of

---

[52] SSOs are organizations made up of industry participants and are one source of industry standards.  Activities associated with standard-setting and SSO participation can create antitrust risk.  *See, e.g., Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492 (1988) (reinstating the lower court's jury verdict for the plaintiffs after finding that the actions of steel conduit manufacturers regarding a proposed standard were designed to exclude a competing product); *Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679 (1978) (holding the association's Code of Ethics, which prohibited competitive bidding, to be illegal); *Radiant Burners, Inc. v. Peoples Gas Light & Coke Co.*, 364 U.S. 656 (1961) (recognizing a cause of action under Sections 1 and 2 of the Sherman Act based on association members' agreement not to provide gas to customers using products not certified by the association).

NON-CONFIDENTIAL VERSION

several documents she had prepared (including drafts of procedures that we had recommended the company create), and we had a preliminary discussion regarding Apple's live antitrust training plan for 2015.

### B.    Implementation Plan

On December 31, 2014, at our request, Apple sent the monitoring team and the Plaintiffs a chart setting forth its plan for implementing each of the recommendations in the Second Report to which it had not objected ("Second Report Implementation Plan").  The Second Report Implementation Plan listed each recommendation from the Second Report; summarized Apple's responses or objections to each recommendation, if any; and outlined Apple's plan for implementing the recommendations to which it had not objected.  It did not include information about *when* Apple expected to implement each recommendation, however, and some descriptions of Apple's plans for implementation were quite vague.  In June 2015 and August 2015, at our request, Apple sent us updated versions of the Second Report Implementation Plan, which listed additional steps Apple had taken or planned to take with respect to those recommendations.[53]

### C.    Challenges and Obstacles

Although our relationship with Apple remained workable and relatively amicable through January 2015, it deteriorated significantly at the end of the third reporting period.  Several specific challenges and obstacles warrant brief discussion; they are summarized at more length at pages 25 to 34 of the Third Report.

### 1.    Risk Assessment

One of our central recommendations from early on has been that Apple undertake a formal risk assessment to identify antitrust-related risks the company faces.[54]  As we explained in the First Report, a risk assessment is a fundamental part of any antitrust compliance program.[55]  The United States Sentencing Commission has specifically identified risk assessments as a key part

---

[53] The August 2015 version of the Second Report Implementation Plan is attached as Exhibit A (redacted from the non-confidential version of the Report).

[54] *See* First Report 45-47; Second Report 74-84.

[55] *See* First Report 45-47.

of any effective compliance program,[56] and the corporate community has also broadly accepted their importance.[57]  Apple did not object when we initially recommended, in the First Report, that it conduct an antitrust risk assessment, but we received little information until the very end of the second reporting period about whether and how Apple was conducting such an assessment. Apple repeatedly asserted privilege objections when confronted with requests to share risk assessment–related information with the monitoring team.

In the Second Report, we again emphasized the importance of Apple's conducting an antitrust risk assessment; we emphasized that the assessment should be comprehensive and formal.  After making these recommendations, we worked during the third reporting period to obtain additional information about Apple's processes for assessing antitrust risk.  On October 22, we met with Mr. Andeer, Mr. McNamara, Ms. Said, and Mr. Vetter to discuss the status of Apple's efforts to assess antitrust risk ("October 22 Meeting").  Mr. Andeer began by providing an overview of the efforts he and his colleagues had made, prior to our recommendation, to understand the antitrust risks the company faced.[58]

Later in the October 22 Meeting, Mr. McNamara provided an overview of Apple's efforts to assess antitrust risk specifically in response to our recommendations.  He said that, around June 2014, Mr. Andeer had asked him to lead the risk assessment, working with Ms. Said.  He explained that he and Ms. Said had chosen the business units on which to focus and then interviewed in-house lawyers who support those business units; Mr. McNamara reported that, at the time of the October 22 Meeting, he and Ms. Said had finished interviewing those lawyers and had just begun interviewing business people in the relevant business units.  Mr. Andeer and Mr. McNamara said that, after the interviews were finished, the CLPG expected to present the results of the risk assessment to relevant "stakeholders," likely including Apple's Executive Team, Risk

---

[56] *See* United States Sentencing Commission Guidelines Manual § 8B2.1(c) (U.S. Sentencing Comm'n 2014).

[57] *See, e.g.*, Business Roundtable, Principles of Corporate Governance (2012), *available at* http://businessroundtable.org/sites/default/files/BRT_Principles_of_Corporate_Governance_-2012_Formatted_Final.pdf; Int'l Chamber of Commerce, The ICC Antitrust Compliance Toolkit (2013), *available at* http://www.iccwbo.org/advocacy-codes-and-rules/areas-of-work/competition/icc-antitrust-compliance-toolkit/.

[58] Although Apple has contended, during the October 22 Meeting and elsewhere, that the work of the CLPG has been an extended series of risk assessments, we have concluded that the only systematic antitrust risk assessment that meets the requirements of the Sentencing Guidelines took place after we made the recommendation contained in our First Report.

NON-CONFIDENTIAL VERSION

Oversight Committee, and Audit and Finance Committee.[59]  At the end of the October 22 Meeting, Apple reiterated that it was unwilling to share the substance of the antitrust risk assessment with the Monitor, either orally or in writing, based on concerns that disclosure might waive its attorney-client privilege. Although the Monitor suggested various ways that he might obtain some information while accommodating Apple's concerns, Apple said it was not willing to provide any information about the substance of its assessment.

During a November 25 meeting, Mr. Reilly and Sara Razi of Simpson Thacher explained that Apple was willing to document its risk assessment *process* but that it would not reduce the risk assessment itself to writing.  Moreover, Mr. Reilly said that, due to privilege concerns, Apple would not be willing to give the monitoring team the same oral risk assessment report that the ET, AFC, and Board would receive.  Apple again rejected the Monitor's suggestions regarding potential means of accommodating the company's privilege concerns while giving the monitoring team meaningful information about the results of the risk assessment.  Mr. Reilly asked whether the Monitor might, instead, be satisfied with a detailed description of the process Apple had followed.  The Monitor expressed willingness to consider that option and requested a concrete proposal from Apple.

On December 22, Ms. Razi sent the Monitor an email setting forth Apple's position regarding the risk assessment recommendation.  Apple asserted that the Second Report had required only a "formal" risk assessment, not a written risk assessment, and stated that, in any event, Apple would not create a written record of its risk assessment or provide written documentation to its Board, the Monitor, or any other audience.  Ms. Razi wrote that this position was "both consistent with best practices and necessary to protect indisputably attorney-client privileged and work product materials."  She also provided a short summary of the information we had previously received from Mr. Andeer and others regarding the CLPG's informal efforts to evaluate antitrust risk.  Finally, she wrote that Mr. McNamara and Ms. Said remained engaged in their risk assessment effort; that Apple would share the results of that assessment with the ET, the AFC, and the Enterprise Risk Management Committee in March 2015;[60]

---

[59] We subsequently learned that Mr. Sewell presented the risk assessment to the ET and the AFC.

[60]  We have been advised that Mr. Sewell presented the results of the risk assessment to the AFC on March 9, 2015.  In early April, Simpson Thacher advised us that the ET would receive its presentation "within the next month," but the presentation did not occur until June 22.  Mr. Sewell explained that the ET presentation took place later than the Board presentation because: 1) Apple wanted all of the ET members to attend, and travel plans often interfered; and 2) the ET had to focus on more time-sensitive issues.

NON-CONFIDENTIAL VERSION

and that, when that process ended, Apple would "provide the ECM with a written description of the process that Mr. McNamara and Ms. Said undertook to conduct this risk assessment, whom they met with, and the individuals/groups that were informed of the risk assessment's results."

The Monitor responded to Ms. Razi by email, stating that the proposal was inadequate, and provided more detailed reasons during a December 30 telephone conversation with Ms. Razi.  Ms. Razi emphasized that Apple had agreed to conduct what she characterized as a "formal" antitrust risk assessment but objected to the Monitor's recommendations that the assessment be memorialized in writing and be disclosed to the monitoring team.  The Monitor responded that, if Apple was not willing to disclose the substance of the risk assessment, he would need to understand what factors went into the substantive analysis and how the company changed its antitrust policies, procedures, and training as a result of the analysis.  Ms. Razi accepted that suggestion and said it represented a very helpful accommodation of Apple's concerns.  On January 2, Ms. Razi sent an email confirming that agreement; the Monitor sent the Plaintiffs a letter on January 7 explaining the agreement and stating that he would hold in abeyance the recommendation that Apple reduce to writing the results of its risk assessment.

### 2.    2015 Training Plan

Another challenge that arose in the third reporting period (and, as described at more length below, persisted into the fourth reporting period) related to our monitoring of antitrust training sessions.  At the January 14 Meeting, Apple provided its preliminary live antitrust training plan for 2015.  Although the training plan did not include the dates of the training sessions, it listed the various groups to which Apple intended to provide antitrust training in 2015 and identified, for each group, the type of monitoring Apple intended to permit—"Live," "Recording," or "None."  In total, the plan designated four sessions for live monitoring, two sessions for video monitoring, and three sessions for no monitoring whatsoever.  In response to Apple's proposal, the Monitor explained that he wanted the company to abide by the commitment it had made in June 2014 to video-record all training sessions and permit the live monitoring of whichever sessions he chose in 2015.  This dispute continued into the fourth reporting period, as explained below.

### 3.    Dispute Regarding The Scope of the Monitorship

Toward the end of the third reporting period, Apple objected that certain requests for compliance-related documents and information were outside the scope of the monitorship because they did not relate solely and specifically to antitrust compliance.  Among the requests to which Apple objected were a

request for information about compliance-related incentives and discipline at Apple[61]—in particular, a request for current materials or guidance used during personnel evaluations—and a request for handbooks, guidelines or other written procedures regarding Apple's procedures for investigating compliance-related allegations.  We made the requests either because there was no information available that specifically related to the antitrust compliance program—for example, Apple had never used its newly drafted antitrust investigations procedure—or because the information sought was inseparable from Apple's compliance program as a whole—for example, Apple's use of incentives and discipline to promote compliance with the law and company policies.  As explained at more length below, Apple continued to object to these requests during the fourth reporting period.

### 4. Scheduling of Employee Interviews

As explained in more detail in our Third Report,[62] Apple also refused to schedule a set of employee interviews we requested for mid-February 2015, claiming that they were both irrelevant and duplicative of interviews we had already conducted.  After significant delays, Apple eventually permitted the Monitor to conduct some, but not all, of these interviews in May 2015.

### D. Third Report

As with our two prior reports, we gave Apple an opportunity to review a draft of the report for confidentiality and then sought comments from Apple and the Plaintiffs regarding factual errors.[63]   Although some of Apple's comments

---

[61] *See* United States Sentencing Guidelines Manual § 8B2.1(b)(6) (U.S. Sentencing Comm'n 2014) (requiring "appropriate incentives to perform in accordance with the compliance and ethics program" and "appropriate disciplinary measures for engaging in criminal conduct and for failing to take reasonable steps to prevent or detect criminal conduct").

[62] *See* Third Report 33-34.

[63] We followed this same process in soliciting comments with respect to the current report. On September 30, the day before we originally intended to file this report, we received from Simpson Thacher a copy of a letter provided to the Plaintiffs the previous day.  The letter, dated September 29, 2015, and signed by Gibson Dunn and Simpson Thacher, demanded an urgent "meet and confer" with the Plaintiffs. The letter claimed, for the first time, that "over Apple's fervent objections, the [Monitor] has—notwithstanding his assurances of confidentiality—unnecessarily included in his reports, and unreasonably refused to redact, sensitive information about Apple's business operations." September 29, 2015 Letter at 2-3. This claim not only ignored the fact that the process for resolving Apple's confidentiality concerns with respect to prior reports had been completely amicable—indeed, there was not even any discussion with respect to redactions in the Third Report—but it also directly contradicted repeated praise by Apple's lawyers concerning the care with which the monitoring team has

*(footnote continued on next page)*

and suggestions were helpful, many were not responsive to the request to point out factual inaccuracies in the draft report. Instead, they were arguments designed to advance Apple's point of view rather than correct the factual record. As appropriate, we noted some of those points when we revised the draft report.

We filed the Third Report with the Court on April 14, 2015. In that Report, we made various recommendations aimed at strengthening the procedures associated with Apple's Antitrust Compliance Program. We also continued to recommend that Apple's Board and ET play a more active role in overseeing the Program, and we recommended that Apple take steps to increase the ACO's independence and authority.

## VII.   Fourth Reporting Period: March 2015 to September 2015

Because the main elements of Apple's revised antitrust compliance program were initially put in place at the end of June 2014, our primary objectives in the fourth reporting period have been to assess the continued development and modification of the Program, including revisions and additions, and to evaluate Apple's implementation of the recommendations we had made in our previous reports. In the absence of an extension under Section VI.A of the Final Judgment, the monitorship will conclude this month. Accordingly, we have also focused on providing the Court with the information it needs to assess whether Apple's Antitrust Compliance Program is sufficiently robust and embedded within the company that it will remain effective without the Monitor's continued oversight. We obtained some very useful information during this reporting period, particularly at the very end of the period. This information came from conducting interviews with Apple executives and Board members, and reviewing new and revised procedures that Apple has developed in response to our recommendations. Regrettably, Apple continued its pattern of limiting and delaying our activities, as in previous reporting periods. Those issues are explained in more detail in Section VII.B.

### A.   Interviews, Meetings, Documents, and Training

#### 1.   Interviews and Meetings

Between March 2015 and the end of the fourth reporting period, we interviewed fifteen people affiliated with Apple. We conducted several of these interviews by telephone; others took place during two trips to Apple's California

---

protected Apple's confidential information. After a series of discussions and email correspondence, we reached an agreement on October 1 regarding how to handle the material for which Apple sought confidential treatment. The agreement included the substitutions for redacted material that appear in the Non-Confidential version of this report.

NON-CONFIDENTIAL VERSION

headquarters—on June 22-23 and August 31-September 3.  As explained at more length in Section VII.B.4, *infra*, Apple asserted objections that resulted in our conducting no interviews between late January and May 2015, and no in-person interviews until late June.

(a)    Board of Directors

On September 2 and 3, we re-interviewed three of Apple's independent directors—Susan Wagner, Ronald Sugar, and Arthur Levinson.  At this stage of our review, we believed it necessary and appropriate to speak again with those members of the Board directly responsible for overseeing Apple's antitrust compliance program.  Dr. Levinson is the Chairman of the Board and a member of the AFC; Dr. Sugar is the Chairman of the AFC; and Ms. Wagner is the newest member of the AFC.  All three interviews provided helpful information regarding the Board's oversight of the Antitrust Compliance Program.

In particular, these Board members provided us with significant information about Apple's consideration of the potential antitrust issues raised by major new products and services the company has recently released, and the oversight the Board provided with respect to those initiatives. [*]



We also obtained relevant information from the three AFC members about their reactions to Apple's antitrust risk assessment—which Mr. Sewell summarized for them in March 2015—and to the live antitrust training they had just received when we interviewed them.  Although they did not share details about the risk assessment, the three AFC members expressed overall confidence that it had been "thoughtful" and had caused Apple personnel to engage in valuable reflection about the antitrust risks the company faces. [**]

With respect to antitrust training, Dr.

---

[*] The redacted passages summarize statements made by Board members Dr. Ronald Sugar and Dr. Arthur Levinson about the review of antitrust issues.

[**] The redacted sentence summarizes the reactions of AFC members Sugar, Levinson, and Susan Wagner to the risk assessment.

NON-CONFIDENTIAL VERSION

Levinson, Dr. Sugar, and Ms. Wagner all praised the session they had just attended.  They generally agreed that it was appropriately tailored to an audience of Board members and that it provoked useful discussion about the antitrust issues Apple faces, particularly given that the session was led by Apple's lead in-house antitrust lawyer.

(b)     Executive Team

On August 31 and September 1, we re-interviewed four members of Apple's Executive Team ("ET") who we determined were particularly relevant to the fulfillment of our mandate under the Final Judgment, either because of their important roles in Apple's legal and compliance functions or because they oversee areas of business that are susceptible to antitrust risk.  We interviewed Tim Cook, Apple's CEO; Bruce Sewell, Apple's General Counsel, who also oversees the company's compliance function; Phil Schiller, Senior Vice President of Worldwide Marketing; and Eddy Cue, Senior Vice President of Internet Software and Services, which is the group primarily involved in the events underlying the ebooks litigation.  Like the Board interviews, our interviews of Mr. Sewell, Mr. Cook, Mr. Schiller, and Mr. Cue were instructive.  Among other things, they helped us understand the ET's current methods for identifying and addressing potential antitrust issues, as well as the ET's efforts to communicate the importance of antitrust compliance throughout the company.

We were struck by the ET's apparent increase in sensitivity to antitrust issues since we last interviewed its members.  Each ET member we interviewed told us that the group now frequently discusses antitrust issues, and Mr. Sewell said his ET colleagues had become adept antitrust issue-spotters, a claim with which others agreed—for example, Mr. Cook expressed the view that the members of the ET have become "highly sensitive" to antitrust compliance.



————————————

\* The redacted sentence quotes Eddy Cue's comparison of the greater scrutiny currently given to antitrust issues within Apple as compared to the level of scrutiny at the time of events underlying the ebooks case.

64   The comments from the ET members were consistent and collectively persuasive, although in response to our requests for contemporaneous documentary corroboration, Apple produced only a small number of calendar entries and a single redacted email.  Apple claims that such discussions are privileged and they are the types of discussions not generally reduced to

*(footnote continued on next page)*

NON-CONFIDENTIAL VERSION

The ET members whom we interviewed also discussed their efforts to set an appropriate tone for Apple personnel and promote antitrust compliance throughout Apple.  Among other things, we learned that, over the past year, certain ET members had requested special antitrust training sessions for employees who report to them and had used the training as an opportunity to discuss with those employees the importance of compliance.[65]  Moreover, the ET members said, in very similar ways, that they attempt to set an example that "doing the right thing" matters.

(c)      Business, Compliance, and Legal Personnel

We interviewed several additional Apple business, compliance, and legal personnel during this reporting period.  In late April and early May, we interviewed by phone a subset of the employees we had hoped to interview in February, including managers responsible for procurement and in-house attorneys who advise on mergers and acquisitions and standard-setting activities.[66]  Those interviews helped to further advance our understanding of those areas of Apple's business that potentially create antitrust risk and the steps the company has taken to mitigate that risk.  In late June, we interviewed a small number of business people who had participated in recent live training sessions, for the primary purpose of obtaining their feedback regarding the relevance and effectiveness of that training.

In late June, we re-interviewed Apple's Chief Compliance Officer, Tom Moyer, with whom we had not spoken for more than a year.  Apple had proposed this interview as a substitute for documents we had requested—blank personnel evaluation forms and related materials—that might shed light on whether Apple's compliance program had in place appropriate positive and negative incentives for its personnel to act in conformity with the law and company policy.  Such incentives are important in encouraging compliance, and should include appropriate discipline for violation of company policies and the law.[67]  Our meeting with Mr. Moyer provided information about Apple's plans to strengthen such incentives and its process for managing compliance-related

---

writing.  Even so, given the amount of attention Apple claims it has given these issues, the amount of documentary corroboration is quite slender.

[65]  These sessions were consistent with Mr. Sewell's request during the June 2014 ET training sessions that its members "waterfall" issues relating to antitrust compliance to their respective staffs.  *See* Section VIII.F.1.

[66] Because of Apple's string of objections to these requests for interviews, and because of the lengthy delays in negotiating for them to take place at all, we agreed to conduct these interviews by phone rather than in person.

[67] *See infra* Section VIII.D.4.

NON-CONFIDENTIAL VERSION

investigations.  In addition, we interviewed an Apple business lawyer to gather information about an antitrust training session the company had offered to in-house lawyers but that we had not been permitted to monitor.

We also met twice with Deena Said, Apple's ACO, to receive updates regarding her work on Apple's Antitrust Compliance Program.

2.      Documents

Apple provided us with documents on a rolling basis throughout the reporting period.  Among the most important were revised versions of the Second Report Implementation Plan, which Apple had updated to include information about additional activities it was undertaking to implement the recommendations we made in the Second Report, and a similar document establishing Apple's plans for implementing the recommendations we made in the Third Report ("Third Report Implementation Plan").[68]  As discussed at significantly more length in Section VIII.D, *infra*, Apple also produced various documents that summarized new procedures Apple had developed as part of its Antitrust Compliance Program, which included revised versions of procedures we had already received and commented on, as well as new procedures that Ms. Said and others had drafted to govern aspects of the Program.  Finally, Apple produced miscellaneous additional documents, such as slides from training sessions and materials associated with Ms. Said's quarterly updates to the Board.

3.      Board and ET Training Sessions

We monitored several training sessions during this reporting period, but the Board and ET training sessions that we monitored during the last week of the reporting period warrant individual discussion.[69]  Mr. Andeer led the sessions, both of which we attended in person.  The training session for the Board lasted for approximately 40 minutes; the ET session lasted approximately 50 minutes. Both were interactive, with Board and ET members asking numerous questions.

As discussed in Section VIII.E.3, *infra*, both sessions focused at the outset on the oversight responsibilities of Board members and senior executives, consistent with a recommendation we made in the Third Report.  Mr. Andeer also discussed the current status of the Antitrust Compliance Program, and spent most of the session discussing substantive principles of antitrust law. Monitoring these training sessions—and, in particular, hearing the Board and ET

---

[68] Apple updated the Third Report Implementation Plan at the end of the reporting period.  That updated version is attached as Exhibit B (redacted from the non-confidential version of the Report).

discuss various issues—provided a valuable window on the training of key personnel required by the Final Judgment, and both the ET's and Board's engagement in these issues.  It validated our decision to live monitor these sessions and was very much in Apple's interests to allow it.[70]

### B.      Challenges and Obstacles

#### 1.      Risk Assessment

As explained in Section VII.B.1, *supra*, and in our previous Reports, we have struggled throughout the monitorship to obtain information related to our recommendation that Apple conduct a formal antitrust risk assessment.  These challenges have arisen primarily because Apple has asserted privilege objections in response to virtually all of our requests for information regarding the assessment.

As stated earlier in this Report, we negotiated a compromise—or thought we negotiated a compromise—during the third reporting period under which Apple would provide us with detailed information regarding its antitrust risk assessment process, as well as information regarding the ways in which it modified its Antitrust Compliance Program as a result of the risk assessment, in exchange for our agreement to forego obtaining the contents of the risk assessment itself.  Early in the fourth reporting period, however, it became apparent that Apple was no longer willing to provide even that limited information.  In its April 9 comments on a draft of the Third Report, Apple took the position that it had fulfilled its side of the compromise by simply producing a memo outlining its risk assessment process[71]—in other words, Apple suggested for the first time that it would not provide us with information regarding the ways in which it had modified its Antitrust Compliance Program as a result of the assessment.

On April 21, we sent the Plaintiffs a letter addressing various disputes.  In that letter, we expressed concern that Apple appeared to be reneging on its commitment to provide us with information regarding the ways in which the risk assessment had affected its antitrust compliance policies, procedures, and training, and we asked Apple to confirm that it intended to uphold its

---

[69] Section V.C of the Final Judgment requires Apple to provide its Board and ET members, among others, with annual antitrust training.

[70] *See infra* Section VII.B.2.

[71] As discussed in Section VIII.B.1, *infra*, the memo was vague and lacked substance.  It consisted largely of a description of Apple's antitrust compliance functions.

**NON-CONFIDENTIAL VERSION**

commitment.  On April 23, Simpson Thacher sent the Plaintiffs a letter in response to ours.  In that letter, Mr. Reilly of Simpson Thacher asserted that our "suggestion that Apple [had] reneged on its commitments [was] simply inaccurate."  He claimed that Apple had agreed to provide information only about its risk assessment process and that "Apple never agreed to provide the 'outputs' of its risk assessment in the sense of identifying specific resulting actions that would reveal attorney-client privileged communications or work product."[72]

Simpson Thacher reiterated that position in an April 28 meeting with representatives of the Plaintiffs and the monitoring team, explaining that, based on its privilege concerns, Apple was not willing to identify particular modifications to the Program that the risk assessment had prompted.  Mr. Reilly and Ms. Razi claimed that Apple had agreed only to provide us with revised Program materials on a rolling basis, and not to identify which particular revisions stemmed from the risk assessment.  They said Apple *might* make a "high-level" representation that it had, in fact, changed its Antitrust Compliance Program because of the risk assessment, but they said Apple would not provide more detailed and specific information.  We responded that, as a preliminary step, Apple should give us whatever information it was willing to provide and that we would assess the sufficiency of that information.

On May 8, having received no further communications on this subject, we sent Apple a request for various documents and information, including "[i]nformation regarding modifications to Apple's Program based on its antitrust risk assessment."  On May 18, Mr. Reilly sent the Monitor a letter reiterating Apple's objection to "providing information directly tying changes to its antitrust compliance program to specific attorney-client communications or attorney work product."  Mr. Reilly wrote that Apple would "provide non-privileged, responsive information regarding both its risk assessment procedures and any changes to its compliance program" but would not "explicitly connect[] those changes to the antitrust risk assessment."

On June 12, we had a telephone conference with Simpson Thacher and representatives of the Plaintiffs to discuss Apple's unresolved objections to our information requests, including this one.  Apple continued to refuse to connect specific changes to the Program to the antitrust risk assessment.  We said we disagreed with Apple's privilege arguments and deplored its retreat from our prior compromise, and we noted that we would be willing to treat as highly confidential any information we received regarding the risk assessment.

---

[72] This invocation of attorney-client privilege was consistent with the extremely expansive view of privilege that Apple has taken throughout the monitorship.

NON-CONFIDENTIAL VERSION

Simpson Thacher said that offer would not adequately address Apple's privilege concerns.

We further discussed our request for information about how the risk assessment affected the Program during a June 22 meeting in California with Ms. Said and with Jonathan Sanders of Simpson Thacher.  During that meeting, Apple offered to provide us with redlined versions of its antitrust compliance policies, procedures, and training; "detailed explanations" of the changes to those documents; and the total number of changes that resulted from the risk assessment.  In the interest of resolving the dispute, we emailed Simpson Thacher and the Plaintiffs on June 25 and stated that we would accept that offer, so long as Apple provided the information to us promptly.  There was, nonetheless, a significant delay in Apple's production of information in response to this agreement.  On July 14, we emailed Simpson Thacher to ask when we could expect to receive the information.  Two days later, at a joint meeting with the Plaintiffs, Simpson Thacher advised us that we would receive it in the next week or two.

Mr. Reilly finally sent us a letter on July 24 in response to the request.[73] The letter began by stating that *                                  Although the letter purported to identify changes to Apple's Antitrust Compliance Program that resulted from the antitrust risk assessment, it largely failed to do so; instead, much of the letter focused on changes that Apple claimed were the result of interactions with the Monitor or of Ms. Said's general efforts to enhance the Program, rather than on changes prompted by the risk assessment.  Contrary to our conversation with Ms. Said and Mr. Sanders, Apple did not promptly provide "redlines" showing changes in its antitrust compliance materials—and did not provide a redline of Antitrust and Competition Law Policy until the last day of the reporting period, Sept. 4, 2015.  The July 24 letter did state, however,

---

[73] The letter is attached as Exhibit C (redacted from the non-confidential version of the Report).

* The redacted material consists of quotations and other material from the July 24 letter that addressed the impact of Apple's risk assessment on different aspects of the Antitrust Compliance Program.

that * At the end of the reporting period, Apple represented that it had no further information to provide.[74]

## 2.   Monitoring of Training

Another challenge arose from Apple's insistence on deciding which antitrust training sessions we would monitor during this reporting period and by what means they would allow us to monitor them.  Apple had agreed in June 2014 to record all of its live antitrust compliance training sessions during 2014 and 2015 and to permit us to live-monitor any sessions that we wished in 2015.  When we met with Apple representatives in Washington, D.C., during the third reporting period, however, Apple provided us with a "training plan" that designated four sessions for live monitoring, two sessions for video monitoring, and three sessions for no monitoring whatsoever.  As discussed above,[75] we told Apple that the "training plan" represented an unacceptable retreat from the company's prior commitments, as well as an inappropriate limitation on the Monitor's discretion under the Final Judgment.[76]

We continued these discussions during the fourth reporting period.  On March 20, in an email setting out our position on various disputes, we reiterated that we expected Apple to honor the representations it had made in 2014 regarding our monitoring of its 2015 training sessions, and we requested a meeting with Apple and the Plaintiffs to attempt to resolve that and other issues.

---

\* The redacted material consists of quotations and other material from the July 24 letter that addressed the impact of Apple's risk assessment on different aspects of the Antitrust Compliance Program.

[74] In its comments on a draft of this report, Apple argued that our account of the extended discussions about the company's risk assessment is "inaccurate in a number of respects."  We have reviewed the detailed and extensive record of these discussions and believe our account constitutes a faithful and accurate summary.

[75] *See supra* Section VII.B.2.

[76] In its comments on a draft of this report, Apple disputed that it ever agreed to permit monitoring of all training sessions in 2015.  The Monitor has advised Apple on many occasions that the commitment was made in a meeting between the Monitor and Apple's General Counsel in June 2014.

We met with attorneys from Simpson Thacher and representatives of the Plaintiffs on April 1 but did not resolve the issue; after that meeting, the Plaintiffs requested that Apple file a written submission addressing this and other issues.

On April 10, Simpson Thacher sent the Plaintiffs the written submission. In that letter, Simpson Thacher denied that Apple had committed to permit monitoring of every training session in 2015. Simpson Thacher further argued that the training plan that Apple had previously produced was sufficient because it would permit monitoring, either live or by video, of all but three of the training sessions Apple deemed to be within the scope of the Final Judgment. Nonetheless, "in the interest of compromise," Apple offered in its April 10 letter to let us monitor two of the three remaining sessions, both for iTunes employees, in person.[77]

The Plaintiffs asked the Monitor to respond by letter, and he did so on April 21. In that letter, the Monitor explained that he stood by his position that he—rather than Apple—should determine which sessions were relevant to his assessment of evaluating Apple's training program, and he reiterated the monitoring team's standing request that Apple record all training sessions and permit the monitoring team to live-monitor whichever sessions we deemed important to our mandate under the Final Judgment. Apple sent the Plaintiffs a short response on April 23, in which Mr. Reilly asserted that it was sufficient that Apple had agreed to permit some form of monitoring of "every non-privileged Final Judgment training" that would occur before the presumptive end of the monitorship in October 2015.

Although we continued to object to Apple's decision to limit our access to live training sessions and its unilateral selection of the method by which we would monitor each session, we reluctantly agreed to Apple's proposal in the interest of moving forward. Members of our team therefore monitored six sessions in person (two iTunes Content training sessions on May 26, two iBooks Store training sessions on June 22, the ET training session on August 31, and the Board training session on September 2) and five sessions by video (sessions for iTunes Content employees on July 21, August 12, and August 27, and sessions for App Store employees on August 10 and August 26). Apple did not permit us

---

[77] Apple continued to refuse to permit us to monitor a training session it provided to in-house attorneys whose work relates to the iBooks Store. We believed that session was important to monitor, given this Court's conclusions that Apple lawyers had played a central role in the events underlying the ebooks litigation.

NON-CONFIDENTIAL VERSION

to monitor the May 6 training session for in-house lawyers who work on iTunes.[78]

### 3.    Disputes Regarding the Scope of the Monitorship

As in previous reporting periods, Apple also claimed that some of our requests for documents and information exceeded the scope of the Monitor's authority under the Final Judgment.

### (a)    Compliance-Related Incentives, Discipline, and Investigative Procedures

Toward the end of the third reporting period, we requested information regarding compliance-related incentives and discipline for Apple employees, and Apple's procedures for investigating compliance-related allegations.  Apple objected that those requests exceeded the scope of the Monitor's authority under the Final Judgment because they did not relate solely to antitrust compliance.[79] We clarified the requests in a March 19 meeting with Simpson Thacher, and Ms. Razi sent us an email the next day stating that Apple stood by its objections. Later that day, the Monitor responded that he believed we had reached an impasse, and Apple and the monitoring team therefore began meeting and conferring with the Plaintiffs in an effort to resolve the issue without judicial intervention.

As stated above, the Plaintiffs asked Apple and the monitoring team to submit letters setting out their positions on this and other issues.  In Mr. Reilly's April 10 letter to the Plaintiffs, he claimed that our requests for blank personnel evaluation forms and for handbooks, guidelines, and written procedures

---

[78] In its comments on a draft of this report, Apple characterized our description of the disputes over the monitoring of training as "inaccurate and nonsensical."  It supported this characterization by manipulating definitions.  It claimed that it "ultimately agreed to allow monitoring of every Final Judgment training" by defining more broad-based antitrust training—inarguably part of a comprehensive antitrust compliance program—as beyond the Monitor's mandate; and characterized as privileged and work product a training session for lawyers based on the mere fact the audience was composed of lawyers.

[79] In general, Apple has consistently objected to our requests that sought information about Apple's compliance program as a whole.  We made such requests only where no antitrust-specific information was available.  Our view is that the antitrust compliance program is part of an overall compliance program and that, while our mandate under the Final Judgment does not by its terms extend to the entire compliance program, certain aspects of the antitrust compliance program cannot be understood and evaluated separately from Apple's overall compliance program—particularly given that Apple has situated its antitrust compliance function within the general compliance organization.

governing the investigation of allegations of misconduct were "improper on their face" because they were insufficiently related to antitrust issues. He wrote that Apple would be willing, however, to make Tom Moyer, its Chief Compliance Officer, available "to provide further information regarding how antitrust compliance would be incorporated in a hypothetical evaluation or disciplinary process." In our April 21 response, we agreed, again in the interest of avoiding further delays, to attempt to fill in the gaps in our knowledge through a meeting with Mr. Moyer. Because of Mr. Moyer's travel schedule, we were not able to meet with him until late June.

A related issue arose in May. On May 8, we sent Apple a list of information requests. The list included a request for certain narrow types of "[i]nformation regarding any internal or external complaints or allegations received since January 1, 2015 regarding potential or actual anticompetitive behavior, an actual or potential violation of the antitrust laws, or an actual or potential violation of the Final Judgment." The request was limited to thirteen specific categories of information, such as when and how the complaint or allegation was initially received, who was involved in analyzing it, how much time elapsed between receipt of the complaint or allegation and its resolution, and whether the complaint or allegation was substantiated. A footnote in the request specifically clarified, "This request is not seeking the substantive facts of any complaint or alleged violation received."

Despite that explicit limitation, Mr. Reilly sent the Monitor a letter on May 18, in which he objected that the request exceeded the scope of the Monitor's mandate under the Final Judgment and did not seek relevant information. He claimed that the request represented an effort to investigate whether Apple personnel were, in fact, complying with the law, and he wrote that it was therefore "by definition outside the scope of [the Monitor's] responsibilities."

We discussed this issue during a June 12 call with Simpson Thacher and representatives of the Plaintiffs. On behalf of Apple, Simpson Thacher asserted that the Second Circuit's February 10, 2014 order denying Apple's motion for a stay pending appeal precluded the Monitor from seeking information regarding actual antitrust allegations. The Monitor explained, in response, that Apple had provided us with only a draft set of investigation procedures, which the company claimed it had never applied. He said we therefore needed information about how Apple has investigated antitrust compliance issues in practice. He emphasized that he was not seeking information regarding Apple's actual compliance or noncompliance with the antitrust laws. He also emphasized the narrowness and specificity of the request, including the specific limitation that it did not seek information regarding the substantive facts of any complaint or allegation. After further discussions, Simpson Thacher agreed to seek a compromise.

**NON-CONFIDENTIAL VERSION**

During our June 22 meeting in California with Ms. Said and Mr. Sanders, Apple informed us that it would provide most of the information we had requested regarding what the company represented was the single responsive complaint or allegation it had received in 2015.  The next day, Apple produced basic information regarding Apple's handling of an antitrust-related allegation that Mr. Moyer, the Chief Compliance Officer, had received in January 2015, and that Apple ultimately identified as baseless.[80]  The materials Apple produced did not address several of the questions contained in our information request, including whether the allegation resulted in any change in Apple's policies, practices, or procedures; whether relevant information was shared with the AFC, the ET, or business groups at Apple; and the manner in which the allegation was documented.  Apple represented, however, that there was in fact no information responsive to any of those sub-requests—*i.e.*, that the allegation resulted in no such changes, that relevant information was *not* shared with the AFC or ET, and that there was no formal documentation of the allegation.

(b)    Compliance Information Related to Apple Music

On June 11, we asked Apple to provide a presentation regarding the manner in which the policies, procedures, and training that comprise Apple's Antitrust Compliance Program affected the process of negotiating contracts with music labels in connection with Apple Music, the new music streaming service Apple announced on June 8, 2015.[81]  We requested that the presentation include the names and roles of Apple personnel who played significant roles in negotiating the transactions, as well as information about any specific efforts the company had made to familiarize those individuals with the company's antitrust policies and procedures and to provide them with antitrust training.

Six days later, on June 17, Theodore J. Boutrous Jr. of Gibson, Dunn & Crutcher LLP ("Gibson Dunn"), outside counsel to Apple, sent the Monitor a letter objecting to the request.  Mr. Boutrous argued that the request fell "well outside the scope of the Monitor's authority" because it constituted an attempt to assess Apple's compliance with the Final Judgment and the law and because it

---

[80] Apple had previously produced information about this allegation to the Plaintiffs and the Monitor pursuant to Section V.H of the Final Judgment.  *See* Final Judgment § V.H (making the ACO responsible for, among other things, "furnishing to the United States and the Representative Plaintiff States on a quarterly basis electronic copies of any non-privileged communications with any Person containing allegations of Apple's noncompliance with any provisions of [the] Final Judgment or violations of the antitrust laws").

[81] *See* Press Release, Apple, Introducing Apple Music—All the Ways You Love Music. All in One Place (June 8, 2015), *available at* https://www.apple.com/pr/library/2015/06/08Introducing-Apple-Music-All-The-Ways-You-Love-Music-All-in-One-Place-.html.

**NON-CONFIDENTIAL VERSION**

focused on a content distribution platform other than the iBooks Store. The Monitor responded to Mr. Boutrous by letter on June 19, explaining that, contrary to Mr. Boutrous's claim, the request had been carefully tailored to avoid seeking information regarding whether Apple was complying with the law and instead sought information that was squarely within the Monitor's mandate under the Final Judgment. The Monitor also expressed disagreement with Mr. Boutrous's assertion that the Final Judgment prohibited inquiry into any content platform other than the iBooks Store. Two days later, Mr. Boutrous sent a letter to the Plaintiffs, reiterating Apple's objection to our request and asking to meet and confer about it.

After discussions with Apple and the Plaintiffs, and, in an effort to obtain some information on this issue, we agreed on June 26 to modify our request. The modified request sought "(1) names and roles of Apple personnel and lawyers (both business personnel and lawyers) who played significant roles in negotiating the transactions associated with the music streaming service Apple announced on June 8, 2015 and (2) information regarding the efforts made to familiarize those individuals with the company's antitrust policies and procedures, and information regarding any antitrust training they have received."

On July 6, Apple informed us that it would provide information in response to the modified request. [*]



---

[*] The redacted material discusses the extensive correspondence with Apple's counsel related to our attempts to obtain further limited information about Apple Music.

NON-CONFIDENTIAL VERSION



[82] As described above (*see* Section VII(A)(1))**,** during our interviews of Board and ET members at the end of the reporting period, we sought to fill gaps in our knowledge regarding the process by which Apple ensured its Apple Music–related conduct was consistent with the antitrust laws.[83]  In response to a request following these interviews, Apple also sent us screenshots of electronic calendar invites purportedly reflecting discussions that occurred between its business people and lawyers regarding Apple Music.[84]

4.      Scheduling of Employee Interviews

During the fourth reporting period, Apple also continued to object to some of our interview requests; in fact, in substantial part because of these objections, we conducted no in-person interviews between late January 2015 and late June 2015.  In January, toward the end of the third reporting period, we asked to schedule interviews for mid-February with approximately eleven employees, several of whom we had been asking to interview since 2014.  Apple

---

[82] A compilation of our Apple Music–related correspondence with Gibson Dunn is attached as Exhibit D (redacted from the non-confidential version of the Report).

[83]  As described above, our interviews with ET members and Board members made a convincing case that there have been numerous discussions, both within the ET and within the AFC, about the antitrust risks involved in negotiating deals with record labels and efforts made to mitigate those risks.  Apple declined to share that story with us in response to our specific requests—a story it should have been eager to tell as an example of lessons learned from the ebooks case—and instead left it for us to discover through interviews several months later.

[84] In its response to this request, Apple also asserted that there were many other discussions between its business people and lawyers that were not documented in any formal manner.

In its comments on a draft of this report, Apple stated, "[we] objected to requests relating to Apple Music because the manner in which Apple counseled its businesspeople in connection with a specific product rollout had nothing to do with an evaluation of the adequacy of its antitrust policies, procedures, and trainings—the actual scope of the Monitor's work under the Final Judgment."  We strongly disagree.  We think the application of Apple's antitrust policies, procedures and training to a specific product rollout goes to the essence of whether Apple's program is comprehensive and effective.

objected that the interviews were duplicative of interviews we had already conducted and were otherwise unnecessary; as noted at pages 33 to 34 of the Third Report, we were not able to resolve the issue before the third reporting period ended.

On March 19, the Monitor met with Ms. Razi but made little progress toward resolving this issue.  The next day, he emailed the Simpson Thacher attorneys and informed them that he believed we had reached an impasse on the request; he informed the Plaintiffs of the potential impasse on March 23.  On April 1, at a joint meeting with Simpson Thacher and the Plaintiffs, the Monitor said he would agree not to request "follow-on" interviews based on information he obtained through these interviews—Apple had complained that interviews inevitably led to other interviews—and also agreed to provide a brief explanation of why we thought each interview would be useful.  We sent those explanations by email the next day and memorialized the commitment not to request "follow-on" interviews in an April 3 email.[85]

On April 10, Mr. Reilly sent the Plaintiffs a letter addressing various then-pending issues, including our outstanding interview requests.  In his letter, Mr. Reilly wrote that Apple remained convinced that each interview was "either unnecessary and duplicative, beyond the scope of the monitor's responsibilities, or both," but that Apple would permit us to interview four of the people we had requested: one in-house lawyer who works on standard-setting issues, another in-house lawyer whom Mr. Reilly described as "Apple's lead M&A counsel involved in the evaluation of antitrust issues arising in the corporate context," and two business people who engage in procurement activities.  The letter warned that, if we made "similar requests during the remaining six months of [the Monitor's] term, Apple [would] not offer the same kinds of 'split-the-baby' solutions moving forward."  This warning was of a piece with the pattern of resistance, delay, partial compromise, and threatened non-cooperation we have experienced in response to our requests.

In his April 21 response, the Monitor explained why he thought the interviews he had requested were important, although he withdrew certain

---

[85] Needless to say, these discussions, offers, and compromises would have been wholly unnecessary if Apple had adhered to the Final Judgment's language regarding the Monitor's discretion to interview "any Apple personnel . . . without restraint or interference by Apple." Final Judgment § VI.G.1. We pointed out that follow-up, including follow-up interview requests, was the way that monitoring or any type of oversight operates.  However, in the face of stiff and continuing resistance, we sought to avoid impasses and further delays by making compromises and accommodations.  None of them should have been necessary.

requests based on new information Mr. Reilly had provided to support Apple's claim that the activities of certain witnesses we had requested to interview did not in fact appear to create antitrust risk.  Despite what we viewed as the insufficiency of Apple's proposed compromise, we agreed to accept it in the interest of avoiding further delays.  In an April 23 letter, Mr. Reilly asked that we consider conducting some or all of the interviews by telephone in the interest of efficiency; again, to avoid further delays, we agreed to do so.  We conducted the four agreed-upon interviews by telephone in late April and early May.

## VIII. Assessment and Recommendations[86]

### A. Context of the Assessment

The Final Judgment requires the Monitor to assess whether Apple's policies and procedures are "reasonably designed to detect and prevent violations of the antitrust laws" and whether Apple's antitrust training program is "sufficiently comprehensive and effective."[87]  The Monitor is also charged with "recommend[ing] to Apple changes to address any perceived deficiencies in those policies, procedures, and training."[88]

During this reporting period, like the last one, we focused on monitoring the continued development and evolution of Apple's antitrust compliance program, and assessing Apple's implementation of the recommendations we had made in our previous reports.  In addition, because this may be the final reporting period of the monitorship, we also attempted to determine whether Apple's Antitrust Compliance Program is sufficiently well developed that it would likely remain strong without the Monitor's presence.

We believe that Apple has made significant progress since we issued the Third Report.  For example, one of our concerns throughout the monitorship has been whether Apple's Board and Executive Team ("ET") are providing adequate

---

[86] At the end of our interview with Tim Cook on September 2, we offered to provide Mr. Cook with an exit briefing on our findings, conclusions, and recommendations.  We repeated the offer to one of Apple's senior in-house lawyers the following day.  Although Mr. Cook initially expressed interest in such an exit briefing ("That sounds like it might be worthwhile"), Apple did not respond further to this offer.

In its comments on a draft of this report, Apple described such a briefing as "wholly unnecessary" in light of this report but states that Apple is "willing to consider the proposal."  We would have anticipated a more prompt response if there were genuine interest—but our offer stands.

[87] Final Judgment § VI.C.

[88] *Id.* § VI.B.

oversight regarding the Antitrust Compliance Program and taking appropriate responsibility for promoting a culture of compliance throughout the company. In all of our previous reports, we determined that significantly more was needed. During this reporting period, we observed a marked increase in the engagement of both the Board and the ET in antitrust compliance issues.  In previous reporting periods, Apple had provided us with little information on which we could conclude that the Board and ET were actively engaged in the Program; our interviews of Board and ET members late in this reporting period, however, provided us with greater reason to believe that they are properly fulfilling their oversight responsibilities and taking concrete steps to promote antitrust compliance at Apple.

Similarly, in the Third Report, we explained that one of our primary concerns was whether Apple had developed adequate procedures for the Program.  During the third reporting period, Apple had developed some of the procedures we had recommended to provide the proper structure for fully implementing Apple's Program, but there was room for substantial improvement in those procedures.  As importantly, Apple had not developed the full set of procedures we recommended.  During this reporting period, the ACO developed several new procedures and significantly improved the procedures that she had previously provided to us.  We gave Apple multiple rounds of suggestions on its draft procedures during this reporting period, which Apple largely implemented.  That collaborative process was productive and, in our view, has resulted in significant improvements to the Program.

Some concerns nonetheless remain.  First, as in past reporting periods, we continue to have insufficient information to fully assess whether Apple has conducted a sufficient antitrust risk assessment and incorporated the results of the assessment into its Antitrust Compliance Program.  As explained in Section VI.C.1, *supra*, during the third reporting period, we agreed not to seek the risk assessment itself.  The limited information we have obtained in light of that agreement suggests that a number of individuals were interviewed in connection with the risk assessment and that the results of the assessment were eventually presented to the AFC and the ET.  There is little indication, however, that the risk assessment significantly affected the substance of the Antitrust Compliance Program, although it certainly does seem to have heightened awareness of the full set of antitrust risks faced by the company and, in the words of the company's General Counsel, brought certain risks into "sharper focus."

Second, we have some concerns about the way Apple has structured the role of the ACO.  The Final Judgment required Apple to designate a person

NON-CONFIDENTIAL VERSION

whom it had not previously employed to serve as its ACO.[89]  The Final Judgment requires the ACO to "report to the Audit Committee or equivalent committee of Apple's Board of Directors" and makes her "responsible, on a full-time basis until the expiration of [the] Final Judgment, for supervising Apple's antitrust compliance efforts" and for performing several enumerated tasks.[90]  As we explained in previous reports, Apple hired someone only four years out of law school for the position.[91]  In many ways, we have been impressed with her performance.  She has worked diligently to develop the Antitrust Compliance Program and has clearly succeeded in building important relationships with others at Apple, including senior personnel, business people, and in-house attorneys.  Everyone we have interviewed has praised her performance.  We nonetheless continue to have some concerns that Apple has structured her role in a way that does not promote independence.  At times, it has appeared to us that the ACO views herself more as an advocate for Apple—albeit, again, one who has made large contributions to its antitrust compliance—than as an independent antitrust compliance officer charged with monitoring the company's activities.

## B.  Antitrust Risk Assessment

### 1.  Recommendations from Our Prior Reports

Throughout this monitorship, one of our central recommendations has been that Apple undertake a formal antitrust risk assessment.[92]  As our previous reports have explained, an antitrust risk assessment is a critical step in Apple's development of a comprehensive and effective Program.  We advised the company in our Second Report that its risk assessment should take the form of a "systematic assessment of the risks that arise from Apple's businesses, the activities of its employees, and its third-party interactions"; that the assessment should include consideration of the company's historical antitrust concerns; and that it should include a "formal . . . process that is dynamic, so that Apple's Antitrust Compliance Program continues to develop as Apple's business changes and expands and as the antitrust regulatory environment changes."[93]  We further recommended in the Second Report that Apple institute a risk assessment

---

[89] Final Judgment § V.

[90] *Id.*

[91] In its comments on a draft of this report, Apple described this characterization as "gratuitous and scurrilous."  It is simply an accurate statement of fact.

[92] *See* First Report 45-47; Second Report 74-84; Third Report 36-46.

[93] Second Report 74-75.

process that is "institutionalized, dynamic, and continuing"[94] and that the company explicitly assign ownership of the assessment to the appropriate Apple personnel, develop a procedure for reporting the results of the antitrust risk assessment to the ROC and AFC, and provide a formal report regarding the risk assessment and its results for review and analysis by the ROC and AFC.

In the Third Report, we expressed concern about the sufficiency of the risk assessment efforts Apple had undertaken. During the third reporting period, in response to recommendations we made in the Second Report, Apple had provided us with a short memorandum explaining work that Ms. Said (the ACO) and Mr. McNamara (a member of the CLPG) had done to evaluate the antitrust risks that the company's activities and lines of business presented ("Risk Assessment Memo"). The Risk Assessment Memo *



Earlier in that reporting period, Apple had provided us with a sample outline for Ms. Said and Mr. McNamara's interviews of iTunes personnel, but it refused to produce the questionnaires it had developed for other relevant business units.

As we explained in the Third Report, this left us with insufficient information to assess whether Apple had satisfied our recommendations: we knew little more than that Apple's antitrust lawyers were engaged in day-to-day counseling and that Mr. McNamara and Ms. Said had interviewed 19 in-house lawyers and 18 business people to assess risk in Apple's business activities. Since Apple had refused, on privilege grounds, to provide us with the substance of its risk assessment, we concluded that we were not in a position to make further recommendations regarding the risk assessment. We therefore recommended that Apple submit the results of its risk assessment to the Court, *ex parte* and *in camera*.

---

[94] *Id.* at 83.

* The redacted material describes the contents of the Risk Assessment Memo.

NON-CONFIDENTIAL VERSION

### 2.   Apple's Response to the Recommendations

Apple gave us little additional information during the first five months of this reporting period regarding the antitrust risk assessment it conducted in response to our recommendations.[95]  However, towards the end of the period, we obtained new information regarding the risk assessment.  The first piece of additional information was Mr. Reilly's July 24 letter to the Monitor, which we described in Section VII.B.1, *supra*, and which Apple represented described the ways in which the risk assessment had affected its Program.  At its core, the letter stated that [*] ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████ although it had provided no examples or specifics.  Mr. Reilly also wrote that the risk assessment had affected the counseling that Apple's lawyers provided to company personnel.  Although Mr. Reilly's letter left open the possibility that Apple would provide us with additional information about ways in which the risk assessment affected the Program, the company told us at the end of the reporting period that there was nothing further to report. ████████████████████████████████████ ███████████████████████████████ is better than no changes at all, but we expected that the risk assessment Apple conducted would have a more significant effect, given that periodic risk assessments are critically important to any effective compliance program, and given the significant changes that have occurred in Apple's business since the monitorship began.

The second and more informative sources of new information regarding the risk assessment were our interviews of AFC and ET members, to whom Mr. Sewell made presentations on March 9 and June 22, respectively, regarding the risk assessment.  We learned that Mr. Sewell made his presentations after reviewing a written report drafted by the Apple employees who conducted the risk assessment.[96]  Mr. Sewell spoke for approximately 20 minutes at each

---

[95] Late in this reporting period, in one of its responses to our requests for information related to Apple Music, *see supra* Section VII.B.3(b), Apple suggested for the first time that the CLPG had conducted a separate antitrust risk assessment focused on that project.  According to Apple, that ██████████████████████████████████████████████████ ████████████████████████████ (The redacted material provides specific details of the manner in which this risk assessment was conducted.)  Apple provided no further information on the subject.

[*] The redacted material addresses the statements in the July 24 letter describing the impact of the risk assessment on specific aspects of Apple's antitrust compliance program.

[96] Mr. Sewell's reference to a written report suggested that Apple had synthesized the findings of its risk assessment into the type of written report we had recommended in our Second Report (*see* Second Report 83) and which Apple had vigorously and consistently opposed.  *See,*

*(footnote continued on next page)*

**NON-CONFIDENTIAL VERSION**

meeting; he discussed the antitrust risks facing Apple, as well as the actions Apple was taking to mitigate those risks.  Dr. Sugar subsequently reported to the full Board on Mr. Sewell's presentation to the AFC.

The AFC and ET members with whom we spoke found the risk assessment to be a valuable and informative exercise. *



The ET and Board members we interviewed agreed that Apple should continue to conduct an antitrust risk assessment on a periodic basis.

Apple objected to the only new risk assessment–related recommendation we made in the Third Report—that it "submit the results of its risk assessment, and associated materials withheld on privilege grounds, to the Court *ex parte* and *in camera*."[97]  The company explained, through counsel, that it objected to the prospect of providing the results of its risk assessment to any third party based on its position that the information was protected by the attorney-client and work product privileges.  In the face of Apple's objection, we decided to hold that recommendation in abeyance.

3.      Further Assessment and Recommendations

In our Third Report, we expressed concern that Apple had so strongly opposed our recommendation that it incorporate a formal antitrust risk

---

*e.g.*, Letter from Matthew J. Reilly to Nathan P. Sutton, Gary M. Becker, and Robert L. Hubbard, Exhibit A (to letter) at 1-2,  6, 7 (Nov. 13, 2014); *see also supra*, Section VI.C.1.  We did not know whether the document referred to by Mr. Sewell was the type of formal written record referred to in Simpson Thacher's letter, or something else.

In its comments on a draft of this report, Apple clarified that the document referred to—and relied on—by Mr. Sewell "was a set of privileged talking points prepared by counsel who did not conduct the risk assessment to assist Mr. Sewell in presenting the risk assessment findings, not a written report of those findings."

* The redacted material summarizes specific statements made by Dr. Levinson and Mr. Sewell about the value of the risk assessment.

[97] Third Report 46.

assessment into its Program.  We concluded that we had insufficient information to determine whether Apple's efforts had satisfied our recommendations and that we therefore could not make further recommendations regarding the risk assessment.  Unfortunately, because we have no direct knowledge of the content of the risk assessment—we have not seen it and witnesses we interviewed were not permitted to address its substance—we again cannot assess whether Apple's efforts have fully satisfied our recommendations.[98]  We are concerned that Apple has been able to identify so few ways in which the risk assessment has affected the Antitrust Compliance Program; Apple should have viewed the risk assessment not as a formal exercise to satisfy our recommendation but instead as an opportunity to develop a comprehensive view of the antitrust risks the company faces.  Although high-level Apple personnel, including Mr. Sewell, the General Counsel, praised the risk assessment in general terms when we interviewed them, they were not able to identify concrete ways in which it has changed or contributed to the Antitrust Compliance Program.  Because of the small amount of information Apple has been willing to provide, we have a limited window into the quality of the risk assessment Apple has conducted.[99]

In this Report, we make one further recommendation regarding Apple's antitrust risk assessment.  It is widely recognized that, to be effective, a risk assessment must be repeated periodically, not conducted once and never updated.[100]  Indeed, it is our understanding that Apple engages in a broad,

---

[98] We asked each of the ET and Board members we interviewed during the week of August 31 for their reactions to the risk assessment.  Because of Apple's assertion of privilege, the witnesses were not able to speak in anything other than generalities.  As a result, we were in no position to probe them on any of the specific matters raised by the risk assessment.

[99] In its comments on a draft of this report, Apple has stated that it did carry out a comprehensive assessment of antitrust risks, "as it has been doing for years," and that its refusal to "share the output of privileged conversations between in-house counsel and business people does not mean that the process Apple carried out was somehow insufficient or ineffective."  We agree.  However, because of these limitations, we did in fact have a limited window into the quality of the risk assessment, which prevents us from validating Apple's own judgment.

[100] *See, e.g.*, United States Sentencing Guidelines Manual § 8B2.1(c) (U.S. Sentencing Comm'n 2014) ("[T]he organization shall *periodically* assess the risk of criminal conduct and shall take appropriate steps to design, implement, or modify each requirement set forth in subsection (b) to reduce the risk of criminal conduct identified through this process.") (emphasis added); Am. Bar Ass'n, Antitrust Compliance: Perspectives and Resources for Corporate Counselers 13 (2d ed. 2010) ("Only a *periodic, regularly scheduled* review will keep your compliance program up-to-date with developments that do not make headlines.") (emphasis added); U.K. Ministry of Justice, The Bribery Act 2010 p. 25 (Mar. 2011), *available at* http://www.justice.gov.uk/downloads/legislation/bribery-act-2010-guidance.pdf (noting that risk assessments should be "periodic, informed and documented"); OECD, Good Practice Guidance on Internal Controls, Ethics, and Compliance 2 (Feb. 18, 2010), *available at* http://www.oecd.org/investment/anti-bribery/anti-briberyconvention/44884389.pdf ("Effective internal controls, ethics, and

*(footnote continued on next page)*

company-wide enterprise risk management process, which assesses risk in a range of substantive areas, on an annual or biannual basis.  We recommend that Apple repeat its formal antitrust risk assessment on an annual basis at least until the expiration of the Final Judgment, and thereafter no less frequently than every two years.  We note that, in meetings during this reporting period, Apple's Chief Compliance Officer and the ACO, among others, agreed that it might be appropriate to repeat the risk assessment, perhaps annually or every two years.[101]

### C.    Apple's Antitrust Compliance Policies

The Final Judgment requires the Monitor to evaluate whether Apple's antitrust policies are "reasonably designed to detect and prevent violations of the antitrust laws."[102]  In the Second and Third Reports, we assessed three Apple policy documents: the Antitrust and Competition Law Policy (or the "Policy"), the section on Competition and Trade Practices in the companywide Business Conduct Policy, and the Antitrust and Competition Law chapter of the companywide Business Conduct ebook.  In the Third Report, we noted that we had recently become aware of a fourth antitrust-related policy—the Standards Legal Policy—which we had not yet had an opportunity to assess.

### 1.    Antitrust and Competition Law Policy

#### (a)    Recommendations from Prior Reports

In the Second Report, we assessed the version of the Antitrust and Competition Law Policy that Apple disseminated to employees in connection with the June 30, 2014 Rollout.  We had a generally positive assessment of the Policy, which we viewed as the most important of Apple's antitrust policy documents, since it is the primary substantive antitrust guide available to employees.  We recommended, however, that Apple expand the content of the Policy to cover additional substantive issues, including antitrust concerns related to employee hiring agreements and the service of senior executives and Board

---

compliance programmes or measures for preventing and detecting foreign bribery should be developed on the basis of a risk assessment addressing the individual circumstances of a company, in particular the foreign bribery risks facing the company . . . . Such circumstances and risks should be regularly monitored, re-assessed, and adapted as necessary to ensure the continued effectiveness of the company's internal controls, ethics, and compliance programme or measures.").

[101] In its comments on a draft of this report, Apple has stated that it accepts and will implement this recommendation.

[102] Final Judgment § VI.C.

members on other companies' boards.  In addition, we recommended that Apple add to the Policy the contact information for all members of the CLPG and the ACO; that Apple require relevant employees—including, at a minimum, all Section V employees—to certify that they have read, understand, and agree to comply with the Policy; and that the company take additional steps to ensure that the Policy is thoroughly disseminated, understood, and used.

In our Third Report, we said we would continue to monitor Apple's efforts to improve the Policy's dissemination throughout the company.  We also recommended that Apple develop a process for periodically reviewing and updating the Policy to ensure that it adequately addresses relevant antitrust risks as changes occur in the legal and regulatory environment, in the industry, and in Apple's business practices.  Finally, we recommended that Apple revise the Policy to refer to the Standards Legal Policy, which relates to potential antitrust risk involved in standard-setting,[103] as well as to any additional procedures Apple adopted as a result of its antitrust risk assessment.

(b)      Apple's Response to the Recommendations

During the third reporting period, Apple took steps to implement the recommendations from the Second Report.[104]  In particular, Apple expanded the Policy's substantive coverage as we recommended, added the Policy to the "resources section" of its annual Final Judgment certification tool, and represented that the ACO would test employees' awareness of the Policy when she conducted the audits required by Section V.E of the Final Judgment.  Apple also stated that it intended to take various steps to increase employee awareness of the Policy, including by posting it on AppleWeb, an internal website for employees, with a "promo tile," which is an icon to attract employees' attention.

During this reporting period, Apple took worthwhile additional steps to improve the policy's dissemination to employees, consistent with our recommendation in the Second Report.  Apple included the full text of the Policy in the latest version of its online antitrust training course for employees.  Moreover, in June, Ms. Said showed us the new AppleWeb promo tile, which included an image of an Apple device and the text, "Apple's Antitrust Policy—Learn more about how Apple competes fairly," and allowed employees to navigate easily to the Policy.  Ms. Said told us that the promo tile remained available for one or two weeks, which she described as typical for content that has been posted to AppleWeb.

[103] *See supra* note 52.

[104] *See* Third Report 48-50.

Apple also responded to the new recommendations we offered in the Third Report.  Apple revised the Policy to implement our recommendation that it refer to the Standards Legal Policy.  In response to our recommendation that it identify other policies or procedures it might adopt in response to the risk assessment, Apple stated that, because of its privilege concerns, it would "not directly link any additional procedures that it adopts to the antitrust risk assessment."  With respect to our recommendation that Apple adopt a process to periodically update and review the Policy to ensure that it adequately addresses the company's antitrust risks, Apple stated that it will review the Policy annually, as well as when it updates its online training, which now incorporates the full text of the policy.  In the Third Report Implementation Plan, the company added that it would "update the Policy accordingly" "[u]pon change of law or policy" and stated that, absent such changes, the next review would occur in August 2015.[105]

(c)      Further Assessment and Recommendations

Apple has continued to take steps to implement our recommendations related to the Policy.  It has fully implemented our recommendations regarding the substantive content of the Policy, and it has continued to work to improve the Policy's dissemination throughout the company.  We view the company's decision to dedicate space to the Policy on its AppleWeb intranet site, which we are told employees visit frequently, as a positive step that will underscore the importance of the Policy and antitrust compliance.

We commend the company's decision to include the full text of the Policy in its online antitrust training course, which makes it more likely that employees will spend time reviewing the Policy.  We believe, however, that Apple could more effectively incorporate it into the online training.  In particular, the online training course provides little introduction to or context for the Policy.  Aside from a heading at the top of the screen that reads, in relatively small font, "What Is Our Policy?," there is no indication of the origin or purpose of the text displayed during that part of the online course.  Indeed, although we have become much more familiar with the Policy than the average Apple employee, it took us some time when we reviewed the online training to realize that it was the Policy we were reading, rather than generic text about principles of antitrust law.  We therefore recommend that Apple take steps to further highlight and explain the Policy itself in the online training—for example, by introducing it with a separate screen that would explain that employees are about to review the Policy

---

[105] In its comments on a draft of this report, Apple clarified that Ms. Said and Mr. Andeer reviewed the policy in August 2015, and that Ms. Said will next review the Policy before June 2016 when she updates the online training course.

and that would identify other places on Apple's intranet where they can find the Policy if they need to refer to it in the future.[106]

Apple's plan to review the Policy annually, as well as when it updates its online training course, is appropriate.  We have not, however, had an opportunity to monitor how that updating process will work in practice, so we have no insight into the nature of the review—whether it will be perfunctory or serious and substantive.

2.   Business Conduct Policy (Competition and Trade Practices Section)

Apple's Business Conduct Policy is publicly available on Apple's website and includes a section on Competition and Trade Practices.  Apple has explained that this section of the Business Conduct Policy is intended to capture, in relatively concise form, the most important antitrust compliance principles relevant to a companywide audience.  We have concluded that the Competition and Trade Practices Section of the Business Conduct Policy satisfies that purpose, and, as in prior reports, we have no further recommendations for its improvement.

3.   Business Conduct ebook (Antitrust and Competition Law Chapter)

As we have explained in our previous reports, the Business Conduct ebook is an interactive, polished expansion and elaboration of the Business Conduct Policy.  Apple first made the ebook available in fall 2012, and, as part of the June 30, 2014 Rollout, Apple introduced a new chapter that discusses antitrust and competition issues.  We made no recommendations related to the ebook chapter in our Second or Third Reports, so neither of Apple's Implementation Plans addresses it.  Moreover, Apple has not made any changes to the ebook chapter since we last assessed it; Apple has advised us that, unless an intervening change in law or policy warrants updating the chapter, it will be revised on the same schedule as the ebook as a whole.  We continue to view the Antitrust and Competition Law chapter of the ebook as a helpful and user-friendly resource for employees.  During our interviews, we learned that knowledge of the existence of the ebook among Apple personnel is not widespread; we suggest that, as part of its emphasizing compliance messages to

_____

[106] In its response to a draft of this report, Apple has stated that it accepts and will implement this recommendation.

NON-CONFIDENTIAL VERSION

Apple personnel more generally, Apple make additional efforts to publicize the ebook.[107]  Aside from this, we make no further recommendations about it.

4.      Standards Legal Policy

During the third reporting period, after various Apple personnel described the company's participation in standard-setting organizations ("SSOs"), we requested that Apple provide us with its current policies and procedures regarding its standard-setting activities.  On February 27, Apple provided us with a document entitled "Apple's Standards Legal Policy," along with a related procedure.  Because we received the Standards Legal Policy at the very end of the third reporting period, we were not able to assess it in the Third Report.

The Standards Legal Policy, which is less than one page long, instructs employees,[*]



Our understanding from employee interviews is that the Standards Legal Policy has existed for at least a few years and is available on an internal website called "Standards Legal Web."  It is also specifically referred to in Apple's Business Conduct Policy, which states that employees who are considering "engaging in activities related to technical standards," including specified examples, "must receive management and Legal approval."  The Business Conduct Policy further directs employees to the Standards Legal Policy "[f]or additional information."  Based on the recommendation we made in the Third Report, Apple revised the Antitrust and Competition Law Policy to state that employees who "wish to participate in a Standards Setting Organization" should consult the Standards Legal Policy.

---

[107] In its comments on a draft of this report, Apple has stated that it accepts and will implement this recommendation.

[*] The redacted material describes the contents of Apple's Standards Legal Policy.

NON-CONFIDENTIAL VERSION

The Standards Legal Policy satisfies what we understand to be its limited purpose—to direct employees to consult with the Legal Department if they are considering engaging in standards-related activities. Because the legality of standards-related activity depends heavily on individual circumstances, we agree that it is appropriate for Apple to provide employees with a list of the situations in which they must consult with attorneys, rather than attempting to explain in the Standards Legal Policy when such activity is lawful or unlawful.

We recommend, however, that Apple modify the Antitrust and Competition Law Policy to direct employees to consult the Standards Legal Policy not only if they "wish to participate in" an SSO, but also if they are contemplating engaging in other standards-related activities, such as contributing technology to a standard or using a standard in an Apple product. This would better capture the range of standards-related activities that warrant review by the Legal Department and would be more consistent with the text of the Business Conduct Policy.[108]

D.    Apple's Antitrust Compliance Procedures

The Final Judgment requires the Monitor "to assess whether Apple's internal antitrust compliance . . . procedures . . . are reasonably designed to detect and prevent violations of the antitrust laws."[109] As our previous reports have explained, no corporate compliance program is self-executing, and it is therefore critical that a company have in place a set of procedures to implement its compliance policies. When the monitorship began, Apple had few formal antitrust compliance procedures of any kind in place. Over the past two years, Apple has begun to develop a more complete set of compliance program procedures.

1.    Procedures for Reviewing and Updating the Antitrust Compliance Program

(a)    Recommendations from Our Prior Reports

Preliminarily, before we address the procedures that we view as most critical to Apple's Program, we assess Apple's efforts to implement our recommendation in the Third Report that it develop a procedure to guide the periodic review and update of its Antitrust Compliance Program, including its policies, procedures, and training. In the Third Report, we recommended that

---

[108] In its comments on a draft of this report, Apple has stated that it accepts and will implement this recommendation.

[109] Final Judgment § VI.C.

such updating procedures work hand-in-hand with Apple's risk assessment and audit processes.

(b)      Apple's Response to the Recommendation

During the fourth reporting period, Apple provided us with documents it had created in response to this recommendation.  Most importantly, in June 2015, Apple produced a memorandum from the ACO entitled "Antitrust Compliance Program Review Procedure" (the "Review Procedure").[110]  The Review Procedure includes a chart listing the next scheduled review of Apple's various antitrust policy and procedure documents, its online antitrust training, and the antitrust portion of its general Business Conduct training.  In addition, the document explains, "The Antitrust Compliance Officer and Competition Law Team will undertake an annual review of policies, procedures, and training in accordance with the chart listed below.  A number of events may trigger updates, including, but not limited to, changes in the law, policy, or substantive changes in Apple's business, including new product lines and services."  The Review Procedure also notes that "Apple may review policies, procedures, and trainings on a more frequent basis" than the annual schedule it establishes.

During this reporting period, Apple also produced materials specific to the live and online antitrust training it provides to employees (the "Live Training Procedure" and the "Online Training Procedure").[111]  Those materials provide additional detail regarding the company's plans for updating the content of its training materials.  With respect to the live training provided to employees who are subject to the Final Judgment, the Live Training Procedure suggests that Apple intends to rely heavily on the CLPG, whose attorneys generally lead the training sessions, to develop current and relevant training materials.  The document states that, ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████  The Online Training Procedure states simply that ███████████████████████ ████████████████████████████████████████ ██████████████████████

---

[110] A copy of these procedures (updated September 2015) is attached as Exhibit E (redacted from the non-confidential version of the Report).

[111] Copies of these procedures are attached as Exhibit F (Final Judgment Live Training Procedure) (redacted from the non-confidential version of the Report), Exhibit G (Non-Final Judgment Live Training Procedure) (redacted from the non-confidential version of the Report), and Exhibit H (Online Training Procedure) (redacted from the non-confidential version of the Report).

(c)      Further Assessment and Recommendations

Apple has satisfied our recommendation that it develop procedures to guide the periodic review and update of the components of the Antitrust Compliance Program.  The Review Procedure establishes a reasonable timeline for the review and update of each component of the Program; we agree that it is generally appropriate to review and, if needed, update each component once per year.

With respect to the material contained in the Live Training and Online Training Procedures, we believe it is appropriate for the CLPG to have primary responsibility for creating and updating the content of Apple's live antitrust training, both because the CLPG members are Apple's antitrust experts and because they lead the training sessions.  The Online Training Procedure is vague regarding the process for updating the online course; we conclude that it does not add anything of substance to the overall Review Procedure but that the Review Procedure applies to all components of the Program and is sufficient.

2.      Detection, Investigation, and Reporting of Violations

(a)      Recommendations from Our Prior Reports

In the Second Report, we recommended that Apple develop formal procedures to detect, investigate, and report potential and actual antitrust violations.  We view such procedures as being at the core of the Final Judgment's requirement that Apple develop a Program that is "reasonably designed to detect and prevent violations of the antitrust laws;"[112] they will also help the company comply with its obligations to take specific action within only a few days of discovering or receiving credible information concerning an actual or potential violation of the Final Judgment[113] and to provide the Plaintiffs every quarter with non-privileged communications regarding allegations that Apple has not complied with the Final Judgment or the antitrust laws.[114]  More fundamentally, it is widely recognized that an effective compliance program must include procedures to detect, investigate, and address potential violations.[115]

---

[112] Final Judgment § VI.C.

[113] *Id.* § V.G.

[114] *Id.* § V.H.

[115] *See, e.g.,* United States Sentencing Guidelines Manual § 8B2.1(a)(1) (U.S. Sentencing Comm'n 2014) (requiring that organizations "exercise due diligence to prevent and detect

*(footnote continued on next page)*

NON-CONFIDENTIAL VERSION

In January 2015, during the third reporting period, Apple provided us with a document entitled "Apple Investigations Procedure: Antitrust."  The document ████████████████████████████████████████████████████████████████████████████████████████████████████████  We informed Ms. Said shortly thereafter that the document was insufficient and did not satisfy our recommendation, and we provided suggestions for its improvement.

In February 2015, Apple produced a revised and expanded draft of the document ("Investigation Procedure" or "February 2015 Investigation Procedure").  Although the February version was a significant improvement from the initial draft, we continued to find it vague and superficial; the Third Report made a number of recommendations for its improvement.  In particular, we recommended that, with respect to the Investigation Procedure, Apple:

- Modify it to account appropriately for the important role Apple managers play in receiving allegations from employees;

- Add the requirement that managers notify the Business Conduct team after receiving an allegation from an employee so that it can be centrally tracked;

- Ensure that employee reports of allegations made directly to Apple managers follow the same referral process as reports received through the Helpline and Whistleblower Line;

- Address potential conflicts of interest;

---

criminal conduct"); *id.* § 8B2.1(b)(1) (requiring that organizations "establish standards and procedures to prevent and detect criminal conduct"); *id.* § 8B2.1(b)(7) (requiring that organizations "take reasonable steps to respond appropriately to . . . criminal conduct and to prevent further similar criminal conduct"); OECD, Good Practice Guidance on Internal Controls, Ethics, and Compliance 2 (Feb. 18, 2010), *available at* http://www.oecd.org/investment/anti-bribery/anti-briberyconvention/44884389.pdf (noting that an effective compliance program should include "measures designed to prevent and detect" unlawful activity); Brent Snyder, Deputy Assistant Attorney General, Antitrust Division, U.S. Dep't of Justice, Compliance Is a Culture, Not Just a Policy, Remarks as Prepared for the International Chamber of Commerce/United States Council of International Business Joint Antitrust Compliance Workshop (Sept. 9, 2014), *available at* http://www.justice.gov/atr/speech/compliance-culture-not-just-policy ("Effective compliance programs should prevent [a violation] from beginning or, at a minimum, detect it and stop it shortly after it starts.").

- Include specific direction as to when an uninvolved third party must conduct an investigation, as well as specific guidance as to which group within Apple will oversee an investigation on behalf of the company;

- Require at least a preliminary initial investigation of any alleged violation of the Final Judgment to determine whether it is credible;

- Clarify how promptly an investigation must be initiated after evidence of a potential violation is discovered, and how quickly Apple must take action after an allegation is found to be credible;

- Mandate that Apple terminate or modify its conduct within three days of determining that an allegation is credible;

- Provide for at least the possibility of imposing financial penalties for substantiated allegations;

- Strengthen the "reporting" section of the Investigation Procedure to require, at a minimum, that the ACO report confirmed cases of employee misconduct related to the antitrust laws or the Final Judgment to the AFC;

- Require that the final results of an investigation be documented;

- Clarify that Apple will share all credible allegations of antitrust and Final Judgment violations with the ET and relevant business groups; and

- Provide that allegations related to antitrust and the Final Judgment will be logged in a central database.[116]

(b)     Apple's Response to the Recommendations

On July 2, Apple provided us with a third draft of its procedure for investigating potential antitrust violations.  Although the draft was an improvement on its predecessors, it did not fully implement all of our

---

[116] In response to the Third Report's recommendations that Apple log allegations in a central database, require managers to report allegations to the Business Conduct team, and ensure that allegations reported to managers are handled by the same procedure as allegations reported through the Helpline, the company informed us that, for the past several years, all groups that receive and investigate compliance allegations have, in fact, forwarded information regarding their investigations to the Business Conduct group.  According to Apple, every quarter, representatives of all of the groups with investigative responsibilities meet to discuss their ongoing and completed investigations to ensure that they are handled in a consistent manner.

recommendations, and was deficient in other respects as well.  We sent Simpson Thacher extensive written feedback, and, on August 7, Apple produced a fourth draft.  Although the fourth draft came much closer to satisfying our recommendations, we sent Apple a few additional comments on August 27, and Apple produced a fifth draft on September 4 ("Updated Investigation Procedure").[117]



The Updated Investigation Procedure begins with an overview stating that

The body of the Updated Investigation Procedure includes three sections—[*]

---

[117] The Updated Investigation Procedure is attached as Exhibit I (redacted from the non-confidential version of the Report).

[*] The redacted materials describe in substantial detail the contents of the Update Investigation Procedures.

[118] We understand that the primary purpose of these meetings is to satisfy the Final Judgment's requirement that the ACO obtain annual certifications that members of Apple's Executive Team, among others, are "not aware of any violation of [the] Final Judgment or the antitrust laws or has reported any potential violation to the Antitrust Compliance Officer."  Final Judgment § V.D.

NON-CONFIDENTIAL VERSION



---

[119] Again, we understand these efforts to be directed primarily at satisfying Section V.D of the Final Judgment.

[120] *See, e.g.*, Third Report 53.

NON-CONFIDENTIAL VERSION



NON-CONFIDENTIAL VERSION



(c)      Further Assessment and Recommendations

After a great deal of time and many rounds of feedback and drafts, we conclude that Apple has now satisfied our recommendations regarding its procedures for detecting, reporting, and investigating potential violations of the antitrust laws and the Final Judgment.

There is, however, a critical qualification to that assessment: we have no insight into how effective the Updated Investigation Procedure will be in practice. The Procedure is newly drafted, and Apple has not provided us with information about how it has been applied, if it has been applied at all. Nonetheless, we believe that, at least on its face, the Updated Investigation

Procedure is "reasonably designed to detect and prevent violations of the antitrust laws,"[121] and we therefore make no further recommendations for its improvement.

> 3.    Development of Procedures for Particularly Risky Business Activities

> (a)    Recommendations from Our Prior Reports

In the Second Report, we recommended that Apple adopt procedures to detect and prevent potential violations arising in business areas that its antitrust risk assessment identified as posing a moderate or high level of antitrust risk.  As explained in the Third Report, we envisioned, for example, that Apple might create specific guidelines for employees participating in trade association meetings, meetings with competitors, or engaging in other activities that could create antitrust risk.

> (b)    Apple's Response to the Recommendations

As explained in the Third Report, Apple has claimed in generic terms that it has generated new procedures as a result of the risk assessment—for example, the Risk Assessment Memo that Apple produced to us during the third reporting period stated that the company had created ██████████████████████ ████████████████████████████████████████████████████—but Apple has provided us with only one document that might potentially fit this description, a document that sets out the company's practices for participating in SSOs.[122]  We have discussed and clarified this recommendation with Apple and its lawyers multiple times, and we have been informed that the company does not have specific plans to develop the types of procedures we had recommended.

---

[121] Final Judgment § VI.C.

[122] *See* Third Report 58-59.  During this reporting period, an Apple attorney who works on standard-setting issues told us during an interview that he had been asked to create the document based on the process his team generally follows when it receives requests related to standards.  He said he was not aware that the document had been distributed to anyone other than the Monitor.  If that understanding is correct, it is not the type of guideline we envisioned when we made this recommendation—we had in mind something that could be distributed to employees before they participated in potentially risky activities—although it may nonetheless be helpful for Apple to have formalized and memorialized the process its lawyers follow in evaluating issues related to standards.

(c)     Further Assessment and Recommendations

In the Third Report, we concluded that Apple had not adequately implemented this recommendation.  Apple took no further action to implement it during the fourth reporting period, so that conclusion remains unchanged.

4.     Incentives and Disciplinary Procedures

(a)     Recommendations from Our Prior Reports

In the First Report, we recommended that Apple adopt and disseminate throughout the company information about appropriate incentives and disciplinary measures to encourage employees to abide by the antitrust laws and Apple's antitrust compliance policies.[123]

When we issued our Second Report, we had obtained some initial information about Apple's ongoing efforts to encourage employees to abide by the law and company policies.  Apple had generally represented that it considered compliance and ethics in annual employee performance reviews and promotion decisions and, more specifically, recognized the importance of work performed by Business Conduct staff in its compensation and promotion decisions.  In the Second Report, we recommended that Apple take further steps to use incentives and disincentives to encourage awareness of, and compliance with, the Antitrust Compliance Program and to communicate expectations that company personnel will comply with the law and with company policies.  We also recommended that Apple further disseminate information within the company about those incentives and disincentives.

During the third reporting period, we requested more specific information on these points, including policies, procedures, and standards used to determine employee discipline for substantiated ethics and compliance violations, as well as blank versions of its personnel evaluation forms.  As explained in Section VII.B.3(a), *supra*, Apple objected that these requests were inappropriate because they related to Apple's overall compliance program, rather than to antitrust compliance specifically.  In the Third Report, we made no further recommendations but observed that Apple's refusal to provide the information we had requested precluded us from assessing the company's efforts to satisfy the recommendations we had made in our prior reports.

---

[123] *See* United States Sentencing Commission Guidelines Manual § 8B2.1(b)(6) (U.S. Sentencing Comm'n 2014) (requiring "appropriate incentives to perform in accordance with the compliance and ethics program" and "appropriate disciplinary measures for engaging in criminal conduct and for failing to take reasonable steps to prevent or detect criminal conduct").

NON-CONFIDENTIAL VERSION

    (b)    Apple's Response to the Recommendations

    Apple's Second Report Implementation Plan stated that the company intended to implement our incentive-related recommendations by ensuring that "additional language regarding ethical behavior is highlighted in the company's Annual Review materials," which are the materials that managers use in completing employee performance evaluations. Apple objected to our requests for the actual materials used in personnel evaluations but suggested that we interview its Chief Compliance Officer, Tom Moyer, to obtain relevant information.

    We interviewed Mr. Moyer regarding these and other issues during the fourth reporting period. Mr. Moyer explained that, based on our recommendations, his team was working to add compliance-related guidance to the company's online personnel evaluation tool. In particular, Mr. Moyer said, if*



    Mr. Moyer also noted that, even before we made our recommendation, Apple provided more general guidance to managers in its performance evaluation system, instructing them to consider factors such as honesty and integrity, in addition to the three categories on which employee performance is formally graded. He further offered his view that, because of Apple's ethical culture, an employee who acted unethically would be unlikely to receive a positive performance evaluation, even if the personnel evaluation materials provided no specific guidance on that subject.

    (c)    Further Assessment and Recommendations

    Apple has partially satisfied our recommendation that it make additional efforts to communicate compliance-related incentives to employees. The new language that Mr. Moyer's team is adding to the performance evaluation tool is a

---

* The redacted material describes Apple's online personnel evaluation tool.

124

start, but it does not have the prominence that its importance demands, nor does it explicitly refer to compliance.  Ethics and compliance are closely related but they are distinct.  Apple can and should do more to emphasize to employees the importance of ethical and compliant behavior, and the direct effects that compliance or noncompliance can have on their success at the company.  For example, Apple could add content to its training materials that would remind employees of the consequences of compliance and noncompliance, perhaps with concrete examples or narratives based on the company's experience.[125]  Apple should also consider adding ethics and compliance to the formal factors on which employees are evaluated, rather than simply mentioning ethical issues in the background guidance that is provided to managers.  Although Apple has taken some positive steps toward implementing our recommendation, we cannot conclude that Apple has fully satisfied it.[126]

5.      Formal Feedback Procedures

(a)      Recommendations from Our Prior Reports

In our First Report, we recommended that Apple implement procedures to obtain systematic feedback from employees regarding the Antitrust Compliance Program, including but not limited to the Helpline and training sessions.  Apple responded to our recommendation by distributing surveys to employees who had attended the September and December 2013 antitrust training sessions.  We concluded that the survey was a positive step but that Apple should do more to gather employee feedback to assess the Program.

As a result, in the Second Report, we recommended that Apple implement a procedure to collect feedback immediately after every live and online training session; we further recommended that the company retain that feedback in such a way that it could easily be accessed and used to update and improve training sessions.  We also recommended in the Second Report that Apple identify other components of the Antitrust Compliance Program that employee feedback could enhance.

---

[125] In its comments on a draft of this report, Apple has stated that it accepts and will implement this recommendation.

[126] In its comments on a draft of this report, Apple has stated that it accepts and will implement this recommendation as follows: it will add language to its performance evaluation tool that specifically refers to compliance and will further add language regarding the need for ethical behavior and compliance to its HR websites that address performance reviews.  Apple has represented that ethics and compliance will be included in one of the other categories used to assess performance rather than as a standalone criterion.

NON-CONFIDENTIAL VERSION

The Third Report noted that Apple had made significant progress in its efforts to implement these recommendations, including by interviewing a small group of employees regarding their participation in live training sessions, distributing a survey to all live trainees, and developing a survey regarding its online antitrust training.  We recommended, however, that Apple further enhance its efforts by expanding the number of interviews it conducted, asking interviewees more probing questions, and incorporating procedures that would ensure feedback was collected from employees as soon as possible after they received antitrust training.  We also recommended that Apple develop specific steps for incorporating employee feedback into the Program.

(b)      Apple's Response to the Recommendations

On July 2, Apple produced a short written document outlining the various mechanisms for obtaining feedback from employees regarding the antitrust compliance training they have received.  On September 4, Apple produced a new version that had been revised in response to our comments ("Feedback Procedure").[127]  The Feedback Procedure explains, in some detail, the process for sending online surveys to employees after they complete live and online training.  It notes that the ACO and the CLPG seek additional feedback through █████████ ███████████████████████ asking participants after each training session whether they would like to share any immediate feedback.  Finally, the Feedback Procedure explains that █████████████████████████████████████████████ █████████████████████████████████████████████ █████████████████████████ Attached to the Feedback Procedure are the survey questions that are distributed to employees regarding live and online training.

During this reporting period, Apple's ACO informed us that all employees now receive surveys within a week after they participate in live or online training.  As for the feedback the ACO collects in connection with the Final Judgment's requirement that she audit the Program, Apple agreed to increase the number of employees it interviewed to obtain feedback from five to ten, noting that the Final Judgment requires Ms. Said's audit to cover only the approximately fifty employees who are included in Section V.A.[128]

---

[127] A copy of these procedures is attached as Exhibit J (redacted from the non-confidential version of the Report).

[128] See Final Judgment § V.A ("each member of Apple's Board of Directors, . . . its Chief Executive Officer, . . . each of its Senior Vice-Presidents, and . . . each of Apple's employees engaged, in whole or in part, in activities relating to Apple's iBookstore").

NON-CONFIDENTIAL VERSION

(c)      Further Assessment and Recommendations

We conclude that Apple has satisfied our recommendation that it develop a procedure to obtain feedback from employees promptly after they receive antitrust training.  The Feedback Procedure sets out an adequate method of collecting feedback, particularly when paired with Apple's representation that all employees who receive antitrust training are now, in fact, asked for feedback within a week.

Apple has also adequately implemented our recommendation that it identify other parts of the Program that could benefit from employee feedback. The questions that employees are asked in connection with the live training survey extend beyond the quality of the training itself, to



Finally, the Feedback Procedure and the Review Procedure[129] together adequately implement our recommendation from the Third Report that Apple's "plan for collecting employee feedback . . . include specific steps for incorporating employee feedback into the Antitrust Compliance Program."  The Feedback Procedure itself is relatively vague regarding the process by which Apple will adjust its Antitrust Compliance Program in response to employee feedback—it states only that the ACO may use the feedback she collects in accordance with the Procedure

The Review Procedure, however, provides additional detail about when each component of the Program will be reviewed and, if necessary, updated, and about the specific role employee feedback will play with respect to some components.  We conclude that the Feedback Procedure and the Review Procedure, in concert, adequately address this recommendation.

---

[129] *See supra* Section VIII.D.1.

NON-CONFIDENTIAL VERSION

6.      Identification of Critical Employees

(a)      Recommendations from Our Prior Reports

In our prior reports, we have assessed Apple's procedures for identifying employees who are subject to certain Final Judgment requirements ("Section V Personnel") and tracking the satisfaction of those requirements.[130]  When we issued the First Report, we had very little information about this subject, because Apple had not given us complete employee lists or organization charts for relevant business units, had not explained its process for identifying Section V Personnel, and had not validated the accuracy of its process for tracking completion of Final Judgment requirements.  We noted that, during the first reporting period, Apple's process for identifying employees "engaged, in whole or in part, in activities relating to Apple's iBook store" and "appropriate employees in Apple iTunes and App Store businesses" was unclear.  We also identified discrepancies in Apple's process for identifying Section V Personnel.

In the Second Report, we concluded that Apple's process for identifying Section V Personnel remained unclear, and we stated that we needed more information, including detail regarding the responsibilities of particular employees.  We also recommended that Apple develop a procedure for identifying other critical employees who might not be Section V Personnel but whose activities might nonetheless create antitrust risk.  We recommended that Apple use its antitrust risk assessment to identify critical employees and that it take steps to ensure that the Antitrust Compliance Program mitigated risks associated with those employees.

During the third reporting period, Apple provided us with a memorandum outlining Ms. Said's procedures for identifying newly hired employees who were within the scope of Section V.  In the Third Report, we explained that the memorandum significantly increased the transparency of Apple's process for identifying newly hired Section V Personnel but that we still had questions; for example, we noted, Apple's process for identifying existing employees who become subject to Section V due to a change in responsibilities

---

[130] Three important provisions of the Final Judgment apply to Section V Personnel.  First, Section V.A requires that Apple's Board of Directors, its Chief Executive Officer, each of its Senior Vice-Presidents, and each of its employees who, in whole or in part, engage in activities "relating to Apple's iBook store" receive a copy of the Final Judgment.  Section V.B requires that any officer, director, or other employee who succeeds to any V.A Employee position also receive a copy of the Final Judgment.  Section V.C of the Final Judgment requires specific training for all V.A and V.B Employees, as well as for "appropriate employees in Apple iTunes and App Store businesses."

remained unclear.  In addition, because Apple had not provided any information regarding its identification of other critical employees outside the Section V category, we concluded that Apple had not satisfied that recommendation.

(b)  Apple's Response to the Recommendations

During this reporting period, Apple provided us with an updated memorandum outlining the ACO's procedures for designating new and existing employees as Section V Personnel ("Section V Memo").  The Section V Memo explains that, each quarter, a project manager who reports to the ACO filters a



The Section V Memo also identifies ████████████████████ [131]  It explains that

The Section V Memo also describes the process for identifying employees who are subject to Section V.C, which extends to "appropriate employees in Apple iTunes and App Store Businesses."  The Memo explains that

Apple also added a new section to the Section V Memo to address our observation in the Third Report that there remained insufficient clarity in the process for identifying existing employees who transitioned into Section V roles.  That new section outlines, at some length, several methods that the ACO and her

---

\* The redacted material summarizes details of the Section V. Memo.

[131] Section V.A applies to "each of Apple's employees engaged, in whole or in part, in activities relating to" the iBooks Store.

**NON-CONFIDENTIAL VERSION**

project manager will use to identify existing employees who become subject to Section V due to role changes within the company.  First, ████████████████████████████████████████

████████ In addition, the Procedure states that ████████

████████████████████████████████████████████████

At the end of the reporting period, Apple provided us with its current list of Section V Personnel, which includes each employee's name, direct and ET managers, and department name, as well as a short explanation of why he or she has been identified as a Section V employee ████████████████

████████████████████████████████████████████████

Apple also took steps during this reporting period to implement our recommendation that it identify employees outside Section V whose activities might create antitrust risk.  First, the Online Training Procedure provides some information about Apple's process for determining which non–Section V employees engage in activities that justify their receiving online antitrust training.  That Procedure describes the ████████████████████████

████████████████████████████████████████ The Procedure states that ████

████████████████████████████████████████

████████ The Procedure further notes that ████

████████████████████████████████████████

With respect to live training, Apple produced a new procedure near the end of the reporting period that governs the provision of live training to employees outside Section V.  The procedure does not provide a great deal of detail, stating only that ████████████████████████████████████

(c)      Further Assessment and Recommendations

We conclude that Apple has satisfied our recommendations from prior reports regarding its identification of critical employees, and we make no further recommendations.  Although Apple's procedure for identifying non–Section V employees who should receive live training remains somewhat vague, we are

satisfied that it, combined with the more specific requirements of the Online Training Procedure, is sufficient to achieve its purposes.

### 7.   Review of Publisher Agreements

We determined during the second reporting period that Apple had adopted an appropriate procedure for reviewing revisions to publisher agreements.  As was the case when we issued our Third Report, we understand that the process for reviewing such revisions has not changed since the Second Report.  Accordingly, we have no reason at this time to further address Apple's procedures for reviewing revisions to publisher agreements.  Based on the representations made by Ms. Said, the publisher agreements are being reviewed appropriately.

### 8.   Audits

#### (a)   Recommendations from Our Prior Reports

Section V.E of the Final Judgment requires the Antitrust Compliance Officer, in consultation with the Monitor, to conduct an annual antitrust compliance audit covering each person identified in Sections V.A and V.B of the Final Judgment and to maintain all records pertaining to such an audit.  We refer to this audit as the "Section V.E Audit."

During the second reporting period, Ms. Said proposed a plan for conducting the Section V.E Audit, which included the review of various documents to ensure that Apple was in compliance with Section V of the Final Judgment.  In the Second Report, we made specific recommendations to augment Ms. Said's proposal for the Section V.E Audit,[132] including that she interview a representative sample of Section V.A and V.B employees regarding particular components of the Antitrust Compliance Program, that she distribute a survey to a broader group of Section V.A and V.B employees, and that she speak with a sample of personnel who had consulted with members of the CLPG to assess whether the CLPG had been helpful and responsive in addressing antitrust issues.

We also recommended in the Second Report that Ms. Said conduct regular Antitrust Compliance Program audits, in addition to the narrower Section V.E Audit, since regular auditing is one of the central principles of an effective

---

[132] *See* Second Report 104-05.

NON-CONFIDENTIAL VERSION

compliance program as defined by the United States Sentencing Guidelines.[133] We recommended that Ms. Said develop auditing procedures under which she would review various components of the Program on an annual basis.  We recommended that she consider conducting the audits in conjunction with Apple's Internal Audit Group and share the results of the audits with Apple's Audit and Finance Committee.

During the third reporting period, we obtained some information regarding Ms. Said's efforts to implement our recommendations from the Second Report.  In particular, she provided us with a memo summarizing her "Audit Observations," which described the steps she had taken to complete her Section V.E Audit, including her review of documents, her submission of a fictitious allegation to the Helpline to test the response of personnel receiving the allegation, her interviews of five employees who had received live antitrust training, and a survey she distributed to all employees who had received live antitrust training; it also provided a very brief overview of the results of the audit.  In addition, Ms. Said provided a revised version of the Audit Proposal she had initially submitted during the second reporting period.  We provided Ms. Said with preliminary feedback on these materials, explaining that they fell short of our recommendations and that Ms. Said's audits would need to replace in some measure our external monitoring when the monitorship ends.  We reserved further judgment pending Ms. Said's revision of the audit materials.

We noted in the Third Report that Apple had not provided any information in response to our recommendation that Ms. Said conduct broader program audits of the Antitrust Compliance Program, in addition to the Section V.E Audit, and we therefore concluded that Apple had not satisfied that recommendation.

(b)     Apple's Response to the Recommendations

On July 29, after lengthy delays,[134] Apple produced an updated and substantially expanded draft audit procedure.  Unlike the previous documents

---

[133] Section 8B2.1(B)(5) provides that a company should "ensure that the organization's compliance and ethics program is followed, including monitoring and auditing to detect criminal conduct; [and] evaluate periodically the effectiveness of the organization's compliance and ethics program."

[134] The cause of the delays is not entirely clear, but Ms. Said told us at multiple points that she had finished drafting various procedures and was waiting for unidentified colleagues at Apple to review her drafts.  On the other hand, in our final meeting with her, she said the delays were solely attributable to her own desire to perfect the procedures.  She and other Apple personnel have consistently denied that the delays resulted from a lack of resources, and the

*(footnote continued on next page)*

NON-CONFIDENTIAL VERSION

Ms. Said had provided to us, this version addressed three separate audits—a "General Antitrust Compliance Program Assessment"; a "Final Judgment Audit," which is the audit required by Section V.E; and a "Business Conduct Helpline Audit in Relation to Antitrust."  Although we viewed this document as an improvement on those we had discussed in our previous Reports, we still saw significant room for improvement, and we sent Apple several pages of suggestions on August 11.

On August 27, Apple provided us with a revised version of the Final Judgment Audit section of the procedure.  The revised section is a substantial improvement over the ACO's initial proposal.  The comments we provided to the ACO focused heavily on the interview component of the audit; in response to her initial proposal, we recommended that the ACO conduct interviews and distribute surveys, rather than simply reviewing documents, and we then made a number of specific recommendations to make her interview and survey questions more probative and useful.  The questions that are included in the August 27 version of the Final Judgment Audit procedure are appropriate—they broadly cover the various components of Apple's Antitrust Compliance Program, and, unlike some of the questions the ACO asked in the 2014 audit, they are generally phrased in an open-ended way that does not suggest the desired response.  Ms. Said told us she intended to begin conducting the audit in September, so we have not have an opportunity to monitor her 2015 Final Judgment audit.

With respect to the broader, programmatic audit, we were surprised to learn on August 31, in the last week of the reporting period, that Ms. Said had decided to retain an outside firm, PricewaterhouseCoopers ("PwC") to conduct that review, supplanting the General Antitrust Compliance Program Assessment she had previously proposed.  According to Ms. Said, she had made that decision sometime after she provided us with the draft procedures on July 29.[135]  She advised us that, as of our August 31 meeting, PwC had already begun its work.  On September 4, Apple produced a revised version of the document it had previously produced regarding the general programmatic audit; Ms. Said told us that the document, which largely sets out questions one might want an audit to answer regarding the sufficiency of the components of the Program, is now essentially a memorialization of what she believes a third party should address in its audit; we are not aware if she has provided the document to PwC.  The document also specifies that a third party will conduct the audit (the previous

members of the AFC advised us that, if Ms. Said lacked adequate resources, they were unaware of it.

[135]  We provided extensive comments on the procedure on August 11.

version had not made clear who the auditor would be), and it vaguely states that the audit will be conducted "on a regular basis."[136]

On the last day of the reporting period, Apple also provided us with what appears to be an excerpt from the statement of work for the PwC audit. That excerpt states,



We think it is appropriate and perhaps preferable for an outside firm, rather than Ms. Said, to conduct the program audit—both because, if properly conducted, the audit will require very substantial resources and because it might be difficult for Ms. Said to objectively review policies, procedures, and trainings in whose creation she has played a critical role. We do not, however, fully understand why Apple decided to retain an outside firm so late in the process, after Ms. Said had already drafted her own procedure for the audit, or why Apple did not notify us of that decision until a few days before the reporting period ended (and after we had devoted substantial time and effort to providing feedback on Ms. Said's draft procedure for conducting the programmatic audit herself). We also have little information regarding the PwC audit—for example, how it will be conducted, when it will be completed, or what Apple will do with its results.[137]

---

[136] The final version of Apple's audit procedures is attached as Exhibit K (redacted from the non-confidential version of the Report).

[137] In its comments on a draft of this report, Apple has represented that it will provide us with further information relating to PwC's work.

NON-CONFIDENTIAL VERSION

(c)     Further Assessment and Recommendations

We conclude that Apple's Section V.E Audit procedure is sufficient, and we make no further recommendations for its improvement.  The important caveat is that, because the 2015 audit did not begin until September, we have not had an opportunity to monitor its implementation.  Our conclusion is based solely on the written procedure that Ms. Said developed and revised in response to our comments.

Because of Apple's very recently disclosed decision to retain an outside firm to conduct its broader audit of the Antitrust Compliance Program, and because Apple has provided us with very little information regarding that audit, we cannot conclude that Apple has satisfied our recommendation that it conduct a programmatic audit, in addition to the audit required by the Final Judgment, although we support, as a general matter, the decision to retain an outside firm to conduct the review.  We recommend that Apple repeat the audit on a periodic basis to ensure that the Program remains consistent, over time, with industry practices and the Sentencing Guidelines.[138]

9.     Communications Regarding the Antitrust Compliance Program

(a)     Recommendations from Our Prior Reports

In the Second Report, we recommended that Apple implement procedures to guarantee that employees receive frequent, routine, and up-to-date communications regarding the Antitrust Compliance Program.  Specifically, we recommended that the managers of the Program undertake efforts to keep employees updated regarding modifications to the Program and other important items, including updates on relevant antitrust regulatory developments and important case studies.  We explained that this type of update would help employees understand the lines between lawful and unlawful behavior and the continuing relevance of antitrust issues; we also noted that this attention would help signal that Apple's leaders were committed to antitrust compliance.

During the third reporting period, Apple provided us with a communications plan for the Antitrust Compliance Program for 2015, which

[*] ██████████████████████████████████████████████████████████

---

[138] In its comments on a draft of this report, Apple has stated that it accepts and will implement this recommendation.

[*] The redacted material describes Apple's communication plan.

NON-CONFIDENTIAL VERSION



In the Third Report, we concluded that the information Apple had recently provided to us made significant progress toward implementing our recommendations from the Second Report. We noted, however, that Apple had not taken steps to implement our recommendation from the Second Report that it provide employees with substantive antitrust-related updates that are not specifically tethered to the policies, procedures, and training associated with the Program. We reiterated that recommendation in the Third Report and suggested that Ms. Said and other Program managers work with the CLPG to incorporate substantive antitrust updates into the communications plan.

(b)      Apple's Response to the Recommendations

Apple made no changes during this reporting period to the communications plan that it provided to us early in the year. As stated above, we concluded in the Third Report that that plan made significant progress toward successfully implementing the recommendations we had made, and we continue to hold that view.

In addition, during this reporting period, Ms. Said demonstrated for us the new promotional icon that was placed on AppleWeb, a heavily visited internal website for Apple employees, for one or two weeks to promote the Antitrust and Competition Law Policy. Apple's decision to highlight a component of the Antitrust Compliance Program in this way is a positive step that likely increased employees' awareness of the Program.

Late in the reporting period, Apple notified us that the Business Conduct group had hired a full-time communications and marketing manager who, among other things, will assist the ACO with antitrust-related communications and updates. When we had our final meeting with Ms. Said on August 31, the employee had just begun work at Apple and Ms. Said had not yet had a chance to meet with her, but Ms. Said stated she was optimistic that the new manager would provide significant assistance in enhancing the company's antitrust-related communications.

Apple objected to our additional recommendation that Ms. Said work with the CLPG to incorporate substantive antitrust updates into Apple's antitrust communications plan and target the updates to relevant audiences within Apple. Apple took the position that its communications plan was "designed to provide information to employees regarding its antitrust compliance trainings, policies, procedures, and other resources" and that "it would be impracticable to include substantive antitrust updates in these communications as well."[139]  Apple further asserted that it was "already complying with this recommendation in substance" by providing substantive antitrust updates through formal training sessions, informal "brown bag" sessions regarding antitrust law, and *ad hoc* discussions" between members of the Apple legal team and employees.  We agreed to hold that recommendation in abeyance.

(c)      Further Assessment and Recommendations

We conclude that the communications Apple provides to its employees regarding the Antitrust Compliance Program are sufficient, although we suggest that Apple consider further our prior recommendation that include occasional substantive updates in its communications plan.  We have no further recommendations at this time.[140]

10.      Business Conduct Helpline

(a)      Recommendations from Our Prior Reports

The Second Report recommended that Apple take steps to increase the effectiveness of its Helpline, which is a telephone service and web portal through which Apple employees can report compliance-related questions and concerns. As we have explained in prior reports, a helpline is critical to an effective compliance program, and we believe it is therefore important that Apple have one that is well-known to Apple personnel and appropriately advertised; this is so even though we have come to understand that most Apple employees would

---

[139] In fact, the discussion of the recent American Express antitrust case was included in the ET and Board training we monitored and was of great interest to both groups.  *See United States* v. *Am. Express Co.*, ___ F. Supp. 3d ___, No. 10-cv-4496, 2015 WL 728563 (E.D.N.Y. Feb. 19, 2015).  A brief, non-technical discussion of the case would seem to be an appropriate subject for a substantive update to Apple personnel who have undergone the antitrust training.

[140] In its comment on a draft of this report, Apple has stated that it accepts and will implement this recommendation, explaining that it "agree[s] to update its communication plan to include the dissemination to employees of substantive antitrust updates such as changes in the law, prominent recent cases, and the like on AppleWeb, as well as efforts to publicize the availability of those resources to Apple's employees."

be unlikely to use the Helpline as their first means of seeking antitrust-related assistance or reporting a potential antitrust violation. We recommended in the Second Report that Apple take steps to audit the effectiveness of the Helpline through candid conversations with employees.

During the third reporting period, in connection with our recommendation that she take steps to solicit feedback regarding the Antitrust Compliance Program, Ms. Said interviewed five employees about the Helpline and other subjects. In addition, the survey she distributed to employees who had received live training also included questions about the Helpline. All employees who were interviewed and who responded to the survey provided favorable responses regarding the Helpline. Ms. Said also submitted a fictitious antitrust-related report through the web-based Helpline reporting tool to test whether personnel responsible for the Helpline would respond appropriately. Members of the Business Conduct team properly routed the report to the appropriate personnel.

In the Third Report, we recommended that Ms. Said continue to conduct regular tests of the Helpline and that she incorporate those audits into her audit plan.

(b)     Apple's Response to the Recommendations

In July, Ms. Said made a second fictitious report to the Helpline. When we met with her on August 31, Ms. Said explained that she had written a script for a call that another employee made to the Helpline telephone service; Ms. Said directed that employee to request guidance about whether he could restrict the price at which a third-party retailer would sell Apple earbuds to consumers. She said that, within two hours, Helpline personnel notified her that they had received the call, which they had identified as raising a potential antitrust issue. During this reporting period, Ms. Said also developed a document that outlines her procedure for conducting further such tests of the Helpline's efficacy.

In addition to her steps to test the Helpline, Ms. Said will again interview a sample of Section V employees regarding the Helpline and other topics during her Section V.E Audit. Ms. Said told us she planned to begin conducting that audit in September. She provided us with a list of the questions she intended to ask interviewees, and we believe they are appropriate.

(c)     Further Assessment and Recommendations

Apple has satisfied our recommendations regarding the Helpline. We further recommend that the company continue to monitor the effectiveness of the

NON-CONFIDENTIAL VERSION

Helpline, including through tests like those the ACO has previously conducted
and through employee interviews and surveys.

11.   Record-Keeping

(a)   Recommendations from Our Prior Reports

Our First and Second Reports emphasized that Apple needed to keep
accurate records regarding its antitrust compliance efforts.  After we noted some
discrepancies in Apple's training records, we specifically recommended in the
Second Report that Apple take steps to improve the accuracy of its training
records, including by considering investing in technology to electronically track
training attendance.  We also recommended that Apple track employee feedback
in a way that it that would make it easily accessible, so that it could be used to
update and improve the Antitrust Compliance Program.  In the Third Report, we
explained that we had received insufficient information to assess Apple's
implementation of those recommendations.

(b)   Apple's Response to the Recommendations

As we recommended, Apple has implemented an electronic tracking
system to record training attendance.  Ms. Said demonstrated the electronic
system to the Monitor during this reporting period, and Apple provided us with
training records derived from it.  In case the electronic system malfunctions,
Apple also continues to use manual sign-in sheets at training sessions.

Apple's Second Report Implementation Plan further points out that,
during this reporting period, Apple developed a written procedure regarding the
collection of employee feedback ("Feedback Procedure").  Although the
Feedback Procedure responds to some of our other recommendations, *see, e.g.*,
Section VIII.D.5, *supra*, it does not address the narrower point of this
recommendation, which is the storage and maintenance of feedback in an
organized and durable manner.  The ACO explained to us during this reporting
period, however, that her project manager is responsible for storing feedback in
electronic format; she noted that she would like to have a more automated
process for retaining feedback because the current process apparently requires
some manual effort by the project manager.

(c)   Further Assessment and Recommendations

Apple's new methods of tracking training attendance satisfy our
recommendation regarding that issue.  The current process for retaining
employee feedback, although perhaps not optimal, satisfies our limited
recommendation that Apple take steps to ensure that the feedback it has received

remains "documented and accessible."  We make no further recommendations on this subject.[141]

E.       Apple's Revised Antitrust Compliance Training Program

1.       Overview

The Final Judgment requires Apple to provide antitrust compliance training to each member of its Board of Directors, its Chief Executive Officer, and its Senior Vice-Presidents; each of its employees engaged, in whole or in part, in activities relating to the iBooks Store; and the successors of all of the individuals in those categories.[142]  In addition, Apple must extend its training program to "appropriate employees in [the] Apple iTunes and App Store businesses."[143]  However, as Apple has recognized, employees outside the categories listed above may also expose the company to antitrust risk and should therefore also receive antitrust training.  Section VIII.D.6 of this Report discusses the company's identification of employees to receive antitrust training.  This section of the Report considers the substantive aspects of the training.

As we have emphasized throughout the monitorship, training is a fundamental component of any antitrust compliance program.  Moreover, the Court has emphasized its importance in these proceedings.  The Final Judgment includes numerous specific references to training, and the Court noted during the August 27 Hearing that training sessions should be "tailored to each employee's position and the situations that employee is likely to encounter."[144]  By implementing a strong antitrust compliance training program, Apple can increase employees' ability to comply with the antitrust laws, as well as their willingness to do so.  Antitrust training should be appropriate for the particular employees who receive it, given their roles and responsibilities, and it should provide employees with sufficient information to know when they should report questionable conduct and when they need to seek guidance from a lawyer or a manager.

---

[141] But, as discussed below, we recommend that, for the duration of the Final Judgment, Apple do a better job of documenting and tracking when senior leaders address antitrust compliance issues with their teams and staff.  *See* Section VIII.F.3.

[142] *See* Final Judgment §§ V.A-V.C.

[143] *Id.* § VFC.

[144] 8/27/13 Tr. 18-19.

NON-CONFIDENTIAL VERSION

2.      Recommendations from Our Prior Reports

(a)      Live Training

Throughout the monitorship, we have been favorably impressed with certain aspects of the antitrust compliance training we have monitored. The content has generally been good, although not—especially in early training sessions—as tailored as we expected to the responsibilities and activities of particular audiences.  The presentations given by members of the CLPG and, in the case of the training provided in 2014 to the Board and ET, by David Boies, have generally been effective.

Nonetheless, we made several recommendations in the Second and Third Reports designed to improve Apple's antitrust compliance training.  In the Second Report, based on our monitoring of various live training sessions Apple provided to employees in the Internet Software and Services business unit, we recommended that Apple incorporate into the sessions more "real-life," Apple-specific examples and discussion, including examples based on the company's past encounters with antitrust allegations and investigations.  We also recommended that Apple hold future training sessions in a more informal setting that would encourage increased interaction between the trainer and trainees: the sessions we monitored during the second reporting period were held in large, auditorium-style rooms that we believed were not particularly conducive to interaction between the trainer and the participants, which was reflected in the generally low levels of active participation we observed.  We also recommended that Apple make arrangements for employees whose activities created a moderate to high level of antitrust risk to be trained in person, rather than remotely, and that Apple provide a specialized antitrust training session for its in-house lawyers.

We monitored little live training during the third reporting period because Apple did not schedule many training sessions, so the Third Report made few additional recommendations on the subject.  That Report did, however, include our assessment of the Board and ET training sessions that David Boies led in 2014.  Those sessions were generally effective, but we recommended that Apple expand their content to include a more comprehensive discussion of Board and executive oversight responsibilities with respect to antitrust compliance, rather than focusing narrowly on principles of antitrust law.  We also recommended that Apple provide specialized training to managers regarding the necessity and appropriate means of escalating antitrust-related allegations and concerns they might receive from their reports.  Finally, we recommended, based on feedback Ms. Said received in an audit she conducted, that Apple provide additional live

antitrust training to the personnel responsible for managing the company's Business Conduct Helpline.

(b)      Online Training

Our assessment of Apple's online antitrust training, which was first introduced as part of the June 30 Rollout, has generally been positive.  We concluded in the Second Report that the online course met the need for broad-based antitrust training that can be offered to large numbers of Apple employees—both to provide additional education to employees who participate in live training and to provide a general introduction to antitrust compliance for employees whose activities create less exposure to antitrust risk.  We further observed that employees we had interviewed expressed positive reactions to the course.

When we issued the Third Report, Apple was in the process of revising the online course for 2015, so we deferred our assessment of the updated training until the next report.  We noted, however, that, during the third reporting period, we interviewed additional employees who had taken the 2014 version of the course.  The interviewees' positive reactions reinforced our belief that the online training Apple provided to employees in 2014 was well-designed and appropriate.

3.      Apple's Response to the Recommendations

Apple agreed to implement our recommendations from the Second and Third Reports related to live training.  With respect to our recommendations that Apple promote more interaction in the sessions, including by holding them in more intimate settings, Apple's Second Report Implementation Plan is vague about the particular steps the company intended to take.  Nonetheless, we observed significant improvement on this issue during the fourth reporting period.  Apple held its training sessions in small conference rooms, rather than the large auditoriums in which it held most of the 2014 sessions, and the training groups were relatively small—we monitored one session that had only four trainees, and larger sessions generally included fewer than twenty participants, seated around a conference table in an informal atmosphere.  Although the amount of interaction during the sessions varied, participants asked thoughtful questions in some of the sessions we monitored, and the trainers made clear that additional questions were welcome.  The Board and ET sessions we monitored live during the week of August 31 were particularly interactive.  We also noted that the trainers appeared to make a significant effort to tie the antitrust concepts they were discussing to examples and hypothetical scenarios related to Apple's

lines of business and, where possible, to the specific lines of business in which members of the training audience were engaged.[145]

Apple also took steps to implement our recommendation that it make arrangements to provide live, rather than remote, training to employees who do not work near Apple's main campus in Cupertino.[146]  During 2014, Apple permitted various employees to live-stream training sessions, rather than attend them in person.  During this reporting period, Apple held two training sessions in Los Angeles, rather than asking employees based there to live-stream sessions that took place in other areas.  We interviewed one Los Angeles-based employee who had live-streamed a session in 2014 and attended a session in person in 2015.  He said he had found both sessions useful, but he noted that, as a remote participant in 2014, he had not been able to ask questions, while he was able to do so as a live participant in 2015.

Late in the reporting period, we learned that, despite those efforts, Apple had permitted several employees to stream one training session, rather than attend in person.  Ms. Said explained that those individuals, who are based in Los Angeles, were identified as presenting a low level of antitrust risk.  She said remote training had become necessary when a session the employees planned to attend in person on Apple's main campus had to be rescheduled.  Ms. Said required the employees to submit screenshots at the beginning, middle, and end of the training session so that she could ensure that they continued to follow the training session from start to finish.  She said the remote trainees could have asked questions by emailing her, since she was at the session and could have relayed the questions to the trainer, but she acknowledged that this had not been made clear to the employees.

Apple also implemented our recommendation that it provide specialized live antitrust training to members of its legal staff, although it did not permit us to monitor those sessions.  On February 13, Mr. Andeer led a live training session for in-house lawyers in the hardware and procurement groups, and on May 6, Mr. Andeer provided live training to in-house lawyers whose work relates to iTunes.  On July 17, Apple also held a general Continuing Legal Education course on antitrust issues, which was open to all of its in-house attorneys.  We interviewed one Apple attorney who attended the May 6 training session, and he

---

[145] Two sets of training slides from this reporting period—from the ET training session and a session for App Store employees—are attached as Exhibits L and M.

[146] Our recommendation in the Second Report left Apple flexibility to provide remote training to employees whose activities create only a low level of antitrust risk.

reacted favorably to it, although the slides Apple produced to us were so heavily redacted that it was difficult for us to assess the substance of the training.

In addition, Apple implemented our recommendation from the Third Report that it expand the content of the Board and ET training sessions to include discussion of Board and executive oversight responsibilities.  In contrast to the 2014 session, where those issues were relegated to a handout that Board and ET members were invited to review on their own time, Mr. Andeer discussed those issues at length during the 2015 Board and ET sessions.  We found his presentation of the subject to be appropriate and useful.

Apple initially objected to our recommendation in the Third Report that it provide specialized training to managers regarding their obligations to escalate antitrust-related allegations that they might receive from the employees they supervise.  The company seemed to misunderstand our recommendation, interpreting it as a directive to provide all of its managers with additional substantive antitrust training, when what we were actually recommending was that managers receive some instruction on how they should forward employees' antitrust concerns to the appropriate resources within the company.  We clarified the matter in subsequent communications with Apple.  Apple continued to object after receiving that clarification.  In late June, however, the company agreed to add content to its existing antitrust compliance training to emphasize the existing requirement that employees, including managers, escalate compliance allegations and to highlight the mechanisms for doing so.  Shortly thereafter, Apple sent us draft training slides with that new content, we provided feedback on them, and Apple included slides incorporating our suggestions in subsequent training sessions.

Finally, with respect to our recommendation that Apple provide additional live antitrust training to the personnel who manage the company's Business Conduct Helpline, the company held a live training session for Business Conduct personnel at the very beginning of this reporting period, on March 6.  We interviewed one person who attended that session, and his reaction was favorable.

### 4.   Further Assessment and Recommendations

We conclude that Apple has satisfied our recommendations related to its live antitrust training.  As discussed in the immediately preceding subsection, the live training sessions we monitored during this reporting session were interactive, engaging, and appropriately tailored to the responsibilities of the respective audiences.

NON-CONFIDENTIAL VERSION

Although Apple permitted a few employees to stream live training sessions, instead of attending in person, we understand that unforeseen logistical complications made that necessary, and, since Apple identified those employees as presenting little antitrust risk, we are not troubled by the decision. We recommend, however, that Apple continue to limit its use of remote training as much as possible and that the company continue to permit streaming, if necessary, only by employees whose activities pose little risk. We also recommend that, if Apple permits employees to stream training sessions remotely, it provide them with a mechanism for asking questions during the training.[147]

With respect to online training, Apple gave us access in June to the 2015 version of the course. When we spoke with Ms. Said later that month, she explained that Apple had not made many changes to the course but had adjusted some of the quiz questions, in addition to adding the text of Apple's Antitrust and Competition Law Policy pursuant to our recommendation.[148] She clarified that employees will be assigned the online course every two years, which we had not previously understood—we had thought it would be an annual course—and she said that a total of approximately 10,000 employees took the course in 2014 and 2015.[149] Aside from the recommendation set forth in Section VIII.C.1, *supra*, regarding the manner in which the Policy is incorporated into the online course, we continue to view the online training as adequate and make no further recommendations for its improvement.

F.    Senior Commitment to Compliance

1.    Recommendations from Our Prior Reports

In our previous reports, we have emphasized the central role that senior personnel play in the development, implementation, and oversight of an effective compliance program. What senior leaders say and do—and what they do not say and do—affects the perceived importance of the Antitrust Compliance Program among employees, and ultimately may well affect their actions. In our view, it is therefore crucial for senior leadership to demonstrate a visible and continuing commitment to compliance; that view is shared across the compliance

---

[147] In its comments on a draft of this report, Apple has stated that it accepts and will implement this recommendation.

[148] *See supra* Section VIII.C.1.

[149] In their interviews during the week of August 31, Mr. Cook, Mr. Sewell, and Dr. Sugar emphasized the breadth of the online antitrust training program as a key element of Apple's commitment to compliance. Indeed, Dr. Sugar suggested that he thought the number of people required to take the online training course was unnecessarily high.

community and is reinforced by statements of this Court and of representatives of the Department of Justice.[150]

During the first reporting period, we concluded that Apple's senior executives, as well as its senior and mid-level managers, could and should do more to reinforce the culture of compliance at Apple. We recommended that senior executives devote more time and attention to compliance matters and address compliance issues more directly and specifically. We noted that, like the company's highest executives, senior and mid-level managers could also have a powerful impact on antitrust compliance throughout the company, particularly given their intimate knowledge of the company's operations and repeated contacts with lower-level employees and third parties.

In the Second Report, we directed a series of recommendations to the ways in which these two groups (the ET and senior and mid-level managers) could improve Apple's compliance culture. We concluded that the ET, as a unit, had traditionally had little direct involvement in compliance issues or oversight. Apple was unwilling to respond to our requests for information regarding the frequency with which the ET addressed compliance issues generally, or antitrust issues specifically. Based on the information available to us, we concluded that it was rare for members of the ET to explicitly and specifically discuss the importance of compliance with Apple employees. It was our view that the ET was relatively detached from compliance issues and that its members had made little effort to emphasize the importance of compliance issues in their communications with Apple personnel. We stated that the members of the ET had an obligation to actively monitor the Program and to use their platform as senior executives to communicate about compliance generally, as well as antitrust compliance specifically, and we emphasized the need for the ET to set an example for employees and to communicate important compliance messages to them.

In the Second Report, we also concluded that the management style of senior and mid-level managers at Apple would provide opportunities to foster a culture of antitrust compliance. Senior executives and managers described Apple management as "hands on." They said, for example, that Apple managers hold frequent meetings with direct reports and indirect staff. We also reported that Mr. Sewell had recently requested his colleagues on the ET to "waterfall" information about the revised Antitrust Compliance Program to their staffs and to the rest of the company. In response to this request, some individual ET members informed us of their plans to schedule staff meetings to discuss

---

[150] *See* Second Report 116-17.

antitrust issues and to instruct direct reports to share the information with their respective teams.  Other members of the ET told us that they planned to ask Mr. Andeer to provide training specifically tailored to their direct reports and teams.

The Second Report described our expectation that senior and mid-level managers would accept Mr. Sewell's challenge and help increase the sensitivity of Apple personnel to antitrust issues, as well as their awareness of the Antitrust Compliance Program.  We noted that Apple could use staff meetings and other forums to convey information about the new Program, the company's commitment to fostering a culture of compliance, and managers' expectation that employees would strictly comply with Apple's policies and procedures.

In the Third Report, we noted that two of Apple's senior managers had asked the CLPG to provide further antitrust training to their personnel during the third reporting period and two others had asked Tom Moyer to provide general Business Conduct training.  We nonetheless concluded that Apple had not demonstrated that the overall conduct of senior managers with respect to antitrust compliance had changed in any material way.  Apple cited additional examples of managers' efforts to stress compliance-related matters—some of which were genuinely impressive—but those examples were not directly related to the Antitrust Compliance Program.  We stated that we were unaware of steps Apple managers had taken to communicate information about conduct expectations, incentives, accountability, and consequences associated with antitrust compliance.  We expressed the hope that Apple would provide us with additional information during the fourth reporting period that would reflect a stronger commitment to antitrust compliance among its senior personnel.

## 2.    Apple's Response to the Recommendations

Apple took strong issue with the Third Report's assessment of the commitment to antitrust compliance among senior personnel.  When it reviewed a draft version of the Third Report, Apple claimed that we had misrepresented the role of the ET in fostering a culture of compliance at Apple, and it noted that several witnesses had relayed anecdotes related to executives' concern for compliance issues.[151]

Apple reiterated that position in the updated Second Report Implementation Plan that it produced during this reporting period, taking the position that "Apple's executives and senior managers have worked extensively to foster a culture of compliance at the company and to communicate those values to Apple employees at all levels."  The Second Report Implementation

---

[151] *See* Third Report 81 n.150.

### NON-CONFIDENTIAL VERSION

Plan noted specifically that Dan Riccio, Apple's Senior Vice President of Hardware Engineering, had asked Ms. Said to speak to his senior reports at his Executive Speaker Series and that, after Ms. Said's presentation, Mr. Riccio "made a separate speech to those individuals extolling the importance of compliance and the importance more specifically of setting an appropriate 'tone at the top' for Apple's employees."[152]  In a separate conversation, Ms. Said told us that approximately fifty people had attended that presentation.  The Second Report Implementation Plan also observed that, on June 22, Bruce Sewell had presented the results of Apple's antitrust risk assessment to the rest of the ET.  In addition, during the fourth reporting period, Ms. Said informed us that she continues to provide quarterly updates to the ET, as well as the Board, and continues to meet on a quarterly basis with certain ET members.

3.      Further Assessment and Recommendations

Our interviews with four ET members at the end of the reporting period—Mr. Cook, Mr. Schiller, Mr. Cue, and Mr. Sewell—have led us to believe that Apple has made significant progress toward implementing our recommendations.  Multiple sources, including Board members, ET members, and in-house lawyers, have told us that the members of the ET are now attuned to potential antitrust issues, proactively seek the advice of counsel when they believe actions they are considering could create antitrust risk, and instruct their employees to take a similarly cautious approach in their activities.  In addition to this day-to-day awareness of antitrust issues, we are encouraged by the actions taken by some senior executives to highlight antitrust compliance, and compliance more generally, throughout the company.  Among the examples shared with us are Mr. Riccio's request that Ms. Said present to members of his team regarding antitrust compliance, after which we understand that Mr. Riccio spoke to the audience about the importance of compliance; Mr. Schiller's decision to devote one of his weekly staff meetings to an antitrust training session, as well as his conversations with his staff before and after that training about antitrust issues; and Mr. Cue, among other things, seeking antitrust training for Apple employees that worked on Apple Music, such as Beats founder Jimmy Iovine.  During this reporting period, Apple has made meaningful efforts to satisfy our recommendation that its senior personnel take concrete steps to emphasize the importance of antitrust compliance.  We recommend that Apple maintain and build upon these efforts going forward.

---

[152] Apple relied on this same example in its May 18 response to our May 8 request for "[a]dditional information regarding steps senior managers have taken to foster a culture of compliance and communicate their expectations regarding Apple's policies and procedures."

NON-CONFIDENTIAL VERSION

We note, however, that our ability to evaluate this activity—and thus to document the progress Apple has made—has often been limited by the absence of evidence establishing when these antitrust-compliance-related discussions took place.   We thus recommend that, during the duration of the Final Judgment, Apple do a better job of documenting and tracking when senior leaders address antitrust compliance issues with their teams and staff.[153]

G.    Oversight of the Antitrust Compliance Program

Our previous reports have identified three levels of oversight for the Antitrust Compliance Program.  We identified Ms. Said, the ACO, as the person with primary responsibility for the day-to-day operation of the Program; the Final Judgment makes her directly accountable to the Board of Directors.  We identified the CLPG as the group responsible for reviewing and advising on business issues that have antitrust implications, as well as for the substantive content of Apple's Program.  Finally, we identified the AFC as having ultimate oversight of the Program, with support from the Risk Oversight Committee.

1.    Role of the ACO

(a)    Recommendations from Our Prior Reports

Throughout this monitorship, one of our significant concerns has been whether the company is providing Ms. Said the resources and, importantly, the independence that she needs to carry out her important responsibilities under the Final Judgment.  For instance, in the Second Report, we emphasized that Ms. Said must carry out her duties with independence and authority, given the Final Judgment's requirement that Apple "designate a person not employed by Apple . . . to serve as the Antitrust Compliance Officer," to "report to the Audit

---

[153] The documentation does not need to be a formal memo.  Documentation in any form, including written notes or an email, is acceptable.  The critical information to include in the documentation is: time, place, personnel present, approximate length of discussion, and general description of subject matter.

In its comments on a draft of this report, Apple has objected to this recommendation on the grounds that it creates a substantial burden, is "practically impossible," and would "chill discussion of these issues."  This overstates the burden and the impracticality.  Apple provided us with very little documentary corroboration for the antitrust compliance-related discussions it claims to have had at senior levels of the company.  The recommendation is modest and simply calls on the company to do a better job of documenting such discussions; it does not require, as Apple asserts, that it document "every meeting, informal conversation, phone call, or comment that senior executives make regarding compliance."

Committee or equivalent," and to "supervis[e] Apple's antitrust compliance efforts."[154]

After observing Ms. Said's performance through the second reporting period, we concluded that Ms. Said had not yet shown the independence and authority that Section V of the Final Judgment contemplated.  We described her role as having developed into that of an antitrust compliance program project manager, rather than the type of Antitrust Compliance Officer that the Final Judgment described as responsible for "supervising Apple's antitrust compliance efforts."  At the time, we understood Ms. Said to be focused on the administrative aspects of the Program, rather than designing substantive elements of it.  We also understood that Ms. Said did not have the same access to undisclosed products that senior antitrust counsel had, and we had no information on which to base a conclusion that anyone had called upon Ms. Said to provide input regarding the substantive antitrust content of the Program.

We did not fault Ms. Said for the way her role had been structured, but rather expressed the view that it stemmed from her relative lack of substantive antitrust experience, Apple's management structure, and the way the company had allocated authority to a job position imposed on it rather than voluntarily created.  To enhance Ms. Said's ability to guide the substance of the Program, we recommended that she be provided elevated access to information about confidential product offerings—the same information provided to Apple's chief competition counsel.  In addition to emphasizing the importance of Ms. Said's independence and authority, the Second Report stressed that Ms. Said must have access to appropriate financial and human resources to carry out her obligations.

After we submitted the Second Report, Ms. Said expressed strong disagreement with our characterization of her role.  She told us that a contract employee who reported to her actually handled the activities we had attributed to her in the Second Report.  Ms. Said asserted that she possessed decision-making authority regarding the Program, citing, for example, her ability to call meetings and set meeting agendas.  We noted that our view of her role might have resulted, at least in part, from the relatively limited insight Apple had provided regarding her working relationship with others at the company and the extent of her authority, and our lack of direct access to her.

In the Third Report, we noted that we had observed Ms. Said becoming increasingly involved in the types of activities we had initially envisioned for her. Before we issued the Second Report, Ms. Said had reported to the AFC in person only once and had provided two brief written reports.  In contrast, during

---

[154] Final Judgment § V.

**NON-CONFIDENTIAL VERSION**

the third reporting period, Ms. Said met individually with each Board member and presented to the AFC a much more substantive and detailed report regarding Apple's efforts to comply with the Final Judgment. She also worked alongside one of the antitrust specialists in the CLPG to conduct Apple's antitrust risk assessment. We also noted in the Third Report that we had had more contact with Ms. Said and that she seemed increasingly to be presenting herself within the company as the face of the Antitrust Compliance Program.

Nonetheless, we explained in the Third Report that we still did not view Ms. Said as the figure of authority that the Final Judgment contemplated. We made clear that we thought that was attributable not to anything Ms. Said had inappropriately done or failed to do but rather to the way Apple had structured her position within the company. For example, she is a member of the Business Conduct team and reports to Mr. Moyer, whereas we read the Final Judgment as suggesting that Ms. Said should answer to no one but the Board regarding her work on Apple's Antitrust Compliance Program. We also viewed Ms. Said's November 2014 report to the AFC as largely an advocacy document—asserting, for example, that Apple was "100% Compliant with the eBooks Final Judgment"—rather than an objective assessment of whether Apple was fulfilling its obligations under the Final Judgment. We further explained that, although Ms. Said had shown herself to be diligent, well-organized, and able, we believed her relative lack of substantive antitrust expertise and her subordinate reporting relationship to members of the compliance and legal teams could limit her independence and her ability to challenge company decisions.

Although we concluded in the Third Report that there had been many positive changes in Ms. Said's role, including the sharp increase in her interaction with the Board and AFC, we recommended that Apple continue to take steps to increase Ms. Said's independence and authority with respect to the management of the Antitrust Compliance Program. We recommended that Apple give Ms. Said full access to undisclosed products and projects, rather than provide her with that information only when Apple's senior management determined that disclosure was appropriate. We further recommended that, to increase Ms. Said's independence, Dr. Sugar or another member of the AFC with appropriate knowledge of, and familiarity with, Ms. Said's work conduct her performance evaluation, and we recommended that Apple consider making the AFC—rather than Apple management—responsible for setting her compensation.

(b)     Apple's Response to the Recommendations

Apple objected to all of the recommendations we made in the Third Report regarding Ms. Said's role and independence. With respect to our general recommendation that Apple continue to take steps to increase Ms. Said's independence and authority, Apple responded that it was "already complying

NON-CONFIDENTIAL VERSION

with this recommendation in substance" since "Ms. Said already possesse[d] sufficient independence and authority to carry out her responsibility."  Apple stated that, unless the Monitor proposed "specific additional steps," the company was "unaware of any way to further increase the ACO's independence and authority, as she already interfaces directly with the Board, the AFC, and the most senior members of Apple's management and possesses full discretion to manage the content and processes of Apple's antitrust compliance program."

Apple also objected to our recommendation that Ms. Said be given full information regarding undisclosed products and projects, explaining that "Ms. Said is already disclosed on specific products and projects as necessary and appropriate."  The company took the position that it would be "both impracticable and unnecessary" to disclose every new product or project, even including items that presented little antitrust risk, to Ms. Said.

In response to our recommendation that a member of the AFC, instead of Mr. Moyer, conduct Ms. Said's performance evaluation, Apple objected on the ground that the recommendation was "unnecessary and would create an unusual role for the AFC, which ordinarily does not conduct performance reviews of individual employees."  At the same time, however, Apple represented it that would "comply with this recommendation in substance" by having Mr. Moyer consult with Dr. Sugar in completing her evaluation.  When we interviewed Mr. Moyer in June, he told us that he had, in fact, consulted with Dr. Sugar, among several others, when he evaluated Ms. Said in 2014.  Nonetheless, Mr. Moyer said he and Dr. Sugar had conferred about how to implement our recommendation and had decided that Dr. Sugar would provide input in a more formal and more collaborative manner; he suggested that he might draft an evaluation and then give Dr. Sugar the opportunity to revise it.

Similarly, regarding our recommendation that Apple consider making the AFC, rather than Apple management, responsible for setting Ms. Said's compensation, Apple objected that "it is unnecessary and would be unusual for the AFC to determine the compensation of an individual Apple employee such as Ms. Said."  Apple stated, nonetheless, that it would "comply with this recommendation in substance by consulting with Dr. Sugar in the course of setting Ms. Said's compensation."

Based on Apple's representations, we agreed to hold all of these recommendations in abeyance, reserving the right to press for their full implementation in a future report.

(c)      Further Assessment and Recommendations

It is clear that Ms. Said has been working diligently on the Antitrust Compliance Program.  The Program is much stronger than it was when the monitorship began, and Ms. Said's efforts have substantially contributed to that improvement.  The Apple personnel we interviewed during this reporting period, including Board and ET members, unanimously praised her, emphasizing in particular her ability to collaborate and to help Apple employees feel comfortable talking with her, while still maintaining the independence that a compliance professional should have.  Ms. Said deserves recognition for her contributions to Apple's Antitrust Compliance Program.

We nonetheless continue to have concerns about the way Apple has structured her role.  For example, the Final Judgment requires the Antitrust Compliance Officer to report to the Board.  Although Ms. Said provides quarterly reports to the AFC[155] and confers with Dr. Sugar at least once a month, her manager is Mr. Moyer, Apple's Chief Compliance Officer, and she has clearly become integrated with Apple employees—we have heard her refer to members of Apple management as her "mentors" and to others at Apple as her "peers." This is the type of concern that motivated our previous reports' recommendations regarding Ms. Said's role, including the recommendations that Ms. Said have access to information regarding undisclosed products and services and that the AFC determine her pay and performance evaluations.  As explained above, Apple objected to all of those recommendations.

Ms. Said and others with whom we spoke during this reporting period strongly believe that she is sufficiently independent.  Dr. Sugar, for example, told us that, although his concurrence is now required regarding Ms. Said's performance evaluations and pay, it would be inappropriate for him to play a more active role in those matters, as we had recommended the company consider.[156]  Ms. Said does appear to have decision making authority regarding the Antitrust Compliance Program—for example, she said that no one had opposed her decision to retain PwC to review the sufficiency of the Program but that, even if someone had, that would not have prevented her from commissioning the audit.  On the other hand, we have not obtained information suggesting that her independence has truly been *tested* and vindicated.  We do

---

[155] The three memoranda Ms. Said provided to the Board during this reporting period are attached as Exhibits N, O, and P (redacted from the non-confidential version of the Report).

[156] When we recommended that the AFC take responsibility for determining Ms. Said's performance evaluations and pay, we intended for the AFC to provide something more than passive "concurrence" in those matters.

not have a sufficient basis on which to conclude that if, for example, Apple management agreed that it wanted to go forward with a course of action that might violate the antitrust laws, Ms. Said would have sufficient authority to "terminate or modify" that conduct, as the Final Judgment requires, in the face of opposition.[157]

As we have stated in previous reports, none of this is intended as a criticism of Ms. Said's efforts; she has been working diligently to fulfill her responsibilities.  Our concern stems from Apple's decision to hire as its ACO a relatively junior lawyer who was not an antitrust specialist and to structure her position in the company in the way that it has.  Because of these concerns, we cannot conclude that Apple has satisfied our recommendations regarding Ms. Said's independence and authority.

These concerns about Ms. Said's independence and authority were deepened by Apple's recent disclosure of an email from her to the ET transmitting our Third Report.  In the email, dated May 20, 2015, Ms. Said allies herself with the Apple team that has opposed and blocked many of the Monitor's requests.  She backs Apple's position that our criticism of the company in our reports for its lack of cooperation is unfounded, and supports the company's position that our requests for information are "well outside the scope of [the Monitor's] responsibilities under the Final Judgment"[158]  There is no effort to separate herself from the advocacy positions taken by Apple and no apparent recognition that her institutional role makes advancing and endorsing those advocacy positions inappropriate.  We have no way of knowing whether this is

---

[157] Final Judgment § V.G.  We do not mean to suggest that we believe such a situation is likely to arise.  We raise this only to illustrate our concerns about Ms. Said's independence and authority within the company.

[158] Specifically, the email states:



The full text of the document is attached as Exhibit Q (redacted from the non-confidential version of the Report).

representative of other communications Ms. Said has had with personnel in the company, but it highlights our concerns about her independence.[159]

### 2.    Role of the CLPG

#### (a)    Recommendations from Our Prior Reports

As our prior Reports explained, the CLPG is a specialized resource that plays an important role in Apple's Antitrust Compliance Program.  We understand that business personnel tend to direct their initial antitrust inquiries to the lawyers who are assigned to their business groups, who then elevate those inquiries, as necessary, to the antitrust specialists in the CLPG.  We concluded in the Second Report that the CLPG's role appeared to be consistent with Apple's business structure and appropriate in the context of the Antitrust Compliance Program.  We made no recommendations in the Second or Third Report regarding the role of the CLPG.

#### (b)    Further Assessment and Recommendations

We continue to view the CLPG's role at Apple as appropriate, and we make no further recommendations on that subject.

### 3.    Role of the Board

#### (a)    Recommendations from Our Prior Reports

Our Reports have emphasized that, as made clear by the United States Sentencing Guidelines and other compliance authorities,[160] Board oversight of a compliance program is critical.  We have highlighted the need for a strong and direct reporting relationship between the ACO and the AFC, the Board's designated committee for risk oversight; we have stressed that this reporting relationship must be genuine, that the ACO's reports to the AFC must be more than perfunctory, and that the ACO must receive significant support from the AFC, including its Chair, Dr. Sugar.  We therefore recommended in the First

---

[159] In its comments on a draft of this report, Apple objected to our expressing concerns about this email, asserting that the single email is "scarcely an indication that Ms. Said lacks independence," and that there is nothing in Ms. Said's institutional role that "prevents her from offering an opinion on the validity or appropriateness of the Monitor's requests."  We could more readily accept this position if Apple, or Ms. Said, could draw our attention to any instances in which she staked out independent positions on these issues or any others that related to the monitorship.

[160] *See* Second Report 124 & n.201.

Report that the ACO and Dr. Sugar participate in a monthly call or meeting regarding Ms. Said's work, as well as the status of Apple's activities under the Final Judgment.

As of the Second Report, Apple had provided us with no information suggesting that the AFC was actively overseeing the Program. We recommended that the AFC take a more active oversight role and that the AFC be "fully informed regarding high-risk areas, the effectiveness of reporting mechanisms, protocols for detecting violations and investigating complaints, and other important aspects of the Program."[161] We also recommended that the AFC review the effectiveness of the ET's management of antitrust risk and its promotion of Apple's Program.[162]

During the third reporting period, Apple informed us of steps it had taken to increase the AFC's knowledge of the Program. For example, the company pointed out that it had provided the AFC with documents related to the Final Judgment, including our Second Report; that Ms. Said had begun speaking more regularly with Dr. Sugar and had met individually with each member of the Board; and that the results of the antitrust risk assessment had been shared with the AFC. We also completed our interviews of Apple's Board members, which gave us valuable insight into the Board's oversight of the Program.

Our general conclusion in the Third Report was that, although the Board continued to rely heavily on senior management for information related to compliance, there had been an increase in Board oversight over the Program. We concluded, however, that Apple's Board should do more to rigorously oversee the Program. For example, we noted that we had seen no evidence that any Board member was significantly involved in overseeing the development of Apple's revised Antitrust Compliance Program, and we observed that we lacked important information, including regarding Board members' reactions to the risk assessment presentation they had received the month before we issued the Third Report.

(b)      Apple's Response to the Recommendations

Throughout the monitorship, Apple has disagreed strongly with our assessment that the Board should be more involved in overseeing the Antitrust Compliance Program. In its objection to the Third Report's recommendation that

---

[161] Second Report 126.

[162] Apple objected to our additional recommendation that the AFC actively participate in defining the threshold at which the Board would receive updates regarding the Program and potential antitrust risks. We agreed to suspend that recommendation.

NON-CONFIDENTIAL VERSION

the Board "more rigorously oversee the Antitrust Compliance Program," Apple stated that it "of course agree[d] that the Board should provide rigorous oversight" but expressed the view that the Board in fact "already [did] so."  To support its assertion, Apple cited the ACO's frequent communications with the AFC, the ACO's "regular presentations to the AFC and memos provided to the Board," and "Board oversight of, and feedback regarding, all aspects of Apple's antitrust compliance program, including Dr. Sugar's role in periodically receiving detailed reports concerning updates to the program."  Apple's objection further asserted that "[i]t is not customary for a board of directors at one of the largest companies in the world to become involved in the day-to-day management of a compliance program," and Apple stated that, unless the Monitor proposed specific steps to increase Board oversight, the company could think of no additional means of implementing our recommendation.  We agreed to hold that recommendation in abeyance pending our assessment of Apple's implementation of the similar recommendations we had made in the Second Report.

During the fourth reporting period, Apple relied on many of the same factors it had cited in its objections to show that it had implemented our recommendations from the Second Report regarding Board oversight.  Apple explained that it had increased the ACO's interactions with the AFC—Ms. Said provides quarterly updates to the AFC regarding the Antitrust Compliance Program, and the full Board receives copies of the written materials Ms. Said prepares.  Ms. Said also speaks with Dr. Sugar, the Chair of the AFC, every month.  During this reporting period, Dr. Sugar and Dr. Levinson, the Chairman of the Board and a member of the AFC, also reviewed the updated version of Apple's online training course.  Finally, Apple pointed out that the antitrust compliance training the Board received in 2015 included specific discussion of the Board's oversight responsibilities, as we recommended in the Third Report.

(c)      Further Assessment and Recommendations

Our interviews at the end of this reporting period with three of Apple's independent directors and Mr. Cook provided us with helpful information about the Board's oversight of the antitrust compliance program.  We learned, for example, that according to the AFC members we interviewed, the AFC discusses the Antitrust Compliance Program during each of its quarterly meetings, and that, according to the AFC members we interviewed, both the AFC and full Board have actively questioned Apple management about potential antitrust

**NON-CONFIDENTIAL VERSION**

issues related to new initiatives like Apple Pay and Apple Music.[163]  Dr. Levinson also told us that the AFC asked questions and "pushed back" whenever Apple decided not to accept one of the Monitor's recommendations and that the AFC spent a significant amount of time discussing the Monitor's concerns about access.[164]

Moreover, during this reporting period's Board training session, Board members asked numerous questions that suggested they were engaged and interested in Apple's antitrust compliance.  We also learned that, as mentioned above, two of the four members of the AFC asked to review "beta" versions of the online training course that was released this year and provided Ms. Said with comments.[165]  On the other hand, we were quite surprised to learn that Dr. Sugar, the Chair of the AFC, who is highly regarded by his colleagues, did not read the full Third Report; he said he reviewed only the executive summary.[166]

Based on all of the information we gathered during this reporting period—including detailed interviews of Board members and ET members, and monitoring of Board antitrust training—we have seen significant improvement in the Board's oversight of the Antitrust Compliance Program.  Its interest in these issues needs to be sustained, especially as Apple enters new markets and develops new products and services.  We recommend that, going forward, the Board exercise rigorous oversight regarding antitrust-related issues.[167]

---

[163] We asked Apple for agendas reflecting that the AFC had discussed Apple Pay and Apple Music.  Apple advised us that its agendas contained no responsive information.

[164] We should note that the Board's awareness of such access issues has not resulted in significant improvements in our access.  To the contrary, our access substantially diminished during the end of the third reporting period and for much of the fourth reporting period.

[165] This appears to be the only written feedback that any members of the AFC have provided to Ms. Said regarding Apple's antitrust compliance program.  Apple advises us that the AFC generally provided feedback to Ms. Said at formal and informal meetings, as well as in phone calls.

[166] Apple had provided Dr. Sugar—and all other AFC members—with a copy of the full report.  In its comments on a draft of this report, Apple asserted that it was "bizarre" for us to expect "the head of the audit committee at a multi-billion dollar company" to read a 90-page report.  We disagree.

[167] In its comments on a draft of this report, Apple has stated that it accepts and will implement this recommendation subject to the clarification that it requires "(1) earlier education of the Board on matters such as new product launches or specific business activities that could potentially raise antitrust issues, and (2) additional detail to be provided by Ms. Said to the AFC regarding specific components of Apple's antitrust compliance program, such as its policies and procedures."

NON-CONFIDENTIAL VERSION

Specifically, we would expect that the AFC members have antitrust-related discussions with ET members early in the product development process, and that such discussions be robust.  In addition, the AFC should make more diligent efforts to obtain knowledge about the elements of the antitrust compliance program.  The AFC members seemed to be familiar with the live and online training but not with any of the procedures that govern the program.

## IX.   Elements of an Effective Compliance Program Under the United States Sentencing Guidelines

The Unites States Sentencing Guidelines are widely recognized as establishing the criteria for evaluating corporate compliance programs.[168]  Indeed, Apple itself has cited the Guidelines as one of the metrics by which it judges the effectiveness of its Antitrust Compliance Program.[169]  We agree that the Guidelines provide the appropriate framework, and we therefore briefly assess Apple's Antitrust Compliance Program against each of the Guidelines' seven elements "minimally require[d]"of an effective compliance program.[170]  We do so, however, with the with the caveat that—because of the scope of our mandate under the Final Judgment and Apple's objections to some of our requests[171]—we have only obtained a partial view of the broader compliance program of which it is a part.

---

[168] *See, e.g.*, Jeffrey M. Kaplan & Joseph E. Murphy, *Preface to* Compliance Programs and the Corporate Sentencing Guidelines: Preventing Criminal and Civil Liability xxiv (2013-2014 ed.) ("[T]he guidelines have effectively established a new standard of accountability of internal compliance."); Brent Snyder, Deputy Assistant Attorney General, Antitrust Division, U.S. Dep't of Justice, Compliance is a Culture, Not Just a Policy, Remarks as Prepared for the International Chamber of Commerce/United States Council of International Business Joint Antitrust Compliance Workshop (Sept. 9, 2014), *available at* http://www.justice.gov/atr/public/speeches/ 308494.pdf ("Chapter 8 of the United States Sentencing Guidelines provides guidance for minimal requirements of an effective compliance and ethics program.").

[169] For example, Apple recently informed us that it had asked PwC to "assess the design of Apple's current antitrust compliance program based on," among other things, PwC's "knowledge of the elements of effective compliance programs set forth in the Federal Sentencing Guidelines."

[170] We also note that "[a] large organization generally shall devote more formal operations and greater resources in meeting the requirements of this guideline than shall a small organization."  *See* United States Sentencing Guidelines Manual § 8B2.1, Application Note 2(C)(ii) (U.S. Sentencing Comm'n 2014).

[171] Apple has consistently objected to our obtaining information about its broader compliance program even where we have sought such information to better evaluate its antitrust program, such as, for example, to see how Apple's investigation procedures—untested in the antitrust context—have been applied in other areas.

- **Standards and procedures to prevent and detect criminal conduct[172]:** Apple has made significant improvements to its policies and procedures aimed at preventing and detecting potential antitrust violations.  As we discussed in Section VIII.C, *supra*, Apple's antitrust compliance policies are appropriate in scope, and the company has taken steps to increase their prominence among employees.  In addition, when the monitorship began, Apple appeared to have no formal procedures for preventing and detecting antitrust violations;[173] the company has now created a written procedure designed for those purposes—its Investigations Procedure.  *See* Exhibit I.  As explained in Section VIII.D.2, *supra*, after having provided Apple with several rounds of feedback regarding earlier drafts, we conclude that the procedure it has developed is adequate on paper.  Critically, however, we have no information about whether or how it has been applied, so we cannot conclude that it is effective in practice.

- **Knowledge, engagement and oversight by the Board and senior executives[174]:** This is an especially important element given this

---

[172] *See* United States Sentencing Guidelines Manual § 8B2.1(b)(1) ("The organization shall establish standards and procedures to prevent and detect criminal conduct.").

[173] As noted earlier in this Report, Apple has consistently objected to our requests for information regarding its procedures for preventing and detecting compliance violations more generally.  We therefore have no insight into whether or how the company has applied those more general procedures to antitrust issues.

[174] *See id.* § 8B2.1(b)(2) ("The organization's governing authority shall be knowledgeable about the content and operation of the compliance and ethics program and shall exercise reasonable oversight with respect to the implementation and effectiveness of the compliance and ethics program. . . . High-level personnel of the organization shall ensure that the organization has an effective compliance and ethics program, as described in this guideline.  Specific individual(s) within high-level personnel shall be assigned overall responsibility for the compliance and ethics program. . . . Specific individual(s) within the organization shall be delegated day-to-day operational responsibility for the compliance and ethics program. Individual(s) with operational responsibility shall report periodically to high-level personnel and, as appropriate, to the governing authority, or an appropriate subgroup of the governing authority, on the effectiveness of the compliance and ethics program.  To carry out such operational responsibility, such individual(s) shall be given adequate resources, appropriate authority, and direct access to the governing authority or an appropriate subgroup of the governing authority.").  *See also* Bill Baer, Assistant Attorney General, Antitrust Division, U.S. Dep't of Justice, Prosecuting Antitrust Crimes, Remarks as Prepared for the Georgetown University Law Center Global Antitrust Enforcement Symposium (Sept. 10, 2014), *available at* http://www.justice.gov/atr/public/speeches/308499.pdf ("The board of directors and senior officers must set the tone for compliance to ensure that the company's entire managerial

*(footnote continued on next page)*

NON-CONFIDENTIAL VERSION

Court's findings with respect to the role of Apple's senior management in this case.  We note, however, that our ability to evaluate senior management's knowledge about the company's overall compliance program has been hampered by: 1) as discussed above,  the scope of our mandate and Apple's objections to our requests; and 2) the company's routine invocation of the attorney-client privilege.  Based on what we have seen, however, the members of the ET are certainly aware of Apple's Antitrust Compliance Policy and, because of the requirements of the Final Judgment, have familiarity with Apple's antitrust training.  That said, we simply do not know whether that Board members and ET members are knowledgeable about the "content and operation" of the overall compliance program, and,[175] although it is appropriate for the Board to assign "overall responsibility" for Apple's compliance program to Mr. Sewell, we continue to believe it should exercise  rigorous oversight. Moreover, as discussed above, we remain concerned about the independence and authority of Ms. Said, Apple's Antitrust Compliance Officer.[176]

Nonetheless, as explained in Section VIII.F, *supra*, we saw significant improvement in the engagement of Apple's high-level personnel—particularly the members of its ET—during this reporting period.[177]  Several members of the ET have recently made efforts to promote the Antitrust Compliance Program to their

---

workforce not only understands the compliance program but also has the incentive to actively participate in its enforcement.".

[175] United States Sentencing Guidelines Manual § 8B2.1(b)(2) (U.S. Sentencing Comm'n 2014) ("The organization's governing authority shall be knowledgeable about the content and operation of the compliance and ethics program and shall exercise reasonable oversight with respect to the implementation and effectiveness of the compliance and ethics program. "); *id.* § 8B2.1, Application Note 3 ("High-level personnel and substantial authority personnel of the organization shall be knowledgeable about the content and operation of the compliance and ethics program, shall perform their assigned duties consistent with the exercise of due diligence, and shall promote an organizational culture that encourages ethical conduct and a commitment to the compliance of the law.").

[176] *Id.* § 8B2.1(b)(2)  ("Specific individual(s) within the organization shall be delegated day-to-day operational responsibility for the compliance and ethics program.  Individual(s) with operational responsibility shall report periodically to high-level personnel and, as appropriate, to the governing authority, or an appropriate subgroup of the governing authority, on the effectiveness of the compliance and ethics program.  To carry out such operational responsibility, such individual(s) shall be given adequate resources, appropriate authority, and direct access to the governing authority or an appropriate subgroup of the governing authority.").

[177] *See id.* § 8B2.1, Application Note 3.

NON-CONFIDENTIAL VERSION

employees, including by providing them with additional antitrust training.  We also learned during this reporting period that certain members of the ET have become more attuned to antitrust risks and have actively sought antitrust advice in the course of planning significant new projects.  With respect to Board oversight, we are encouraged by the regular communications that now take place between the ACO and the Chair of the AFC.  Apple has also informed us that the AFC discusses the Antitrust Compliance Program at each of its quarterly meetings and that it received a presentation on the antitrust risk assessment Apple conducted in response to our recommendations. Even so, we believe the Board should exercise even more rigorous oversight, including becoming more knowledgeable about various aspects of the Program.

- **Reasonable efforts not to include within "substantial authority personnel" any individual whom the corporation knows, or should know, has engaged in unlawful or unethical activity[178]:** Again, our ability to evaluate Apple's adherence to this principle is circumscribed by our lack of information.  As result of Apple's objections, we have only a limited window into Apple's hiring, promotion, and disciplinary systems.  Moreover, even where Apple has told us about the procedures it has in place, it has not provided specific examples demonstrating how those procedures operate in practice.  We discuss this issue in more detail below.

  Most relevant to this particular principle, however, we are not aware that the company took any action to limit the discretion or authority of the individuals who had primary involvement in the events that led to ebooks litigation, specifically Eddy Cue, Senior Vice President, Internet Software and Services, whose testimony on certain issues in the ebooks case was found "not credible" by the Court.[179]   (Apple and Mr. Cue continue to disagree with the Court's assessment of both his testimony and the case.)  Nevertheless, we interviewed Mr. Cue at length, and he seems to

---

[178] *Id.* § 8B2.1(b)(3) ("The organization shall use reasonable efforts not to include within the substantial authority personnel of the organization any individual whom the organization knew, or should have known through the exercise of due diligence, has engaged in illegal activities or other conduct inconsistent with an effective compliance and ethics program.").

[179] 952 F. Supp. 2d at 661 n.19.

NON-CONFIDENTIAL VERSION

have been chastened by the ebooks experience.[180]  More importantly, he and other members of the ET have learned some painful lessons and now report that they actively seek out antitrust legal advice, a claim corroborated by others within the company.[181]

- **Communications and training regarding standards and procedures and other aspects of the compliance and ethics program[182]:** We were impressed by the antitrust training we monitored during this reporting period.  The live training sessions we observed were interactive, useful, and relevant; unlike in previous reporting periods, the trainers made a significant effort to provide examples and explanations that were tailored to Apple personnel and, where possible, to the particular business responsibilities of the training audience.  We also continue to believe that Apple's online antitrust training course, which approximately 10,000 employees took in either 2014 or 2015, is useful and effective.  Outside the context of training, Apple has taken some productive steps to increase communications to employees regarding the Antitrust Compliance Program, including through the significant internal publicity that accompanied the June 30, 2014 Rollout of Apple's revised antitrust compliance materials and through more recent actions to promote the Program.

---

[180] Mr. Cue said that he now regularly discusses antitrust issues with his staff and that he has adjusted the manner in which he conducts negotiations.  For example, Mr. Cue said that he now tells Apple's partners that ███████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████  (The redacted material contains specific quotes from Mr. Cue about his discussions with the company's record label partners while negotiating agreements for Apple Music.)

[181] In its comments on a draft of this report, Apple objected to our characterization that Cue "seems to have been chastened" by the ebooks case, stating that we have provided "no support for the idea that Mr. Cue or any other employee was 'chastened' by the result."  Although we fully understand that "Apple and Mr. Cue continue vigorously to dispute the idea that he or they did anything wrong," Mr. Cue made a forceful and convincing case, using specific examples, that it has caused him to behave differently since then.  The support for our statement comes from Mr. Cue's words and his demeanor when he said them.

[182] See United States Sentencing Guidelines Manual § 8B2.1(b)(4) (U.S. Sentencing Comm'n 2014) ("The organization shall take reasonable steps to communicate periodically and in a practical manner its standards and procedures, and other aspects of the compliance and ethics program, to [the members of the governing authority, high-level personnel, substantial authority personnel, the organization's employees, and, as appropriate, the organization's agents] by conducting effective training programs and otherwise disseminating information appropriate to such individuals' respective roles and responsibilities.").

- **Monitoring and auditing the compliance and ethics program for effectiveness**[183]: Apple's procedures for monitoring and auditing the Antitrust Compliance Program have been a work in progress throughout the monitorship.  We found the ACO's initial proposal for the audit required by Section V.E of the Final Judgment to be inadequate, as explained in the Second and Third Reports.  After having provided several rounds of feedback, we are satisfied with the ACO's current procedure, which will include, among other things, review of records to ensure that Apple has complied with specific requirements of the Final Judgment and interviews of a limited number of employees to assess the effectiveness of the training they have received.  With respect to our recommendation that Apple conduct a broader, programmatic audit, the company notified us in the final days of this reporting period that it had retained an outside consulting firm to assess the comprehensiveness and effectiveness of the Antitrust Compliance Program.  We think that is a generally wise decision, but we have insufficient information regarding the specific nature of the review to determine whether it, in fact, satisfies this element of the Sentencing Guidelines.

- **Ensuring consistent enforcement and discipline of violations**[184]: Since early in the monitorship, we have sought to obtain information about Apple's practices and procedures for compliance-related incentives and discipline.  In response to our recommendations, Apple added some new language to its employee performance evaluation system that will advise managers to consider whether employees ███████████████ ████████████████████████████████████ Apple has claimed that it provides additional incentives, such as praise and

---

[183] *See id.* § 8B2.1(b)(5) ("The organization shall take reasonable steps . . . to ensure that the organization's compliance and ethics program is followed, including monitoring and auditing to detect criminal conduct; . . . to evaluate periodically the effectiveness of the organization's compliance and ethics program; and . . . to have and publicize a system, which may include mechanisms that allow for anonymity or confidentiality, whereby the organization's employees and agents may report or seek guidance regarding potential or actual criminal conduct without fear of retaliation.").

[184] *See id.* § 8B2.1(b)(6) ("The organization's compliance and ethics program shall be promoted and enforced consistently throughout the organization through (A) appropriate incentives to perform in accordance with the compliance and ethics program; and (B) appropriate disciplinary measures for engaging in criminal conduct and for failing to take reasonable steps to prevent or detect criminal conduct.").

NON-CONFIDENTIAL VERSION

recognition, to employees who act in an ethical manner, but we lack specific information that would substantiate that assertion. With respect to discipline, Apple's new procedure for preventing, detecting, and investigating antitrust violations states in generic terms that the company will take disciplinary action against employees who violate the antitrust laws, including, if warranted, termination or a change in job responsibilities. Apple also claims in general terms that it has, in fact, disciplined and terminated employees who have violated the law, but it has been either unwilling or unable to provide us with anything beyond anecdotal information to support that assertion.

- **Responding appropriately to incidents and taking steps to prevent future incidents[185]:** Apple has not provided us with information regarding substantiated antitrust allegations, and it has also been unwilling, as a general matter, to provide us with information about ways in which it has formally changed the Antitrust Compliance Program in response to compliance incidents (or even in response to its antitrust risk assessment). We do note, however, that Apple personnel appear to have become more cautious in their business activities in the aftermath of the ebooks litigation and more aware of the potential perils posed by the antitrust laws.

In sum, although we find that Apple's Antitrust Compliance Program satisfies some of the elements set out in the Sentencing Guidelines, there are others as to which the Program remains a work in progress. In addition, there are elements regarding which we cannot reach a conclusion either way, given Apple's refusal to provide us with certain categories of information that we have requested.

## X.   Conclusion

During this reporting period, Apple made substantial progress in developing and improving its Antitrust Compliance Program and in implementing the numerous recommendations we made in our previous reports. In particular, Apple has worked during this reporting period to improve the procedures associated with its Program, which had been one of our primary areas of concern in our recent reports. Although the procedures remain

---

[185] *See id.* § 8B2.1(b)(7) ("After criminal conduct has been detected, the organization shall take reasonable steps to respond appropriately to the criminal conduct and to prevent further similar criminal conduct, including making any necessary modifications to the organization's compliance and ethics program.").

**NON-CONFIDENTIAL VERSION**

untested, we think that, at least on paper, they are much better than they were even a few months ago.  We also noted a significant improvement in the engagement and involvement of Apple's ET in antitrust issues; we were favorably impressed in our interviews at the end of the reporting period by the extent to which the ET now appears to be attuned to antitrust risk and accustomed to seeking legal advice.

Regrettably, one of the constants over the past two years has been Apple's lack of willing cooperation with our court-mandated efforts.  We continued to have requests rejected on a regular basis during this reporting period for no good reason; indeed, it turns out that Apple had a positive story to tell about the attention it paid to antitrust considerations in connection with Apple Music—a positive story that appears to reflect well on its ET, its Board, its lawyers, and its business personnel.  And yet, our efforts to obtain basic information about how Apple handled antitrust issues relating to Apple Music were met with objections, resistance, and the provision of minimal information in response to repeated requests.  In this respect, Apple has been its own worst enemy.[186]

This lack of cooperation has cast an unnecessary shadow over meaningful progress in developing a comprehensive and effective antitrust compliance program.  This point was noted by most of the ET members and all the Board members we interviewed the week of August 31, all of whom were familiar with the access problems we continued to experience but who at the same time apparently believed it was not their responsibility to put a stop to it.  That was indeed unfortunate and meant that the problems were allowed to fester.  What weight to give this lack of cooperation, measured against the substantial advances in the construction of a credible antitrust compliance program, is ultimately for the Court to decide.

Because this report may be the last one we file with the Court, we wish to thank the Court for the trust it has placed in us.  It has been an honor and a privilege to serve in this important role.

---

[186] In its comments on a draft of this report, Apple took issue with our characterization of the manner in which it provided information about Apple Music.  We think the correspondence attached as Exhibit D speaks for itself.

NON-CONFIDENTIAL VERSION

October 5, 2015

Michael R. Bromwich
External Compliance Monitor
The Bromwich Group

Bernard A. Nigro Jr.
Maria R. Cirincione
Fried, Frank, Harris, Shriver & Jacobson LLP

Jack A. Herman
Robbins, Russell, Englert, Orseck, Untereiner &
Sauber LLP

109

NON-CONFIDENTIAL VERSION

### Appendix

The U.S. Court of Appeals for the Second Circuit issued two important decisions in this matter during this reporting period.  First, on May 28, 2015, the Second Circuit unianimously affirmed this Court's denial of Apple's motion to disqualify the Monitor, rejecting Apple's claims that the Monitor could not act impartially and that the Court had improperly modified the Final Judgment to expand the Monitor's role.  *See United States v. Apple, Inc.*, 787 F.3d 131 (2d Cir. 2015).  Second, on June 30, 2015, the Second Circuit affirmed this Court's judgment that Apple had unlawfully "orchestrated an agreement with and among the Publisher Defendants . . . [and] that the conspiracy unreasonably restrained trade in violation of § 1 of the Sherman Act."  *United States v. Apple, Inc.*, 791 F.3d 290, 314 (2d Cir. 2015).

Both opinions suggest that the parties' briefing and oral argument may have left the Second Circuit panels with some misconceptions regarding our activities, which we respectfully feel we must take this opportunity to correct.  First, contrary to what members of the panels may have been led to believe, *see Apple*, 787 F.3d at 135; *Apple*, 791 F.3d at 353 (Jacobs, J., dissenting), we *never* sought to interview Apple personnel outside the presence of counsel, nor did we attempt to interview Apple personnel regarding topics unrelated to the company's Antitrust Compliance Program.  The direct communication we proposed had nothing to do with interviews of Apple personnel; instead, it focused on trying to create a cooperative and collaborative monitorship, a partnership with the shared goal of improving Apple's Antitrust Compliance Program, rather than a relationship characterized by confrontation and resistance.

The disqualification opinion for the Court also suggests that we had expected a certain "level of submissiveness" from Apple based on experience in prior monitorships that resulted from consent decrees.  *Apple*, 787 F.3d at 135.  To the contrary, we entered the monitorship with no preconceptions and, in fact, were well aware that Apple had objected to the monitorship.  It is true that we did not expect to meet the remarkable resistance we faced, nor could we have easily predicted such resistance, having had no prior dealings with the company.  But our expectations were not shaped by any misunderstanding of Apple's opposition to the monitorship.

In addition, the panel that issued the disqualification opinion expressed concern that, by submitting a declaration in proceedings before this Court, the Monitor had "litigate[d] on the side of a party in connection with an application to the court he serves."  *Id.* at 138.  To the contrary, as this Court found, the Monitor's only purpose in filing the declaration was to defend against allegations

**NON-CONFIDENTIAL VERSION**

that he had engaged in misconduct and correct the record.  With Apple having objected to any *ex parte* communications between the Monitor and the Court, a declaration seemed to the Monitor the logical vehicle for bringing facts to the Court's attention.  The Monitor certainly did not intend to align himself improperly with one party or another but instead simply felt he needed to use a procedural vehicle that was available to him to share with the Court his perspective on Apple's claims and to correct the record.  The situation was, to our knowledge, unprecedented; as a non-party to the ebooks litigation, it was not clear to the Monitor what alternative means were available for him to provide the Court with factual information of which DOJ and the Plaintiff States were unaware.

The dissent from the Second Circuit opinion on the merits of Apple's antitrust liability deepens the Monitor's concern that members of the Second Circuit may have been led to believe things that were not true about our conduct.  First, the dissent implies that the Monitor took an inappropriately aggressive approach in the early weeks of the monitorship.  *See Apple*, 791 F.3d at 353 (Jacobs, J., dissenting) (stating that the Monitor "started his inquiry immediately on his appointment" and "multiplied interviews, document inspections, and discontents").  The Monitor regrets that the parties' briefing and argument left that impression.  In reality, shortly after the monitorship began, we requested a small number of interviews and documents for the purpose of obtaining necessary background information that would be necessary to our later assessment of Apple's Antitrust Compliance Program.  Apple objected vehemently to even that limited, introductory work.

Second, the dissent states that, because of the structure of his role under the Final Judgment, the Monitor "was (in every respect important to a lawyer) retained and run by the adversary."  *Id.*  That is simply not true.  To the contrary, the Monitor has made careful efforts to maintain his independence from both Apple and the Plaintiffs.  The Monitor has made all of his decisions regarding the monitorship, including which documents to request and which Apple personnel to interview, without *any* consultation with the Plaintiffs.  The Monitor has at no time consulted with the Plaintiffs regarding what interviews to seek or what documents to request.  Nor has he reported information obtained from documents and interviews to the Plaintiffs, except in a very general way in monthly meetings that Apple has attended, and in his semiannual reports to the Court.  On this point, too, the parties' briefing and argument may have left the Second Circuit with misapprehensions, which the Monitor could not allow to stand uncorrected.

ii

Exhibit A

Second Implementation Plan (August 2015)

[Exhibit Not Included in Non-Confidential Version at Apple's Request]

Exhibit B

Third Report Implementation Plan (August 2015)

[Exhibit Not Included in Non-Confidential Version at Apple's Request]

Exhibit C

Letter from Matthew Reilly dated July 24, 2015

[Exhibit Not Included in Non-Confidential Version at Apple's Request]

Exhibit D

Apple Music–related correspondence with Gibson Dunn

[Exhibit Not Included in Non-Confidential Version at Apple's Request]

Exhibit E

Antitrust Compliance Program Review Procedure
(updated September 2015)

[Exhibit Not Included in Non-Confidential Version at Apple's Request]

# Exhibit F

# Final Judgment Live Training Procedure

[Exhibit Not Included in Non-Confidential Version at Apple's Request]

# Exhibit G

## Non-Final Judgment Live Training Procedure

[Exhibit Not Included in Non-Confidential Version at Apple's Request]

Exhibit H

Online Training Procedure

[Exhibit Not Included in Non-Confidential Version at Apple's Request]

# Exhibit I

## Updated Investigation Procedure

[Exhibit Not Included in Non-Confidential Version at Apple's Request]

# Exhibit J

## Feedback Procedure

[Exhibit Not Included in Non-Confidential Version at Apple's Request]

# Exhibit K

## Audit Procedure

[Exhibit Not Included in Non-Confidential Version at Apple's Request]

Exhibit L

Training slides–Executive Team training session

[Exhibit Not Included in Non-Confidential Version at Apple's Request]

Exhibit M

Training slides–App Store employees


[Exhibit Not Included in Non-Confidential Version at Apple's Request]

Exhibit N

# Memo from Deena Said to the Audit and Finance Committee (March 2015)

[Exhibit Not Included in Non-Confidential Version at Apple's Request]

Exhibit O

Memo from Deena Said to the Audit and Finance
Committee (June 2015)

[Exhibit Not Included in Non-Confidential Version at Apple's Request]

Exhibit P

Memo from Deena Said to the Audit and Finance
Committee (August 2015)

[Exhibit Not Included in Non-Confidential Version at Apple's Request]

Exhibit Q

# Email from Deena Said to the Executive Team, dated May 20, 2015

[Exhibit Not Included in Non-Confidential Version at Apple's Request]